1  David W. Shapiro, Esq.
   BOIES, SCHILLER & FLEXNER LLP
2  1999 Harrison Street, Suite 900
   Oakland, California 94612
3  Telephone: (510) 874-1000
   Facsimile: (510) 874-1460
4  E-mail: dshapiro@bsfllp.com
   California Bar Number: 219265
5
   Stuart H. Singer, Esq.
6  (*Pro Hac Vice* to be Filed)
   Carlos M. Sires, Esq.
7  (*Pro Hac Vice* to be Filed)
   BOIES, SCHILLER & FLEXNER LLP
8  401 East Las Olas Boulevard, Suite 1200
   Fort Lauderdale, Florida 33301
9  Telephone: (954) 356-0011
   Facsimile: (954) 356-0022
10 E-mail: ssinger@bsfllp.com
   E-mail: csires@bsfllp.com
11
   Willie E. Gary, Esq.
12 (*Pro Hac Vice* to be Filed)
   GARY, WILLIAMS, PARENTI, FINNEY,
13 LEWIS, MCMANUS, WATSON &
   SPERANDO
14 221 East Osceola Street
   Stuart, Florida 34994
15 Telephone: (772) 283-8260
   Facsimile: (772) 220-3343
16 E-mail: weg@williegary.com

17 Attorneys for Plaintiffs Jeff Pokorny and Larry Blenn

18            UNITED STATES DISTRICT COURT

19           NORTHERN DISTRICT OF CALIFORNIA

20 Jeff Pokorny and Larry Blenn            )  CASE NO. _____
   on behalf of themselves and those similarly )
21 situated,                               )
                                           )  **COMPLAINT AND DEMAND FOR JURY**
22            Plaintiffs,                  )  **TRIAL**
                                           )
23 v.                                      )
                                           )
24 Quixtar, Inc., James Ron Puryear Jr., Georgia )  CLASS ACTION
   Lee Puryear, and World Wide Group, L.L.C., )
25 Britt Worldwide L.L.C., American Multimedia )
   Inc., Britt Management, Inc., Bill Britt and )
26 Peggy Britt,                            )
                                           )
27            Defendants.                  )
                                           )
28 _____     )

ORIGINAL
F I L E D

JAN 1 0 2007

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

EMC

C 07 0201

1

BOIES, SCHILLER & FLEXNER LLP
OAKLAND, CALIFORNIA

## CLASS ACTION COMPLAINT

Plaintiffs Jeff Pokorny and Larry Blenn on behalf of themselves and those similarly situated, sue defendants Quixtar, Inc. ("Quixtar"), Ron Puryear, Georgia Lee Puryear, World Wide Group, L.L.C., Britt Worldwide L.L.C., American Multimedia Inc., Britt Management, Inc., Bill Britt and Peggy Britt, and allege as follows:

### Nature of Action

1.     This is an action to recover damages caused by defendants' operation of a pyramid scheme. This pyramid scheme is fraudulent because it induces individuals to invest in products and marketing tools and to recruit new victims into the scheme with the false promise of enormous profits. The pyramid scheme here consists of two separate, but related businesses: Quixtar, Inc., a multilevel marketing business, and the "Kingpins Corporations," which are a group of businesses that sell purported motivational materials and services to distributors of Quixtar's products. New entrants into the pyramid scheme are effectively required to invest money to buy products from Quixtar and "tools and functions" from the "Kingpin Corporations." Because Quixtar distributors (euphemistically referred to as "Independent Business Owners" (or "IBO's" by Quixtar)) most often do not sell products to consumers who are not also distributors, they can obtain a return on their investment in the Quixtar program only by recruiting new distributors who will then buy products (and recruit more distributors who will buy products), which purchases result in "bonuses" to the recruiting distributor.

### Type of Action

2.     This is an action brought, on behalf of a national class of distributors, pursuant to the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.* ("RICO") and, on behalf of a California class of distributors, pursuant to the California Business and Professions Code §§ 17200, *et seq.* and 17500, *et seq.*

**Parties**

3.       Plaintiff Jeff Pokorny ("Pokorny") is, and at all material times was, an individual who resides in the county of Alameda, in the state of California. Pokorny entered into a Registration Agreement with Amway and became an Amway distributor on or about October 1994. He later became a Quixtar distributor when the Amway organization launched Quixtar, at which time all Amway distributors in the United States were converted to Quixtar distributors. While a distributor, Pokorny was in the World Wide DreamBuilders' "line of sponsorship" run by defendants Ron Puryear and Georgia Lee Puryear. Pokorny operated his Quixtar distributorship under the name "Pokorny Enterprises."

4.       Plaintiff Larry Blenn ("Blenn") is, and at all material times was, an individual who resides in the county of San Joaquin, in the state of California. Blenn entered into the Quixtar Registration Agreement with Quixtar and became a Quixtar distributor on or about January 2005. While a distributor, Blenn was in the World Wide DreamBuilders' "line of sponsorship" run by defendants Ron Puryear and Georgia Lee Puryear. Blenn operated his Quixtar distributorship under the name "Blenn Enterprises."

5.       Defendant Quixtar, Inc. ("Quixtar") is, and at all relevant times was, a corporation organized under the laws of the state of Virginia, with its principal place of business in the state of Michigan, and doing business regularly throughout the United States, including in the state of California. Quixtar transacts its business in the Northern District of California in accordance with 18 U.S.C. § 1965(a) and (b) and California Code of Civil Procedures § 410.10. Quixtar is the successor-in-interest of the Amway Corporation ("Amway"), which did business in the state of California and in this District.

6.       Defendant World Wide Group, L.L.C. ("World Wide Group") is, and at all relevant times was, a corporation organized under the laws of the state of Washington, with its

3

1   principal place of business in the state of Washington and doing business regularly in the state

2   of California   World Wide Group transacts its business in the Northern District of California in

3   accordance with 18 U.S.C. § 1965(a) and (b) and California Code of Civil Procedure § 410.10.

4   Defendant World Wide Group is in the "tools and functions" business and sells its products to

5   distributors, including plaintiff.  World Wide Group also does business under the name of

6   World Wide Dream Builders.

7

8            7.     Defendant Ron Puryear is, and at all relevant times was, an individual residing

9   in the county of Spokane, in the state of Washington.  Defendant Ron Puryear is an owner of

10  World Wide Dream Builders and/or World Wide Group and individually does business in

11  California.  Ron Puryear transacts his business and promotes the World Wide Dream Builders

12  "line of sponsorship," as explained further herein, in the Northern District of California in

13  accordance with 18 U.S.C. § 1965(a) and (b) and California Code of Civil Procedure § 410.10.

14

15           8.     Defendant Georgia Lee Puryear is, and at all relevant times was, an individual

16  residing in the county of Spokane, in the state of Washington.  Defendant Georgia Lee Puryear

17  is an owner of World Wide Dream Builders and/or World Wide Group, which does business

18  throughout the state of California and individually does business in California.  Georgia Lee

19  Puryear transacts her business and promotes the World Wide Dream Builders "line of

20  sponsorship," as explained further herein, in the Northern District of California in accordance

21  with 18 U.S.C. § 1965(a) and (b) and California Code of Civil Procedure § 410.10.

22

23           9.     Defendant Britt Worldwide L.L.C. ("Britt Worldwide") is, and at all relevant

24  times was, a corporation organized under the laws of the state of Washington, with its principal

25  place of business in the state of Washington and doing business regularly throughout the state

26  of California.  Defendant Britt Worldwide is the upline "line of sponsorship" to defendants

27  World Wide Group, Ron Puryear and Georgia Lee Puryear.  In other words, defendants World

28

4

BOIES, SCHILLER & FLEXNER LLP
OAKLAND, CALIFORNIA

Wide Group, Ron Puryear and Georgia Lee Puryear report to and work with Defendant Britt Worldwide to promote their "tools and functions" businesses. Defendant Britt Worldwide is in the "tools and functions" business and sells its products to distributors. Defendant Britt Worldwide transacts its business in the Northern District of California in accordance with 18 U.S.C. § 1965(a) and (b) and California Code of Civil Procedure § 410.10.

10.    Defendant American Multimedia Inc. ("American Multimedia") is, and at all relevant times was, a corporation organized under the laws of the state of North Carolina, with its principal place of business in the state of North Carolina and doing business regularly throughout the state of California. Defendant American Multimedia is in the "tools and functions" business and sells its products to distributors. Defendant American Multimedia transacts its business in the Northern District of California in accordance with 18 U.S.C. § 1965(a) and (b) and California Code of Civil Procedure § 410.10.

11.    Defendant Britt Management, Inc. ("Britt Management") is, and at all relevant times was, a corporation organized under the laws of the state of Nevada, with its principal place of business in the state of Nevada and doing business regularly throughout the state of California. Defendant Britt Management, Inc. is in the "tools and functions" business and sells its products to distributors. Defendant Britt Management transacts its business in the Northern District of California in accordance with 18 U.S.C. § 1965(a) and (b) and California Code of Civil Procedure § 410.10.

12.    Defendant Bill Britt is, and at all relevant times was, an individual citizen residing in the county of Orange in the state of North Carolina. Defendant Bill Britt is an owner of Britt Worldwide, American Multimedia and Britt Management, which are in the "tools and functions" business and which all do business throughout the state of California. Defendant Bill Britt is the upline "line of sponsorship" to Ron Puryear and Georgia Lee

5

1    Puryear. In other words, Defendant Bill Britt advises and works with Ron Puryear and Georgia

2    Lee Puryear to promote their "line of sponsorship" and their "tools and functions" business.

3    Defendant Bill Britt transacts his business and promotes his "line of sponsorship" in the

4    Northern District of California in accordance with the 18 U.S.C. § 1965(a) and (b) and

5    California Code of Civil Procedure § 410.10.

6

7         13.    Defendant Peggy Britt is, and at all relevant times was, an individual citizen

8    residing in the county of Orange in the state of North Carolina. Defendant Peggy Britt is an

9    owner of Britt Worldwide, American Multimedia, and Britt Management, which are in the

10   "tools and functions" business and which all do business throughout the state of California.

11   Defendant Peggy Britt is the upline "line of sponsorship" to Ron Puryear and Georgia Lee

12   Puryear. In other words, Defendant Peggy Britt advises and works with Ron Puryear and

13   Georgia Lee Puryear to promote their "line of sponsorship" and their "tools and functions"

14   business. Defendant Peggy Britt transacts her business and promotes her "line of sponsorship"

15   in the Northern District of California in accordance with the 18 U.S.C. § 1965(a) and (b) and

16   California Code of Civil Procedure § 410.10.

17

18        14.    All of the above named defendants had sufficient and continuous contact with

19   the Northern District of California in that, among other things, the defendants have been

20   actively promoting the pyramid scheme through the use of mails and wires in the district,

21   selling products in the district, promoting their "tools and functions" businesses in the district,

22   and promoting their "lines of sponsorship" in the district.

23

24                              **Jurisdiction and Venue**

25        15.    The defendants are subject to the jurisdiction of this Court. The corporate

26   defendants at all relevant times have been engaged in continuous and systematic business in

27   this State, have designated agents for service of process in this State, and/or have committed

28

6

BOIES, SCHILLER & FLEXNER LLP
OAKLAND, CALIFORNIA

1 tortious acts in this State. The individual defendants have at all relevant times been engaged in

2 continuous and systematic business in this State and/or have committed tortious acts in this

3 State. The actions giving rise to this lawsuit were taken by defendants at least in part in

4 California. Plaintiffs Pokorny and Blenn are citizens of California. In accordance with 18

5 U.S.C. § 1965(a) and (b), the defendants are subject to this Court's jurisdiction in that they

6 "transact affairs" in the Northern District of California and "the ends of justice require that

7 other parties residing in any other district be brought before the Court, the Court may cause

8 such parties to be summoned, and process for the purpose may be served in any judicial district

9 of the United States by the marshal thereof." 18 U.S.C. § 1965(a) and (b). In accordance with

10 California's long-arm statute, California Code of Civil Procedure § 410.10, this Court has

11 personal jurisdiction over the defendants.

12

13    16.    Because plaintiffs Pokorny and Blenn assert claims pursuant to the Racketeer

14 Influenced Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 – 1968, this Court has

15 jurisdiction over this action pursuant to 28 U.S.C. § 1331. Because plaintiffs Pokorny and

16 Blenn assert state law claims under the California Business and Professions Code, this Court

17 may exercise supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

18

19    17.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and (c) and 18

20 U.S.C. § 1965(a) and (b) because a substantial number of the acts and transactions that gave

21 rise to the claims of the plaintiffs and the plaintiff class occurred within this District;

22 defendants did, or solicited, business, and transmitted communications by mail or wire relating

23 to their illegal pyramid in this district; transacted their affairs, and/or resided within California

24 and this judicial district; plaintiff Pokorny is a resident of this district, and defendants'

25 wrongful acts occurred in this District and have directly impacted the general public of this

7

1    district; and the ends of justice require that parties residing in other districts be brought before

2    this Court.

3                          **The Arbitration Agreement**

4        18.    Before becoming Quixtar distributors, prospective distributors, including

5    plaintiffs and members of the class, were required to sign Quixtar's Registration Agreements.

6    In very small print buried in the Registration Agreement there is an arbitration provision. The

7    arbitration provision is provided on a "take-it-or-leave-it" basis with no opportunity for

8    negotiation. The prospective distributors received no explanation of the arbitration provision

9    and would not have been permitted to become Quixtar distributors unless they signed the

10   Registration Agreement which contains the offending and unenforceable arbitration provision.

11   As a result of the unequal bargaining positions, the hidden terms and the overall harshness of

12   the adhesive arbitration provision, Quixtar's arbitration provision is procedurally

13   unconscionable. Plaintiffs do not assert that the entire Registration Agreement is

14

15   unconscionable; rather they assert that the arbitration provision contained in Quixtar's

16   Registration Agreement is unconscionable.

17

18       19.    Quixtar's arbitration provision is also permeated with substantively

19   unconscionable terms as demonstrated by the following examples, which are not exhaustive.

20       20.    The arbitration provision incorporates Quixtar's Rules of Conduct. *See* Exhibit

21   1, Quixtar's IBO Registration Agreement ("Authorization and Agreement"). The Rules of

22   Conduct grant Quixtar the power to unilaterally modify the arbitration provision at anytime,

23   thereby rendering the arbitration provision illusory. More specifically, the Rules of Conduct

24   provide that "[i]n order to preserve the goals and purposes of the IBO Plan, the corporation

25

26   reserves to itself the sole right to adopt, amend, modify, supplement or rescind any or all of

27

28

                                    8

B O I E S ,   S C H I L L E R   &   F L E X N E R   L L P
O A K L A N D ,   C A L I F O R N I A

1    these Rules . . . . ." Quixtar's unilateral right to modify renders the arbitration agreement

2    substantively unconscionable.

3        21.    Quixtar's arbitration provision is also substantively unconscionable to the extent

4    it provides arbitrators biased by virtue of Quixtar's ability to "train" the arbitrators who are to

5    resolve disputes.

6        22.    Quixtar's arbitration provision subjects distributors to prohibitively expensive

7    arbitration fees thereby rendering the agreement substantively unconscionable. Quixtar's

8    

9    arbitration agreement requires an individual to pay "location" costs for the arbitration and

10    hearing costs that total $18,000.00 for a three day trial. These excessive hearing fees work to

11    preclude distributors from vindicating their rights. While rules do provide for indigent relief,

12    the likelihood of being able to establish indigency is difficult and the decision rests with the

13    Case Administrator.

14        23.    The Quixtar arbitration agreement arbitrarily provides a two year statute of

15    limitation for any claims brought by a distributor against Quixtar. This provision severely

16    

17    limits a distributor's right where, as in this case, the plaintiffs are seeking relief under a federal

18    statute that provides a four year statute of limitations.

19        24.    In addition, Quixtar's arbitration provision purports to restrict a distributor's

20    right to bring a class action. This class action restriction further renders the arbitration

21    

22    provision substantively unconscionable.

23        25.    Finally, Quixtar's mandatory pre-arbitration "conciliation" process also renders

24    the arbitration provision substantively unconscionable. This lengthy and onerous process is

25    designed to stifle claims against Quixtar. In fact, the Rules of this "conciliation" process

26    require the distributor to submit his claim to Quixtar to allow Quixtar, the offending party, to

27    resolve the claim.

28

BOIES, SCHILLER & FLEXNER LLP
OAKLAND, CALIFORNIA

26.    Because Quixtar's arbitration provision is unconscionable, the claims of the plaintiffs and the class are not subject to arbitration and this action is properly before this Court.

### The Nature of Pyramid Schemes

27.    While pyramid schemes can take different forms, they are at core inherently illegal schemes by which their perpetrators induce others to join the scheme with the promise of high profits and rewards from a putative business. The reality of the schemes, however, is that rewards to those that join come almost exclusively from the recruitment of new participant victims of the scheme.

28.    "Like chain letters, pyramid schemes may make money for those at the top of the chain or pyramid, but "must end up disappointing those at the bottom who can find no recruits." *Webster v. Omnitrition Int'l Inc.*, 79 F.3d 776, 781 (9th Cir. 1996) (quoting *In re Koscot Interplanetary, Inc.*, 86 F.T.C. 1106, 1181 (1975), *aff'd mem. sub nom., Turner v. F.T.C.*, 580 F.2d 701 (D.C. Cir. 1978)). As such, "[p]yramid schemes are said to be inherently fraudulent . . . ." *Omnitrition* at 781.

29.    Pyramid schemes are characterized as "[s]uch contrivances are characterized by the payment by participants of money to the company in return for which they receive (1) the right to sell a product *and* (2) the right to receive in return for recruiting other participants into the program rewards which are unrelated to sale of the product to ultimate users." *Omnitrition* at 781.

30.    According to the Ninth Circuit, the "satisfaction of the second element of the *Koscot* test is the *sine qua non* of a pyramid scheme: 'As is apparent, the presence of this second element, recruitment with rewards unrelated to product sales, is nothing more than an elaborate chain letter device in which individuals who pay a valuable consideration with the

1    expectation of recouping it to some degree via recruitment are bound to be disappointed.'"

2    *Omnitrition* at 782.

3        31.    The Ninth Circuit has adopted the *Koscot* standard and has held that "the

4    operation of a pyramid scheme constitutes fraud for purposes of several federal antifraud

5    statutes." *Omnitrition* at 782.

6        32.    California law also renders pyramid schemes illegal. California Penal Code §

7    327 defines an endless chain (or pyramid scheme) as follows:

8

9           any scheme for the disposal or distribution of property whereby a participant pays a
       valuable consideration for the chance to receive compensation for introducing

10          additional persons into participation in the scheme or for the chance to receive
       compensation when a person introduced by the participant introduces a new participant.

11          Compensation . . . does not . . . include payment based upon sales made to persons who
       are not participants in the scheme and who are not purchasing in order to participate in

12          the scheme.

13              **Quixtar and the Kingpins Operations Constitute a Pyramid Scheme**

14       33.    Quixtar, the Kingpin Companies, and the individual defendants operate a

15   fraudulent pyramid scheme. The defendant companies and individuals recruit people to

16   become Quixtar distributors, entice them to purchase Quixtar products and related "tools and

17   functions" through material false statements and omissions, and then distribute the proceeds of

18   product sales to new recruits based almost exclusively on participants' recruitment of new

19   victims, rather than on the sale of products to retail users of Quixtar's products. As a result of

20

21   investing in the scheme, plaintiffs and the class have suffered millions of dollars in losses.

22       34.    The defendants have operated and promoted the fraudulent scheme through the

23   use of the United States mail and interstate wire communications. Through their creation and

24   operation of the pyramid scheme, defendants specifically intended to, and did in fact, defraud

25   the distributors, including plaintiffs and the members of the class.

26

27       35.    The first part of the illegal pyramid scheme consists of a multi-level marketing

28   business run by Quixtar. At the bottom rung of the operation is a network of so-called

independent distributors, euphemistically referred to as IBOs. Quixtar induces new recruits to join the Quixtar program through material false representations that such recruits will be able to re-sell Quixtar products for a profit. Quixtar purports to sell its consumer products through the IBOs, but in fact few of Quixtar's products are ever sold to anyone other than the IBOs, and IBOs are not financially rewarded by Quixtar or its affiliated companies for selling the products to consumers. The prices IBOs pay for Quixtar's products (and associated costs) are so high that any profit on retail sales is virtually impossible. In practice, 95% of Quixtar's products are not sold to retail consumers, but rather to the IBOs. Because the IBOs are Quixtar's actual customers and consumers of its products, Quixtar requires an ever expanding network of so-called distributors (IBOs) in order to keep Quixtar afloat.

36.    Quixtar's lowest level distributors are instructed not to waste their time on marketing and selling the Quixtar products to actual retail consumers, but instead to focus on consuming the products themselves and recruiting others to be distributors. Quixtar provides its distributors with lists of products they should purchase for their own use in order to turn their home into a "300 PV Home" (a PV is point system by which distributors earn "bonuses"). *See* Exhibit 2, The 300 PV Home flyer. Quixtar products would be difficult to sell to consumers unaffiliated with Quixtar in any event because they are sold by Quixtar at inflated prices when compared to similar products sold in the retail marketplace.

37.    New distributors are assigned to an existing "line of sponsorship" to which the recruiting distributor already belongs. The lines of sponsorship include a hierarchy of distributors that start with the newly-recruited distributors and proceed by seniority up to a senior distributor who heads the line of sponsorship. The most senior distributor who heads a line of sponsorship is known as a "Kingpin." Junior (or "downline") distributors purchase products from more senior (or "upline") distributors within their line of sponsorship, as well as

12

1    the "tools and functions" described below. Bonuses are paid to upline distributors based on

2    sales of Quixtar products and "tools and functions" to downline distributors.

3        38.    According to Quixtar's website, there are currently sixteen lines of sponsorship:

4            a.    World Wide DreamBuilders;

5            b.    Yager (InterNET Services);

6            c.    Britt;

7            d.    Network 21;

8            e.    Team;

9            f.    InterNet Associates (INA);

10           g.    eFinity;

11           h.    International Connection;

12           i.    International Leadership Development (ILD);

13           j.    MMP (MarketMan Productions);

14           k.    proalliance;

15           l.    Interbiz;

16           m.    IBO Alliance;

17           n.    GlobalNet;

18           o.    ProSystemOne; and

19           p.    GBO Alliance.

20   *See* Exhibit 3, Quixtar Facts, *available at* http://www.quixtarfacts.com/quixtarandloas.html.

21       39.    The second part of the defendants' pyramid scheme consists of a group of

22   businesses that sell "tools and functions" purportedly to help downline distributors sell the

23   Quixtar products. These "tools and functions" businesses are operated by the Kingpins and are

24   referred to herein as "Kingpin Corporations."

13

40.    The "tools and functions" businesses sell "tools" that purport to help market and sell Quixtar products and "functions" that consist of motivational meetings and events. The tools include tapes, CDs and videos, which contain information that Kingpins and Kingpin Corporations, with Quixtar's knowledge and consent, represent are essential to success as a distributor. Although the Kingpins are Quixtar distributors and are compensated on Quixtar's sales of products to other lower level distributors within their lines of sponsorship, the majority of their revenue is derived from the "tools and functions" business of their Kingpin Corporations. Lower level distributors in the lines of sponsorship are effectively required to purchase the "tools and functions" from the Kingpin Corporations. Distributors are told that the "tools and functions" are necessary to help them become successful Quixtar distributors. For example, the starter kit for new IBOs, which is distributed by Quixtar, states unequivocally as follows:

As with any business, there will obviously be an investment involved. You will need "tools" to build your business successfully.

*See* Exhibit 4, IBO Starter Kit at p. 15 (emphasis added). The starter kit provided by Quixtar to new distributors includes a list of tools that are recommended for purchase by all new distributors. The total cost of this initial set of tapes and materials is $434.94. *Id.* at p. 16.

41.    In truth, the defendants' statements about the need for tools and functions are materially false. These "tools and functions" do not help the distributors sell Quixtar products to end consumers at retail. Few Quixtar products are sold to consumers; instead, most are purchased by Quixtar distributors for their own use, and to the extent distributors do sell the Quixtar products, any profit is eliminated by the costs of buying the "tools and functions."

42.    The only value of the "tools and functions" products to lower level distributors is that some of the material teaches them how to recruit new distributors, to whom they can sell Quixtar products and, thus, from whom they can earn "bonuses." In fact, the IBO Starter Kit

sold by World Wide Group contains a section specifically designed to teach IBOs how to

recruit new IBOs. For example, the section "Invite Your Prospects" provides:

> Inviting your prospects is where it starts to get fun....
> <u>Tips:</u> Be in a hurry and keep it simple. The most common mistake is saying too much
> .... "Hi_____ this is _____. Are you going to be home tomorrow night? Great I
> just got back from a seminar that explained how to create an income by using the
> technology of the internet. I grabbed you some information (tape/video/CD) because I
> thought you might be interested ...."

*See* Exhibit 4, IBO Starter Kit at p. 11.

43. In truth, distributors are recruited to Quixtar because Quixtar omits to inform the distributors that they are entering into an illegal pyramid scheme, and that the overwhelming majority of distributors lose money, rather than earn money. These are material omissions.

44. The ownership of the "tools and functions" businesses demonstrates the close association between the Quixtar Kingpins, their "tools and functions" businesses, and Quixtar's lines of sponsorship:

| <u>Tools & Functions Business</u> | <u>Kingpin Owners</u> | <u>Affiliated Line of Sponsorship</u> |
|---|---|---|
| World Wide Dream Builders | Ronald and Georgia Lee Puryear | World Wide Group |
| Internet Service Corporation | Dexter and Birdie Yager | Yager |
| Marker Man Productions | Jody and Kathy Victor | Yager |
| American Multimedia, Inc. | Bill and Peggy Britt | Britt |
| Network 21 | Jim and Nancy Dornan | Network 21 |
| TEAM | Orrin and Laurie Woodward | Team |
| INA | Jim and Margee Floor | InterNET Associates (INA) |
| eFinity | Group of leaders | eFinity |
| International Connection | Brian and Marg Hays | International Connection |
| International Leadership | Jack and Rita Daughery | International Leadership |

15

BOIES, SCHILLER & FLEXNER LLP
OAKLAND, CALIFORNIA

| Tools & Functions Business | Kingpin Owners | Affiliated Line of Sponsorship |
|---|---|---|
| Development (ILD) | | Development |
| MMP (MarkerMan Productions) | Jody and Kathy Victor | MMP (MarkerMan Productions) |
| Pro Alliance | Group of leaders | proalliance |
| Interbiz | Brad and Vera Doyle | Interbiz |
| IBO Alliance | Group of leaders | IBO Alliance |
| GlobalNet | Leif and Bonnie Johnson | GlobalNet |
| ProSystemOne | Joe and Dawn Pici | ProSystemOne |
| GBO Alliance | Carl and Marsha Reardon | GBO Alliance |

This group of "tools and functions" businesses will be collectively referred to as "Kingpin Corporations" and the distributors who own those businesses are collectively referred to as "Kingpins."

45.     While Quixtar and the Kingpins (and their Kingpin Corporations) independently perpetrate a fraud on distributors, they also have a symbiotic relationship that furthers their ability to carry on the pyramid scheme and have agreed to work together to promote and perpetuate the pyramid scheme.

46.     By way of example, Quixtar's "Achieve Magazine," which is distributed by Quixtar to distributors through the United States mail, promotes the Kingpins' tools business. The January 2001 issue of Achieve Magazine contains a joint promotional statement by Kingpin defendants Ron and Georgia Lee Puryear, who head the World Wide DreamBuilders line of sponsorship, and Doug DeVos Quixtar's Chief Operating Officer. The joint statement provides:

> We are now more convinced than ever that the largest business is yet to be built . . . .
> We believe it could just as easily be someone who possesses a dream and reads this
> Achieve Magazine for the first time, perhaps listens to a motivating tape, attends a

16

BOIES, SCHILLER & FLEXNER LLP
OAKLAND, CALIFORNIA

function and begins to build their dream by showing the plan and sharing their dream with others.

*See* Exhibit 5, Achieve Magazine, January/February 2001 issue at p.3. The following pages of the Quixtar Achieve Magazine promote the World Wide Group's "tools" business with advertisements for tapes, books and videos sold by the defendant Puryears and the World Wide Group. *Id.* at p. 14.

47.     Plaintiffs scheme violates the federal RICO and mail and wire statutes and the California Penal Code § 327 because it is a fraudulent pyramid scheme or "endless chain." Accordingly, even if defendants can establish compliance with the FTC's decision in *In re Amway Corp.*, 93 F.T.C. 618 (1979), which they cannot as explained below, the scam nevertheless violates the federal mail and wire statutes and the California Penal Code § 327.

48.     The defendants and others have attempted to mask their criminal conduct behind a 25 year old FTC order, in *Amway*, which held that Quixtar's predecessor company, Amway, was not a pyramid scheme. Quixtar and its associates actions do constitute a scheme to defraud under federal law, and do not even meet the requirements described in the *Amway* order.

49.     In *Amway*, the FTC ruled that Amway was not a pyramid scheme because it adopted and purportedly enforced certain rules that were intended to avoid the characteristics of a pyramid scheme.

50.     The FTC held that a direct marketing business like Amway would not be considered a pyramid scheme if the sponsor of the business did not violate the "initial investment" rule, the "70%" rule, the "buyback" rule, and the "10 customer" rule, all of which are described in more detail below.

51.     The FTC reasoned in *Amway* that the company's operations did not constitute a pyramid scheme because:

17

BOIES, SCHILLER & FLEXNER LLP
OAKLAND, CALIFORNIA

1    The Amway system is based on retail sales to consumers. Respondents have avoided
2    the abuses of pyramid schemes by (1) not having a 'headhunting' fee; (2) making
     product sales a precondition to receiving the performance bonus; (3) buying back
3    excessive inventory; and (4) requiring that products be sold to consumers Amway's
     buy-back, 70% and ten customer rules deter unlawful inventory loading . . . .

4    *Id.* at 107-109. Accordingly, if any one of these rules is not followed, then the business at issue

5    may be deemed a pyramid scheme.

6
7    52.    On its website, Quixtar denies that its business is an illegal pyramid scheme,

8    citing the FTC in *Amway.* See Exhibit 6, Quixtar's Pyramid Web Page *available at*

9    http://www.ibofact.com/Quixtar-Questions-22QuixtarQuestions.htm#question%205. Contrary

10   to the pronouncements on its website, Quixtar operates a pyramid scheme, and its rules and

11   policies are a sham, meant to give the appearance that Quixtar complies with the rules

12   described in *Amway,* but which are routinely ignored in practice.

13   53.    **The Initial Investment Rule**: The FTC decision noted that pyramid schemes

14   involve a payment or initial disbursement by a new participant in exchange for the right to sell

15   products and the right to receive rewards, in return for recruiting other participants into the

16   program and which are unrelated to sale of product to the ultimate user. The FTC found that

17
18   Amway did not require such an investment because "the Amway system does not involve an

19   'investment' inventory by a new distributor. A kit of sales literature costing only $15.60 is the

20   only requisite." *In re Amway Corp.*, 93 F.T.C. 618, [107] (1979). Today, however, Quixtar

21   and the other defendants require a significant investment by a new distributor. Each new

22   Quixtar distributor is effectively required to make an initial investment of thousands of dollars
23
24   through the purchase of Quixtar products and through the purchase of the "tools and functions"

25   materials. For example, the starter kit for new IBOs, which is distributed by Quixtar, states

26   unequivocally: "As with any business, there will obviously be an investment involved. You

27   *will need* 'tools' to build your business successfully." See Exhibit 4, IBO Starter Kit at p. 15

28

B O I E S ,   S C H I L L E R   &   F L E X N E R   L L P
O A K L A N D ,   C A L I F O R N I A

1  (emphasis added).  Quixtar's Achieve Magazine for May/June 2006 encourages existing IBOs

2  to have new registrants purchase products at the same time they register:

3      Activation: The biggest factor affecting activation is whether an IBO buys products at

4      registration. Quixtar's data says that IBOs who register with PV are much likelier to
    order products after registration. *To impact activation: promote the purchase of*

5      *products with every registration*

6  *See* Exhibit 7, *Four Signs of Business Health*, Achieve Magazine, May/June 2006 issue at p.

7  18. While Quixtar's initial sign up fee is $117.00, in practice, defendants require an initial

8  investment by a new distributor in an average amount of between $2000 and $4000 in the first

9  twelve months, through the purchase of products and the "tools and functions" materials.

10      54.  In *Omnitrition*, like Quixtar, there was no significant charge to become a

11  distributor and the distributors had no quota of product that they had to buy. *Omnitrition* at

12  780. However, in order to receive any benefit from the system or to move up to the next level

13  as a "Bronze Supervisor," the distributors had to purchase and convince three other recruits to

14  purchase a certain amount of product. *Id.* Quixtar has a similar structure where advancement

15  is based on both the amount of product the IBO self consumes and the number of persons the

16  IBO can recruit as distributors to likewise purchase Quixtar's products. In *Omnitrition* the

17  multilevel marketer argued that its business plan did not meet the first element of the *Koscot*

18  test because: "it does not charge for the right to sell its products at the distributor level" but the

19  court disagreed. *Id.* at 782. The court explained that in order to move up within the

22  Omnitrition pyramid scheme:

23      A participant must pay a substantial amount of money to Omnitrition *in the form of*
    *large monthly product orders. In exchange for these purchases, the supervisor receives*

24      *the right to sell the products and earn compensation based on product orders made by*
    *the supervisor's recruits.* This compensation is facially 'unrelated to the sale of product

25      to ultimate users" because it is paid based on the suggested retail price of the amount
    ordered from Omnitrition rather than based on actual sales to consumers. On its face,

26      Omnitrition's program appears to be a pyramid scheme. *Omnitrition cannot save itself*
    *simply by pointing to the fact that it makes some retail sales.*

27  *Id.* at 782 (emphasis added). Quixtar's pyramid scheme is analogous to Omnitrition's.

28

55.    **The "70%" Rule**:  In the *Amway* decision, the FTC explained the 70% rule as follows: "[t]o ensure that distributors do not attempt to secure the performance bonus solely on the basis of purchases, Amway requires that, to receive a performance bonus, distributors must resell at least 70% of the products they have purchased each month ...Amway enforces the 70% rule." *Amway*, 93 F.T.C. 618 at 72-75.  Quixtar has a 70% rule in the Quixtar Business Reference Guide:

> An IBO must sell at least 70% of the total amount of products purchased during a given month in order to receive the Performance Bonus or recognition due on all the products purchased; if the IBO fails to sell at least 70%, then such IBO may be paid that percentage of Performance Bonus measured by the amount of products actually sold, rather than the amount of products purchased, and recognized accordingly.

*See* Exhibit 8, Business Reference Guide at D-19 (Rules of Conduct 4.18).  In practice, Quixtar does not enforce the 70% rule and allows product purchases for self-consumption by IBOs and sales to the downline distributors to count toward the 70% retail sales.  *See* Exhibit 9, January 20, 2004 Memo from Ron Mitchell of Quixtar's Rules Administration Office.  Thus, Quixtar also violates the 70% rule of the *Amway* decision.

56.    **The "Buyback" Rule**:  In the *Amway* decision, the FTC described the buyback rule as follows:  "Amway, the Direct Distributor or the sponsoring distributor will buy back any unused marketable products from a distributor whose inventory is not moving or who wishes to leave the business .... Amway enforces the buy-back rule ...." *Amway*, 93 F.T.C. 618 at [72-75].  Quixtar's buyback rule set forth in Section D-22 of the Rules of Conduct Rule 5.3.6 provides that:

> IBOs are required to purchase back from any of their personally registered IBOs who are resigning their IBO, upon their request, any unused currently marketable products and/or currently marketable literature and merchandising or business-building aids...The IBO shall offer to repurchase said products, literature, and merchandising or business- building aids at a price mutually agreeable to the departing IBO.

*See* Exhibit 8, Business Reference Guide at D-22.  In practice, however, Quixtar does not enforce the buyback policy for its products.  First, its rule provides that the buyback price will

20

be "mutually agreeable," and, in practice the lower level distributor is at the mercy of whatever price its upline distributor decides to pay for the returned inventory, which is typically a fraction of the original price paid by the distributor. Second, distributors are uniformly discouraged from asking for a buyback. Therefore, distributors are left with thousands of dollars of inventory that cannot be sold on the retail market. Third, the buyback rule applies only to "resigning" IBOs. Therefore, when an IBO purchases Quixtar products and is unhappy with the product or has purchased too much product, Quixtar is not required to buy back the products from a current IBO. In addition, while Rule 5.3.6.1.2 provides that the buyback rules "is not intended to prohibit buy-back or exchange of products, literature, or merchandising and business-building aids upon mutual agreement between an IBO and one of his or her personally registered IBOs under circumstances other than those wherein an IBO has elected to resign," there is no requirement that Quixtar buy back any product. *See* Exhibit 8, Business Reference Guide at D-22. Thus, there is no guarantee that a current IBO can return the products, and that lack of a guarantee violates the *Amway* buy-back rule. Most products sold to distributors are never bought back by Quixtar, regardless of the desires of the lower level distributors.

57. The Kingpin Corporations' buyback rule for its "tools and functions" sales is similarly illusory. The policy provides for a refund on "commercially reasonable" terms, but those terms are dictated by the Kingpins. In practice, the Kingpin Corporations either refuse to buy-back any "tools and functions" materials or pay only a fraction of the original purchase price as compensation. While Quixtar instructs distributors that the "tools and functions" materials are necessary, Quixtar's Rules of Conduct 5.3.6.3 provides that for these purchases "the corporation cannot assist in procuring such refund." *See* Exhibit 8, Business Reference Guide at D-22.

BOIES, SCHILLER & FLEXNER LLP
OAKLAND, CALIFORNIA

58.    **The Ten Customer Rule**:  The "ten customer rule" approved by the FTC in *Amway* provided that "distributors may not receive a performance bonus unless they prove a sale to each of ten different retail customers during each month.... The ten customer rule is enforced by Amway and the Direct Distributors...." *Amway*, 93 F.T.C. 618 at [72-75].  The FTC added: "[p]yramid sales plans based on inventory loading or headhunting fees create an incentive for recruiting rather than selling products to consumers ... Amway's ten-customer rule deters inventory loading by sponsoring distributors." *Id.* at 142-147.  Quixtar does not enforce the ten customer rule and, indeed, tacitly approves systematic noncompliance with it.

59.    First, by Quixtar's own definition, sales to individuals who are affiliated with Quixtar in some manner, and who are thus not retail customers, count as sales to customers, contrary to what the FTC *Amway* Order contemplated.  Quixtar's Member/Client Volume Rule in the Rules of Conduct Section D-19 Rule 4.22 provides:

> In order to obtain the right to earn a Performance Bonus on downline volume during a given month, an IBO must: (a) make not less than one sale to each of 10 different retail customers *(e.g., Members or Clients)*; or (b) have at least 50 PV of sales to any number of retail customers; or (c) have $100 at Member/Client Volume Cost.  Member/Client Volume Rule Cost shall mean the published IBO cost for all items or any orders sold to a Member or Client, or the actual price paid to Partner Stores by Members or Clients.  If applicable, Partner Store Member/Client Volume Rule Cost is applied in the month when the Corporation credits Partner Store Volume to an IBO's business.

The Rules of Conduct define the terms "member" and "client" as follows:

> Member: 'A registered customer, who for a fee may purchase products and services at preferred pricing and be entitled to an array of other member benefits.'

> Client: 'A retail customer registered with Quixtar who has the ability to purchase directly.'

*See* Exhibit 8, Business Reference Guide at E-3 and E-5.  Quixtar by its own rule does not require IBOs to sell products to retail customers unaffiliated with the scheme in order to qualify for a bonus.  Accordingly, Quixtar's business plan violates the FTC's ten customer rule because it does not require distributors to sell products to any true unaffiliated retail customers.

BOIES, SCHILLER & FLEXNER LLP
OAKLAND, CALIFORNIA

1    60.    Second, Quixtar does not even enforce the ten customer rule as written. In order

2   to appear to enforce this rule, Quixtar created a "self-reporting" system for distributors to

3   certify that they comply with this policy. Quixtar knows that this rule is not followed and that

4   the Kingpins uniformly instruct the downline distributors to "check" the ten customer box on

5   their reporting form, regardless of whether they have made ten sales to retail customers.

6    61.    All of the defendants – Quixtar, its Kingpin distributors, and the Kingpin

7   Corporations – are aware of, approve, promote, and facilitate the systematic noncompliance

8   with or breach of, the rules that purportedly protect against the operation of a pyramid scheme,

9   as discussed in the *Amway* FTC Order. Quixtar's rules governing pyramid schemes are

10   therefore a sham.

## Class Action Allegations

12    62.    This action is brought by plaintiffs as a class action pursuant to Federal Rule of

13   Civil Procedure 23.

14    63.    Plaintiffs seek relief on behalf of themselves and a nationwide class of all

15   persons who were Quixtar distributors from January 2003 until the present and who were

16   injured as a result of defendants' illegal pyramid scheme (the "class"). Excluded from the

17   class are the defendants, their employees, family members, and affiliates.

18    64.    Plaintiffs also seek relief on behalf of themselves and a subclass for the

19   California State law claims, which includes all persons who are members of the class and who

20   were or are Quixtar distributors resident in California (the "subclass").

21    65.    The members of the class and the subclass number in the thousands and joinder

22   of all Class members in a single action is impracticable.

23    66.    There are questions of law and/or fact common to the class and subclass,

24   including but not limited to:

BOIES, SCHILLER & FLEXNER LLP
OAKLAND, CALIFORNIA

a. Whether defendants were operating an unlawful pyramid scheme;

b. Whether distributors paid money to defendants in exchange for (1) the right to sell a product and (2) the right to receive, in return for recruiting others in to the program, rewards which were unrelated to the sale of the product to retail consumers;

c. Whether distributors were required to make an investment into the pyramid scheme;

d. Whether defendants enforced the 70% rule;

e. Whether defendants enforced the buy-back rule;

f. Whether defendants enforced the ten customer rule;

g. Whether defendants' conduct constitutes an "Endless Chain" under the California Penal Code;

h. Whether defendants omitted to inform plaintiffs and the plaintiff class that they were entering into an illegal pyramid scheme where the overwhelming majority of participants lose money;

i. Whether defendants engaged in acts of mail and/or wire fraud in direct violation of RICO;

j. Whether and to what extent the conduct has caused injury to the plaintiff and the plaintiff class;

k. Whether defendants' conduct constitutes an unlawful, unfair and fraudulent business practice under the California Business and Professions Code; and

l. Whether defendants' conduct constitutes false advertising under the California Business and Professions Code.

24

BOIES SCHILLER & FLEXNER LLP
OAKLAND CALIFORNIA

67.    These and other questions of law and/or fact are common to the class and the subclass, and predominate over any question affecting only individual class members.

68.    The plaintiffs' claims are typical of the claims of the class and the subclass in that plaintiffs were distributors for Quixtar and lost money as a result of the pyramid scheme.

69.    The plaintiffs will fairly and adequately represent the interests of the class and the subclass in that plaintiffs' claims are typical of those of the class and plaintiffs' interests are fully aligned with those of the class.  The plaintiffs have retained counsel who is experienced and skilled in complex class action litigation.

70.    Class action treatment is superior to the alternatives, if any, for the fair and efficient adjudication of the controversy alleged herein, because such treatment will permit a large number of similarly-situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender.

71.    The plaintiffs know of no difficulty likely to be encountered in the management of this action that would preclude its maintenance as a class action.

### FIRST CLAIM FOR RELIEF
**(Judgment Declaring Quixtar's Arbitration Agreement Unconscionable)**

72.    The plaintiffs re-allege the foregoing paragraphs as though fully set forth herein

73.    Plaintiffs and the class do not claim the Quixtar Registration Agreement is unconscionable, but do claim the arbitration provision contained within the Registration Agreement is procedurally and substantively unconscionable.

74.    Quixtar's Registration Agreement contains an arbitration provision.

75.    Quixtar's arbitration provision was presented to plaintiffs and the plaintiff class on a "take it or leave it basis."  The plaintiffs and plaintiff class were not given any opportunity

COMPLAINT AND DEMAND FOR JURY TRIAL

to negotiate the terms of the arbitration provision. As such, the arbitration provision is procedurally unconscionable.

76.    Quixtar's arbitration provision is permeated with substantively unconscionable terms examples of which, while not exhaustive, are as follows:

77.    Quixtar's arbitration provision incorporates Quixtar's Rules of Conduct. Quixtar's Rules of Conduct grant Quixtar the power to unilaterally modify the terms of the arbitration provision at any time, thereby rendering the arbitration provision illusory. Quixtar's unilateral right to modify the arbitration provision renders the arbitration agreement substantively unconscionable.

78.    Quixtar's Rules of Conduct provide an inherently biased arbitrator training and arbitrator selection process. Forcing IBOs to arbitrate in an inherently biased arbitral forum renders the arbitration provision substantively unconscionable.

79.    Quixtar's Rules of Conduct require arbitration to take place in the J.A.M.S. arbitral forum. The J.A.M.S. arbitral forum requires an individual IBO to pay "location" costs that total $18,000.00 for a three day trial. Most distributors and class members, who have each already lost thousands of dollars during their involvement with the defendants, do not have the financial means to pay these excessive hearing fees. Accordingly these prohibitively expensive arbitration costs preclude distributors from vindicating their rights and render Quixtar's arbitration provision substantively unconscionable.

80.    Quixtar's arbitration provision contains an arbitrary two year statute of limitations provision for any claims brought by an IBO against Quixtar. Here, plaintiffs seek relief on behalf of themselves and a class of similarly situated distributors under the RICO statute which contains a four year statute, which has a four year statute of limitations.

26

1   Quixtar's arbitrary limitations period severely restricts an IBO's right to bring statutory claims

2   and is therefore, substantively unconscionable.

3       81.    Quixtar's arbitration provision and Rules of Conduct prevent an IBO from

4   bringing a class action in arbitration. The distributors have all lost money through their Quixtar

5   involvement and are unable to afford to bring individual claims in arbitration. Accordingly,

6   Quixtar's class action prohibition renders the arbitration provision substantively

7   unconscionable.

8       82.    Quixtar's Rules of Conduct provide a mandatory pre-arbitration "conciliation

9
10  process." The intent of this "process" is to stifle claims against Quixtar. The Rules of Conduct

11  provide that the distributor must submit his claim to Quixtar, and allow Quixtar, the offending

12  party, to resolve the claim. This biased pre-arbitration requirement is intended to deter

13  distributors from indicating their rights. Accordingly, Quixtar's pre-arbitration conciliation

14
15  process is substantively unconscionable.

16      83.    Accordingly, the Court should declare that Quixtar's arbitration provision is

17  procedurally and substantively unconscionable and that the plaintiffs' claims are properly

18  before this Court.

19              **SECOND CLAIM FOR RELIEF**
20              **(RICO 18 U.S.C. § 1962(a))**

21      84.    The Quixtar/Kingpin Enterprise is an association in fact of entities and

22  individuals, within the meaning of "enterprise" as defined in 18 U.S.C. § 1961(4). It is

23  composed of defendants Quixtar, Ron and Georgia Lee Puryear, World Wide Group, Britt

24  Worldwide L.L.C., American Multimedia, Britt Management, and Bill and Peggy Britt.

25      85.    From at least January 2003 and continuing until the present, both dates being

26
27  approximate and inclusive, the defendants Quixtar, Ron Puryear, Georgia Lee Puryear, and

28

COMPLAINT AND DEMAND FOR JURY TRIAL

BOIES, SCHILLER & FLEXNER LLP
OAKLAND, CALIFORNIA

1   World Wide Group, Britt Worldwide, American Multimedia, Britt Management, Bill Britt and

2   Peggy Britt, were members of the Quixtar/Kingpin Enterprise.

3       86.     From at least January 2003 and continuing until the present, both dates being

4   approximate and inclusive, the defendants Quixtar, Ron Puryear, Georgia Lee Puryear, and

5   World Wide Group, Britt Worldwide, American Multimedia, Britt Management, Bill Britt and

6   Peggy Britt, and others, associated together and with others for the purpose of, among other

7   things, executing a scheme to defraud through a pattern of racketeering consisting of distinct

8   acts of mail and wire fraud. The association in fact of the defendants and others constituted an

9   "enterprise" as defined by Title 18, United States Code, Section 1961(4). The Quixtar/Kingpin

10  Enterprise engaged in and affected interstate and foreign commerce. Among other things, the

11  Quixtar/Kingpin Enterprise transacts business through the use of the United States mails and

12  the use of interstate telephone wires. The Quixtar/Kingpin Enterprise advertises, markets, and

13  sells goods and services throughout the United States.

14

15      87.     The defendants are distinct from the Quixtar/Kingpin Enterprise. Each

16  defendant has perpetrated particular racketeering acts, but each defendant is a separate

17  individual or entity from the Quixtar/Kingpin Enterprise.

18

19      88.     The pattern of racketeering activity alleged below is distinct from the

20  Quixtar/Kingpin Enterprise. Each act of racketeering activity is distinct from the

21  Quixtar/Kingpin Enterprise in that each is a separate crime committed by an entity or individual

22  while the Quixtar/Kingpin Enterprise is an association of entities and individuals. The

23  Quixtar/Kingpin Enterprise has the common purpose of distributing products and "tools and

24  functions" materials. The Quixtar/Kingpin Enterprise has an ongoing structure and/or

25  organization supported by personnel and/or associates with continuing functions or duties.

26

27

28

BOIES, SCHILLER & FLEXNER LLP
OAKLAND, CALIFORNIA

89.    To further their goals, which were to (a) earn money through fraudulent means, (b) entice individuals to purchase products from Quixtar and "tools and functions" materials from Kingpins by giving such individuals the false impression that they would be able to recruit others to purchase Quixtar products, and (c) reap large profits for themselves based on false representations, members of the Quixtar/Kingpin Enterprise engaged in various forms of criminal activity, including (a) mail fraud, (b) wire fraud, and (c) conspiracy.

90.    By reason of defendants' pattern of racketeering activity, plaintiffs and the class have been injured and have lost millions of dollars. Defendants' acts of mail and wire fraud were a proximate cause of the injuries that plaintiffs and the class suffered.

91.    From at least January 2003 and continuing until the present, both dates being approximate and inclusive, within the Northern District of California and elsewhere, the defendants Quixtar, Ron Puryear, Georgia Lee Puryear, World Wide Group, Britt Worldwide, American Multimedia, Britt Management, Bill Britt and Peggy Britt, all being employed by and associated with the Quixtar/Kingpin Enterprise did knowingly, willfully and unlawfully conduct and participate, directly and indirectly, in the conduct of the affairs of that enterprise through a pattern of racketeering activity.

92.    The racketeering acts set out below, and others, all had the same pattern and similar purpose of defrauding plaintiffs and the class for the benefit of defendants. Each racketeering act was related, had a similar purpose, involved the same or similar participants and methods of commission and had similar results affecting similar plaintiffs and the class. The racketeering acts of mail and wire fraud were also related to each other in that they were part of the Quixtar/Kingpin Enterprise's goal to fraudulently induce plaintiffs and the class to join the pyramid scheme and cause others to join the scheme.

93.     Defendants' wrongful conduct has been and remains part of defendants' ongoing way of doing business and constitutes a continuing threat to the property of plaintiffs and the class. Without the repeated acts of mail and wire fraud, defendants' fraudulent pyramid scheme would not have succeeded.

94.     Revenue gained from the pattern of racketeering activity, which constitutes a significant portion of the total income of defendants, was reinvested in the operations of the Quixtar/Kingpin Enterprise for the following purposes: (a) to expand the operations of the Quixtar/Kingpin Enterprise through additional false and misleading advertising and promotional materials aimed at recruiting new distributors; (b) to facilitate the execution of the pyramid scheme; and (c) to convince current distributors to recruit new distributors, execute the pyramid scheme, and purchase Quixtar products and "tools and functions" materials. The plaintiffs and the class were injured by the reinvestment of the racketeering income into the Quixtar/Kingpin Enterprise because they invested millions of dollars of their own money through their purchase of Quixtar products and "tools and functions" materials.

95.     For the purpose of executing the scheme, and attempting to do so, the defendants knowingly and recklessly placed and caused to be placed in the United States mail, or took or received therefrom, matters or things to be sent to or delivered by the United States mail consisting of, among other things, Quixtar products and literature, "tools and functions" tapes and literature, money, and correspondence related to the Quixtar/Kingpin Enterprise. It was reasonably foreseeable that these mailings or receipts would take place in furtherance of the fraudulent scheme. In addition, defendants knowingly and recklessly placed or caused to be placed these and other misleading information and material on websites on the Internet and sent these misleading materials through interstate wire communications, including defendants'

1    "CommuniKate" system, which includes both interstate telephone and facsimile

2    communications.

3         96.     In connection with promoting their pyramid scheme, the defendants mailed

4    product and "tools and functions" invoices, letters, promotional materials, brochures, products

5    and checks to plaintiffs and the class and received communications between and among

6    themselves by and through the United States mail, in all fifty states, in violation of 18 U.S.C. §

7    1341.

8    

9         97.     Defendants also engaged in wire fraud, in violation of 18 U.S.C. § 1343, by,

10    among other things, knowingly and recklessly transmitting or causing to be transmitted by

11    means of wire communications, in interstate and foreign commerce, materials promoting

12    defendants' fraudulent pyramid scheme on Internet web sites, by facsimile and telephone,

13    including promotional materials, registration information, product information, "tools and

14    functions" information, and invoices. The defendants maintain websites on the Internet where

15    IBOs can and do purchase products and "tools and functions" materials. Quixtar maintains a

16    website at the address www.quixtar.com, World Wide Group and World Wide Dream Builders

17    maintain a website at the address www.wwdb.com, and American Multimedia maintains a

18    website at address www.ami-media.com. The defendants sent and received these interstate

19    wire communications to and from all fifty states.

20    

21         98.     The pattern of racketeering activity through which the affairs of the

22    Quixtar/Kingpin Enterprise were conducted and in which the defendants and others participated

23    consisted of the following:

24    

25                            **Racketeering Act Number One**

26         99.     On or about January 2, 2005, plaintiff Blenn received, through the United States

27    mail, a Quixtar Achieve Magazine Special Issue featuring the "New Qualifiers of 2004," which

28    

31

promoted the Quixtar/Kingpin Enterprise and contained material false representations regarding the success that could be achieved through Quixtar by purchasing products and recruiting others to do the same. As a result of his receipt of the Achieve Magazine and the representations contained therein, plaintiff Blenn purchased Quixtar products, "tools and functions" materials, and recruited others to do the same. Plaintiff Blenn continued to receive Quixtar magazines and catalogs through the United States mail during the first week of every month that he was a registered IBO. The Quixtar magazines and catalogs were sent on a monthly basis to plaintiff Blenn with the purpose and intent of promoting Quixtar's pyramid scheme, all in violation of 18 U.S.C. § 1341.

### Racketeering Act Number Two

100. On or about February 1, 2005, the defendant Quixtar distributed Quixtar information by interstate wire transmissions over the world wide web. On that date, plaintiff Blenn reviewed information on Quixtar's web site. The Quixtar web sites promoted the fraudulent pyramid scheme and contained material false representations regarding the wealth that could be achieved by agreeing to be an IBO. As a result of the representations on the web site, plaintiff Blenn maintained his position as an IBO and continued to order Quixtar products and recruit others to do the same, all in violation of 18 U.S.C. § 1343.

### Racketeering Act Number Three

101. On or about November 18, 2003, the defendants Ron Puryear, Georgia Lee Puryear, World Wide Group, Britt Worldwide, American Multimedia, Britt Management, Bill Britt and Peggy Britt distributed information by interstate wire transmissions over the world wide web promoting their "Dream Night 2004" convention for January 14, 2004 in San Jose, California. The World Wide Group's website promoted the fraudulent pyramid scheme and contained material false representations regarding the wealth that would be achieved if an IBO

32

1  purchased "tools and functions" and followed the instructions contained therein. Defendants

2  Ron Puryear, Georgia Lee Puryear, World Wide Group, Britt Worldwide, American

3  Multimedia, Britt Management, Bill Britt and Peggy Britt posted the internet message to

4  encourage current distributors to attend the convention where they would purchase products

5  and "tools and functions" materials. On November 18, 2003, plaintiff Pokorny read the

6  information distributed by the defendants and purchased a ticket for "Dream Night 2004" using

7  the defendants' World Wide Group's website, all in violation of 18 U.S.C. § 1343.

8

9                          **Racketeering Act Number Four**

10      102.    On or about December 9, 2000, plaintiff Pokorny purchased a subscription for

11  Quixtar's "CommuniKate" telephone and fax system and paid a monthly fee for the Quixtar

12  CommuniKate message system until September 2006. From December 2000 through

13  September 2006, plaintiff Pokorny received invoices from Quixtar on a monthly basis through

14  the United States mail in violation of 18 U.S.C. § 1341. Thereafter, plaintiff Pokorny received

15  interstate telephone and facsimile messages daily from Kingpins and IBOs outside of

16  California, affiliated with the World Wide Dream Builders Line of Sponsorship, until he

17  terminated his IBO distributorship. These messages included material false representations

18  regarding the necessity of the "tools and functions" materials and false representations

19  regarding the tremendous wealth opportunity that could be realized by being an IBO, all in

20  violation of 18 U.S.C. § 1343.

21

22                          **Racketeering Act Number Five**

23      103.    On or about January 5, 2005, defendants World Wide Group, Ron Puryear,

24  Georgia Lee Puryear, Bill Britt, Peggy Britt, Britt Worldwide, American Multimedia and Britt

25  Management placed in the United States mail an "IBO Ticket Order Form" for "Dream Night

26  2005." That order form was sent from World Wide Group's office in Seattle, Washington, to

27

28

BOIES, SCHILLER & FLEXNER LLP
OAKLAND, CALIFORNIA

BOIES, SCHILLER & FLEXNER LLP

OAKLAND, CALIFORNIA

1  plaintiff Blenn's residence in San Joaquin County. The order form contained advertisements

2  for various Dream Night Conventions in different cities in January 2005. One such convention

3  was in San Jose on January 14, 2005, which plaintiff read about in the order form and attended.

4  Defendants World Wide Group, Ron Puryear, Georgia Lee Puryear, Bill Britt, Peggy Britt,

5  Britt Worldwide, American Multimedia and Britt Management mailed the order form in order

6  to induce current distributors to attend conventions where they would purchase products and

7  "tools and functions" materials and listen to speeches and tips on how to recruit new

8  distributors. Plaintiff Blenn did purchase the "Dream Night 2005" ticket and attended the

9  function, all in violation of 18 U.S.C. § 1341.

10 

### Racketeering Act Number Six

11 

12      104.   On or about April 6, 2005, the defendants World Wide Group, Ron Puryear,

13 Georgia Lee Puryear, Bill Britt, Peggy Britt, Britt Worldwide, American Multimedia and Britt

14 Management distributed their "Spring Leadership 2005" convention on the World Wide Group

15 website which took place April 22-24, 2005 in Las Vegas, Nevada. Defendants World Wide

16 Group, Ron Puryear, Georgia Lee Puryear, Bill Britt, Peggy Britt, Britt Worldwide, American

17 Multimedia and Britt Management posted the advertisement to induce distributors to attend the

18 Spring Leadership 2005 convention, at which they would purchase Quixtar products and "tools

19 and functions" materials, and listen to speeches and tips on how to recruit new distributors. On

20 April 6, 2005, Plaintiff Blenn read the information distributed by the defendants and purchased

21 a ticket through the website, all in violation of 18 U.S.C. § 1343.

22 

23      105.   To the extent proof of reliance is legally required, in engaging in the

24 aforementioned wire and mail fraud, defendants knew that plaintiffs and the class would

25 reasonably rely on their representations and omissions which would result in the plaintiffs and

26 

27 

28

1    the class joining the fraudulent pyramid scheme and purchasing the products and "tools and

2    functions" materials.

3        106.    Defendants knew that the misrepresentations and omissions described above in

4    promoting and executing the fraudulent pyramid scheme were material because they caused the

5    plaintiffs and the class to join and participate in the illegal pyramid scheme.

6

7        107.    Had plaintiffs and the class known that defendants were promoting a fraudulent

8    pyramid scheme, they would not have joined the pyramid scheme.

9        108.    Defendants' acts of mail and wire fraud were a proximate cause of the injuries

10   that plaintiffs and the class suffered. By reason of defendants' pattern of fraudulent conduct,

11   plaintiffs and the class lost millions of dollars.

12       109.    Under 18 U.S.C. § 1964(c), the plaintiffs and the class are entitled to treble their

13   general and special compensatory damages, plus interest, costs and attorney's fees.

14

15                        **THIRD CLAIM FOR RELIEF**
                        **(RICO 18 U.S.C. § 1962(c))**

16       110.    The plaintiffs re-allege the foregoing paragraphs as though fully set forth herein.

17       111.    Defendants are associated with the Quixtar/Kingpin Enterprise. In violation of

18   18 U.S.C. § 1962(c), defendants conducted and/or participated in the conduct of the affairs of

19

20   the Quixtar/Kingpin Enterprise, including, but not limited to, participation in activities in

21   furtherance of defendants' fraudulent pyramid scheme, through the pattern of racketeering

22   activity alleged in the First Claim for Relief.

23       112.    As a direct and proximate result of defendants' violation of 18 U.S.C. § 1962(c),

24   the plaintiffs and the class were induced to, and did, become distributors in defendants' illegal

25   pyramid scheme and purchased millions of dollars of Quixtar products and "tools and

26   functions" materials and recruited others to do the same. The plaintiffs and the class were

27   injured by defendants' unlawful conduct. The funds used to purchase the Quixtar products and

28

35

BOIES, SCHILLER & FLEXNER LLP
OAKLAND, CALIFORNIA

the "tools and functions" materials constitute property of the plaintiffs and the plaintiff class within the meaning of 18 U.S.C. § 1964(c).

113.   Under 18 U.S.C. § 1964(c), the plaintiffs and the plaintiff class are entitled to treble their general and special compensatory damages, plus interest, costs and attorney's fees.

## FOURTH CLAIM FOR RELIEF
### (RICO 18 U.S.C. § 1962(d))

114.   The plaintiffs re-allege the foregoing paragraphs as though fully set forth herein.

115.   Defendants agreed to work together in a symbiotic relationship to carry on the pyramid scheme. In accordance with that agreement, defendants conspired to violate 18 U.S.C. § 1962(a) and (c), in violation of 18 U.S.C. § 1962(d).

116.   As a direct and proximate result of defendants' violation of 18 U.S.C. § 1962(d), the plaintiffs and the class were injured by defendants' unlawful conduct. The funds used to purchase the Quixtar products and the "tools and functions" materials constitute property of the plaintiffs and the class under 18 U.S.C. § 1964(c).

117.   Under 18 U.S.C. § 1964(c), plaintiffs and the plaintiff class are entitled to treble their general and special compensatory damages, plus interest, costs and attorney's fees.

## FIFTH CLAIM FOR RELIEF
### (Unlawful, Unfair and Fraudulent Business Practices Under the California Business and Professions Code § 17200, *et seq.*)

118.   The Plaintiffs and the subclass re-allege the foregoing paragraphs as though fully set forth herein.

119.   Defendants are engaged in an illegal pyramid scheme or "endless chain" as defined under California Penal Code § 327. Defendants utilize this illegal pyramid scheme with the intent, directly or indirectly to dispose of property, in the form of Quixtar products and "tools and function materials" and to convince distributors to recruit others to do the same.

36

BOIES, SCHILLER & FLEXNER LLP
OAKLAND, CALIFORNIA

120.    Defendants are engaged in ongoing and continuous unlawful, unfair, and fraudulent business acts or practices, and unfair, deceptive, untrue and misleading advertising within the meaning of the California Business and Professions Code § 17200, *et seq.* The acts or practices alleged herein constitute a pattern of behavior, pursued as wrongful business practice that has victimized and continues to victimize thousands of California consumers.

121.    Pursuant to California Business and Professions Code § 17200, an "unlawful" business practice is one that violates California law. Defendants' business practices are unlawful because they involve the creation and promotion of an illegal pyramid scheme or "endless chain" under California law.

122.    Pursuant to California Business and Professions Code § 17200, an "unfair" business practice includes a practice that offends an established public policy, or that is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers. Defendants' promotion and operation of an illegal pyramid scheme is unethical, oppressive and unscrupulous in that defendants are duping California consumers out of millions of dollars through their illegal pyramid scheme.

123.    Pursuant to California Business and Professions Code § 17200, a "fraudulent" business practice is one that is likely to deceive the public. Defendants' business practice is fraudulent in that they have deceived the public by misrepresenting the nature of their business. For example, defendants have made numerous misrepresentations about the income that can be realized by becoming a distributor and have failed to inform the public that they are openly an illegal pyramid scheme. California citizens have relied, and continue to rely on defendants' misrepresentations and omissions to their detriment.

124.    Defendants' business practices are "unfair business practices" within the meaning of the Business and Professions Code § 17200, *et seq.* in that they are engaged in a

37

practice that offends established public policy, and/ or is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.

125. Defendants' business practices are "fraudulent" within the meaning of the Business and Professions Code §17200, *et seq.* in that members of the public are deceived and continue to be deceived by the business practice.

126. As a result of their unlawful acts, defendants have reaped and continue to reap unfair benefits and illegal profits at the expenses of plaintiffs and the class members. Defendants should be made to disgorge these ill-gotten gains and restore to the plaintiffs and the class the wrongfully taken revenue.

## SIXTH CLAIM FOR RELIEF
### (California Business and Professions Code § 17500, *et seq.*)

### False Advertising

127. The Plaintiffs and the subclass re-allege the foregoing paragraphs as though fully set forth herein.

128. Defendants' business acts, false advertisements and materially misleading omissions alleged herein constitute unfair trade practices and false advertising, in violation of the California Business and Professions Code § 17500, *et seq.*

129. Defendants engaged in false, unfair and misleading business practices, consisting of false advertising and materially misleading omissions that were likely to deceive the public and include, but are not limited to:

    a. defendants' failing to disclose to consumers that they were entering into an unlawful pyramid scheme;

    b. defendants' misrepresenting the amount of money that a distributor would earn;

c.   defendants' misrepresenting that purchasing the "tools and functions"

materials was necessary in order to be a successful distributor; and

d.   defendants' misrepresenting that distributors would not need to engage

in retail sales to make money and instead would earn the promised

revenue by simply self-consuming products and convincing others to do

the same.

130.   Defendants' marketing and promotion of the illegal pyramid scheme constitutes misleading, unfair and fraudulent advertising in connection with their false advertising to induce consumers to join the illegal pyramid scheme. Defendants knew or should have known, in the exercise of reasonable care, that the statements they were making were untrue or misleading and did deceive members of the public. Defendants' knew or should have known, in the exercise of reasonable care, that California citizens, including plaintiff, would rely, and did in fact rely on defendants' misrepresentations and omissions.

131.   Defendants should be ordered to disgorge, for the benefit of the plaintiffs and the plaintiff class their Quixtar profits and compensation and/or make restitution to the plaintiff and the class.

## PRAYER FOR RELIEF

132.   The named plaintiffs and the plaintiff class request the following relief:

a.   Judgment declaring Quixtar's arbitration provision unconscionable and

unenforceable;

b.   Certification of the class;

c.   A jury trial and judgment against defendants;

d.   Damages in the amount of the named plaintiffs' and the class' financial

loss as a result of defendants' conduct and for injury to their business

and property, all as a result of defendants' violations of § 1964(a), (c)

39

and (d) and that such sum be trebled in accordance with 18 U.S.C. § 1964(c);

e.   Restitution and disgorgement of monies, pursuant to the California Business and Professions Code;

f.   The cost of suit including reasonable attorney's fees in accordance with 18 U.S.C. § 1964(c);

g.   For general, compensatory and exemplary damages in an amount yet to be ascertained; and

h.   For such other damages, relief and pre and post judgment interest as the Court may deem just and proper.

# DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial as provided by Rule 38(a) of the Federal Rules of Civil Procedure.

Dated: January 10, 2007

Respectfully submitted,

BOIES, SCHILLER & FLEXNER LLP

By: _____

David W. Shapiro
California Bar No. 219265
1999 Harrison Street, Suite 900
Oakland, California 94612
Tel.: (510) 874-1000
Fax: (510) 874-1460

Stuart H. Singer (*Pro Hac Vice* to be Filed)
Carlos M. Sires (*Pro Hac Vice* to be Filed)
401 East Las Olas Boulevard
Suite 1200
Ft. Lauderdale, FL 33301
Tel.: (954) 356-0011
Fax: (954) 356-0022

Willie E. Gary (*Pro Hac Vice* to be Filed)
GARY, WILLIAMS, PARENTI, FINNEY,
LEWIS, MCMANUS, WATSON &
SPERANDO
221 E. Osceola St.
Stuart, FL 34994
Tel.: (772) 283-8260
Fax: (772) 220-3343

COMPLAINT AND DEMAND FOR JURY TRIAL