1   David W. Shapiro, Esq.
    BOIES, SCHILLER & FLEXNER LLP
2   1999 Harrison Street, Suite 900
    Oakland, California 94612
3   Telephone: (510) 874-1000
    Facsimile: (510) 874-1460
4   E-mail: dshapiro@bsfllp.com
    California Bar Number: 219265
5
    *Additional attorneys on following page*
6
    Attorneys for Plaintiffs Jeff Pokorny and Larry Blenn
7

8                        **UNITED STATES DISTRICT COURT**
                        **NORTHERN DISTRICT OF CALIFORNIA**
9                          **SAN FRANCISCO DIVISION**

10

11  Jeff Pokorny and Larry Blenn            )   **CASE NO. C 07-0201 SC**
    on behalf of themselves and those similarly )
12  situated,                               )
                                            )   **PLAINTIFFS' MEMORANDUM IN**
13                    Plaintiffs,           )   **OPPOSITION TO QUIXTAR'S**
                                            )   **MOTION TO DISMISS OR STAY**
14  v.                                      )   **AND COMPEL COMPLIANCE WITH**
                                            )   **DISPUTE RESOLUTION**
15  Quixtar, Inc., et al,                   )   **AGREEMENT**
                                            )
16                    Defendants.           )
                                            )   CLASS ACTION
17                                          )
                                            )
18                                          )   Date: April 27, 2007
                                            )   Time: 10:00 a.m.
19                                          )   Room: 1, 17th Floor
                                            )   Judge: Honorable Samuel Conti
20  _____      )

21

22

23

24

25

26

27

28

B O I E S ,   S C H I L L E R   &   F L E X N E R   L L P
O A K L A N D ,   C A L I F O R N I A

1          Additional counsel:

2
David Boies, Esq. (*Pro Hac Vice*)
3     BOIES, SCHILLER & FLEXNER LLP
333 Main Street
4     Armonk, NY 10504
Telephone: (914) 749-8200
5     Facsimile: (914) 749-8300
E-mail: dboies@bsfllp.com
6

7     Stuart H. Singer, Esq. (*Pro Hac Vice*)
Carlos M. Sires, Esq. (*Pro Hac Vice*)
8     Sigrid S. McCawley, Esq. (*Pro Hac Vice*)
BOIES, SCHILLER & FLEXNER LLP
9     401 East Las Olas Boulevard, Suite 1200
Fort Lauderdale, Florida 33301
10    Telephone: (954) 356-0011
Facsimile: (954) 356-0022
11    E-mail: ssinger@bsfllp.com
E-mail: csires@bsfllp.com
12    E-mail: smccawley@bsfllp.com

13
Willie E. Gary, Esq. (*Pro Hac Vice*)
14    Maria Sperando, Esq. (*Pro Hac Vice*)
Mary Diaz, Esq. (*Pro Hac Vice*)
15    GARY, WILLIAMS, PARENTI, FINNEY,
LEWIS, MCMANUS, WATSON &
16    SPERANDO
221 East Osceola Street
17    Stuart, Florida 34994
Telephone: (772) 283-8260
18    Facsimile: (772) 220-3343
E-mail: weg@williegary.com
19    E-mail: mps@williegary.com
E-mail: mad@williegary.com
20

21

22

23

24

25

26

27

28

# <u>TABLE OF CONTENTS</u>

Page

TABLE OF AUTHORITIES ................................................................................................ii

PRELIMINARY STATEMENT ........................................................................................ 1

STATEMENT OF FACTS ................................................................................................ 2

ARGUMENT ................................................................................................................... 6

    I.    CALIFORNIA LAW GOVERNS THE ENFORCEABILITY ISSUE ..................... 6

    II.  THE UNCONSCIONABILITY STANDARD ......................................................... 8

    III. THE QUIXTAR AGREEMENT IS PROEDURALLY UNCONSCIONABLE ....... 8

    IV. THE QUIXTAR "CONCILIATION" REQUIREMENTS ARE NOT
         ENFORCEABLE BECAUSE THEY ARE BIASED, SUBSTANTIVELY
         UNCONSCIONABLE, AND FUTILE ................................................................. 9

        A.  The Quixtar Conciliation Procedure is Substantively Unconscionable. ............ 11

        B.  The Quixtar Conciliation Procedure is Futile. .................................................. 12

    V.  THE QUIXTAR ARBITRATION PROVISIONS ARE UNENFORCEABLE
         BECAUSE THEY ARE BIASED AND SUBSTANTIVELY
         UNCONSCIONABLE ........................................................................................ 13

        A.  Biased Arbitrators and Biased Selection Procedure........................................... 14

        B.  Biased and Non-Mutual Confidentiality Provision. ........................................... 16

        C.  Treatment of Class Actions. ............................................................................... 17

        D.  Excessive Arbitration Costs: Fee Sharing and Fee Shifting. ............................. 18

        E.  Non-Mutual Reduction of the Statute of Limitations......................................... 21

        F.  Quixtar's Unilateral Right to Modify the Agreement. ....................................... 22

        G.  Quixtar's Unilateral Right to Litigate in Court. ................................................. 22

    VI. THE SEVERANCE CLAUSE SHOULD NOT BE USED TO SAVE ANY
         PORTION OF QUIXTAR'S UNCONSCIONABILITY-PERMEATED
         ADR PROGRAM............................................................................................... 23

CONCLUSION .............................................................................................................. 25

BOIES, SCHILLER & FLEXNER LLP
OAKLAND, CALIFORNIA

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

i

CASE NO. C 07-0201 SC     PLAINTIFF'S MEMORANDUM IN OPPOSITION TO QUIXTAR'S MOTION TO DISMISS OR STAY
AND COMPEL COMPLIANCE WITH DISPUTE RESOLUTION AGREEMENT

1

2

# TABLE OF AUTHORITIES

Page

**Cases**

*Alexander v. Anthony Int'l,*
    341 F.3d 256 (3d Cir. 2003) ...................................................................................21

*Al-Safin v. Circuit City Stores, Inc.,*
    394 F.3d 1254 (9th Cir. 2005)..........................................................................21, 22

*Appling v. State Farm Mut. Auto. Ins. Co.,*
    340 F.3d 769 (9th Cir. 2003) ...........................................................................9, 16

*Armendariz v. Found. Health Psychcare Servs., Inc.,*
    6 P.3d 669 (Cal. 2000) ............................................................................................8

*Blair v. Scott Specialty Gases,*
    283 F.3d 595 (3rd Cir. 2002)...........................................................................19, 24

*Cole v. Burns Intern. Sec. Servs.,*
    105 F.3d 1465 (D.C. Cir. 1997) ............................................................................19

*Comb v. Paypal, Inc.,*
    218 F. Supp. 2d 1165 (N.D. Cal. 2002) .............................................................8, 20

*DeOrnellas v. Aspen Square Mgmt,*
    295 F. Supp. 2d 753 (E.D. Mich. 2003) ...............................................................18

*DeValk Lincoln Mercury, Inc. v. Ford Motor Co.,*
    811 F.2d 326 (7th Cir. 1987)................................................................................13

*Discover Bank v. Sup. Court,*
    113 P.3d 1100 (Cal. 2005) ....................................................................................17

*Dunham v. Envtl Chem. Corp.,*
    No. 06-03389, 2006 WL 2374703 ..........................................................10, 12, 13

*Ferguson v. Countrywide Credit Indus.,*
    298 F.3d 778 (9th Cir. 2002)...............................................................................6, 24

*Fortune v. Castle Nursing Homes,*
    843 N.E.2d 1216 (Ohio Ct. App. 2005) ...............................................................21

*FTC v. Amway,*
    93 FTC 618 (1979)...................................................................................................3

*Glover v. St. Louis-San Francisco Ry. Co.,*
    393 U.S. 324 (1969) .................................................................................10, 12, 13

*Heurtebise v. Reliable Business Computers,*
    550 N.W. 2d 243 (Mich. 1996) ............................................................................23

*HIM Portland, LLC v. DeVito Builders,*
    317 F.3d 41 (1st Cir. 2003) ...................................................................................13

BOIES, SCHILLER & FLEXNER LLP
OAKLAND, CALIFORNIA

ii

*Hooters of America, Inc. v. Phillips,*
  173 F.3d 933, 940 (4th Cir. 1999)...................................................................................24

*Ingle v. Circuit City Stores,*
  328 F.3d 1165, 1180 (9th Cir. 2003)..............................................................................24

*Kemiron v. Aguakem Int'l,*
  290 F.3d 1287 (11th Cir. 2002).......................................................................................13

*Klaxon v. Stentor Elect. Mfg.,*
  313 U.S. 487 (1941).........................................................................................................6

*Klussman v. Cross Country Bank,*
  36 Cal. Rptr. 3d 728 (Cal. Ct. App. 2005) .................................................................7, 17

*Little v. Auto Stiegler,*
  63 P.3d 979 (Cal. 2003) .................................................................................................23

*Lozada v. Dale Baker Oldsmobile,*
  91 F. Supp. 2d 1087 (W.D. Mich. 2000).............................................................17, 18, 24

*Martinez v. Master Prot. Corp.,*
  12 Cal. Rptr. 3d 663 (Ct. App. 2004).............................................................................21

*Mercuro v. Superior Court,*
  116 Cal. Rptr. 2d 671, 678-79 (Cal. Ct. App. 2002) ................................................14, 16

*Morrison v. Circuit City Stores, Inc.,*
  317 F.3d 646 (6th Cir. 2003)..........................................................................................20

*Nagrampa v. MailCoups, Inc.,*
  469 F.3d 1257 (9th Cir. 2006)...................................................................................2, 6, 8

*Nitro Distributing v. Alticor, Inc.,*
  No. 03-3290, at *28 (W.D. Mo. Sept. 16, 2005); 453 F.3d 995 (8th Cir. 2006)............. passim

*Nyulassy v. Lockheed Martin Corp.,*
  16 Cal. Rptr. 3d at 296 (Cal. Ct. App. 2004) ............................................................. passim

*Pabst v. Shearer,*
  156 P. 466 (Cal. 1916) .....................................................................................................7

*Paracor Fin., Inc. v. Gen. Elec. Capital Corp.,*
  96 F.3d 1151 (9th Cir.1996).............................................................................................7

*Procter & Gamble Co. v. Amway Corp.,*
  280 F.3d 519 (5th Cir. 2002)............................................................................................3

*San Remo Hotel, L.P. v. City & County of San Francisco,*
  Cal., 545 U.S. 323 (2005)...........................................................................................9, 16

*Sehulster Tunnels/Pre-Con v. Traylor Brothers, Inc.,*
  4 Cal. Rptr. 3d 655 (Cal. Ct. App. 2003) ...................................................................11, 13

BOIES, SCHILLER & FLEXNER LLP
OAKLAND, CALIFORNIA

iii

*Stewart & Asso. Int'l v. Quixtar, Inc.*,
No. 05-3440 (W.D. Mo. Nov. 20, 2006) ........................................................................ passim

*Stirlen v. Supercuts, Inc.*,
60 Cal. Rptr. 2d 138 (Cal. Ct. App.1997) ...................................................................21

*Szetela v. Discovery Bank*,
118 Cal. Rptr. 2d 862 (Cal. Ct. App. 2002) ...........................................................8, 17

*Ting v. AT&T*,
182 F. Supp. 2d 902 (N.D. Cal. 2002) ......................................................................19

*Ting v. AT&T*,
319 F.3d 1126 (9th Cir. 2003)................................................................................ passim

*Toppings v. Meritech Mortgage Servs. Inc.*,
569 S.E. 2d 149 (W. Va. 2002) ..................................................................................15

*United States v. Westinghouse Elec. Corp.*,
648 F.2d 642 (9th Cir. 1981) .......................................................................................7

*Veliz v. Cintas Corp.*,
No. C 03-1180, 2004 WL 2452851 (N.D. Cal. April 5, 2004) .................................21

*Victoria v. Sup. Court*,
710 P.2d 833 (Cal.1985) .............................................................................................18

*Waggaman v. Nw. Sec. Ins. Co.*,
94 Cal.Rptr. 170 (Cal. Ct. App. 1971) .......................................................................18

*Webster v. Omnitrition Intern.*,
79 F.3d 776 (9th Cir. 1996)..........................................................................................3

*Williams v. Pacific Maritime Ass'n*,
617 F.2d 1321 (9th Cir. 1980).....................................................................................12

*Wolsey, Ltd. v. Foodmaker, Inc.*,
144 F.3d 1205 (9th Cir. 1998).....................................................................................13

*Wong v. T-Mobile USA, Inc.*,
No. 05-73922, 2006 WL 2042512 (E.D. Mich. July 20, 2006) .................................17

**Statutes**

18 U.S.C. § 1964(c)............................................................................................................21

28 U.S.C. § 1914 ...............................................................................................................20

B O I E S ,   S C H I L L E R   &   F L E X N E R   L L P
O A K L A N D ,   C A L I F O R N I A

Plaintiffs Jeff Pokorny and Larry Blenn ("Plaintiffs"), individually and as class representatives, respectfully file this Memorandum of Points and Authorities in Opposition to the Motion to Dismiss or Stay and Compel Compliance with Dispute Resolution Agreement filed by Defendant Quixtar, Inc. ("Quixtar").

### PRELIMINARY STATEMENT

Plaintiffs have pleaded and will prove that Quixtar has induced hundreds of thousands of individuals into participating in an illegal "get rich quick" pyramid scheme.  In reality, over 99% of the participants in Defendant's scheme lose their money and, for Mr. Blenn and many others, the end result was foreclosure on their homes.

To hinder potential plaintiffs from exposing their wrongdoing, Quixtar put provisions into the Registration Agreement it requires be signed that purport to force claimants to run a biased, non-mutual, lengthy, expensive and futile gauntlet of procedural obstacles before their claims may be resolved.  Even then, the claims would be heard by so-called "neutral arbitrators" who are, in the words of one court, specially trained to have a "very favorable view of [Quixtar]." *Nitro Distributing v. Alticor, Inc.*, No. 03-3290, at *28 (W.D. Mo. Sept. 16, 2005), *aff'd*, 453 F.3d 995 (8th Cir. 2006), (Appendix of Unpublished Authorities ("App."), filed herewith, Ex. 1).  These "neutrals" are even taught that Quixtar "was not a pyramid scheme and that the business was legitimate" – in other words, they are taught that the precise substantive claims Plaintiffs assert here lack merit.  *Id.*

Although Defendant remarkably asserts that every court that has considered the Quixtar ADR Agreement "has found it valid and enforceable" (Quixtar Mem. 10), in reality the agreement was deemed both procedurally and substantively unconscionable in the very case attached as Exhibit A to Quixtar's own brief: "[T]he Court finds the arbitrator selection process and the use of JAMS as the administrator and the neutral in the [Quixtar] arbitration proceedings

BOIES, SCHILLER & FLEXNER LLP
OAKLAND, CALIFORNIA

to be unconscionable." *Stewart & Assocs. Int'l v. Quixtar, Inc.*, No. 05-3440, at *8 (W.D. Mo. Nov. 20, 2006) (App. Ex. 2). In another case, the court found that Quixtar's process "does not come close to passing any reasonable test of fairness and neutrality required for a legitimate arbitration proceeding." *Nitro*, at *28.

As will be shown herein, Quixtar's biased and unfair conciliation and arbitration clauses are unenforceable, so Quixtar's Motion to Dismiss or Stay should be denied. If there is any doubt at this point, Plaintiffs are at least entitled to limited discovery and an evidentiary hearing on the issues raised by Quixtar's motion – as well as the first count of Plaintiffs' Complaint and Quixtar's recently filed counterclaim – all of which go to the issue of enforceability of the dispute resolution provisions of the agreements. *Nagrampa v. MailCoups, Inc.*, 469 F.3d 1257, 1264 (9th Cir. 2006 (en banc).[1]

## STATEMENT OF FACTS

Quixtar begins its statement of "facts" with a self-laudatory description of its business. In reality, however, as Plaintiffs have specifically alleged and will prove, and as been documented on programs such as NBC's Dateline and CBS's 60 Minutes, Quixtar is not a legitimate business that sells "its own brand of home care products" through "hundreds of thousands" of "independent distributors." Quite the contrary, the vast majority of Quixtar's products are sold to the "distributors" themselves (euphemistically called Independent Business Owners or IBOs).[2]

---

[1] *Nagrampa* makes clear that where, as here, "the crux of the complaint is not the invalidity of the contract as a whole, but rather the arbitration provision itself," the court, not the arbitrator, must decide if the provision is enforceable. 469 F.3d at 1164.

[2] IBOs are taught not to attempt to sell the Quixtar products to actual, independent consumers and to devote their efforts to luring other individuals into becoming IBOs, thus expanding the illegal pyramid. (*See* Declaration of Robert Fitzpatrick ("Fitzpatrick Decl.") ¶ 8; "300 PV" Home Flyer, Declaration of Sigrid McCawley ("McCawley Decl.") Ex. A; Power Point Presentation Board, McCawley Decl. Ex. B ("Substitute these products for what you are currently consuming"); "Four Signs of Business Health," McCawley Decl. Ex. C; "Kick Start! It's Got Legs!" Promotion flyer, McCawley Decl. Ex. D, at 1.)

2

BOIES, SCHILLER & FLEXNER LLP
OAKLAND, CALIFORNIA

B O I E S ,   S C H I L L E R   &   F L E X N E R   L L P
O A K L A N D ,   C A L I F O R N I A

1   Quixtar alleges that its business model was approved by the FTC.  Even assuming that

2   *FTC v. Amway*, 93 FTC 618 (1979) was correctly decided,[3] Quixtar does not dispute Plaintiffs'

3   specific allegations, which are well supported by evidence, that Quixtar is not enforcing the very

4   policies that led the FTC to its conclusion.  In fact, IBOs are trained to not worry about

5   compliance with these rules.  (Declaration of Jeff Pokorny ("Pokorny Decl.") ¶ 12.)

6

7   It is also not true that the Puryear and Britt Defendants and other "Kingpins" sell the so-

8   called Business Support Materials (BSMs) to IBOs "for the purpose of helping IBOs sell more

9   Quixtar products."  (Quixtar Mem. 3.)  Plaintiffs have alleged, and overwhelming evidence will

10   show, that the BSMs (books, tapes, seminars, etc.) are largely devoted to teaching IBOs how to

11   recruit new IBOs (because very few Quixtar products are sold at retail and the only way IBOs

12   earn money is by recruiting new IBOs who buy from them and through whom they earn

13

14   bonuses).[4]

15   As the Fifth Circuit has explained:

16   Newly recruited distributors become "down-line" distributors who earn
      commissions for the "upline" distributors who recruited them. More senior and
17   profitable distributors sell their products predominately to downline distributors
      rather than to consumers. There is high turnover among the more junior
18   distributors. The most elite and profitable distributors rely on the sale of
      motivational tools rather than Amway products to earn large profits.
19

20   *Procter & Gamble Co. v. Amway Corp.*, 280 F.3d 519, 522 (5th Cir. 2002).

21   To prevent junior IBOs from filing a lawsuit that would topple its pyramid scheme,

22   Quixtar forces all IBOs to sign a Registration Agreement that incorporates by reference a 42-

23

---

24   [3]  The FTC decision was not judicially reviewed.  Although Quixtar portrays it as an exoneration of its business
      model, in fact the FTC found that Amway had illegally engaged in deceptive recruiting and price fixing, and a cease
25   and desist order was entered.  With respect to the finding that Amway was not a pyramid scheme, the Ninth Circuit
      has stressed that the issue is not  "formal adoption" of anti-pyramiding policies, but rather whether the "rules
26   *actually work*" to ensure that bonuses are tied to actual retail sales rather than recruiting of new participants in the
      scheme.  *Webster v. Omnitrition Intern.*, 79 F.3d 776, 782-83 (9th Cir. 1996) (emphasis in original).
27   [4]  (*See* Quixtar's "Direct Approach" script, McCawley Decl. Ex. E; Ron & Georgia Lee Puryear of World Wide
      Dream Builders, *Achieve Magazine*, McCawley Decl. Ex. F ("We believe it could just as easily be someone who
28   possesses a dream and reads this Achieve Magazine for the first time, perhaps listens to a motivating tape, attends a
      function and begins to build their dream, by showing the plan and sharing their dream with others."))

B O I E S ,   S C H I L L E R   &   F L E X N E R   L L P
O A K L A N D ,   C A L I F O R N I A

page document entitled Rules of Conduct[5] ("RoC"), which Quixtar is free to amend unilaterally at its whim.  RoC 1.[6]  The RoC sets up a so-called "dispute resolution system" that in reality is a ruse intended to ensure that Quixtar will never have to face a jury or even a neutral arbitrator. The RoC sets forth a gauntlet IBOs must run to obtain even a biased resolution of their claims. And an IBO is supposed to run the gauntlet entirely on his own, with a perpetual gag order barring him from discussing even the general basis for his claim with his peers *from the very instant* that he "becomes aware" of a potential claim.  RoC 11.  (Declaration of Stephen Hayford ("Hayford Decl.") ¶ 31.)

In short, an IBO such as Mr. Pokorny or Mr. Blenn who accuses Quixtar of illegal activity is supposed to pursue a non-binding process which by its terms is charged with issuing recommendations that "further the goal of compliance and must be consistent with IBO Plan and the Rules of Conduct," RoC 11.4, which are part of the very scheme that Plaintiffs challenge as unlawful.  After submitting the claim to Quixtar itself, which obviously will reject it, the claimant is then supposed to obtain a recommendation from a hearing panel (which meets as little as three times a year) of the IBOAI board, RoC 11.3, which Quixtar falsely describes as an "independent trade association" but is really composed of Kingpins, the very people who dupe IBOs into buying BSMs, a central aspect of the pyramid scheme alleged in Plaintiffs' complaint. (*See* Declaration of Robert Fitzpatrick ("Fitzpatrick Decl.") ¶ 10.)  In the unlikely event that the panel were to recommend in Plaintiffs' favor, the matter remains subject to further review by the full IBOAI board, RoC 11.3.2, which is also composed of Kingpins.  (*See* Fitzpatrick Decl. ¶

---

[5]  The "BSMAA" and the "DM" arbitration provisions that Quixtar references at page 5-6 of its brief both incorporate the Quixtar RoC and therefore, all of the arguments made regarding the unconscionability of the RoC, likewise apply to the "BSMAA" and the "DM".

[6]  The June 2006 version of the RoC, which Plaintiffs had never even seen until Quixtar filed its motion, is attached as Ex. 2 to the VanderVen Declaration submitted by Quixtar.

10.)[7]  The hearing panel may seek an "opinion or clarification" from Quixtar's legal department on the interpretation of the RoC.  (*See* Hayford Decl. ¶ 36.)  Then, regardless of what the IBOAI panel and board have to say, the case goes back to the accused wrongdoer, Quixtar itself, which makes the "final decision."  RoC 11.3.3.  (*See* Hayford Decl. ¶ 35.)  There are no time limits for any recommendation or decision, so it could be years before a "final decision" is rendered, and IBOs are prohibited from seeking binding relief until they receive this "decision."  Under the RoC, even if a claimant successfully weaves his way to the conclusion of Quixtar's "non-binding conciliation process," he is precluded from obtaining binding relief from any court or even from an unbiased arbitrator.  Instead, the agreement says he should pay substantial fees, follow non-mutual and biased rules, endure a shortened statute of limitations, and choose an arbitrator from a list of individuals designated and trained by Quixtar itself to have a "very favorable view of defendants."  *Nitro*, at *28.  (*See* Hayford Decl. ¶ 21.)  As noted above, the "neutrals" are even taught that Quixtar "was not a pyramid scheme and that the business was legitimate."  *Id.*

Even after *Nitro* emphatically held that Quixtar's process failed "any reasonable test of fairness and neutrality required for a legitimate arbitration proceeding," *id.*, Quixtar continued with the same "arbitrator training program."  Instead of abandoning the program in response to the judicial declaration that it was biased and unfair, Quixtar put some lipstick on it.  Quixtar exercised its right of unilateral modification and amended the RoC to give claimants a highly limited right to opt-out of the Quixtar-trained list and to choose, for a higher fee,[8] an "untrained" JAMS arbitrator from a list under contract to hear Quixtar arbitrations.  The claimant has fewer

---

[7]  Based on public information, Mr. Fitzpatrick has determined that 6 of 8 panel members and 8 of 20 board members are Kingpins.  Discovery will show that all or almost all of the rest are Kingpins as well.

[8]  Under RoC 11.5.56(A)&(B), there is a $6000 daily fee cap for the services of trained arbitrators, but no fee cap for untrained arbitrators.

B O I E S ,   S C H I L L E R   &   F L E X N E R   L L P
O A K L A N D ,   C A L I F O R N I A

B O I E S ,   S C H I L L E R   &   F L E X N E R   L L P

O A K L A N D ,   C A L I F O R N I A

1    than 14 days to exercise this right,[9] and before he chooses whether to opt-out, he receives from

2    the JAMS case administrator a Quixtar explanation "encouraging the use" of an arbitrator trained

3    by Quixtar, RoC 11.5.17(A), with no notice that the arbitrator-training program has been held

4    unlawful by a federal court.  (*See* Hayford Decl. ¶¶ 22-28.)

5         Despite the opt-out, the arbitration clause was recently held to be both substantively and

6    procedurally unconscionable in *Stewart*.  The court severed the unconscionable provisions and

7    ordered that any arbitration would have to be administered and heard by true neutrals.

8

9         Mr. Pokorny admits that he signed the Quixtar agreement three times (not ten times, the

10   remaining seven times claimed by Quixtar were "auto-renewals").  Mr. Blenn denies that he ever

11   signed the agreement.  Rather, on May 4, 2005, Mr. Blenn signed Quixtar's "Business Name

12   Change" form which does not contain any reference to the arbitration agreement or the RoC.

13   And even Quixtar admits that Mr. Blenn never agreed, by "auto-renewal" or otherwise, to the

14   amended, post-*Nitro* version of the ADR rules.  (Quixtar Mot., VanderVen Decl. ¶ 16.)[10]

15

16                                       **ARGUMENT**

17   **I.    CALIFORNIA LAW GOVERNS THE ENFORCEABILITY ISSUE**

18        In determining the enforceability of an arbitration agreement, federal courts apply

19   "ordinary state-law principles that govern the formation of contracts," including generally

20   applicable state-law defenses to enforcement, such as unconscionability.  *Ferguson v.*

21   *Countrywide Credit Indus.*, 298 F.3d 778, 782 (9th Cir. 2002), (quoting *First Options of*

22

23

24   ───────────────
     [9]  Under RoC 11.5.17(B), the plaintiff must opt-out 14 days from the date the opt-out notice is <u>sent</u>, regardless of
25   when the letter is <u>received</u>. (*See* Hayford Decl. ¶ 14.)
     [10]  Mr. VanderVen declares that Mr. Blenn and his wife "auto-renewed" for 2006 on Dec. 18, 2005 but cancelled
26   that auto-renewal on Jan. 7, 2006.  Additionally, although Mr. VanderVen claims Mr. Blenn auto-renewed his
     business agreement on Dec. 18, 2005, the "true and correct copy of Blenn's history," which Quixtar attaches as Ex.
27   15, does not indicate any auto renewal date.  In fact, next to the words "Auto Renewal" is the letter "N."
     Furthermore, there is no indication of a "Y" or "N" next to the words "Arbitration Agreement."  Quixtar claims,
28   without any evidentiary support, that the rules were amended to add the opt-out in October 2005.  (Quixtar Mem.
     18.)  The version attached as Exhibit 2 to the VanderVen declaration is dated June 2006.  There is thus no basis for
     Quixtar's assertion that Mr. Blenn agreed to these rules. (Quixtar Mem. 17 n.13.)

*Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)); *Nagrampa v. MailCoups, Inc.*, 469 F.3d at 1271.

A federal court applies the substantive state law of the forum state in which it sits, including the forum state's choice of law provisions. *Klaxon v. Stentor Elect. Mfg.*, 313 U.S. 487, 496 (1941); *Paracor Fin., Inc. v. Gen. Elec. Capital Corp.*, 96 F.3d 1151, 1164 (9th Cir.1996). Courts sitting in California apply a presumption that California law, the law of the forum, is the same as that other forums. *See United States v. Westinghouse Elec. Corp.*, 648 F.2d 642, 647, n.1 (9th Cir. 1981); *Pabst v. Shearer*, 156 P. 466, 467 (Cal. 1916); Restatement of Conflict of Laws § 622. Thus, unless a party pleads and proves that another state's law is applicable and materially different, California law applies. *Id.*

Here, Quixtar contends that Michigan law should be applied instead of California law. However, Quixtar has done nothing to rebut the presumption that Michigan law differs from forum law, and thus California law applies. Moreover, the sole basis for the contention that Michigan law applies is an "incorporated by reference" provision from the 42-page-long RoC (a provision that is not in the signed contract itself) stating that "Michigan law shall apply in all arbitrations under these rules." RoC 11.5.21. Obviously, this is a federal court proceeding, not "an arbitration under these rules," so this provision is inapplicable on its face.

Even if the Michigan choice of law provision is deemed to have relevance to the present motion, under California choice of law rules, the choice of Michigan law must be ignored to the extent, if any, that Michigan unconscionability law is less favorable to Plaintiffs. This was made clear in *Klussman v. Cross Country Bank*, 36 Cal. Rptr. 3d 728 (Cal. Ct. App. 2005), which considered a conflict between forum law, California, which deems class action waivers unconscionable, and the contractually selected law, Delaware, which allowed such waivers. There, as here, California law governed despite the choice of law clause, because the Delaware

rule was contrary to California's public policy and California had a "materially greater interest"

in the matter.  *Id.*[11]

## II.     THE UNCONSCIONABILITY STANDARD

The unconscionability test under California law includes two prongs: procedural and

substantive unconscionability:

> The procedural component is satisfied by the existence of unequal bargaining
> positions and hidden terms common in the context of adhesion contracts.  The
> substantive component is satisfied by overly harsh or one-sided results that
> "shock the conscience."  The two elements operate on a sliding scale such that the
> more significant one is, the less significant the other need be.  A claim of
> unconscionability cannot be determined merely by examining the face of the
> contract; there must be an inquiry into the circumstances under which the contract
> was executed, its purpose, and effect.

*Comb v. Paypal, Inc.*, 218 F. Supp. 2d 1165, 1172 (N.D. Cal. 2002).[12]  "[T]he more substantively

oppressive the contract term, the less evidence of procedural unconscionability is required to

come to the conclusion that the term is unenforceable and vice versa."  *Nagrampa*, 469 F.3d at

1280 (quoting *Armendariz v. Found. Health Psychcare Servs., Inc.*, 6 P.3d 669, 690 (Cal. 2000)).

## III.    THE QUIXTAR AGREEMENT IS PROCEDURALLY UNCONSCIONABLE

California law provides that an agreement is procedurally unconscionable if it is

presented on a "take it or leave it" basis with no meaningful opportunity to negotiate.  *See Comb*,

218 F. Supp. 2d at 1172-73*; Szetela v. Discovery Bank,* 118 Cal. Rptr. 2d 862, 867 (Cal. Ct. App.

2002) ("When the weaker party is presented the clause and told to 'take it or leave it' without the

opportunity for meaningful negotiation, oppression and therefore procedural unconscionability

---

[11]  In rejecting the Delaware choice of law provision, the *Klussman* court held that "California's fundamental public policy interest in protecting its residents is materially greater than Delaware's interest in uniformity among its corporate citizens."  *Id.* at 741.  The pertinent factors there, just as here, were that the named plaintiffs were California citizens (Mr. Pokorny lives in Alameda Country, California, Mr. Blenn in San Joaquin County, California), they signed the Quixtar documents in California (Mr. Pokorny signed in Alameda Country, California, Mr. Blenn in Stanislaus County, California), they invoked California law (Plaintiffs here have claims under California and federal law), and they sought to represent a class of California citizens (Plaintiffs here sue on behalf of both a nationwide class and a California sub-class).  *Id.*

[12]  Michigan law is the same. *See Stewart*, at 7 (applying Michigan law); *Nitro*, at 20 (same).

B O I E S ,   S C H I L L E R   &   F L E X N E R   L L P

O A K L A N D ,   C A L I F O R N I A

are present.")[13]  (*See* Hayford Decl. ¶ 11.)

The very Quixtar agreement at issue here twice recently has been found to be procedurally unconscionable.  *Stewart*, at 7 n.4; *Nitro*, at 20-22.  Quixtar is therefore bound by these rulings and should be estopped from now arguing otherwise.  *See Appling v. State Farm Mut. Auto. Ins. Co.*, 340 F.3d 769, 775 (9th Cir. 2003) ("Offensive non-mutual collateral estoppel . . . estop[s] a defendant from relitigating an issue which the defendant previously litigated and lost against another plaintiff"); *San Remo Hotel, L.P. v. City & County of San Francisco, Cal.*, 545 U.S. 323, 336 n. 16 (2005).

In any event, if for any reason the Court now allows Quixtar to relitigate the issue of procedural unconscionability, the result should be the same.  Mr. Pokorny was given the arbitration agreement on a "take it or leave it basis" with no meaningful opportunity to negotiate. (Pokorny Decl. ¶ 2.)  Mr. Blenn never even saw or signed the arbitration provision to which Quixtar is attempting to bind him and he certainly was never given an opportunity to negotiate the agreement.  (Declaration of Larry Blenn ("Blenn Decl.") ¶ 2.)  The ADR clause is in small type, and incorporates by reference a difficult-to-understand 42-page document.  (Hayford Decl. ¶¶ 10, 12.)  It is unquestionable that Quixtar is an enormous company with superior bargaining power.  If the Court at this point has any doubt that Quixtar's arbitration agreement is procedurally unconscionable, then Plaintiffs should be entitled to an opportunity for discovery on the issue of unconscionability, which will establish that Quixtar has never negotiated the terms of the arbitration provision with any entry level IBO.[14]

---

[13]  Michigan law is similar.  *See Nitro*, at 20-22 (applying Michigan law); *Stewart* at 7 n.4 (same).

[14]  Discovery will further establish that, contrary to Quixtar's unsupported assertion, Plaintiffs and the vast majority of IBOs are not the "sophisticated businessmen" that Quixtar portrays them to be.  Rather, the evidence will show that the IBOs themselves are the consumers of the vast majority of Quixtar's entire product line.  (*See* Fitzpatrick Decl. ¶ 7)

B O I E S ,   S C H I L L E R   &   F L E X N E R   L L P
O A K L A N D ,   C A L I F O R N I A

**IV.    THE QUIXTAR "CONCILIATION" REQUIREMENTS ARE NOT ENFORCEABLE BECAUSE THEY ARE BIASED, SUBSTANTIVELY UNCONSCIONABLE, AND FUTILE**

Quixtar fails to cite any case in which any portion of its so-called "conciliation procedure," or any similar unconscionable or futile procedure, was deemed to be an enforceable condition precedent that required dismissal or stay of a pending lawsuit.[15]  In fact, the cases are uniform in holding that a plaintiff is not obliged to exhaust futile, biased procedures controlled by the adverse party.  The defects in the Quixtar conciliation procedure include:

- The process is expressly limited to recommendations and decisions that promote the plan and rules of conduct that are being alleged as unlawful in this case.

- The provision is not mutual, i.e., plaintiffs must submit to conciliation and arbitration if they wish to pursue a claim against Quixtar, but Quixtar need not do so if it wishes to sue plaintiffs.  RoC 11.5.  In fact, Quixtar does not even sign the Registration Agreement and it is not subject to the RoC at all.

- Any conciliation would not be before a neutral; it would be before a panel of the Kingpin-dominated IBOAI board, which is allied with Quixtar and adverse to Plaintiffs.

- Quixtar itself makes the "final decision" on plaintiffs' claim, RoC 11.3.3, so in the unlikely event that the biased board ruled in favor of plaintiffs, Quixtar could and surely would unilaterally change the recommendation.

- All of the rules of conciliation are subject to unilateral change at any time at Quixtar's whim.  RoC 1.

- The procedure is burdensome and open-ended as to time, with plaintiffs required to jump through numerous procedural hoops to see it to conclusion.  Defendant has strong motivation to delay and prolong the process, as plaintiffs are prohibited from seeking binding relief until the conciliation procedure concludes, regardless of how long it lasts. The entire Quixtar conciliation process is designed to encourage "voluntary compliance with the Rules of Conduct by every IBO," RoC 11.3, and here Plaintiffs are challenging these very rules as an unlawful pyramid scheme.

- All applicable statutes of limitations are reduced to two years.  RoC 11.5.

As will be discussed below, in a number of recent cases, conciliation obligations far less

---

[15] In *Stewart* and *Nitro*, the courts ruled that the Quixtar agreement was procedurally unconscionable and that the arbitration portion was substantively unconscionable.  In both cases, Quixtar did not even argue for enforcement of the conciliation portion of the agreement.

B O I E S ,   S C H I L L E R   &   F L E X N E R   L L P
O A K L A N D ,   C A L I F O R N I A

onerous have been held unenforceable on grounds of bias, unconscionability and/or futility.

Courts do not force a plaintiff to give the adverse party a "free peek" at his case or submit to

futile, unfair, and one-sided procedures. *See*, *e.g.*, *Glover v. St. Louis-San Francisco Ry. Co.*,

393 U.S. 324, 331 (1969); *Dunham v. Envtl Chem. Corp.,* No. 06-03389, 2006 WL 2374703, slip

op. at *8 (N.D. Cal. Aug. 16, 2006).

### A.    <u>The Quixtar Conciliation Procedure is Substantively Unconscionable.</u>

The entire conciliation process is expressly designed to encourage "voluntary compliance

with the Rules," RoC 11.3, and not to hear claims such as Plaintiffs', which challenge the

legality of those very rules. *See also* RoC 11.1 (compliance with the rules is "essential"); 11.1.5

(hearing panel was created to help resolve "disputes and concerns arising under the Rules").  It is

expressly required that "any resolutions, remedies and sanctions recommended by the Hearing

Panel or the IBOA International board should promote and further the goal of compliance and

must be consistent with the IBO Plan and the Rules of Conduct."  RoC 11.4.  Here, Plaintiffs do

not seek compliance with or interpretation of the rules, and there is no valid basis for forcing

Plaintiffs into the futile rules-driven conciliation process.

Furthermore, bias renders a conciliation requirement unconscionable and unenforceable.

A contractual provision requiring submission of disputes to neutrals for non-binding

recommendations is unconscionable and invalid if the neutrals are selected by adverse parties:

"An ADR clause in a contract that excludes one of the parties to a dispute from any voice in the

selection of the 'neutrals' cannot be enforced; that provision conflicts with our fundamental

notions of fairness and tends to defeat ADR's ostensible goals of expeditious and equitable

dispute resolution." *Sehulster Tunnels/Pre-Con v. Traylor Brothers, Inc.*, 4 Cal. Rptr. 3d 655,

667 (Cal. Ct. App. 2003).  (*See also* Hayford Decl. ¶¶ 14-18.)

The court in *Nyulassy v. Lockheed Martin Corp.*, 16 Cal. Rptr. 3d 296 (Cal. Ct. App.

B O I E S ,   S C H I L L E R   &   F L E X N E R   L L P

O A K L A N D ,   C A L I F O R N I A

2004) explained that even though a requirement of pre-arbitration discussions with plaintiff's supervisors may appear to "present a laudable mechanism for resolving employment disputes informally," it was unenforceable because the reality was that "requiring plaintiff to submit to an employer-controlled dispute resolution mechanism (i.e., one without a neutral mediator) suggests that defendant would receive a 'free peek' at plaintiff's case, thereby obtaining an advantage if and when plaintiff were to later demand arbitration."[16]  *Id.* at 307-08.

Citing *Nyulassy*, Judge White of this Court recently struck another one-sided conciliation obligation as unconscionable:  "in conjunction with the agreement's one-sided obligation to arbitrate imposed on [plaintiff], the provision to exhaust the grievance procedures adds to the contract's substantive unconscionability by permitting [defendant] to preview [plaintiff]'s claims against her employer."  *Dunham,* 2006 WL 2374703, slip op. at * 8.

### B.    The Quixtar Conciliation Procedure is Futile.

Furthermore, and regardless of whether the conciliation obligation is unconscionable, a plaintiff need not participate in a futile effort at conciliation.  (*See* Hayford Decl. ¶ 38.)  Where, as here, the conciliation process would be conducted before persons affiliated with the same defendants "charged with neglecting and betraying" the plaintiff's rights, the courts will not require plaintiffs to "exhaust the remedies administered by the [defendants]," because this "would only serve to prolong the deprivation of rights to which these petitioners according to their allegations are justly and legally entitled."  *Glover*, 393 U.S. at 331[17]

The Quixtar conciliation procedure at issue here is even more patently futile than the process at issue in *Glover*.  Even after a dispute is heard by a non-neutral, Kingpin-dominated

---

[16]  The *Nyulassy* court refused to enforce a conciliation provision where, as here, the procedure would be controlled by the biased defendant, the provision was non-mutual, and the contract shortened the pertinent statutes of limitation.  *Id.*

[17]  The *Glover* Court thus refused to enforce a "wholly futile" collective bargaining agreement provision obliging the plaintiff to make a pre-suit presentation of his grievance to his employer and union, who were alleged to have discriminated against him.  *Id.*; *accord*, *Williams v. Pacific Maritime Ass'n,* 617 F.2d 1321, 1331 n.13 (9th Cir. 1980), *cert. denied,* 449 U.S. 1101 (1981).

B O I E S ,   S C H I L L E R   &   F L E X N E R   L L P
O A K L A N D ,   C A L I F O R N I A

B O I E S ,   S C H I L L E R   &   F L E X N E R   L L P

O A K L A N D ,   C A L I F O R N I A

panel and board, the final decision is made *by Quixtar itself*.  The futility of this process is exacerbated by the nature of this lawsuit; obviously, there is zero chance that Quixtar itself or the Kingpin-dominated IBOA would ever accept Plaintiffs' claims and agree that it has operated an illegal pyramid scheme and violated RICO and the California Business and Professions Code.  It would serve no purpose to delay this case with a futile procedure.

The cases cited by Quixtar have no relevance at all to the present matter.  In *Wolsey, Ltd. v. Foodmaker, Inc*.,144 F.3d 1205 (9th Cir. 1998), the sole issue was whether the contractually-provided non-binding arbitration before the American Arbitration Association was an "arbitration" within the meaning of the Federal Arbitration Act.  There were no issues even remotely similar to those here, such as whether the arbitration panel was biased or the procedure unfair, futile, or unconscionable.  Indeed, *Wolsey* actually supports Mr. Pokorny and Mr. Blenn, because the court emphasized that the essence of arbitration is an agreement to have disputes decided "*by a third-party arbitrator*."  *Id*. at 1208 (emphasis added).  Here, as noted above, the final decision is made by Quixtar itself, so the process is clearly pointless.  *See Glover*, 393 U.S. at 331.[18]

The Quixtar conciliation process includes all of the same one-sided, defendant-controlled provisions that alone were enough to invalidate the conciliation programs at issue in *Glover*, *Dunham*, *Nyulassy*, and *Sehulster*.  In addition, the Quixtar contract, as discussed below, contains many additional unfair requirements that were not present in the above cases.  When viewed in the entirety, this Court should invalidate these provisions and allow Mr. Pokorny and

---

[18]  Quixtar also relies on *DeValk Lincoln Mercury, Inc. v. Ford Motor Co.*, 811 F.2d 326 (7th Cir. 1987), but in that case there again were no issues as to whether the mediation board was biased or the procedure unfair, futile, or unconscionable.   The issue was whether plaintiff had "substantially complied" with an undisputedly valid mediation requirement.  *Id*. at 336-37.  *HIM Portland, LLC v. DeVito Builders*, 317 F.3d 41 (1st Cir. 2003), *Kemiron v. Aguakem Int'l*, 290 F.3d 1287 (11th Cir. 2002), and other cases cited by Quixtar also did not involve any unconscionability/futility issues.  *HIM Portland* and *Kemiron* both actually rejected efforts by the defendants to compel conciliation/arbitration and allowed the plaintiffs to litigate in court.

13

Mr. Blenn to proceed with this suit without participating in Quixtar's sham process, which would only delay resolution of this matter.  (*See* Hayford Decl. ¶¶ 51-52.)

## V.   THE QUIXTAR ARBITRATION PROVISIONS ARE UNENFORCEABLE BECAUSE THEY ARE BIASED AND SUBSTANTIVELY UNCONSCIONABLE

Ignoring that its arbitration clause has been deemed substantively unconscionable in *Nitro* and *Stewart*, and the fact that it is now collaterally estopped from relitigating this issue, Quixtar makes an alternative argument, that even if its conciliation procedure is unenforceable, its arbitration requirements should be upheld.  However, Plaintiffs cannot be forced to give up their right to petition the courts in favor of an expensive, biased arbitration that deprives them of important rights granted by law.

### A.     Biased Arbitrators and Biased Selection Procedure.

Quixtar's arbitration agreement is unconscionable because it allows Quixtar to train the arbitrators.  (*See* Hayford Decl. ¶¶ 19-21.)  The *Nitro* court has already held that arbitrators who are trained by Quixtar can be presumed to be inherently biased thereby rendering Quixtar's arbitration agreement unconscionable:

> It is this court's opinion that the procedure utilized by Defendants to screen, train and ultimately hand-pick their panel of arbitrators does not come close to passing any reasonable test of fairness and neutrality required for a legitimate arbitration proceeding.  Amway's "training" covered a two day period and then a third day of "interviews."  The training covered subjects including profiles of people who started and now run Amway, the benevolent and independent culture of Amway, procedures utilized in arbitration, and a summary of various complaints the arbitrators could anticipate.  The arbitrator candidates even participated in some "role playing" as successful Amway distributors.  Also included throughout the two days were assurances that Amway was not a pyramid scheme and that the business was legitimate. . . The videos run almost ten (10) hours, but suffice it to say that it appears clear to this court that the training atmosphere and content of discussion was decide to produce a very favorable view of defendants.

*Nitro*, at *23 (emphasis added).  Other courts have similarly noted that a biased arbitrator renders an arbitration agreement unconscionable.  In *Mercuro v. Superior Court*, the court explained:

> [T]he size of Countrywide, its parent corporation and all its affiliates compared to the relatively few available NAF arbitrators means employees will be victims of

14

B O I E S ,   S C H I L L E R   &   F L E X N E R   L L P

O A K L A N D ,   C A L I F O R N I A

the "repeat player effect."  The fact an employer repeatedly appears before the same group of arbitrators conveys distinct advantages over the individual employee.  These advantages include knowledge of the arbitrators' temperaments, procedural preferences, styles and the like and the arbitrators' cultivation of further business by taking a 'split the difference' approach to damages.'

116 Cal. Rptr. 2d 671, 678-79 (Cal. Ct. App. 2002).

After the September 16, 2005 decision in *Nitro*, Quixtar apparently (with no notice to Plaintiffs) modified its arbitration provision in an effort to skirt the effects of the *Nitro* decision.  However, instead of abandoning its dubious arbitrator "training program," Quixtar kept it intact and simply provided a highly limited opt-out.  Under the current rules (to which at least Mr. Blenn did not consent), an IBO who files a demand in arbitration will first receive a letter with a list of five Quixtar-trained arbitrators for selection from a cleverly (but deceptively) named "Roster of Neutrals."  Included in the letter, which is sent by the JAMS Case Administrator, is a Quixtar explanation of why it is allegedly better for the IBO to select a Quixtar-trained arbitrator. RoC 11.5.17.  Of course there is no mention in the letter of the fact that a federal court has held this training program to be inherently biased toward Quixtar.

If the IBO carefully sifts through the numerous rules relating to the arbitration process, the IBO will find that he must serve an objection to the use of a Quixtar-trained arbitrator within "14 calendar days from the date of the Arbitrator Selection Letter."  RoC 11.5.17(b).  (*See* Hayford Decl. ¶¶ 22-26.)  If the IBO is unaware of his right to object or does not respond quickly enough within the short window, then he waives his right to an arbitrator who has not participated in the Quixtar training program.  Finally, if the IBO does opt-out, he must choose (subject to Quixtar's veto) from five individuals on an "Alternative Roster" selected by the case administrator, *id.*,[19] and he is subject to potentially higher fees.  RoC 11.5.56(A)&(B) ($6000

---

[19] Quixtar falsely asserts that an IBO who opts out may "*select any neutral from the JAMS panel*."  (Quixtar Mem. 18, (emphasis in original).)  He must choose from the five individuals selected and listed by the Case Administrator, and even then Quixtar may veto the IBO's selection by striking the name.  Rules 11.5.17(B)&(C).

15

daily fee cap for trained arbitrators, but no fee cap for untrained arbitrators).

The *Stewart* court held that, even with this change to the arbitrator selection process, the Quixtar agreement is still substantively and procedurally unconscionable. *Stewart*, at *8. The court reasoned that, even under the new rules, the JAMS arbitrators have a financial interest that renders them presumptively biased. *Id.*; *see also Toppings v. Meritech Mortgage Servs. Inc.*, 569 S.E. 2d 149 (W. Va. 2002) (declaring arbitration clause unconscionable that permitted lender to designate the decision maker, when the arbitration provider was compensated on a case-volume fee system, because "the decision maker's income as an arbitrator is dependent on continued referrals from the creditor"); *Mercuro,* 116 Cal. Rptr. 2d at 678-79.  (*See also* Hayford Decl. ¶¶ 25-28.)

As discussed above, Quixtar should be bound by collateral estoppel from relitigating the arbitrator-selection-methods issues that it lost in *Nitro* and *Stewart*.  *See Appling*, 340 F.3d 769; *San Remo*, 545 U.S. 323.  Even if the Court allows Quixtar to relitigate, the result should be the same – a strong condemnation of Quixtar's arbitrator selection and training processes, and a finding that they are unconscionable and unenforceable.

**B.      Biased and Non-Mutual Confidentiality Provision.**

Rule 11 of Quixtar's ADR agreement includes a one-sided confidentiality provision which gags IBOs (but not Quixtar) from <u>ever</u> discussing even potential claims with anyone "not directly involved in the dispute resolution process."  (*See* Hayford Decl. ¶¶ 47-48 ("The 'gag rule' imposed by Quixtar here can only serve to deter the advancement of legitimate claims to arbitration and therefore in my view is unreasonable and unfair.")).  The gag requirement arises from the very moment that the claimant "becomes aware of a potential Rule violation or of a claim against another IBO or the Corporation."  RoC 11.  Although provisions for maintaining the confidentiality of arbitral hearings are common, the Quixtar "becomes aware" requirement

B O I E S ,   S C H I L L E R   &   F L E X N E R   L L P
O A K L A N D ,   C A L I F O R N I A

goes far beyond the norm and should be deemed unconscionable. The provision bars an IBO who discovers a potential claim from <u>ever</u> discussing his situation with similarly situated peers, totally foreclosing the possibility of collective action. And there is <u>no</u> gag at all on Quixtar.

The Ninth Circuit has specifically held that even AT&T's mutual, far-less-restrictive confidentiality provision in an arbitration agreement was substantively unconscionable because it gave the defendant a "far superior legal posture." *Ting v. AT&T*, 319 F.3d 1126, 1151-52 (9th Cir. 2003)*; see also Acorn v. Household Intern*, 211 F.Supp.2d 1160, 1172 (N.D.Cal. 2002). Quixtar's is patently more unconscionable than those at issue in *Ting* and *Acorn*.

## C.      Treatment of Class Actions.

Quixtar does not dispute that an arbitration clause is unconscionable if it prohibits class actions. Instead, Quixtar says only that the agreement it drafted, after obviously being aware of the existence of class actions, is silent on whether class actions are permitted, and that the arbitrator should make this interpretation. However, the law does not permit Quixtar to use its self-created ambiguity to its own advantage. Unless Quixtar unequivocally stipulates that class arbitration is permitted, the arbitration requirement must be stricken on this basis alone.

Class action waivers in arbitration agreements are flatly prohibited. *Discover Bank v. Sup. Court*, 113 P.3d 1100 (Cal. 2005); *Ting*, 319 F.3d at 1150; *Klussman*, 36 Cal. Rptr. 3d 728, 733.[20] Any other result would allow companies to create for themselves "virtual immunity" with respect to small individual claims:

> By imposing this clause on its customers, Discover has essentially granted itself a license to push the boundaries of good business practices to their furthest limits, fully aware that relatively few, if any, customers will seek legal remedies … The potential for millions of customers to be overcharged small amounts without an effective method of redress cannot be ignored…. This is not only substantively unconscionable, it violates public policy by granting Discover a "get out of jail free" card while compromising important consumer rights.

---

[20] The same is so under Michigan law. *See Lozada v. Dale Baker Oldsmobile*, 91 F. Supp. 2d 1087, 1105 (W.D. Mich. 2000); *Wong v. T-Mobile USA, Inc.*, No. 05-73922, 2006 WL 2042512, *5 (E.D. Mich. July 20, 2006).

17

BOIES, SCHILLER & FLEXNER LLP     OAKLAND, CALIFORNIA

1    *Szetela v. Discover Bank*, 118 Cal. Rptr. 2d 862, 868 (Cal. Ct. App. 2002).

2         Although the Quixtar RoC do not state expressly that class actions are prohibited, it

3    appears that Quixtar drafted the ADR provisions to achieve this result *sub silentio*.  According to

4    Quixtar's own brief, any class "would need to be limited to those IBOs who had satisfied the

5    contractual condition precedent and exhausted their conciliation remedy," (Quixtar Mem. 13),

6    which if so (and Plaintiffs disagree that it is so) would effectively prohibit class actions, in view

7    of the fact that there are "hundreds of thousands" of IBOs, (*id*. 2), and the conciliation process is

8    lengthy, burdensome, and futile.  *See* Part IV *supra*.  Moreover, the one-sided confidentiality

9    requirement, RoC 11, in effect prevents class members from discussing potential class claims.

10   Finally, the Quixtar ADR program does not adopt the JAMS arbitration rules, which expressly

11   permit class actions in a rule that is almost identical to Rule 23 of the Federal Rules of Civil

12   Procedure.  (*See* JAMS Class Action Procedures, McCawley Decl. Ex. G.)

13        Under these circumstances, Quixtar is in no position to argue, as it does (Quixtar Mem.

14   21), that this Court should just ignore the class action issue and let an arbitrator decide if the

15   agreement prohibits class actions.  If the agreement prohibits class actions, it is unconscionable

16   and the case does not belong in arbitration at all.  Quixtar, the sole drafter of the agreement, must

17   not be allowed to benefit from its self-created ambiguity.  *See Victoria v. Sup. Court*, 710 P.2d

18   833, 834-35, (Cal.1985); *Waggaman v. Northwest Sec. Ins. Co*., 94 Cal.Rptr. 170, 173 (Cal. Ct.

19   App. 1971) (ambiguity created by drafter's silence is strongly construed against drafter).

20        **D.     Excessive Arbitration Costs: Fee Sharing and Fee Shifting.**

21        Quixtar's arbitration provision is unconscionable because it provides that the plaintiff

22   must pay fees far higher than they would pay if the case remains in court.  *Ting*, 319 F.3d at 1151

23   (plaintiffs cannot be forced to bear arbitration fees "greater than those a complainant would bear

24   if he or she would file the same complaint in court"); *Armendariz*, 6 P.3d at 687 (same). (*See*

B O I E S ,   S C H I L L E R   &   F L E X N E R   L L P

O A K L A N D ,   C A L I F O R N I A

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*also* Hayford Decl. ¶¶ 44-46.)[21]  This applies to both the "fee sharing" (both sides pay a share of

the arbitrator's fees) and "fee shifting" (loser pays attorneys' fees) requirements.  RoC 11.5.55 &

11.5.48.  With respect to fee sharing, Quixtar does not dispute that it is unconscionable for a

plaintiff to have to bear excessive arbitration fees.  Its only argument (again arising from

Quixtar's self-created ambiguity) is that the amount of arbitration fees that Plaintiffs would pay

is "pure speculation."  (Quixtar Mem. 20.)

    Although the exact amount of arbitration fees that Plaintiffs would pay is not specified

(and Plaintiffs are entitled to discovery on this issue before any adverse ruling), it is clear that the

fees will be multiple times higher than Plaintiffs would have to pay in court.  The Quixtar-

drafted agreement says that fees shall be assessed on the basis of an unspecified "fee schedule,"

with "standard track" cases charged at the arbitrator's unspecified "published hourly rate,"

subject to a $6000 per day fee cap if, but only if, a plaintiff selects a biased, Quixtar-trained

arbitrator.  Otherwise, the fee is the full "published hourly rate," whatever that may be.  In

addition to the fees, the plaintiff must pay a $300 initiation fee, RoC 11.5.55, unspecified

"hearing room rental fees," RoC 11.5.57, and a share of both the arbitrator's and the case

manager's accommodation, travel, and other expenses, RoC 11.5.58.

    Quixtar's RoC, no doubt intentionally in view of the case law, does not specify which

party must pay these fees.  Quixtar does not contend that IBOs do not have to pay fees, only that

IBO's might not have to pay *all* the fees because "fees might be shared by the parties in a multi-

party case" such as this.  (Quixtar Mem. 19.)

    Although until discovery we will not know the exact "published hourly rate" of the

---

[21]  Michigan law is similar.  See, e.g., *DeOrnellas v. Aspen Square Mgmt*, 295 F. Supp. 2d 753, 765-66 (E.D. Mich.
2003) (holding unconscionable a provision requiring sharing of arbitration fees that "would act as a deterrent to the
pursuit of [plaintiff's] remedies"); *Lozada*, 91 F. Supp. 2d at 1004 (noting that the Michigan Supreme Court would
not likely allow fee-sharing in a consumer case, "where the size of individual claims is small [and] the failure to
limit costs would prevent the vindication of statutory causes of action").

B O I E S ,   S C H I L L E R   &   F L E X N E R   L L P
O A K L A N D ,   C A L I F O R N I A

1   arbitrators, even ten years ago "JAMS/Endispute arbitrators charge[d] an average of $400 *per*

2   *hour*," and "fees of $500 or $600 per hour [we]re not uncommon." *Cole v. Burns Intern. Sec.*

3   *Servs.*, 105 F.3d 1465, 1481 n.8 (D.C. Cir. 1997); *see also Ting v. AT&T,* 182 F. Supp. 2d 902,

4   934 (N.D. Cal. 2002) *aff'd in part, rev'd in part on other grounds by Ting v. AT&T*, 319 F.3d

5   1126, (9th Cir. 2003) (citing average daily rate of $1899 for arbitrators in California).[22]  A

6   published research study found that the costs of pursuing an arbitral claim with JAMS were from

7   339% to 3,597% higher than a court action, and that costs of American Arbitration Association

8   ("AAA") arbitration were from 154% to 3,009% higher.[23]

9

10          For a case such as this, which involves RICO and California law claims against three

11   groups of defendants, several weeks of trial time likely will be required.  Even if Plaintiffs were

12   assessed only one-half of the total fee, the Plaintiffs' share would still be far more than the $350

13   filing fee of this Court.  28 U.S.C. § 1914.  *See, e.g.*, *Comb v. PayPal*, 218 F. Supp. 2d 1165

14   (N.D. Ca. 2002) (estimated $5000 arbitral fee held excessive); *Ting*, 319 F.3d  at 1151

15   (approving a Tenth Circuit decision "holding unenforceable a fee-splitting provision that would

16   cost an employee between $1875 and $5000 to resolve a particular claim"); *Acorn*, 211

17   F.Supp.2d at 1174 (ten times the cost of court action).[24]  The fees that Plaintiffs would be

18

19

20

21   [22]  Although these authorities establish that arbitration would be substantially more costly to Plaintiffs than litigation
in this Court would cost, Plaintiffs are entitled to discovery if there is any doubt. *Blair v. Scott Specialty Gases*, 283

22   F.3d 595, 609 (3rd Cir. 2002) ("without some discovery . . . it is not clear how a claimant could present information
on the costs of arbitration").

23   [23]  Public Citizen, *The Costs of Arbitration*, at 54 (2002)), *available at*: http://www.citizen.org/documents/
ACF110A.PDF.  *See also* Richard C. Reuben, *The Dark Side of Alternative Dispute Resolution,* Calif. Law., Feb.

24   1994, at 53-56.

       [24]  Quixtar's fee-sharing arrangement is not saved by the possibility of a fee waiver upon a showing of indigency.

25   Contrary to Quixtar's contention, the issue is not whether Plaintiffs are indigent and unable to pay; the test is
whether the fees substantially exceed those that a court would charge and deter the filing of claims.  *See Morrison v.*

26   *Circuit City Stores, Inc.*, 317 F.3d 646, 664 (6th Cir. 2003) (issues are whether the "overall cost of arbitration . . . is
greater than the cost of litigation in court" and whether the "cost-splitting provision would *deter* a substantial

27   number of similarly situated potential litigants"); *Ting*, 319 F.3d at 1151; *Armendariz*, 6 P.3d at 686-87.  The answer
here is clearly yes.  Thus, the provision is unconscionable, and Plaintiffs should not be compelled to bear the burden

28   of additional fees even to the extent they have the resources to do so.

       Moreover, there are no standards set forth for the granting of a Quixtar fee waiver; a claimant who files for
relief is at the mercy of an undefined "Arbitration Indigency Fund," with the only appeal to the arbitrator.  RoC

20

required to pay to participate in Quixtar's arbitration process would prohibit Plaintiffs from bringing their action. (Blenn Decl. ¶ 4; Pokorny Decl. ¶ 4.) Thus, the fee-sharing provisions are unconscionable and unenforceable.

Moreover, the Quixtar rules explicitly provide for "loser pays" fee shifting, which adds to the unconscionability by putting a plaintiff at risk of liability for *all* arbitration-related fees *and even the defendant's* "reasonable attorneys' fees," RoC 11.5.48, which in this complicated RICO and state law class action case could be millions of dollars. In contrast, here in federal court, Plaintiffs will be awarded their attorneys' fees if they prevail, but they would not have to pay Defendant's fees if they lose. *See* 18 U.S.C. § 1964(c).

Judge Armstrong of this Court has squarely held that "[b]ecause the loser-pay provision can be prohibitively expensive," it is unconscionable, as it forces a plaintiff to risk attorneys' fee liability that he would not risk in normal litigation, and would be "manifestly unfair." *Veliz v. Cintas Corp.*, No. C 03-1180, 2004 WL 2452851, *22, *37, *42 (N.D. Cal. April 5, 2004) *Accord*, *e.g.*, *Alexander v. Anthony Int'l*, 341 F.3d 256, 269 (3d Cir. 2003); *Fortune v. Castle Nursing Homes*, 843 N.E.2d 1216, 1220 (Ohio Ct. App. 2005). Thus, both the "fee sharing" and "fee shifting" provisions of the Quixtar RoC are unenforceable.

### E. <u>Non-Mutual Reduction of the Statute of Limitations.</u>

Quixtar's arbitration agreement is also substantively unconscionable because it arbitrarily creates a non-mutual two year statute of limitations period for all claims. *See Stirlen v. Supercuts, Inc.*, 60 Cal. Rptr. 2d 138, 152 (Cal. Ct. App.1997) (holding that one year statute of limitations in arbitration agreement was a factor weighing toward unconscionability); *Nyulassy*,

---

11.5.53. There is no support for Quixtar's assertion that the standard is similar to that "required by courts for litigants to proceed *in forma pauperis*." (Quixtar Mem. 20) The mere theoretical possibility of fee relief – either from a discretionary indigency waiver or from a post-hearing arbitral fee award – does not make the fee-shifting provision conscionable. *See* Public Citizen, at 8 (noting that an unemployed woman whose social security disability benefits had not yet begun was denied an indigency fee deferral by the AAA).

B O I E S ,   S C H I L L E R   &   F L E X N E R   L L P
O A K L A N D ,   C A L I F O R N I A

16 Cal. Rptr. 3d at 296 (same).  (*See* Hayford Decl. ¶ 50.)  The Plaintiffs have brought class

action claims under RICO and California Business and Professions Code, which both provide

four year statues of limitations.  An arbitrary two year statute of limitations on plaintiffs (with no

similar limit on Quixtar's claims against plaintiffs) would prevent thousands of individuals from

vindicating their statutory rights and accordingly is unconscionable.  *See also, e.g., Al-Safin v.

Circuit City Stores, Inc.*, 394 F.3d 1254, 1261 (9th Cir. 2005); *Martinez v. Master Prot. Corp.*,

12 Cal. Rptr. 3d 663, 671-72 (Cal. Ct. App. 2004).

### F.    Quixtar's Unilateral Right to Modify the Agreement.

The arbitration provision incorporates Quixtar's Rules of Conduct, which provide that

the Corporation reserves to itself the sole right to adopt, amend, modify, supplement or rescind

any or all of these Rules . . . ."  RoC 1.  (*See* Hayford Decl. ¶ 13.)  A defendant's unilateral right

to modify renders an arbitration requirement substantively unconscionable.  *See Al-Safin*, 394

F.3d at 1261-62.  Quixtar asserts that the RoC is not modifiable at Quixtar's whim because RoC

11.5.1 states that any changes to the RoC will be by "mutual agreement" between Quixtar and

the IBOA International Board.  In the first place, under RoC 1, Quixtar can simply ignore or

modify RoC 11.5.1.  Moreover, the IBOA board is made up of Kingpins who are involved in the

very tools businesses that are the subject of Plaintiffs' pyramid scheme allegations.  The IBOA

International Board can not reasonably be deemed a "representative" of the Plaintiffs and other

low level IBOs. As the Rules can be changed by Quixtar and the Kingpins (or by Quixtar alone)

on a whim without any negotiation with the affected IBOs, the Rules are unconscionable under

*Al-Safin.*

### G.    Quixtar's Unilateral Right to Litigate in Court.

The Quixtar rules force IBOs to conciliate/arbitrate their claims against Quixtar but leave

Quixtar free to sue IBOs in court.  (*See* Hayford Decl. ¶ 13.)  "IBOs shall give notice in writing

22

CASE NO. C 07-0201 SC    PLAINTIFFS' MEMORANDUM IN OPPOSITION TO QUIXTAR'S MOTION TO DISMISS OR STAY AND COMPEL COMPLIANCE WITH
DISPUTE RESOLUTION AGREEMENT

B O I E S ,   S C H I L L E R   &   F L E X N E R   L L P
O A K L A N D ,   C A L I F O R N I A

1    of any claim or dispute [and] must then try in good faith to resolve the dispute using the Dispute

2    Resolution procedures contained herein." RoC 11.5. No similar obligation is imposed on

3    Quixtar if it has a claim against an IBO. Even if the rules could somehow be interpreted to

4    require Quixtar itself to conciliate/arbitrate, Quixtar could just change the rules unilaterally if it

5    preferred to sue an IBO in court. RoC 1. This is unconscionable.

6

7           An arbitration agreement is substantively unconscionable and unenforceable if it lacks a

8    "modicum of bilaterality," such as where, as here, "the employee's claims against the employer,

9    but not the employer's claims against the employee, are subject to arbitration." *Little v. Auto*

10   *Stiegler*, 63 P.3d 979, 984 (Cal. 2003) (citing *Armendariz*, 6 P.3d at 691).[25] It is "unfairly one-

11   sided" for a defendant with superior bargaining power to impose arbitration on a plaintiff "but

12   not to accept such limitations when it seeks to prosecute a claim against the [plaintiff], without at

13   least some reasonable justification for such one-sidedness." *Armendariz*, 6 P.3d at 692. Here,

14   Quixtar has no valid business justification, so this non-mutual requirement is invalid.

15

16   **VI.    THE SEVERANCE CLAUSE SHOULD NOT BE USED TO SAVE ANY
            PORTION OF QUIXTAR'S UNCONSCIONABILITY-PERMEATED ADR
17          PROGRAM**

18          Quixtar will likely assert that, if any or all of the challenged portions of its ADR rules are

19   held unconscionable, the Court should just re-write the contractual provision and "red-line" or

20   sever the invalid provisions and send the case to arbitration anyway. (*See* Hayford Decl. ¶ 52.)

21   This is what occurred in *Stewart* – the arbitrator selection provision was stricken as

22   unconscionable but, instead of allowing the plaintiffs to remain in court, the court ruled that the

23   parties would have to arbitrate in a different arbitral forum. However, this case differs from

24

25

26

27   _____

     [25]   The Michigan Supreme Court has reserved ruling on whether a non-mutual agreement is unenforceable as a
     matter of public policy, but it has held that there is no binding arbitration agreement where, as here, the defendant

28   has not agreed to be bound. *Heurtebise v. Reliable Business Computers*, 550 N.W. 2d 243, 247 (Mich. 1996). Here,
     only the IBOs sign the Registration Agreement, not Quixtar, and there is no suggestion anywhere that the
     registration agreements themselves, or the incorporated Rules of Conduct, are binding on Quixtar.

B O I E S ,   S C H I L L E R   &   F L E X N E R   L L P
O A K L A N D ,   C A L I F O R N I A

B O I E S ,   S C H I L L E R   &   F L E X N E R   L L P
O A K L A N D ,   C A L I F O R N I A

1    *Stewart* in several material respects, and Mr. Pokorny and Mr. Blenn have the right to remain in

2    court.

3            In some cases, there may be an argument for severance if only one discrete provision is

4    deemed unconscionable, but an ADR clause can and should be held void in its entirety where, as

5    here, there are "multiple defects" indicating a "systematic effort to impose arbitration" on

6    Plaintiffs, "not simply as an alternative to litigation, but as an inferior forum that works to the

7    [defendant's] advantage." *Armendariz,* 6 P.3d at 696-97.  An ADR clause is "wholly

8    unenforceable" if the court detects an "insidious pattern" that "functions as a thumb on

9    [defendant's] side of the scale" if a dispute arises.  *Ingle v. Circuit City Stores*, 328 F.3d 1165,

10   1180 (9th Cir. 2003); *accord*, *Ferguson v. Countrywide Credit Indus.*, 298 F.3d 778, 787 (9th

11   Cir. 2002) (courts look to whether the agreement as a whole is "permeated by

12   unconscionability").[26]

13

14

15           Unlike in *Stewart*, here it is plain that the entire Quixtar ADR process is a "systematic

16   effort" to impose an "inferior forum" on Plaintiffs and other similarly situated IBOs.  The list of

17   "multiple defects" goes on and on:  bias, lack of mutuality, excessive fees, prohibition of

18   discussion of claim with others, *sub silentio* prohibition of class actions, and an unwillingness to

19   make genuine reforms even after the program was held unconscionable in both *Nitro* and

20   *Stewart*.  If the Court is not satisfied that all of this is so, Plaintiffs request an opportunity for

21   limited discovery on the facts relevant to unconscionability before Quixtar's motion is decided.[27]

22

23           In *Stewart*, the plaintiffs argued that the *Quixtar arbitration* process had additional

24

---

[26] Michigan law appears to be in accord.  *Lozada*, 91 F. Supp. 2d at 1105 (denying motion to compel arbitration
25   where contract had two defects, a waiver of class actions and a waiver of declaratory and injunctive relief); *Stewart*,
     at 9 (noting that an ADR program with "many biased rules" may be entirely invalid) (quoting *Hooters of America*,
26   *Inc. v. Phillips*, 173 F.3d 933, 940 (4th Cir. 1999)).

[27] If permitted, Plaintiffs will seek discovery, for example, on the conciliation process, the Quixtar arbitrator
27   training program, the costs associated with arbitration, information about Quixtar arbitrations, whether Quixtar has
     been involved in any class actions in the JAMS forum, changes to the Rules of Conduct, the IBOIA Board and its
28   relationship with Quixtar, the communications sent to Plaintiffs participating in the arbitration process, and the
     statistics regarding Quixtar's success rate in arbitration.  *See Blair*, 283 F.3d at 609.

defects beyond the use of biased JAMS arbitrators, but Quixtar's biased, lengthy, and futile *conciliation* program was not even at issue.  In fact, other than the "loser pays" provision, the *Stewart* plaintiffs apparently did not raise <u>any</u> of the defects that Plaintiffs have detailed here.  Other than the bias of the JAMS arbitrators, the *Stewart* plaintiffs argued only "the lack of guaranteed discovery, the mandatory 'loser pays' provisions, the provision on confidentiality, and the provision allowing Amway to intervene in any proceedings." *Stewart*, at 9.[28]  The court found these provisions to be reasonable and "similar to the rules promulgated by the AAA." *Id.*

The provisions challenged here by Plaintiffs are far from standard and reasonable.  Rather, they are unilaterally imposed by Quixtar to "place its thumb on the scale" and obtain an unfair advantage.  Accordingly, the unconscionable provisions should not just be severed, and the process should be held unenforceable in its entirety.  If there is any doubt on this point, Plaintiffs are entitled to discovery regarding Quixtar's conciliation related counterclaims for specific performance and declaratory judgment.

## CONCLUSION

For the reasons stated above, Quixtar's motion should be denied in its entirety.

Dated: April 6, 2007                          Respectfully submitted,

                                              BOIES, SCHILLER & FLEXNER LLP

                                              By:   /s/ David W. Shapiro
                                              David W. Shapiro
                                              Attorneys for Plaintiffs

---

[28]  The confidentiality provision at issue in *Stewart* is not the one at issue here.  As the conciliation program was not in dispute, it appears the challenge in *Stewart* was to Rule 11.5.31, which requires proceedings in arbitration to be kept confidential.  Although this rule is more drastic than standard in that it gags plaintiffs from discussing with outsiders even the "substance of, or basis for, the claim," the court correctly noted that arbitration confidentiality provisions are common.  Here, in contrast, Plaintiffs are primarily concerned with Rule 11, which perpetually gags claimants (but <u>not</u> Quixtar) from discussing their claims with anyone "not directly involved in the dispute resolution process" <u>from</u> <u>the</u> <u>very</u> <u>instant</u> that the claimant "becomes aware of a potential Rule violation or of a claim against another IBO or the Corporation."  This is highly extraordinary, unreasonable, and unconscionable.  *See* Part V.B *supra*.

B O I E S ,   S C H I L L E R   &   F L E X N E R   L L P
O A K L A N D ,   C A L I F O R N I A