UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| JEFF POKORNY and LARRY BLENN on behalf of themselves and those similarly situated, | No. 07-00201 SC |
| Plaintiffs, | ORDER DENYING DEFENDANTS' MOTIONS TO DISMISS OR STAY AND TO COMPEL COMPLIANCE WITH DISPUTE RESOLUTION AGREEMENT |
| v. | |
| QUIXTAR INC., et al., | |
| Defendants. | |

**I.   INTRODUCTION**

Before the Court are motions brought by three different groups of defendants, each asking that the Court either dismiss this action without prejudice, or stay the action and compel all of the plaintiffs to participate in various forms of alternative dispute resolution, which defendants argue the plaintiffs are contractually obligated to do.  The plaintiffs, for their part, argue that they did not agree to participate in the alternative dispute resolution, that the contractual provisions purportedly requiring them to participate are unconscionable and unenforceable, and that certain of their claims are not viable for alternative dispute resolution and should proceed before the Court regardless.

Having reviewed the voluminous briefs submitted by the

parties,[1] as well as the supporting declarations and documentary evidence, the Court hereby DENIES all of the defendants' motions.

## II.   <u>PROCEDURAL BACKGROUND AND PENDING MOTIONS</u>

Plaintiffs Jeff Pokorny ("Pokorny") and Larry Blenn ("Blenn," collectively with Pokorny, "Plaintiffs") brought this suit against Quixtar, Inc. ("Quixtar") and a number of its affiliates, alleging that Quixtar operates an illegal pyramid scheme in violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C § 1961 <u>et seq.</u> ("RICO"), and the California Business and Professions Code § 17200, <u>et seq.</u>   <u>See</u> Compl., Docket No. 1.

### A.   <u>Original Motions</u>

The Court previously took the following motions under submission:

Quixtar moved the Court to dismiss or stay the litigation and to compel Plaintiffs to comply with a dispute resolution agreement.   <u>See</u> Docket No. 28 ("Quixtar Mot.").   Plaintiffs opposed this motion and Quixtar replied.   <u>See</u> Docket Nos. 59 ("Opp'n to Quixtar Mot."), 71 ("Quixtar Reply").

---

[1]Despite each party having had the opportunity to submit in excess of 40 pages of briefing to support its argument, the parties still found need to violate the Civil Local Rules governing the font size and spacing of text in their briefs, including footnotes. The Court will not endeavor to list each violation here.

For the reasons discussed herein, this litigation will proceed before the Court rather than before an arbitrator or other neutral. Counsel should review the Civil Local Rules before proceeding.  The first noteworthy item counsel will find in reviewing those rules is that they are not, in fact, called the "Civil Local Guidelines." If the parties fail to abide by the Civil Local Rules in future submissions, the Court will strike the non-compliant portion of any brief.

**United States District Court**
For the Northern District of California

**United States District Court**
For the Northern District of California

1    Defendants Britt Worldwide, L.L.C. ("Britt Worldwide"),

2    American Multimedia, Inc., Britt Management Inc. ("Britt

3    Managment"), Bill Britt, and Peggy Britt (collectively the "Britt

4    Defendants"), joined the Quixtar Motion and also moved the Court

5    to dismiss the litigation and compel compliance with the dispute

6    resolution agreement.  See Docket No. 32 ("Britt Mot.").

7    Plaintiffs opposed this motion, and the Britt Defendants replied.

8    See Docket Nos. 60 ("Opp'n to Britt Mot."), 70 ("Britt Reply").

9    Defendants James Ron Puryear, Jr., Georgia Lee Puryear, and

10   World Wide Group L.L.C. ("World Wide", collectively the "Puryear

11   Defendants")[2] joined the Quixtar Motion and the Britt Motion and

12   also moved the Court to dismiss or stay the litigation and compel

13   compliance with the dispute resolution agreement.  See Docket No.

14   36 ("Puryear Mot.").  Plaintiffs opposed this motion and the

15   Puryear Defendants replied.  See Docket Nos. 61 ("Opp'n to Puryear

16   Mot."), 69 ("Puryear Reply").

17   In support of their Opposition briefs, the Plaintiffs

18   submitted declarations from Stephen Hayford and Robert

19   Fitzpatrick, two purported experts.  See Docket Nos. 65, 66.

20   Quixtar objected to and moved to strike these declarations.  After

21   extensive briefing on that question, including Plaintiffs

22   requesting leave to file a sur-reply and Quixtar opposing that

23   request, the Court ultimately granted Quixtar's motion and struck

24   the two declarations.  See Docket No. 90.

25

26   [2]Quixtar, the Britt Defendants, and the Puryear Defendants are
     collectively referred to in this order as "Defendants."  The Britt
27   Defendants and the Puryear Defendants are collectively referred to
     as the "IBO Defendants."

28

**United States District Court**
For the Northern District of California

**B.**   <u>**First Amended Complaint**</u>

While the foregoing motions were pending, Plaintiff Kenneth Busiere ("Busiere," collectively with Pokorny and Blenn, "Plaintiffs") filed suit in the Los Angeles County Superior Court against the same Defendants involved here, seeking injunctive relief under California Business and Professions Code section 17200.  <u>See</u> Docket No. 88.  Defendants removed that suit to the Central District of California and moved to dismiss.  Judge Matz in the Central District concluded that the <u>Busiere</u> action was duplicative of the present matter and dismissed that case without prejudice.  <u>See</u> Docket No. 91 Exs. 1, 2.

After Judge Matz dismissed the <u>Busiere</u> action, Plaintiffs sought leave to amend their Complaint here to add Busiere as a plaintiff and to add claims for injunctive relief.  <u>See</u> Docket No. 94.  Before the Court ruled on the Motion for Leave, the parties stipulated that Plaintiffs could amend the Complaint, that the pending motions to dismiss or stay would be applicable to the First Amended Complaint, and that the parties could submit supplemental briefing solely to address the question of whether the new claims for injunctive relief should be submitted to arbitration.  Docket No. 99.  The Court approved the stipulation. Docket No. 100.  Thus, the operative pleading is now the First Amended Complaint ("FAC").  Docket No 97.

Plaintiffs, Quixtar, and the Puryear Defendants all submitted supplemental briefs.  Docket Nos. 103 ("Pls.' Supp."), 101 ("Quixtar Supp."), 102 ("Puryear Supp.").  Each then submitted a reply to the first round of supplemental briefing.  Docket Nos.

104 ("Pls.' Supp. Reply"), 105 ("Quixtar Supp. Reply"), 107
("Puryear Supp. Reply").

C.   **Changes in Governing Law**

Pursuant to Civil Local Rule 7-3(d), the parties have also
brought to the Court's attention a number of purportedly relevant
judicial decisions issued following the close of briefing on the
pending motions.  See Docket Nos. 86 (Davis v. O'Melveny & Myers,
485 F.3d 1066 (9th Cir. 2007)), 93 (Shroyer v. New Cingular
Wireless Servs., Inc., 498 F.3d 976 (9th cir. 2007)), 113
(Morrison v. Amway Corp., No. 06-20138, 2008 U.S. App. LEXIS 2693,
(5th Cir. Feb. 6, 2008) ("Morrison II")), 111 (McCrone v. Amway
Corp., No. 07-2737 (N.D. Ohio Feb. 21, 2008) (as amended, Mar. 3,
2008)).  The parties dispute whether or not Morrison II is
relevant and whether or not it was appropriate for Plaintiffs to
notify the Court of that decision.  See Docket Nos. 109, 110, 112.
Plaintiffs moved the Court to strike Quixtar's last submission on
this issue, relating to a petition for rehearing of the Fifth
Circuit's decision.  Docket No. 113.  Quixtar then informed the
Court that the petition for rehearing had been denied, apparently
rendering moot the motion to strike.  Docket No. 114.

III.   **FACTUAL BACKGROUND**

A.   **Parties**

Quixtar is a multi-level marketing program that sells a
variety of products and services through a network of individual
distributors known as Independent Business Owners ("IBOs").  See
Quixtar Mot. at 2; VanderVen Decl. Ex. 1.  In addition to selling

5

Quixtar products, IBOs can earn bonuses by recruiting new distributors into their "line of sponsorship." *See* FAC ¶ 2; VanderVen Decl. Ex. 2 at B-2.   In order to help the businesses they sponsor (i.e., the new IBOs they have recruited), IBOs may sell Business Support Materials ("BSMs"), also known as "tools" and "functions".  *See* Quixtar Mot. at 3; VanderVen Decl. Ex 2 at C-4.   These may include motivational books and recordings, as well as conferences and seminars, all intended to help the IBO sell more Quixtar products.  *See* VanderVen Decl. Ex 2 at C-4.

Bill and Peggy Britt are Quixtar IBOs, members of Britt Worldwide, and owners of American Multimedia, Inc., and Britt Management.  *See* Britt Decl. ¶¶ 1-3.

James and Georgia Puryear are Quixtar IBOs and members of World Wide.  Davis Decl. ¶ 3.  World Wide offers convention and event planning, organizational assistance, tax assistance, and other forms of support to IBOs.  *Id.* ¶ 4.  Since January 2005, World Wide has also sold BSMs to certain qualified IBOs.  *Id.* ¶ 5.

Plaintiffs allege that they are IBOs "downline" from the Puryears in the same line of sponsorship, and the Puryears are downline from the Britts.  *See* FAC ¶¶ 4-15.

**B.   Applicable Agreements**

Defendants assert that Plaintiffs entered into numerous agreements incorporating the arbitration provisions at issue here.

Upon joining Quixtar, all IBOs are required to execute the Quixtar-Affiliated IBO Registration ("Registration").  *See* FAC ¶ 20, Ex. 1; VanderVen Decl. ¶ 4.  The Registration includes the "Agreement to Arbitrate" and incorporates the Dispute Resolution

**United States District Court**
For the Northern District of California

Procedures found in the Quixtar Rules of Conduct ("RoC").   See FAC ¶¶ 20, 22, Ex. 1; VanderVen Decl. Ex. 2 at D-39.

In 1997, 1998, and 1999, Pokorny signed forms that included the arbitration provision and incorporated the RoC when he renewed his Registration.   See VanderVen Decl. Exs. 6-8.   Quixtar claims that Pokorny renewed his agreement to these terms when he automatically renewed his Registration in subsequent years. Quixtar Mot. at 4-5.   Pokorny disputes that the auto-renewals amount to his agreement to those terms.   Pls.' Quixtar Opp'n at 6. However, Pokorny does not appear to argue that he did not agree to the arbitration provision, or that, to the extent that provision is enforceable, his relationship with Quixtar is not governed by it.

Unlike Pokorny, Blenn claims he never signed the Registration form, was never made aware of the RoC, and never agreed to arbitrate his claims.   See Blenn Decl. ¶ 2.   Blenn's wife Lorraine completed the Registration in 2004.   VanderVen Decl. Ex. 12. Blenn and his wife subsequently signed a Quixtar Business Name Change Form, which added Blenn to his wife's business and changed the name of the business to Blenn Enterprises.   Id. Ex. 14.   The Business Name Change Form does not reference arbitration or the RoC.   See id.   The Blenns then apparently renewed their IBO Registration.   See Ex. 15.

In addition to the Registration, Quixtar asserts that both Pokorny and Blenn agreed to arbitrate by entering the BSM Arbitration Agreement ("BSMAA").   Quixtar Mot. at 5.   Pokorny signed the BSMAA himself.   VanderVen Decl. Ex. 10.   Blenn's wife

United States District Court
For the Northern District of California

7

**United States District Court**
For the Northern District of California

1   signed it prior to Blenn completing the Business Name Change Form.

2   See id. Ex. 13.

3   Finally, Quixtar asserts that Plaintiffs agreed to arbitrate

4   their disputes when they joined the Dreambuilders Membership

5   ("DM"). Quixtar Mot. at 6. DM sells services and BSMs to IBOs

6   affiliated with World Wide. Davis Decl. ¶¶ 7, 8. To register

7   with DM, an IBO must visit the DM website and agree to the DM

8   Terms and Conditions. Id. ¶ 12(f). Pokorny registered with DM in

9   December 2004 and upgraded his membership in March 2005 and May

10  2006. Id. ¶ 9. Blenn registered with DM in December 2004 and

11  upgraded his membership in March 2005. Id. ¶ 10. The DM Terms

12  and Conditions in effect at the time Pokorny and Blenn joined DM

13  included a "Binding Arbitration" section, which required the

14  registrant to agree to submit to binding arbitration which would

15  be "conducted in accordance with the rules of the then in force

16  Quixtar Arbitration Rules set forth in the IBO Rules Of Conduct."

17  Id. Exs. 1, 2.

18  Other than the general allegations that he is a Quixtar IBO

19  and that all IBOs were required to execute the Registration, the

20  parties do not provide any information about specific agreements

21  applicable to Busiere. Busiere did not join the other Plaintiffs'

22  claims for damages, and asserts that the claims he did join for

23  injunctive relief are not subject to the arbitration provisions

24  regardless of whether those provisions are enforceable.

25  **C.   The Quixtar Dispute Resolution Process**

26  All of the foregoing agreements ultimately incorporate the

27  Quixtar dispute resolution process Plaintiffs challenge here. The

28

multi-stage process is outlined in section 11 of the RoC.  <u>See</u>

VanderVen Decl. Ex. 2 at D-39 to D-53.

The first stage in a dispute between IBOs or between an IBO

and Quixtar is Informal Conciliation:

> In most cases, concerns or disputes about
> apparent or alleged violations of the [RoC]
> will first be handled informally, as described
> above, once questions about the proper
> interpretation of the [RoC] have been
> clarified.  IBOs with serious or persistent
> disputes that have not been previously
> resolved should contact the Business Conduct
> and Rules Department.  That department,
> individually or with the assistance of the
> Hearing Panel Chairperson, will attempt to
> resolve an IBO's concerns in conjunction with
> the affected IBO and the assistance of upline
> leadership.

<u>Id.</u> at D-40.  "Hearing Panel" refers to the Independent Business

Owners' Association International ("IBOAI") Hearing Panel.  <u>Id.</u>

According to Quixtar, the IBOAI is "the voice of the IBO" and

"provides an open channel of communication with [Quixtar] on all

aspects of the business, taking an active role in shaping its

future."  <u>Id.</u> at C-4.  An IBO may join the IBOAI for a small

annual fee, and IBOs that reach the "Platinum" level of business

become voting members of the IBOAI.  <u>Id.</u>  Quixtar equates the

Informal Conciliation to a "standard commercial mediation."

Quixtar Mot. at 4-5.

If Informal Conciliation is not successful, the IBO may

present its claim to the Hearing Panel in Formal Conciliation.

VanderVen Decl. Ex. 2 at D-40 to D-42.  At the Formal Conciliation

hearing, the IBO may argue its case to a three-member panel of

IBOAI board members, using documentary evidence and individual

9

testimony as it sees fit. _Id._ at D-41. The panel's goal is to "mediate or conciliate each dispute by determining the facts and recommending to [Quixtar] any possible resolutions or remedy in accordance with the [RoC]." _Id._ Following the hearing, the panel issues a written recommendation for resolution of the dispute. _See id._ The full board of the IBOAI may, at its discretion, review the panel's recommendation, and may consider additional written argument and evidence from the parties. _Id._ Finally, Quixtar itself will review the recommendation of the panel (or the full board, if applicable) and the complete case file, conduct any additional investigation it deems necessary, and will issue a final decision accepting, reversing, or modifying the panel's recommendation. _Id._

If an IBO fails to resolve its dispute through either of the above procedures, it must submit its claim to binding arbitration as follows:

> In the event that the parties are unable to resolve their disputes within 90 days or after the above outlined Conciliation Process is complete, whichever is later, the parties are required to submit any remaining claim(s) arising out of their IB, the IBO Plan, or the Rules of Conduct (including any claim against another IBO, or any such IBO's officers, directors, agents, or employees or against [Quixtar] or any of its officers, directors, agents, or employees) to binding arbitration in accordance with the Arbitration Rules as stated below. The Arbitration award shall be final and binding and judgment thereon may be entered by any court of competent jurisdiction. Demand for arbitration shall be made within two years after the issue has arisen, but in no event after the date when the initiation of legal proceedings would have been barred by the applicable statute of limitations. IBOs acknowledge that their

**United States District Court**
For the Northern District of California

1
2
3
4

> application or ITC form evidences a
> transaction involving interstate commerce.
> The United Stated Arbitration Act shall govern
> the interpretation, enforcement, and
> proceedings pursuant to the arbitration
> proceedings.

5   Id. at D-42.  This is substantially the same text that appears

6   under the heading "AGREEMENT TO ARBITRATE" on the Registration.

7   See FAC Ex. 1.  Following this provision of the RoC, there are an

8   additional eleven pages of rules governing an arbitration

9   proceeding initiated by an IBO.  See VanderVen Decl. Ex. 2 at D-42

10  to D-53.  The relevant provisions of those rules are discussed

11  below in the context of unconscionability.

12      Defendants, by their various motions, assert that Plaintiffs

13  are bound to follow the procedures described above rather than

14  litigate in this Court.  See Quixtar Mot.; Britt Mot.; Puryear

15  Mot.  Plaintiffs argue that the arbitration agreement is

16  procedurally and substantively unconscionable, and therefore,

17  unenforceable.  See FAC ¶¶ 20-28.

18

19  **IV.   CHOICE OF LAW**

20      Plaintiffs argue that California law governs whether the ADR

21  provisions are unconscionable.  See Opp'n to Quixtar Mot. at 6-7.

22  Quixtar argues that Michigan law governs the question.  See

23  Quixtar Reply at 2-3.  The Court finds that California law governs

24  the question whether the ADR Provisions are unconscionable.

25      Section 2 of the Federal Arbitration Act, 9 U.S.C. § 1 et

26  seq. ("FAA"), provides that arbitration agreements "shall be

27  valid, irrevocable, and enforceable, save upon such grounds that

28

                                    11

exist at law or in equity for the revocation of any contract."  9
U.S.C. § 2.  Thus, "[i]n determining the validity of an agreement
to arbitrate, federal courts 'should apply ordinary state-law
principles that govern the formation of contracts.'"  Ferguson v.
Countrywide Credit Indus., Inc., 298 F.3d 778, 782 (9th Cir. 2002)
(quoting First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938,
944 (1995)).

In determining which state-law principles apply, a district
court applies the choice-of-law rules of its forum state.  See
Paracor Fin., Inc. v. Gen. Elec., 96 F.3d 1151, 1164 (9th Cir.
1996).  Under California law, the choice-of-law analysis depends
on whether the parties have a choice-of-law provision in their
contract.  See ABF Capital Corp. v. Grove Props. Co., 126 Cal.
App. 4th 204, 216 (Ct. App. 2005).

Quixtar rests its claim that Michigan law applies on RoC
11.5.21, which states:

> Unless otherwise specified in the parties'
> contract, the law of Michigan shall apply in
> all arbitrations under these rules.  The
> Arbitrator's decision on applicable law shall
> be final and binding for purposes of the
> arbitration and enforcement of any award.

VanderVen Decl. Ex. 2 at D-47.  California law recognizes, subject
to limitations, contractual choice of law provisions which
designate the law to be applied regarding an agreement's
construction and enforceability.  Nedlloyd Lines B.V. v. Super.
Ct., 3 Cal. 4th 459, 464-65 (1992).  This recognition extends to
arbitration agreements.  See Cronus Invs., Inc. v. Concierge
Servs., 35 Cal. 4th 376, 387 (2005).

12

**United States District Court**

For the Northern District of California

The problem for Quixtar is that RoC 11.5.21 does not designate which law is to be applied regarding the enforceability or construction of the ADR Provisions, but rather mandates which law "shall apply in all <u>arbitrations</u>" once they have been initiated.  VanderVen Decl., Ex. 2 at D-47 (emphasis added).  The courts, rather than arbitrators, "must decide whether the arbitration provision is invalid and unenforceable under 9 U.S.C. § 2 of the FAA."  <u>Nagrampa v. Mailcoups, Inc.</u>, 469 F.3d 1257, 1264 (9th Cir. 2006).  A provision which refers only to the law which an arbitrator must apply when hearing a dispute does not determine which "state-law principles" a court must apply when making the determination whether the agreement giving the arbitrator that power is enforceable.  <u>See Ferguson</u>, 298 F.3d at 782.

Quixtar asserts that this reading of RoC 11.5.21 is too narrow.  The only support Quixtar offers for this position, however, is a rhetorical question in a footnote.  Quixtar Reply at 2 n.3 ("Why would the parties call for Michigan law governing only the arbitration but allow the law of the 50 states to control whether the agreement was in fact formed?").  Quixtar should have considered this when it drafted the agreement, as examples of broadly-drafted and enforceable choice-of-law clauses are readily available.  <u>See</u>, <u>e.g.</u>, <u>Burger King Corp. v. Rudzewicz</u>, 471 U.S. 462, 481 (1985).  The Court will not read "all arbitrations under these Rules" to mean "all disputes under this contract."  The Court's interpretation is supported by the fact that other relevant agreements purporting to incorporate the Quixtar Arbitration Agreement have their own choice-of-law provisions,

suggesting that RoC 11.5.21 is only applicable to arbitration proceedings.  For example, the DM Terms and Conditions, which govern the relation between DM, an IBO, and its downline IBO customers, is purportedly governed by the law of the state of Washington, even though that same agreement requires that arbitration be conducted in accordance with the RoC.  <u>See</u> Davis Decl. Ex. 1.

Because there is no governing choice-of-law provision, the Court follows the "government interest analysis" used by California courts.  <u>See</u> <u>ABF Capital</u>, 126 Cal. app. 4th at 216 (citing <u>Wash. Mut. Bank v. Super. Ct.</u>, 24 Cal. 4th 906, 919-20 (2001)).  Under this test, the party advocating the application of another state's law must demonstrate how application of that law will further that state's interest.  <u>See</u> <u>Wash. Mut. Bank.</u>, 24 Cal. 4th at 920.  For the court to follow another state's law, the party advocating that law has the burden of showing three things: (1) that there is a material difference between California law and the other state's law; (2) if there is a material difference in the law, that the foreign state has an interest in having its own law applied, and that such interest conflicts with California's interest in the application of California law; and (3) that the other state's interests would be more impaired if the court does not apply that state's law.  <u>See</u> <u>id.</u> at 919-20.  If the party fails to show any of these factors (e.g., if the laws do not materially differ, or if the laws differ but the foreign state does not have a strong interest in application of its law in this matter), the court must apply California law.  <u>See</u> <u>id.</u>

14

United States District Court
For the Northern District of California

Quixtar failed to satisfy this burden, or even to address these factors in a meaningful way. Nonetheless, under the test outlined above, it is clear that California law must apply. First, there is a material difference between Michigan and California law regarding unconscionability. While Michigan law recognizes the availability of alternative goods, services, or employment as a defense to procedural unconscionability, California law does not. Compare Clark v. DaimlerChrysler Corp., 706 N.W.2d 471, 475 (Mich. Ct. App. 2005), with Nagrampa, 469 F.3d at 1283 (collecting California authority). Quixtar argues that if Plaintiffs did not want to be bound by the arbitration agreement, they could have signed up with a different company. See Quixtar Reply at 4-5. This defense has been explicitly rejected in California. See Nagrampa, 469 F.3d at 1283.[3]

Second, Quixtar fails to identify what interest Michigan has in application of its law in this matter. Plaintiffs argue that California has a strong interest in protecting its citizens. See Opp'n to Quixtar Mot. at 7-8. Plaintiffs rely on Klussman v. Cross Country Bank, 36 Cal. Rptr. 3d 728 (Ct. App. 2005).

---

[3]Quixtar cites two cases in support of its position that California considers the availability of alternatives. Quixtar Reply at 5. Neither is applicable. In the first, Dean Witter Reynolds, Inc. v. Superior Court, 211 Cal. App. 3d 758 (Ct. App. 1989), the plaintiff was an investor and attorney specializing in class action litigation, which, in combination with the availability of alternatives, the court found to diminish any procedural unconscionability. See id. at 771-72; Nagrampa, 469 F.3d at 1283 (distinguishing Dean Witter Reynolds). Quixtar also relies on this Court's order compelling arbitration in Posern v. Prudential Securities, Inc., No. C-03-0507 SC (N.D. Cal. May 3, 2004). Posern is irrelevant because it was applying New York's law of unconscionability rather than California's. See id. at 17.

United States District Court
For the Northern District of California

1  <u>Klussman</u> dealt with a contractual waiver of the right to bring

2  class action suits.  Like Pokorny, Blenn, and Busiere, the

3  <u>Klussman</u> plaintiffs were California residents who executed the

4  contested contract in California, asserted claims under California

5  law, and sought to represent California citizens in a class.  <u>See</u>

6  <u>id.</u> at 730-31; Compl. ¶¶ 2-4, 69-70.  While the specific

7  unconscionable provision in <u>Klussman</u> was different, the court

8  there recognized California's interest in protecting plaintiffs

9  similar to Pokorny, Blenn, and Busiere.  Given that none of the

10  Defendants asserts Michigan's interest, or describes how that

11  interest conflicts with California's interest in this matter, the

12  Court will apply California law.

13

14  V.   **DISCUSSION**

15       A.   **The Arbitration Agreement Applies to Blenn**

16       Before considering the merits of the unconscionability

17  dispute, the Court must address the threshold question of whether

18  the various arbitration agreements apply to Blenn, or only to

19  Pokorny.[4]  Blenn claims that he never signed any of the agreements

20  at issue here, and is therefore not bound to arbitrate, even if

21  the Court finds the Quixtar dispute resolution process

22  _____

23       [4]Quixtar also suggests that participation in the Informal
    Conciliation process is a condition precedent to initiating
24  arbitration or litigation, and that Plaintiffs' failure to engage
    in that process is sufficient reason to dismiss the case without
25  addressing unconscionability.  This begs the question.  Plaintiffs
    argue that the Informal Conciliation process is itself
26  unconscionable, and that they should not be required to participate
    in it.  As such, the Court considers that issue below, in the
27  context of substantive unconscionability, rather than as a
    dispositive threshold question.

28
                                    16

enforceable.   The Court disagrees.   Blenn claims to be a Quixtar distributor, and as Plaintiffs themselves allege, all Quixtar distributors are required to execute the Registration.   This is part of the basis for Plaintiffs' challenge to the entire Quixtar ADR scheme.   <u>See</u> FAC ¶¶ 78-90.   If Blenn were not a Quixtar distributor, he would not be representative of (or even a member of) the proposed class, and could not have suffered the alleged injuries which give him standing.   More to the point, Blenn's relationship to the Defendants is through his business, Blenn Enterprises.   Blenn Enterprises, through Lorraine Blenn, executed the Registration and the BSMAA.   That it did so prior to Blenn's becoming a part of Blenn Enterprises is immaterial.

### B.   <u>Legal Standard</u>

Under California law, the unconscionability of a contract provision is a question of law to be decided by the Court.   <u>See</u>, <u>e.g.</u>, <u>Am. Software, Inc. v. Ali</u>, 46 Cal. App. 4th 1386, 1391 (Ct. App. 1996).   A party asserting unconscionability must demonstrate both procedural and substantive unconscionability at the time the contract was made.   <u>See</u> <u>id.</u> at 1390.   "Substantive unconscionability focuses on the actual terms of the agreement, while procedural unconscionability focuses on the manner in which the contract was negotiated and the circumstances of the parties."   <u>Id.</u>   Although both procedural and substantive unconscionability must be present, courts apply a sliding scale, such that the greater the evidence of one form of unconscionability, the less evidence of the other is necessary.   <u>See</u> <u>Davis</u>, 485 F.3d at 1072-73 (citing <u>Armendariz v. Found. Health Psychcare Servs., Inc.</u>, 24

17

United States District Court

For the Northern District of California

1    Cal. 4th 83, 114 (2000)).

2        C.   **Procedural Unconscionability**

3        Plaintiffs first argue that the arbitration agreement is

4    procedurally unconscionable because Quixtar presented it to them

5    on a "take it or leave it" basis without meaningful opportunity to

6    negotiate.[5]  Opp'n to Quixtar Mot. at 8-9; Pokorny Decl. ¶ 2.

7    Quixtar does not suggest that Plaintiffs negotiated the terms of

8    the agreement, or even could have done so, but rather that the

9    IBOAI negotiated the terms of the agreement on behalf of all IBOs,

10   including Plaintiffs.  Quixtar Mot. at 16.  Quixtar also argues

11   that there is no procedural unconscionability because Plaintiffs

12   signed the agreements and because Plaintiffs could have worked

13   with a company other than Quixtar.  Quixtar Mot. at 16; Quixtar

14   Reply at 4.

15       As the latter two of Quixtar's arguments are easily disposed

16   of, the Court addresses those before delving into the negotiation

17   issue.  First, the fact that Plaintiffs signed the agreements is

18   immaterial.  Plaintiffs' argument is not that they did not enter

19   the agreements with Defendants, but that the agreements they

20   entered are unconscionable.[6]  That the Plaintiffs entered an

21   _____

22       [5]The parties dispute whether the IBOs are "sophisticated
     business people" or inexperienced and unsophisticated.  Neither has
23   produced evidence on this issue, and the Court finds it unnecessary
     to resolve, given that it is clear Quixtar was in a superior
24   bargaining position to Plaintiffs and does not contest that
     Plaintiffs themselves did not have a meaningful opportunity to
25   negotiate, apart from the IBOAI's participation.

26       [6]The Court has already rejected Blenn's position that he did
     not execute the Registration or other arbitration agreement.  Thus,
27   the purported class of plaintiffs includes those who are Quixtar
     distributors, and all distributors were required to execute the

28                                    18

**United States District Court**
For the Northern District of California

agreement with Quixtar is the starting point of the discussion, not the end of it.  Were it otherwise, no party to a contract would ever be able to argue unconscionabilty.  Second, the Court has already determined that the availability of alternatives does not preclude a finding of procedural unconscionability under California law.  See supra Section IV; Shroyer, 498 F.3d at 985.  The sole remaining issue is the negotiation of the arbitration agreements.

To determine whether a contract provision is procedurally unconscionable, the Court looks for oppression or surprise, where oppression "'arises from an inequality of bargaining power that results in no real negotiation and absence of meaningful choice.'"  Nagrampa, 469 F.3d at 1280 (quoting Flores v. Transamerica HomeFirst, Inc., 93 Cal. App 4th 846, 853 (Ct. App. 2001)).  The focus of the inquiry is on the manner in which the contract was presented and negotiated.  Id. at 1282.  "When the weaker party is presented the clause and told to 'take it or leave it' without the opportunity for meaningful negotiation, oppression, and therefore procedural unconscionability, are present."  Szetela v. Discover Bank, 97 Cal. App. 4th 1094, 1100 (Ct. App. 2004).

Quixtar does not contest the fact that none of the Plaintiffs negotiated the terms of the arbitration agreements.  The determinative question, then, is whether Plaintiffs' interests were sufficiently represented by the IBOAI during those negotiations.  Quixtar's predecessor, Amway, had some form of

Registration.

19

conciliation procedure in its Rules of Conduct as early as 1994, and added binding arbitration provisions in 1998, after negotiation with the Board of the Amway Distributors Association ("ADA"), the IBOAI's predecessor.  <u>See</u> VanderVen Decl. ¶¶ 5-6. The ADA and Amway notified all then-current Amway distributors of the new provisions.  <u>Id.</u> ¶ 7, Exs. 3, 4.

Participation in the IBOAI is open to all IBOs, but not mandatory.  <u>See id.</u> Ex. 2 at C-4.  However, even among the IBOs that join the IBOAI, voting rights are restricted to those who have achieved the "Platinum" level.  <u>Id.</u>  Nothing in the record gives any indication that Plaintiffs were even members of the IBOAI.  However, they never reached the Quixtar Platinum level, so even if they were members of the IBOAI, they had no right to vote for board members.  <u>See</u> Davis Decl. ¶¶ 9-10.  The record is also devoid of any evidence regarding the formal relationship between the IBOAI and its IBO members.  This is particularly significant given that Plaintiffs, as downline, or junior, IBOs, are not only suing Quixtar but are also suing upline, or senior, IBOs. Plaintiffs allege that certain upline IBOs, including the Britt Defendants and the Puryear Defendants, are jointly participating in an unlawful enterprise with Quixtar.  In such a scenario, allowing the most senior IBOs to "negotiate" the rights of all other IBOs would be leaving the proverbial fox in charge of the henhouse.

Without any factual allegations to support Defendants' assertion that the IBOAI acted with Plaintiffs' interests in mind, the record supports a conclusion of at least minimal procedural

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1    unconscionability.   Defendants concede that none of the Plaintiffs

2    had the opportunity to negotiate the terms of the arbitration

3    agreement.   That alone supports a finding of procedural

4    unconscionability.   <u>See</u>, <u>e.g.</u>, <u>Szetela</u>, 97 Cal. App. 4th at 1100.

5    To overcome this conclusion, Quixtar would have had to present

6    evidence or legal authority that the IBOAI adequately represented

7    Plaintiffs' interests.   Quixtar provided neither.

8        D.   **<u>Substantive Unconscionability</u>**

9        Substantive unconscionability examines the fairness of the

10   actual provisions of the contract.

> An arbitration provision is substantively
> unconscionable if it is "'overly harsh'" or
> generates "'one-sided' results." <u>Armendariz</u>,
> 24 Cal. 4th at 114 (quoting <u>A & M Produce Co.</u>
> <u>[v. FMC Corp.]</u>, 135 Cal. App. 3d [473, at]
> 486, 487 [(Ct. App. 1992)]. "[T]he paramount
> consideration in assessing conscionability is
> mutuality." <u>Abramson [v. Juniper Networks,</u>
> <u>Inc.]</u>, 115 Cal. App. 4th [638,] 657 [(Ct. App.
> 2004)]. California law requires an
> arbitration agreement to have a "modicum of
> bilaterality," <u>see</u> <u>Armendariz</u>, 24 Cal. 4th at
> 117, and arbitration provisions that are
> "unfairly one-sided" are substantively
> unconscionable, <u>see</u> <u>Little v. Auto Stiegler,</u>
> <u>Inc.</u>, 29 Cal. 4th 1064, 1071 (2003).

20   <u>Nagrampa</u>, 469 F.3d at 1280-81.   Quixtar asserts that Plaintiffs'

21   case should be dismissed for failure to participate in Informal

22   Conciliation, as required by the RoC.   Plaintiffs argue in

23   response that the entire Quixtar ADR process is substantively

24   unconscionable, and therefore not enforceable.

25        1.   <u>Pre-Arbitration Procedures</u>

26       Quixtar spends a good portion of its Motion and Reply

27   briefing arguing that courts favor non-binding mediation and are

28                              21

United States District Court
For the Northern District of California

willing to enforce agreements requiring non-binding mediation as a condition precedent to arbitration or litigation.  See Mot. at 7-12; Reply at 5-6.  Despite the impressive list of cases Quixtar cites, the effort is not well spent.  Plaintiffs do not challenge the general proposition that, where the parties enter a valid and enforceable agreement to mediate or arbitrate, the Court should require compliance.  Rather, Plaintiffs argue that the Informal and Formal Conciliation procedures set forth in the RoC are substantively unconscionable, and therefore unenforceable.  Opp'n to Quixtar Mot. at 10-13.  Quixtar cites more than a dozen cases in support of its position that Courts are willing to enforce agreements which require non-binding mediation, but none of those cases required the court to rule on unconscionability, and only one — Allen v. Apollo Group, Inc., No. H-04-3041, 2004 U.S. Dist. LEXIS 26750 (S.D. Tex. Nov. 9, 2004) — even involved a challenge to the validity of the agreement.  The remainder of the cases involve ancillary questions of contract interpretation, such as whether the dispute in question fell within the parties' ADR agreement, whether a party had in fact satisfied a condition precedent to arbitration, or whether the FAA governs a particular form of ADR.[7]  None of those questions is relevant here.

_____

[7]See Wolsey, Ltd. v. Foodmaker, Inc., 144 F.3d 1205 (9th Cir. 1998); DeValk Lincoln Mercury, Inc. v. Ford Motor Co., 811 F.2d 326 (7th Cir. 1987); HIM Portland, LLC v. DeVito Builders, Inc., 317 F.3d 41 (1st Cir. 2003); Kemiron Atl., Inc. v. Aquakem Int'l, Inc., 290 F.3d 1287 (11th Cir. 2002); Bill Call Ford, Inc. v. Ford Motor Co., 48 F.3d 201 (6th Cir. 1995); Ziarno v. Gardner Carton & Douglas, LLP, No. 03-3880, 2004 U.S. Dist. LEXIS 7030 (E.D. Pa. Apr. 8, 2004); Mortimer v. First Mt. Vernon Indus. Loan Ass'n, No. AMD 03-1051, 2003 U.S. Dist. LEXIS 24698 (D. Md. May 19, 2003); Fisher v. GE Med. Sys., 276 F. Supp. 2d 891 (M.D. Tenn. 2003);

United States District Court
For the Northern District of California

Moreover, some of Quixtar's authorities are actually unfavorable.  Quixtar's general position is that participation in Informal Conciliation is a condition precedent to arbitration or litigation, and that the Court should therefore order Plaintiffs to Informal Conciliation or to arbitration.  In <u>Kemiron Atlantic</u>, the parties had agreed to a multi-step dispute resolution process that included mediation and arbitration.  290 F.3d at 1289.  The court ruled that despite the general policy favoring arbitration, the FAA only gives the courts authority to order arbitration where the parties have agreed to it.  <u>Id.</u> at 1291.  In that case, because the parties had not mediated their dispute, they had not done all of the necessary pre-arbitration steps, so the court held it did not have the power to compel arbitration, and the case proceeded in litigation.  <u>Id.</u>  In <u>HIM Portland</u>, the court followed <u>Kemiron</u> and reached the same conclusion.  317 F.3d at 44 ("Where contracting parties condition an arbitration agreement upon the satisfaction of some condition precedent, the failure to satisfy the specified condition will preclude the parties from compelling arbitration and staying proceedings under the FAA.").[8]  By that

---

<u>Ponce Roofing, Inc. v. Roumel Corp.</u>, 190 F. Supp. 2d 264 (D.P.R. 2002); <u>Philadelphia Hous. Auth. v. Dore & Assocs. Contracting, Inc.</u>, 111 F. Supp. 2d 633 (E.D. Pa. 2000); <u>Preferred MSO of Am.-Austin LLC v. QuadraMed Corp</u>, 85 F. Supp. 2d 974, 979-80 (C.D. Cal. 1999); <u>AMF Inc. v. Brunswick Corp.</u>, 621 F. Supp. 456 (S.D.N.Y. 1985).

[8]Oddly, Quixtar quotes this exact passage in support of its motion.  However, the court in <u>HIM Portland</u> only held that the condition precedent — mediation — must be satisfied before the court could order arbitration.  The appellate court affirmed the district court's denial of a motion to compel arbitration, but did not compel mediation, which is what Quixtar would have this Court do.

1   reasoning, even if the Court were to find the arbitration

2   agreement here valid and enforceable, it could not grant Quixtar's

3   alternate request and compel arbitration.

4       Plaintiffs, however, advance a number of problems with the

5   Conciliation stages of the Quixtar process, and argue that the

6   agreement is not enforceable.  The specific defects Plaintiffs

7   allege are:

8       1.   The Hearing Panel must make recommendations that promote
             the RoC being challenged here.
9

10      2.   The Conciliation requirement is not mutual.  IBOs must
             bring claims against Quixtar using the Quixtar ADR
             process, but Quixtar is not required to do so.
11

12      3.   The Conciliation process is not neutral because the
             IBOAI board is dominated by the "Kingpin" IBOs that
             Plaintiffs allege are part of the same unlawful
13           enterprise as Quixtar.

14      4.   At most, the Hearing Panel or IBOAI board can make a
             recommendation, which Quixtar may accept, reject, or
15           modify at its discretion.

16      5.   Quixtar may unilaterally modify the RoC.

17      6.   The procedure is burdensome, time-consuming, and
             designed to encourage compliance with the very rules
18           Plaintiffs are challenging here.

19      7.   IBOs must initiate all arbitration proceedings within 2
             years, even if the applicable statute of limitations is
20           longer.

21  Opp'n to Quixtar Mot. at 10.  Based on these provisions,

22  Plaintiffs argue that the Conciliation process is unconscionable

23  and futile.  Id. at 10-14.

24      Quixtar relies heavily on the Ninth Circuit decision in

25  Wolsey because that case required plaintiffs to go through a

26  multi-stage ADR process comparable to Quixtar's.  See Quixtar

27  Reply at 5-6.  The reliance is misplaced.  In that case, the

28
                                   24

parties' agreement had a choice-of-law provision which required application of California law. Wolsey, 144 F.3d at 1209. California's statutes governing arbitration procedure apparently conflicted with the arbitration provisions in the parties' contract. Id. at 1210-11. While Quixtar is correct that the outcome of Wolsey was ordering the parties to submit their disputes to non-binding arbitration, the only legal issue that the court actually decided was whether the choice-of-law provision incorporated California arbitration rules. See id. at 1209-13. That question of contract interpretation has no bearing on the present matter. The parties here do not dispute what rules govern the arbitration; they dispute whether those rules are valid.

In support of their claim of substantive unconscionability, Plaintiffs direct the Court's attention to Nyulassy v. Lockheed Martin Corp., 120 Cal. App. 4th 1267 (Ct. App. 2004). Nyulassy's employment agreement required him to submit his employment claims to arbitration, even though his employer was not required to do so. Id. at 1282. The agreement also required him to submit to discussions with his supervisors to attempt informal resolution before, and as a condition precedent to, arbitration. Id. at 1282-83. And the agreement gave him only 180 days to bring his claims against his employer, even where the governing statutes of limitations were as long as four years. Id. The court held that, taken together, these three factors rendered the arbitration agreement substantively unconscionable. Id. at 1283. The court noted that requiring the employee to submit to employer-controlled, non-binding dispute resolution before arbitration

25

**United States District Court**
For the Northern District of California

1    would give the employer a "free peek" at the employee's case,

2    giving the employer an unfair advantage if the dispute proceeded

3    to arbitration.  Id. at 1282-83.

4        Two district courts have considered the Nyulassy ruling in

5    some depth, and provide meaningful guidance on the issue.  In

6    Dunham v. Environmental Chemical Corp., No. 06-03389, 2006 U.S.

7    Dist. LEXIS 61068, at *16-18 (N.D. Cal. Aug. 16, 2006), Judge

8    White found that an arbitration agreement requiring an employee to

9    submit all her claims against her employer to arbitration, but

10   allowing the employer to pursue any legal remedy available, was

11   unconscionable.  The court then considered a provision requiring

12   the employee to exhaust pre-arbitration remedies in the company's

13   internal grievance procedure.  Id. at *21.  Following Nyulassy,

14   the court found that, in conjunction with the non-mutual

15   arbitration provision, the pre-arbitration requirements were

16   substantively unconscionable.  Id. at *22-23.  Plaintiffs urge the

17   Court to follow Dunham.

18       By contrast, the court in Allen considered Nyulassy but found

19   the arbitration provision at issue to be valid and enforceable.[9]

20   2004 U.S. Dist. LEXIS at *32.  Contrary to Quixtar's reading of

21   that case, the Allen court did not reject Nyulassy's holding

22

23       [9]Quixtar describes the holding in Allen as "rejecting
     unconscionability challenge to mandatory pre-arbitration grievance
     procedures."  Quixtar Mot. at 12.  This is inaccurate.  The claim
24   in Allen was that the arbitration agreement was unenforceable
     because it violated public policy, not because it was
25   unconscionable.  See Allen, 2004 U.S. Dist. LEXIS at *15, 24, 28.
     Despite this, the Court considers Allen here because of its
26   discussion of Nyulassy and because the contract provisions in
     question are similar even though the theory for challenging them is
27   different.

28                                  26

"precisely because the mediation in <u>Allen</u>, as here, was non-binding." Quixtar Reply at 6. Rather, the court found that two of the three conditions supporting a conclusion of unconscionability in <u>Nyulassy</u> — the lack of mutuality and the shortened time limits — were not present. <u>Allen</u>, 2004 U.S. Dist. LEXIS at *31 ("The parties' agreement in the present case does not contain two out of the three characteristics of the agreement in <u>Nyulassy</u> that led the California court to find it 'one-sided.'"). That the pre-arbitration process was non-binding was not, in itself, sufficient to support a finding of unconscionability.

The Informal and Formal Conciliation provisions of the RoC are more like those in <u>Nyulassy</u> and <u>Dunham</u> than those in <u>Allen</u>. First, the RoC imposes no requirement on Quixtar to engage in Informal or Formal Conciliation. Quixtar claims that the obligations are bilateral, citing the portion of RoC 11.5 which says, "In the event the parties are unable to resolve their disputes within 90 days or after the above outlined Conciliation Process is complete, the parties are required to submit any remaining claims . . . to binding arbitration in accordance with the Arbitration Rules as stated below." That "the parties" must continue on to arbitration if conciliation fails does not make the requirement mutual, as there is no provision requiring Quixtar itself to enter either Informal or Formal Conciliation in the first place. In fact, RoC 11.3.4 allows the parties to skip Formal Conciliation and move directly to arbitration if both sides are IBOs and Quixtar is not a party. Thus, if Quixtar initiates the dispute, it is not required to engage in Informal or Formal

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1   Conciliation, and if an IBO initiates a dispute against Quixtar,

2   that party must go through additional steps it would not have to

3   take, under the same rules, if the dispute were with another IBO.

4   The mutuality Quixtar claims is illusory.

5        Second, the RoC shortens the statute of limitations to two

6   years for all claims.  <u>See</u> VanderVen Decl. Ex. 2 at D-42, RoC

7   11.5.  The Court addresses the propriety of a contractually-

8   reduced limitations period for arbitration separately below.

9   However, as in <u>Nyulassy</u>, the shortened limitations period renders

10  the requirement to participate in Informal and Formal Conciliation

11  substantively unconscionable.  The RoC cuts the window for seeking

12  relief at both ends.  At the front end, the IBO cannot initiate an

13  arbitration against Quixtar until at least 90 days after the claim

14  arises, because it must go through Conciliation first.  At the

15  back end, the IBO only has two years to initiate the arbitration

16  (or less if the applicable statute of limitations is shorter).

17       These two factors alone are enough for the Court to

18  distinguish <u>Allen</u> and to follow <u>Nyulassy</u> in finding the pre-

19  arbitration provisions of the Quixtar process unconscionable.

20  However, even if an IBO goes through both stages of Conciliation

21  and prevails, Quixtar has the unilateral right to reverse or

22  modify the Hearing Panel's decision, and there are no standards

23  governing whether Quixtar does so.  Under RoC 11.3.3, "After

24  consideration of the entire file and completion of any independent

25  investigation, the Corporation will issue a final decision and may

26  accept, reverse, or modify either the Hearing Panel's

27  recommendation or the IBOA International Board's recommendation as

28                                    28

appropriate." Id. at D-41, RoC 11.3.3.  Unlike the Hearing Panel itself, Quixtar is not even nominally required to make a decision in line with the RoC.  The parties debate extensively whether the Hearing Panel or the IBOAI Board is a true "neutral" for the purposes of Conciliation.  This debate seems irrelevant, however, given that neither the Hearing Panel nor the IBOAI Board has any actual authority.  Quixtar is ultimately the only one to make a decision in the process.  That Quixtar's final decision on the matter is non-binding does not salvage the rest of the process.

Quixtar makes the incongruous argument that, because it only has the final decision in cases where it is a party, and not in disputes between IBOs, this somehow makes the process better. Quixtar Reply at 9-10 ("The feature calling for Quixtar's 'final decision' applies only to conciliations in which Quixtar is itself a party, not where the conciliation involves a dispute among IBOs").  It does not.  To the contrary, it means that Quixtar has an advantage in the process that no other party has.  If Plaintiffs were on the receiving end of a complaint and were unsuccessful at the Formal Conciliation stage, they would not be able to reverse the Hearing Panel, and they would not be able to appeal to Quixtar.  Only Quixtar has that right.

Finally, the Court agrees with Plaintiffs that because the entire Conciliation process is governed by, and intended to perpetuate, the RoC, it cannot serve as a fair and meaningful system for challenging the RoC.  Quixtar claims that "there is no limitation on disputes that may be taken into conciliation" because the scope of the ADR process is broad.  Quixtar Reply at

United States District Court
For the Northern District of California

8.   That the process may ostensibly be used to address "any issues related to" an IBO's Quixtar business does not make it a useful or fair vehicle for doing so.   The defect is not that the RoC has a limited scope.   Rather, it is that the RoC is self-perpetuating and therefore inherently biased against the IBO challenging it. The only standard guiding the Hearing Panel during Conciliation is compliance with the RoC.   <u>See</u> VanderVen Decl. Ex. 2 at D-40 to D-42, RoC 11.3.1, 11.4.   As the RoC itself cannot be in violation of the RoC, an IBO that wishes to challenge the process has no meaningful chance to succeed.   Quixtar asserts that the "remedies available are broad enough to accommodate rules challenges, and there is nothing in the conciliation process to prevent rules changes."   Quixtar Reply at 8.   This is implausible, as the Hearing Panel is not authorized to fashion remedies which modify the RoC.   <u>See</u> <u>id.</u> at D-42, RoC 11.4 ("Any resolutions, remedies, and sanctions recommended by the Hearing Panel or the IBOA International Board should promote and further the goal of compliance and must be consistent with the IBO Plan and Rules of Conduct.").   At most, the Hearing Panel could recommend a change to the RoC, but as explained above, Quixtar has no obligation to accept that recommendation.

      The Court finds, without reaching every possible defect identified by Plaintiffs, that the RoC requirement that an IBO engage in Informal and Formal Conciliation prior to arbitration is substantively unconscionable, and exceedingly so.   The ADR deck could not possibly be stacked more in Quixtar's favor than it is here.   Having already concluded that the agreement is procedurally

30

unconscionable because the Plaintiffs did not have a chance to
negotiate its terms, the Court holds that the pre-arbitration
provisions of the agreement are unconscionable, and declines to
enforce them.

    2.  <u>Arbitration</u>

    The same standards set forth above determine the substantive
unconscionability of the Quixtar arbitration agreement.[10]  <u>See
supra</u> Section V.D.  The Court has concluded that the non-binding
Conciliation provisions are not enforceable.  Quixtar therefore
moves to stay this action and compel arbitration under the Quixtar
Arbitration Rules.  Quixtar Mot. at 13-22; Quixtar Reply at 11-15.
Plaintiffs contend that the Quixtar Arbitration Rules set forth in
RoC 11 are substantively unconscionable, even independent of the
Conciliation provisions.  The Court agrees with Plaintiffs.

    a)  <u>Non-Mutual Obligation to Arbitrate</u>

    To begin, some of the defects in the Conciliation process are
equally applicable to the arbitration process, and therefore weigh
in Plaintiffs' favor.  As noted above, the arbitration provision
is non-mutual.  Nothing in RoC 11.5 requires Quixtar to enter the
ADR process in the first place:

        IBOs shall give notice in writing of any claim
        or dispute arising out of or relating to their
        IB, or the IBO Plan or Rules of Conduct, to
        the other party or parties, specifying the
        basis for any claim and the amount claimed or
        relief sought.  They must then try in good
        faith to resolve the dispute using the Dispute

---

[10]Because the arbitration procedures are included in the same
agreement as the conciliation procedures, the procedural
unconscionability analysis above is equally applicable here.  <u>See
supra</u> Section V.C.

**United States District Court**
For the Northern District of California

**United States District Court**
For the Northern District of California

1    Resolution procedures contained herein.

2    VanderVen Decl. Ex. 2 at D-42, RoC 11.5.  Quixtar may be forced

3    into ADR if an IBO initiates the dispute, but if Quixtar

4    initiates, it is free to do so in court.  Requiring one party to

5    arbitrate its claims, but not the other, is the paradigm of one-

6    sidedness, and a prime example of substantive unconscionability.

7    See Little, 29 Cal. 4th at 1072 (citing Armendariz, 24 Cal. 4th at

8    119).[11]

9              b)   Reduced Statute of Limitations

10        The lack of mutuality regarding mandatory arbitration carries

11   over into the statute of limitations dispute.  The relevant

12   portion of RoC 11.5 states:  "Demand for arbitration shall be made

13   within two years after the issue has arisen, but in no event after

14   the date when the initiation of legal proceedings would have been

15   barred by the applicable statute of limitations."  VanderVen Decl.

16   Ex. 2 at D-42, RoC 11.5.  If Quixtar has a complaint against an

17   IBO, it may initiate legal proceedings after the two year

18   limitation expires because it is not required to arbitrate.  This

19   imbalance is significant.  In a dispute between Quixtar and an IBO

20   arising out of the same set of facts, where each party alleges the

21   same unlawful conduct — for example, breach of a written contract

22

23        [11]Under California law, the party with superior bargaining
     power may preserve a judicial remedy for itself without
24   automatically rendering an arbitration provision unconscionable, so
     long as the party's legitimate business realities create a need for
25   that remedy, and so long as those business issues are set forth in
     the contract or established on the record before the court.  See,
26   e.g., Davis, 485 F.3d at 1080.  Quixtar has not argued that the
     imbalance discussed here is justified by the realities of its
27   business.

28                                    32

**United States District Court**
For the Northern District of California

1  — Quixtar could initiate litigation after two years, while the

2  IBO's claim would be barred for failure to demand arbitration

3  within the same two year period.  In defense of the shortened

4  statute of limitations, Quixtar cites a parcel of Michigan cases

5  where courts approved a contractually-shortened statute of

6  limitations.  See Quixtar Mot. at 20.  Those cases do not govern.

7  But the proposition is not that parties may never shorten the

8  statute of limitations.  Such an agreement may be enforceable

9  under California law as well, if it applies to both parties and

10 the shortened time is still reasonable.  See, e.g., Soltani v. W.

11 & S. Life Ins. Co., 258 F.3d 1038, 1043-44 (9th Cir. 2001).  Where

12 the reduction is unilateral, as here, it is substantively

13 unconscionable.  See, e.g., Nyulassy, 120 Cal. App. 4th at 1283.

14                    c)    Treatment of Class Actions

15      The next defect Plaintiffs identify in the Quixtar

16 arbitration scheme is a barrier to bringing class action suits.

17 Quixtar Opp'n at 17-18.  There is nothing in the RoC, however,

18 which explicitly precludes a class action.  Plaintiffs acknowledge

19 that the RoC is silent on the issue, but claim that the silence

20 creates an ambiguity, and that such ambiguity must be construed

21 against Quixtar as the drafter of the provision.  The Court

22 disagrees.  While it may be the case that the Court must interpret

23 an ambiguous provision in favor of the non-drafting party, silence

24 does not necessarily create ambiguity, and the authorities

25 Plaintiffs cite do not compel the Court to find an ambiguity where

26 none exists.  See Victoria v. Super. Ct., 40 Cal. 3d 734, 738-39

27 (1985); Waqqaman v. Northwestern Sec. Ins. Co., 16 Cal. App. 3d

28

33

571, 577 (Ct. App. 1971).  Plaintiffs claim that the problems they

identified in the Informal and Formal Conciliation processes are

barriers to class actions, and that without an explicit provision

allowing class action, the arbitration agreement is

unconscionable.  The Court has already determined that the pre-

arbitration provisions are unenforceable, but there is no basis

for carrying that conclusion further here.

d)   Confidentiality Rules

Plaintiffs also point to the confidentiality provision in the

RoC as problematic.  The confidentiality rule appears at least

three times in the RoC.  First, the introductory paragraph of RoC

11 states:

> IBOs who are involved in the dispute
> resolution process in any manner will not
> disclose to any other person not directly
> involved in the dispute resolution process (a)
> the substance of, or basis for, the claim; (b)
> the content of any testimony or other
> information obtained through the dispute
> resolution process; or (c) the resolution
> (whether voluntary or not) of any matter that
> is subject to the dispute resolution process.

VanderVen Decl. Ex. 2 at D-39, RoC 11.  It next appears in the

third paragraph of RoC 11.5:

> If IBOs become involved in a claim or dispute
> under the Dispute Resolution process of the
> Arbitration Rules, they will not disclose to
> any other person not directly involved in the
> conciliation or arbitration process (a) the
> substance of, or basis for, the claim (b) the
> content of any testimony or other evidence
> presented at an arbitration hearing or
> obtained through discovery; or (c) the terms
> of [sic] amount of any arbitration award.

Id. at D-42, RoC 11.5.  A nearly identical provision appears in

34

RoC 11.5.31:

> Once a Demand or submission has been sent, the
> arbitration process shall remain confidential.
> No party to the claim shall disclose to any
> other person not directly involved in the
> arbitration process (a) the substance of, or
> basis for, the claim; (b) the content of any
> testimony  or other evidence presented at an
> arbitration hearing or obtained through
> discovery in the arbitration; or (c) the terms
> or amount of any arbitration award.  The
> Arbitrator shall maintain the confidentiality
> of the hearings and the proceeding and shall
> have the authority to make appropriate rulings
> to safeguard confidentiality, unless the law
> provides to the contrary.

Id. at D-48, RoC 11.5.31.  The Court includes all three versions because Plaintiffs and Quixtar focus on different provisions in their arguments.

Quixtar argues that the confidentiality restriction is bilateral, because RoC 11.5.31 says "No party to the claim shall disclose" any of the details of the dispute.  Quixtar Reply at 12. That the provision is bilateral does not automatically make it enforceable, however.  See Davis, 485 F.3d at 1078 ("Rather, the logic of Ting [v. AT&T, 319 F.3d 1126 (9th Cir. 2003)] in this regard is that even facially mutual confidentiality provisions can effectively lack mutuality and therefore be unconscionable.").

Plaintiffs point to the opening paragraph of RoC 11, which states, "The Dispute Resolution Process begins at the point when the IBO becomes aware of a potential Rule violation or of a claim against another IBO or the Corporation and continues through each step of the process. . . ."  Opp'n to Quixtar Mot. at 16.  All three versions of the confidentiality rule refer to the "dispute resolution process."  Plaintiffs interpret these provisions to

35

require the IBO to maintain confidentiality from the moment an IBO "becomes aware" of a claim.  As such, the RoC prevents an IBO from contacting other IBOs to assist in litigating or arbitrating a dispute.  It would also "severely handicap if not stifle an [IBO's] ability to investigate and engage in discovery."  <u>Davis</u>, 485 F.3d at 1078.  Further, requiring confidentiality of all decisions denies potential plaintiffs access to precedent, while allowing Quixtar to develop useful strategies for all stages of the process based on its prior disputes.

These limitations are nearly identical to others that have been found unconscionable under California law.  <u>See</u> <u>id.</u> at 1078-79; <u>Ting</u>, 319 F.3d at 1151-52.  Quixtar does not address <u>Ting</u> in its briefs, and <u>Davis</u> was decided by the Ninth Circuit after this motion was submitted.  The only authority Quixtar offers in favor of upholding the confidentiality provisions is unpersuasive.  In <u>Stewart & Associates International v. Alticor, Inc.</u>, No. 05-3440-CV-S-RED, slip op. (W.D. Mo. Nov. 20, 2006) ("<u>Stewart</u>"), the court rejected unconscionability of the confidentiality provisions without any analysis.  Beyond its discussion of arbitrator selection, which the Court addresses below, the <u>Stewart</u> court simply concluded, "[A]fter reviewing the arbitration rules identified as allegedly unconscionable, the Court concludes that none of the identified rules is substantively unreasonable."  <u>Id.</u> at 9.  Quixtar also cites <u>Morrison v. Amway Corp.</u>, 49 F. Supp. 2d 529 (S.D. Tex. 1998) ("<u>Morrison I</u>"), <u>rev'd</u>, <u>Morrison II</u>, 2008 U.S. App. LEXIS 2693.  The substantive unconscionability analysis in <u>Morrison I</u> amounted to a total of three sentences with no mention

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

of confidentiality.  Neither <u>Stewart</u> nor <u>Morrison I</u> applied

California law, and neither is sufficient to overcome <u>Ting</u> and

<u>Davis</u>.

     e) <u>Selection of Arbitrators</u>

  Plaintiffs argue that even if an IBO manages to overcome all

of the foregoing obstacles, the arbitration will still be unfair

because the process Quixtar uses to select arbitrators is itself

unconscionable.  Quixtar claims that Plaintiffs refer to an

outdated version of the RoC, and that the current version has been

amended to address Plaintiffs' concerns.

  The previous version of the RoC required the IBO to use a

JAMS arbitrator who had participated in a training program

conducted by Quixtar and the IBOAI.  The training was purportedly

designed to give potential arbitrators background on how Quixtar's

business operates, as familiarity with the general business would

make the arbitration more efficient and more effective.  In

previous disputes, IBOs challenged this requirement, asserting

that the training program provided an overly-positive view of

Quixtar and biased the arbitrators in Quixtar's favor.  <u>See</u>

<u>Stewart</u>, <u>supra</u>; <u>Nitro Distr. Co. v. Alticor, Inc.</u>, No. 03-3290,

slip op. (W.D. Mo. Sept. 16, 2005), <u>aff'd</u>, 453 F.3d 995 (8th Cir.

2006), ("<u>Nitro</u>").

  The <u>Nitro</u> court described Quixtar's arbitrator training in

detail.

> Amway's "training" covered a two day period
> and then a third day of "interviews."  The
> training covered subjects including profiles
> of the people who started and now run Amway,
> the benevolent and independent culture of

> Amway, procedures to the [sic] used in
> arbitration, and a summary of various
> complaints the arbitrators could anticipate.
> The arbitrator candidates even participated in
> some "role playing" as successful Amway
> distributors.  Also included throughout the
> two days were assurances that Amway was not a
> pyramid scheme and that the business was
> legitimate.  Defendants claim, however, that
> the training was not out of the ordinary nor
> improper as the panel was not specifically
> told how to resolve possible issues they would
> see.  On the videos, the Defendants state they
> will not discuss the meaning of the Rules of
> Conduct that are not absolutely "black and
> white."

Nitro, slip op. at 23.  The court found that the training went

beyond basic education of arbitrators regarding specialized

subject matter to subtle manipulation of the arbitration process.

Id. at 24.  Ultimately, the court concluded that "allowing such

training and influence over the arbitrators as Defendants have in

this situation is both unreasonable and unfair," and refused to

enforce the arbitration agreement.  Id. at 25.

Although Quixtar asserts that it is not estopped from re-

arguing the fairness of the arbitrator selection process struck

down by the Nitro court, it does not actually make the argument in

either of its briefs.  Rather, it relies on the updated RoC, which

gives IBOs an alternate means of selecting an arbitrator.

Under the current RoC, Quixtar still trains possible

arbitrators with the same process, and still maintains a "Roster

of Neutrals" who have participated in the training.  See VanderVen

Decl. Ex. 2 at D-45 to D-46, RoC 11.5.14, 11.5.17.  After

receiving the arbitration demand, the arbitration administrator

sends the parties a list of at least five people from the Roster

38

of Neutrals who are available to conduct the arbitration.  <u>Id.</u> at
D-46, RoC 11.5.17.A.  With this list of neutrals, the
administrator includes an explanation encouraging the use of the
trained neutrals, but providing instructions on how to object.
<u>Id.</u>  The parties have 14 calendar days from the date the
administrator sends the list of neutrals to object to the use of
trained neutrals, and opt instead for a JAMS arbitrator who has
not participated in the training.  <u>Id.</u>, RoC 11.5.17.B.  The
parties then choose from an alternate list of arbitrators, with
each party having the opportunity to strike two names from the
list.  <u>Id.</u>, RoC 11.5.17.C.  Quixtar asserts that there is a third
option after trained and untrained JAMS arbitrators.  However,
this provision only applies if JAMS is unwilling or unable to
conduct the arbitration, <u>see</u> <u>id.</u> at D-43, RoC 11.5.5, and is not
actually a route available to an IBO dissatisfied with the JAMS
options.  If the parties opt to use a Quixtar-trained arbitrator,
they are billed at the arbitrator's published hourly rate, but the
fee cannot exceed $6,000.00 per day.  <u>Id.</u> at D-52, RoC 11.5.56.A.
If the parties instead select to use an arbitrator from the
alternative list of untrained neutrals, they are billed at the
arbitrator's published hourly rate with no daily cap.

This mutli-option selection system was apparently adopted in
response to the <u>Nitro</u> ruling, and is intended to address the bias
that court found.  The same court considered the updated selection
process in <u>Stewart</u>.  <u>Stewart</u>, slip op. at 6.  The court in <u>Stewart</u>
found that the process remained unfair because, as noted above,
there was no real alternative to JAMS neutrals, and because, since

United States District Court

For the Northern District of California

1    Quixtar had built the relationship with JAMS, even the untrained

2    JAMS neutrals would favor Quixtar.  Id. at 8-9.

3        The Court does not agree with the Stewart conclusion

4    regarding JAMS neutrals.  That JAMS is a for-profit operation is

5    not, in itself, sufficient basis for concluding that it is

6    inherently biased in favor of a party that has sent it significant

7    business.  Though for-profit, JAMS is in the business of being

8    neutral, and a persistent bias in favor of certain parties would

9    undermine its overall success.  Plaintiffs have offered no

10   evidence supporting a different conclusion.

11       However, the neutrality of the untrained JAMS arbitrators is

12   not sufficient to overcome other imbalances in the amended

13   selection process.  First, the Court finds that the initial

14   arbitrator selection notice unfairly benefits Quixtar.  As noted

15   above, Quixtar does not deny that the use of trained arbitrators

16   is to its advantage.  That the arbitrator selection notice

17   encourages the use of a decidedly unfair process, without

18   describing any possible disadvantages of using trained neutrals,

19   is improper.  Even assuming an IBO recognizes this disadvantage,

20   it must then risk incurring higher fees to opt out and use

21   untrained neutrals.  Quixtar should not encourage the use of an

22   unfair process and IBOs should not have to pay extra to avoid that

23   unfairness.  The Court therefore finds the process for selecting

24   arbitrators embodied in the current RoC unconscionable.

25                   f)   Cost of Arbitration

26       Finally, Plaintiffs challenge the fee provisions of the

27   Quixtar ADR scheme as unconscionable in part because arbitration

28                                  40

**United States District Court**
For the Northern District of California

is more costly than litigation, and in part because the RoC shifts the fees to the losing party.  In response, Quixtar argues that Plaintiffs cannot prove that they would incur higher costs by arbitrating, and that speculative costs are not a sufficient basis for refusing to enforce the arbitration agreement.  Quixtar does not appear to address the fee-shifting issue at all in its Motion or Reply.

Quixtar asserts that "Rule 11.5.56 does not specify which party will pay the arbitrator's fees or how such fees might be shared by the parties in a multi-party case like the present one." Quixtar Mot. at 19.  Though technically accurate, this is disingenuous.  Although RoC 11.5.56 does not specify which party pays the fees, RoC 11.5.48 does.

> The Arbitrator may grant any remedy or relief
> that the Arbitrator deems just and equitable
> and that would have been available to the
> parties had the matter been heard in court.
> The Arbitrator shall, in the award, assess
> arbitration fees, costs, expenses, reasonable
> attorneys' fees, and compensation as provided
> in the applicable Fees/Costs Schedule, in
> favor of the prevailing party and, in the
> event any fees or costs are due the
> Administrator, in favor of the Administrator.
>
> The Arbitrator shall award to a prevailing
> party reimbursement for that party's
> reasonable attorney's fees in whole or in
> part.

VanderVen Decl. Ex. 2 at D-50, RoC 11.5.48.  An IBO who initiates an arbitration against Quixtar under the RoC and does not prevail will potentially be responsible not only for the full cost of the arbitration itself, but also for Quixtar's reasonable attorney's fees.  By contrast, litigation in federal court provides for a

**United States District Court**
For the Northern District of California

1    successful RICO plaintiff to recover attorney's fees, but does not

2    expose such a plaintiff to the risk of having to pay the

3    defendant's fees if the suit is unsuccessful.  <u>See</u> 18 U.S.C. §

4    1964(c).  Practically speaking, a "loser pays" provision makes

5    arbitration a much greater financial risk than litigation.  The

6    RoC thus requires an IBO to incur greater risk in the prosecution

7    of statutorily-protected rights.  This undoubtedly discourages

8    IBOs from demanding arbitration, and therefore favors Quixtar

9    substantially.  <u>See</u> Blenn Decl. ¶¶ 3-11; Pokorny Decl. ¶¶ 3-11.

10   Courts have held such provisions unenforceable in California and

11   other states.  <u>See</u> <u>e.g.</u>, <u>Veliz v. Cintas Corp.</u>, No. 03-1180, 2004

12   WL 2452851, at *22, 23, 37, (N.D. Cal. April 5, 2004)

13   (invalidating "loser pays" provision as to plaintiffs from

14   California, Colorado, and New Jersey).  The Court finds that the

15   "loser pays" provision in RoC 11.5.48 unfairly favors Quixtar and

16   is therefore unconscionable.

17        With regard to the total cost of arbitration relative to

18   litigation, the Court finds that Plaintiffs have not provided

19   adequate evidentiary support for their contention.

20               g)   <u>Severability</u>

21        Quixtar urges the Court to simply sever any provisions in the

22   RoC that the Court finds unconscionable, but to enforce the

23   remainder, as the court in <u>Stewart</u> did.  <u>See</u> <u>Stewart</u>, slip op. at

24   9-10.  Under California law, the Court has the discretion to sever

25   or to reject the entire agreement.  <u>Ingle v. Circuit City Stores,</u>

26   <u>Inc.</u>, 328 F.3d 1165, 1180 (9th Cir. 2003) (citing <u>Circuit City</u>

27   <u>Stores, Inc. v. Adams</u>, 279 F.3d 889, 895 (9th Cir. 2002); Cal.

28                                    42

Civ. Code. § 1670.5(a)).

The Stewart court was able to sever easily because it found only one provision unconscionable under the applicable law. See Stewart, slip op. at 9-10. The same is not true here. Severing the offending provisions would remove the Informal and Formal Conciliation requirements, the non-mutual arbitration requirement, the reduced statute of limitations, the confidentiality requirements, the arbitrator selection process, and the fee shifting provisions. Even if the Court chose to "enforce" the remainder, it would have virtually no effect. Where an arbitration agreement is so permeated with unconscionable provisions, the Court may refuse to enforce the agreement as a whole, rather than severing specific provisions. See Armendariz, 24 Cal. 4th at 124-25; Ingle, 328 F.3d at 1180.

The Quixtar arbitration agreement is simply too tainted to be saved through minor adjustments. Therefore, though mindful of the strong state and federal policies favoring arbitration, the Court holds that the entire Quixtar ADR scheme is unconscionable and unenforceable.

## VI.   THE IBO DEFENDANTS' MOTIONS

The foregoing analysis focuses largely on how the arbitration provision unfairly favors Quixtar in a dispute initiated by an IBO. Despite this, the Court finds large portions of it applicable to the Britt Defendants and the Puryear Defendants as well, and therefore DENIES their motions.

The IBO Defendants assert that because they are IBOs who

43

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1    executed the Registration (or third party beneficiaries of the

2    agreement contained in the Registration), their disputes with

3    Plaintiffs are governed by the Quixtar ADR process.  The Court has

4    already concluded that Plaintiffs had no meaningful opportunity to

5    negotiate any of these provisions with Quixtar, and the IBO

6    Defendants do not suggest that, though submitting to the terms

7    themselves, they negotiated the terms directly with Plaintiffs.

8    Nor do the IBO Defendants suggest that Plaintiffs had any chance

9    to negotiate the terms of the BSMAA or the DM Terms & Conditions.

10    As such, the Court's prior rulings regarding procedural

11    unconscionability are equally applicable here.

12      Although some of the provisions addressed above are non-

13    mutual between Quixtar and Plaintiffs, the same provisions may be

14    mutual and bilateral between Plaintiffs and the IBO Defendants.

15    The Court still finds the majority unconscionable.  The

16    confidentiality provisions still hamper Plaintiffs to the same

17    degree against the IBO Defendants as they do against Quixtar.  The

18    fee-shifting provisions are also equally offensive in Plaintiffs'

19    dispute against the IBO Defendants.  Finally, the arbitrator

20    selection process is as unfair to Plaintiffs in this context as it

21    was above, particularly where Plaintiffs allege that the IBO

22    Defendants acted in concert with Quixtar in an illegal enterprise.

23    Together, these three defects in the ADR scheme render it

24    substantively unconscionable, and therefore unenforceable.

25

26    **VII.  CLAIMS FOR INJUNCTIVE RELIEF**

27      Because the Court rejects the entire Quixtar ADR scheme

28                              44

embodied in the RoC, it need not separately address the claims for injunctive relief Busiere added in the First Amended Complaint.

**VIII.  <u>CONCLUSION</u>**

For the foregoing reasons, the Court finds that the arbitration agreement contained in the Registration, the BSMAA, and the DM Terms and Conditions, and incorporating the RoC, is procedurally and substantively unconscionable, and therefore unenforceable.  The Court therefore ORDERS as follows:

1.   Quixtar's Motion to Dismiss or Stay and Compel Compliance With Dispute Resolution Agreement is DENIED.

2.   The Britt Defendants' Motion to Dismiss and Compel Compliance With Dispute Resolution Agreement is DENIED.

3.   The Puryear Defendants' Motion in Support of Joinder in Quixtar's and Britt's Motion to Dismiss or Stay Litigation and Compel Compliance With Dispute Resolution Agreement is DENIED.

4.   Plaintiffs' Motion to Strike Quixtar's Reply Re: Statement of Recent Decision is VACATED AS MOOT.

IT IS SO ORDERED.


Dated:  March 31, 2008.


_____
UNITED STATES DISTRICT JUDGE