United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JEFF POKORNY, LARRY BLENN, and KENNETH BUSIERE, on behalf of themselves and those similarly situated, | ) Case No. 07-0201 SC )<br>) ORDER REQUIRING<br>) <u>SUPPLEMENTAL BRIEFING</u><br>) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| QUIXTAR INC., et al., | ) ) |
| Defendants. | ) ) |

## I.  **INTRODUCTION**

Before the Court is a Motion for Settlement filed jointly by Plaintiffs Jeff Pokorny, Larry Blenn, and Kenneth Busiere ("Plaintiffs") and Defendants Quixtar Inc., et al. ("Defendants"). ECF No. 141 ("Mot."). The parties seek class certification, appointment of class counsel, and preliminary approval of the class settlement. <u>Id.</u> at 1. Plaintiffs and Defendants separately filed responses in support of the Motion. ECF Nos. 143 ("Pls.' Resp."), 144 ("Defs.' Resp."). For the following reasons, the Court finds that it cannot grant the relief requested without additional information from the parties. Accordingly, the Court CONTINUES the hearing date on the Motion to April 8, 2011, and ORDERS the parties to submit supplemental briefing addressing the following issues.

**United States District Court**
For the Northern District of California

**II. BACKGROUND**

    **A.   Factual Background**

    Quixtar is a multi-level marketing program that sells a variety of products and services through a network of individual distributors known as Independent Business Owners ("IBOs"). <u>See</u> First Amended Complaint ("FAC") ¶ 2. In addition to selling Quixtar products, IBOs can earn bonuses by recruiting new distributors into their "line of sponsorship." <u>See</u> <u>id.</u> IBOs often sell Business Support Materials ("BSMs"), also known as "tools and functions," to these recruits. <u>Id.</u> ¶¶ 39, 41-42. These BSMs include tapes, compact discs, and videos that contain information claimed to be "essential to success as a distributor." <u>Id.</u> ¶ 42. In their FAC, Plaintiffs claimed that a registration fee of $117 was required to become a Quixtar IBO, but alleged that in practice, most IBOs make an initial investment of $200 to $4000 in their business "through the purchase of products and the 'tools and functions' materials." <u>Id.</u> ¶ 58.

    Plaintiffs alleged that this operation constituted a fraudulent pyramid scheme. <u>Id.</u> ¶ 35. Plaintiffs claimed that Quixtar "induces new recruits to join the Quixtar program through material false representations that such recruits will be able to re-sell Quixtar products for a profit." <u>Id.</u> ¶ 37. Plaintiffs claimed that "95% of Quixtar's products are not sold to retail consumers," but rather to other IBOs down the lines of sponsorship. <u>Id.</u> Plaintiffs alleged: "The prices IBOs pay for Quixtar's products (and associated costs) are so high that any profit on retail sales is virtually impossible." <u>Id.</u> ¶ 37. Plaintiffs

United States District Court
For the Northern District of California

wrote: "Because the IBOs are Quixtar's actual customers and consumers of its products, Quixtar requires an ever expanding network of so-called distributors (IBOs) in order to keep Quixtar afloat." Id.  Plaintiffs claimed that because it constituted a fraudulent pyramid scheme or "endless chain," Quixtar's practices "violated the federal RICO and mail and wire statutes and the California Penal Code § 327." Id. ¶ 52.  Also named as Defendants in the FAC are individuals and entities alleged to be Quixtar distributors in the "lines of sponsorship" linking Plaintiffs and Quixtar. Id. ¶¶ 8-16.

     **B.**   **Procedural Background**

     Although this action commenced nearly four years ago, the parties seek to settle this action relatively early in the proceedings.  Plaintiffs' Initial Complaint was filed on January 10, 2007.  ECF No. 1 ("Compl.").  On March 5, 2007, Defendants separately filed several motions to dismiss and/or stay the action and compel Plaintiffs to participate in arbitration pursuant to arbitration provisions in the IBO registration agreements.  ECF Nos. 28, 32, 36.  On March 31, 2008, the Court denied these motions, finding the arbitration agreements to be procedurally and substantively unconscionable and therefore unenforceable.  ECF No. 115 ("Mar. 31, 2008 Order").[1]  Defendants appealed this order under 9 U.S.C. § 16(a)(1)(B), and the Court stayed proceedings pending the appeal.  ECF No. 127.  On April 20, 2010, a Ninth Circuit panel

---

[1] The March 31, 2008 Order also provides a more detailed account of the procedural history of the case, including a discussion of several continuances, motions to strike, and Plaintiffs' motion to file an amended complaint. See id. at 2-5.

affirmed.  <u>Pokorny v. Quixtar, Inc.</u>, 601 F.3d 987 (9th Cir. 2010).
On November 3, 2010, after several continuances, the parties
jointly filed this Motion for Settlement.  <u>See</u> Mot.  Thus, the
parties seek settlement of this putative class action before an
answer has been filed, before discovery has commenced, and before a
class certification motion has been filed and ruled upon.

     **C.**  **The Proposed Settlement**

     A Settlement Agreement is attached to the Motion for
Settlement.  <u>See</u> ECF No. 141-2 ("Settlement Agreement").  Attached
to the Settlement Agreement are the proposed Class Notice, <u>id.</u> ex.
A ("Notice"), Summary of Notice, <u>id.</u> Ex. B ("Summary of Notice"),
Claim Form, <u>id.</u> Ex. C ("Claim Form"), and Second Amended Complaint,
<u>id.</u> Ex. E ("SAC").  On December 3, 2010, the parties filed an
amendment to the Settlement Agreement, the Notice, the Summary of
Notice, and the SAC.  ECF No. 155 (Dec. 3, 2010 Amendment").  On
December 15, 2010, the parties filed a Motion to Amend and/or
Correct their Motion for Settlement.  ECF No. 156 ("Mot. to
Amend/Correct").  The following summarizes the proposed settlement,
as amended by these subsequent filings.

          1.  <u>Class Structure</u>

     The parties seek the class to be defined as:

> All Persons who, at any time during the Class
> Period, were (i) an IBO or (ii) a legal entity
> through which an IBO conducted a Quixtar-
> related business. Excluded from the Settlement
> Class are Quixtar, the Identified BSM
> Companies, their owners, shareholders, family
> members, and affiliates.

ECF No. 142 ("Proposed Order") at 1.

     The parties provide definitions for the terms "person," "class

4

<div style="writing-mode: vertical-lr">**United States District Court** For the Northern District of California</div>

period," "IBO," "BSM," and "Identified BSM Companies" in the Settlement Agreement. <u>See</u> Settlement Agreement § 1. This class would include all individuals or entities who were Quixtar IBOs from January 1, 2003 to the date the Court preliminarily approves the Settlement, excluding the companies and individuals named as Defendants in the SAC. The parties do not attempt to estimate the number of members in this proposed class.

### 2. Injunctive Relief Provisions

Under the Settlement, Quixtar and Plaintiffs would enter into a Consent Judgment. <u>Id.</u> § 5.1. Under the Consent Judgment, Quixtar would modify its IBO registration agreements to provide "not less than a 90-day refund period for registration fees." <u>Id.</u> § 5.1.1. Quixtar would also make additional disclosures in the application forms distributed to prospective IBOs, including disclosing Quixtar's refund policies and the fact that product purchases are optional. <u>Id.</u> § 5.1.2. Quixtar would be barred from "compensating any IBO primarily for the act of recruiting or registering other IBOs" and "requiring any IBO to purchase or maintain any specified amount of inventory." <u>Id.</u> § 5.1.3. For twenty-four months, Quixtar would reduce prices for IBOs on "Quixtar-branded products" by an average of at least five percent from its January 2007 pricing levels. <u>Id.</u> § 5.1.4. Quixtar would offer free training to IBOs for product, product merchandising, and business skills, and it would increase its budget for such training programs by an average of $7 million or more over 2008 levels for twenty-four months. <u>Id.</u> § 5.1.5. Finally, Quixtar would "maintain and enforce quality control" over BSMs sold or distributed by

**United States District Court**
For the Northern District of California

**United States District Court**
For the Northern District of California

1  Quixtar IBOs and their affiliates or sold or distributed in a

2  manner suggesting sponsorship, affiliation, or approval by Quixtar.

3  Id. § 5.1.6.  These provisions would be subject to monitoring by

4  Class Counsel throughout the term of the Consent Judgment.  Id. §

5  5.1.7.  The parties estimate the economic value of the injunctive

6  relief to the class to be approximately $100 million.  Id. § 12.2.

7                    3.  Economic Relief Provisions

8      Under the Settlement, Quixtar would establish a Cash Fund and

9  a Product Credit Fund.  Id. § 5.2.  The Cash Fund would be an

10  interest-bearing escrow account into which Quixtar would deposit

11  $34 million.  Id. § 5.2.1.  This Cash Fund would be used to pay

12  "[c]osts of notice and the administering of the Settlement,

13  including costs of the Claims Administrator, any Special Master

14  under Section 10.1.2[2], reimbursement for litigation costs and

15  payment of Plaintiffs' attorneys' fees as determined by the Court."

16  Id. § 6.1.3.  An initial amount of $500,000 would be withdrawn from

17  the Cash Fund to establish a Notice Fund to be used to pay escrow

18  fees, Claims Administrator fees, the costs of providing notice to

19  the class, the costs of administering the settlement, and "other

20  reasonable and customary fees and expenses as may be agreed upon in

21  a writing signed by Plaintiffs' Counsel and Quixtar's Counsel."

22  Id. § 9.1.

23      In addition to the above-mentioned fees and expenses, two

24  forms of cash awards to class members would be paid out of the Cash

25  Fund: reimbursements of Quixtar's registration fees and payments to

26  _____

27

28  [2] The Settlement Agreement has no Section 10.1.2.  A Special Master
    is discussed in Section 6.1.2 of the Settlement Agreement.

**United States District Court**
For the Northern District of California

1   class members "who can establish they suffered special hardships"

2   as a consequence of their recruitment and service as a Quixtar IBO.

3   Id. §§ 6.1.1, 6.1.2.

4        Class members who paid Quixtar's initial registration fee but

5   did not "continue participation in Quixtar by renewing their

6   Quixtar distributorships at the end of the first year of their

7   distributorships" would be eligible to receive a refund of this

8   fee. Id. § 6.1.1. To receive a refund, class members would have

9   to submit a Claim Form within the 90-day refund period as specified

10  in the Class Notice and submit a Proof of Claim form attesting "to

11  the amount paid as a registration fee, the approximate date they

12  registered, and the fact that they did not renew their

13  distributorship after the first year." Id. The total recovery for

14  registration fees would be limited to $5 million, with refunds pro-

15  rated if more than $5 million in claims were received. Id. The

16  parties do not state the amount of the fees to be reimbursed, but

17  Plaintiffs alleged in their FAC that the registration fee was $117.

18  FAC ¶ 58.

19       To receive cash awards under the Settlement's hardship

20  provision, a class member must allege a loss of at least $2500,

21  explicitly identify the amount of the loss being claimed, and

22  "include any substantiation, including any supporting documents,

23  regarding the amount of the loss." Settlement Agreement § 6.1.2;

24  Mot. to Amend/Correct at 1. The Settlement Agreement contemplates,

25  but does not provide the structure for, "a streamlined hardship

26  claims procedure for resolving hardship claims (including

27  determining such proof or documentation that shall be required to

28

7

apply for a hardship payment)" to be established "with assistance
of Plaintiffs' Counsel, subject to approval of the Court." Id. §
6.1.2.  A special master, "appointed by the Court with input from
Plaintiffs' Counsel and Quixtar at the time of final approval of
the Settlement Agreement," would review the hardship claims and
make a final decision on the validity of each claim. Id.  The
maximum hardship payment to each member of the class would be
$15,000.  Id.

Claims would be pro-rated if, after all costs and expenses are
paid, the allowable claims to class members exceeds the amount left
in the Cash Fund.  Id. § 6.1.4.  Any remaining amount of the Cash
Fund left after all approved claims and expenses are paid would be
"distributed by the Court for the benefit of the class." Id. §
6.1.5.  The Settlement Agreement does not provide the details of
this distribution, but it does specify that none of the Fund would
be remitted to Quixtar.  Id.

The Product Credit Fund would provide free Quixtar product to
class members.  Id. § 6.2.1.  Class members who purchased at least
$100 in Business Support Materials would be eligible to receive a
"product bundle" with an approximate retail value of $100.  Id.
These bundles would be limited to certain categories of Quixtar
products -- "Artistry skincare, HomeCare . . . or Nutrilite
vitamin, mineral, or supplement products." Id.  To receive these
product bundles, class members must submit a Claim Form during a
to-be-determined 90-day period after the class notice is sent.  Id.
§§ 6.2.2, 6.3.  The total retail value of the products to be
distributed under the Product Credit Fund would be capped at $21

**United States District Court**
For the Northern District of California

million; if claims are submitted, the value of the product bundles would be pro-rated. Id. § 6.2.4. If less than $21 million of approved claims are submitted, the Honorable David Weinstein ("Judge Weinstein"), a retired judge who served as the parties' mediator during settlement negotiations, would "direct distribution of additional product up to the $21 million limit of the Product Credit so as to benefit the class of former IBOs." Id. Judge Weinstein would "give due regard to the reasonable commercial interests of Quixtar" in making this additional distribution. Id. Judge Weinstein would also be empowered to distribute the remaining product to charities as cy pres. Id. No portion of the Product Credit Fund would be remitted to Quixtar. Id.

### 4.    Fee Awards

While the Settlement Agreement correctly states that awards of attorneys' fees, costs, and incentive awards are subject to the Court's discretion, Defendants agree not to oppose a motion by Plaintiffs' counsel for attorneys' fees of up to $20 million, which would be paid out of the $34 million Cash Fund. Id. § 12.1.

### 5.    Notice to Class Members

Although the Settlement Agreement contemplates a $500,000 Notice Fund to be established from which a Claims Administrator could pay costs associated with class notice, id. §§ 9.1-9.2, the parties have not filed a Notice Plan with the Court. In a December 3, 2010 joint filing, the parties stated they had reviewed proposals from prospective claims administrators, and nominated Rust Consulting to serve as the Claims Administrator. ECF No. 154. The parties attached as an exhibit Rust Consulting's two-page

**United States District Court**
For the Northern District of California

1    proposal, which includes a total estimated project cost of $406,076

2    and the assumptions used to prepare the proposal.  <u>Id.</u> Ex. C.  The

3    parties also submitted Rust Consulting's twelve-page promotional

4    pamphlet.  <u>Id.</u> Ex. D.

5             6.   <u>Releases of Liability</u>

6         Under the Settlement, all of the class members who do not

7    affirmatively opt out of the class by providing the Claims

8    Administrator with their name, address, telephone number and a

9    statement of exclusion thirty days prior to the Final Settlement

10   Hearing would permanently release all "Released Claims."  <u>Id.</u> §§

11   10.1, 1.29-1.31.[3]  These claims would be released not only against

12   Defendants, but also against "every IBO who, during the Class

13   Period, sold or marketed Quixtar products or attempted to recruit

14   other Persons to register as an IBO."  <u>Id.</u>

15

16   _____

17

18   [3] The Parties' definition of "Released Claims" is extremely broad,
     as it includes claims that could have been asserted in Plaintiffs'
19   complaint and all claims that are "based upon, or arise out of, or
     reasonably relate to (i) the purchase or sale or offer of sale of
20   any Quixtar product during the Class Period other than warranty
     claims or other claims for defective products, (ii) the purchase or
21   sale or offer of sale of any BSM during the Class Period, (iii) the
     payment of monies to Quixtar to register as a Quixtar IBO during
22   the Class Period, (iv) the IBOs' contract with Quixtar, including
     the Quixtar Independent Business Owner Compensation Plan, the Biz
23   Reference Guide, and the Rules of Conduct, (v) Quixtar's and the
     BSM Companies' business operations during the Class Period, (vi)
24   any actual or potential recruitment of any Quixtar IBO during the
     Class Period, (vii) any allegation that, during the Class Period,
25   Quixtar and/or the BSM Companies operated, separately or together,
     any type of illegal or fraudulent scheme, and/or (viii) any of the
26   facts, schemes, transactions, events, matters, occurrences, acts,
     disclosures, statements, misrepresentations, omissions, or failures
27   to act that have been or could have been alleged or asserted in the
     Action."  <u>Id.</u> § 1.31.

28

**United States District Court**
For the Northern District of California

### III. **LEGAL STANDARD**

When the parties to a putative class action reach a settlement agreement prior to class certification, "courts must peruse the proposed compromise to ratify both the propriety of the certification and the fairness of the settlement." <u>Staton v. Boeing Co.</u>, 327 F.3d 938, 952 (9th Cir. 2003). First, the Court must assess whether a class exists. <u>Id.</u> (citing <u>Amchem Prods. Inc. v. Windsor</u>, 521 U.S. 591, 620 (1997)). Second, the court must determine whether the proposed settlement "is fundamentally fair, adequate, and reasonable." <u>Hanlon v. Chrysler Corp.</u>, 150 F.3d 1011, 1026 (9th Cir. 1998).

### IV. **DISCUSSION**

#### A. **Class Certification**

Federal Rule of Civil Procedure 23(a) provides four requirements for class certification: (1) numerosity ("the class is so numerous that joinder of all members is impracticable"); (2) commonality ("there are questions of law or fact common to the class"); (3) typicality ("the claims or defenses of the representative parties are typical of the claims or defenses of the class"); and (4) adequacy of representation ("the representative parties will fairly and adequately protect the interests of the class"). Fed. R. Civ. P. 23(a)(1)-(4). In addition, the court must also find that the requirements of Rule 23(b)(1), (b)(2), or (b)(3) are satisfied. <u>Dukes v. Wal-Mart Stores, Inc.</u>, 603 F.3d 571, 580 (9th Cir. 2010). Rule 23(b)(3) requires a finding by the court "that questions of law or fact common to class members

11

predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Courts refer to the requirements of Rule 23(b)(3) as its "predominance" and "superiority" requirements. <u>Amchem Prods., Inc. v. Windsor</u>, 521 U.S. 591, 615 (1997).

### 1.   <u>Numerosity</u>

Rule 23(a)(1) provides that a class action may be maintained only if "the class is so numerous that joinder of all parties is impracticable." Fed. R. Civ. P. 23(a)(1). However, "impracticable" does not mean impossible; it refers only to the difficulty or inconvenience of joining all members of the class. <u>Harris v. Palm Springs Alpine Estates, Inc.</u>, 329 F.2d 909, 913-14 (9th Cir. 1964). In arguing that the numerosity requirement is satisfied, Plaintiffs allege that "the Settlement Class consists of hundreds of thousands of IBOs," but they do not cite support for this statement. Pls.' Resp. at 8.

The Court finds that Plaintiffs' broad and unsubstantiated allegation of a class of "hundreds of thousands" is neither sufficiently specific nor documented for the Court to find the numerosity requirement satisfied. Accordingly, the Court orders the parties to submit additional briefing on the estimated size of the proposed class, and to submit evidence relied upon in making this estimate. If there is uncertainty in this estimate, the parties should attempt to quantify the level of uncertainty and explain why this uncertainty exists.

12

**United States District Court**
For the Northern District of California

### 2.   Commonality

Rule 23(a)(2) requires that there be "questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  The commonality requirement must be "construed permissively."  <u>Hanlon v. Chrysler Corp.</u>, 150 F.3d 1011, 1019 (9th Cir. 1998).  "All questions of fact and law need not be common to satisfy the rule.  The existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class."  <u>Id.</u>  "The commonality test is qualitative rather than quantitative -- one significant issue common to the class may be sufficient to warrant certification."  <u>Dukes</u>, 603 F.3d at 599 (quotation marks omitted).

Plaintiffs argue that this requirement is satisfied because "the class claims depend on a factual finding that Quixtar's U.S. business at the time of the lawsuit was focused, not on retail sales to consumers, but instead on IBO recruitment and self-consumption of BSM and Quixtar products."  Pls.' Resp. at 8.  The Court agrees, and provisionally finds this requirement to be satisfied.

### 3   Typicality

Rule 23(a)(3) requires that the representative parties' claims be "typical of the claims . . . of the class."  Fed. R. Civ. P. 23(a)(3).  "Under the rule's permissive standards, representative claims are 'typical' if they are reasonably co-extensive with those of absent class members; they need not be substantially identical."  <u>Hanlon</u>, 150 F.3d at 1020.  Rule 23 "does not require the named plaintiffs to be identically situated with all other class members.

13

It is enough if their situations share a common issue of law or fact and are sufficiently parallel to insure a vigorous and full presentation of all claims for relief." Cal. Rural Legal Assist., Inc. v. Legal Servs. Corp., 917 F.2d 1171, 1175 (9th Cir. 1990). In practice, "[t]he commonality and typicality requirements of Rule 23(a) tend to merge." Gen. Tel. Co. of the Southwest v. Falcon, 457 U.S. 147, 157 n.13 (1982).

Plaintiffs claim that this requirement is satisfied because "all parties – from Plaintiffs to the Settlement Class Members – have suffered losses because of their shared experience as Quixtar IBOs, and all parties have the same legal claims arising from Quixtar's operations identified in the Complaint." Pls.' Resp. at 9. Plaintiffs do not allege what losses they suffered, aside from the fact that they "lost money as a result of the pyramid scheme." FAC ¶ 74. The Court provisionally finds this requirement to be satisfied.

4.   <u>Adequacy of Representation</u>

Rule 23(a)(4) requires a showing that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "This factor requires: (1) that the proposed representative Plaintiffs do not have conflicts of interest with the proposed class, and (2) that Plaintiffs are represented by qualified and competent counsel." Dukes, 603 F.3d at 614.

The parties claim that there are no prospective conflicts of interest between the class members, but the facts alleged suggest otherwise. The proposed class includes all Quixtar IBOs except

14

United States District Court
For the Northern District of California

1  Quixtar, the other named Defendants, and the "Identified BSM
2  Companies" and their owners, shareholders, family members, and
3  affiliates. See Proposed Order. Plaintiffs have alleged that
4  Quixtar operated a fraudulent pyramid scheme in which IBOs were
5  financially rewarded for recruiting other IBOs into their "lines of
6  sponsorship." As such, there is a potential conflict between the
7  named Plaintiffs and the members of the proposed class who were
8  IBOs within the named Plaintiffs' lines of sponsorship. The Court
9  does not know if the named Plaintiffs successfully recruited other
10 IBOs into their lines of sponsorship, but if so, there is a
11 prospective conflict between these IBOs and Plaintiffs. Similarly,
12 there is a prospective conflict between named Plaintiffs and the
13 IBOs higher up on the Plaintiffs' lines of sponsorship.

14        Furthermore, "a class representative must be part of the class
15 and 'possess the same interest and suffer the same injury' as the
16 class members." East Tex. Motor Freight System, Inc. v. Rodriguez,
17 431 U.S. 395, 403 (1977) (quoting Schlesinger v. Reservists Comm.
18 to Stop the War, 418 U.S. 208, 216 (1974)). The parties have
19 shared too little information about the named Plaintiffs and the
20 class as a whole for the Court to find that the named Plaintiffs
21 possess the same interest and suffered the same injury as the
22 class. Under the Settlement Agreement, different groups of the
23 class are compensated differently. For instance, class members who
24 paid the Quixtar's initial registration fee but did not participate
25 as IBOs are eligible to receive a full refund of those fees; these
26 class members would essentially receive a full recovery under the
27 Settlement. On the other hand, a class member who paid the

28

15

registration fee and invested in several thousand dollars of BSMs and Quixtar product but is unable to demonstrate a "special hardship" would only receive a product bundle with a $100 retail value; these class members would only recover a fraction of their damages under the settlement.  It is not clear whether the interests of both these groups are adequately represented by named Plaintiffs.  For these reasons, the Court orders named Plaintiffs to submit declarations in which they state, in detail, the nature and amount of their alleged injuries.

In addition, Plaintiffs' counsel, Boies Schiller and Flexner, LLP ("Boies Schiller") and Gary, Williams, Parenti, Finney, Lewis, McManus, Watson & Sperando ("Gary Law") (collectively, "Plaintiff's counsel") have not demonstrated in their papers that they are qualified and competent class counsel.  Plaintiffs' Response contains two paragraphs in which Plaintiffs' counsel is breathlessly lauded, see Pls.' Resp. at 11-12, but no attorneys have filed declarations in which they state their qualifications.  Accordingly, the Court orders supplemental briefing on the adequacy of class counsel requirement.

> 5.  Predominance and Superiority

Rule 23(b)(3) requires the court to find that "the questions of law or fact common to class members predominate over any questions affecting only individual members."  Fed. R. Civ. P. 23(b)(3).  While evaluation of Rule 23's predominance requirement on a settlement motion does not require an analysis of potential trial management problems, "other specifications of the Rule -- those designed to protect absentees by blocking unwarranted or

16

overbroad class definitions -- demand undiluted, even heightened, attention in the settlement context." Amchem, 521 U.S. at 20.  The terms of a proposed settlement are "relevant to a class certification." Id.  Rule 23(b)(3) also requires that the class action be "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).  The factors relevant to assessing superiority include:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).

As discussed above, the release of liability contemplated in the Settlement Agreement is very broad.  With limited exceptions, the Settlement would extinguish all claims against Quixtar, and every other IBO, arising out of the class members' relationships with Quixtar, from 2003 to the present.  Id. §§ 10.1, 1.29-1.31. As such, it is not limited to claims premised on the allegation that Quixtar is a fraudulent pyramid scheme.  Plaintiffs state that "although there have been lawsuits in the past concerning Quixtar's relationships with IBOs, Plaintiffs' counsel are unaware of any litigation already brought by individual class members asserting against Quixtar the range of claims at issue in this case." Pls.' Resp. at 11.  This statement is not helpful to the Court; first, it is unclear if Plaintiffs' counsel intends "the range of claims at issue in this case" to mean the claims brought

in the Complaint or the broader set of claims that would be precluded by the Settlement.  Second, this statement is an argument from ignorance -- the Court will not conclude that there is no other litigation brought by IBOs against Quixtar because Plaintiffs' counsel states that it is "unaware" of such litigation. Plaintiffs' counsel should support this statement with a sworn declaration stating the basis for this belief.

In support of their superiority argument, Plaintiffs argue that individual suits by the class members are unlikely because "the value of any individual Settlement Class Member's claim is likely to range from a few hundred to a few thousand dollars." Pls.' Resp. at 11.  This statement, if true, would support their argument, but Plaintiffs provide no support for it.  Accordingly, the Court orders supplemental briefing on the issue of the range of claims within the class.

In sum, the Court finds that too little information has been placed before the Court for it to conditionally certify the class. Because it does not certify the class, it does not name Boies Schiller and Gary Law as class counsel.

**B.    Fairness of the Settlement**

Because the Court finds that it cannot certify the class without additional information, it cannot find that the proposed settlement is fair to the class.  However, in the interest of efficiency, and because some issues with the fairness of the proposed settlement are readily apparent to the Court, it addresses those issues here.

The Ninth Circuit has warned that "there are real dangers in

United States District Court
For the Northern District of California

1   the negotiation of class action settlements of compromising the

2   interests of class members," because "[i]ncentives inherent in

3   class-action settlements" can "result in a decree in which the

4   rights of [class members, including the named plaintiffs] may not

5   [be] given due regard by the negotiating parties." <u>Staton</u>, 327

6   F.3d at 959 (internal quotation marks omitted).  These incentives

7   stem from the fact that "[t]he class members are not at the table;

8   class counsel and counsel for the defendants are." <u>Id.</u>  This can

9   "influence the result of the negotiations without any explicit

10  expression or secret cabals," and is why "district court review of

11  class action settlements includes not only consideration of whether

12  there was actual fraud, overreaching or collusion but, as well,

13  substantive consideration of whether the terms of the decree are

14  'fair, reasonable and adequate to all concerned.'" <u>Id.</u> at 950

15  (citing <u>Officers for Justice v. Civil Serv. Comm'n of San</u>

16  <u>Francisco</u>, 688 F.2d 615, 625 (9th Cir. 1982)).  Due in part to

17  these dangers of "collusion between class counsel and the

18  defendant," the Ninth Circuit has adopted the rule of other

19  circuits that "settlement approval that takes place prior to formal

20  class certification requires a higher standard of fairness,"

21  leading to "a more probing inquiry than may normally be required

22  under Rule 23(e)." <u>Hanlon</u>, 150 F.3d at 1026.

23       The Court first notes that many of the hallmarks of collusive

24  unfairness are present in this Settlement Agreement.  Defendants

25  agree to not oppose an attorneys' fees motion by Plaintiffs'

26  counsel for as much as $20 million.  If the Settlement and the

27  contemplated motion for attorneys' fees are approved, nearly two-

28

thirds of the $35 million Cash Fund would be awarded to Plaintiffs' counsel.  The parties appear to justify the size of this proposed award by agreeing that the injunctive relief in the Settlement is valued by the class at $100 million.  The Court has difficulty accepting this estimate as fact -- the parties offer no evidence in support of this estimate, nor do they attempt to justify it through attorney declarations.

Many of the Court's criticisms of the parties' motion for class certification also apply to the proposed settlement.  For example, it is not clear that the settlement will fairly compensate all class members.  Plaintiffs allege that "the value of any individual Settlement Class Member's claim is likely to range from a few hundred to a few thousand dollars."  Pls.' Resp. at 11.  Under the settlement, IBOs who purchased BSMs but who suffered a "special hardship" of less than $2500 would only receive a "product bundle" worth a retail value of $100.  As such, these class members would only receive a fraction of their alleged damages.  Conversely, class members who paid the initial registration fee and did not participate would be refunded their $117 fee -- thus they would be fully compensated for their alleged injury.  Without knowing more about the class, there is no way to know if this arrangement is fair to the class as a whole.

The Court discusses specific fairness issues below.

1.   <u>Injunctive Relief</u>

The parties claim that the Settlement's injunctive relief has an estimated value of $100 million to the class.  As previously stated, the Court has doubts about this estimate's accuracy;

20

**United States District Court**
For the Northern District of California

additionally, the prospective relief offered here only has value to class members who are presently serving as Quixtar IBOs and plan to do so into the future.  It offers no value to class members who have no interest in continuing their relationship with Quixtar. While the injunctive relief may benefit future Quixtar IBOs, these individuals are not part of the class and are not subject to the same releases of liability.  As such, the Court will not consider the benefits to non-class members in determining the fairness of the Settlement.

Accordingly, the Court orders the parties to address the following questions in supplemental briefing.  Each response should be supported by evidence filed with the Court.

- What is the basis for the parties' estimate that the injunctive relief in the Settlement has a value of $100 million to the class?

- How many members of the proposed class stand to benefit from the proposed injunctive relief?  That is -- how many members of the proposed class are still active Quixtar IBOs?

- Do any of the named Plaintiffs plan to continue their relationships with Quixtar?  If so, Plaintiffs should provide sworn declarations so stating.

    2.   The Product Credit Fund

There is an issue concerning the value to the class of the so-called "$21 Million Product Credit Fund."  In the Settlement Agreement, the parties agree that "[t]he value of the products distributed pursuant to the $21 Million Product Credit shall be

calculated based upon retail prices for those products." Id. §
6.2.5. However, Plaintiffs alleged in their FAC that Quixtar
products "are sold at inflated prices when compared to similar
products sold in the retail marketplace." FAC ¶ 36. Thus, it is
not clear to the Court that the Product Credit Fund provides a $21
million value to the class. Accordingly, the Court orders the
parties to address the following questions in supplemental
briefing. Each response should be supported by evidence filed with
the Court.

- How many members of the proposed class are eligible to
  receive a product bundle from Quixtar?

- What is the average cost to Quixtar of each $100 "product
  bundle"?

- The Settlement provides that "Quixtar's actual out-of-
  pocket shipping and handling charges" related to sending
  the product bundles "shall be paid from the Cash Fund."
  Settlement Agreement § 6.2.6. What is the estimated cost
  of shipping and handling per product bundle?

- The product bundles are limited to "Artistry skincare,
  HomeCare (limited to two bundles, each of which may be
  capped at not less than 30,000 claims per bundle), or
  Nutrilite vitamin, mineral, or supplement products." Id.
  § 6.2.1. On what basis did the parties conclude that
  these products were an adequate award for the class?

- The product bundles are only available to class members
  who purchased $100 or more in BSMs. What is the average
  amount of BSMs purchased by class members who purchased

22

1   any BSMs?

2   The Court also takes issue with the provision empowering Judge

3   Weinstein to make cy pres distributions.  If a cy pres distribution

4   must be made, it will be made by the Court.

5   3.   The Cash Fund

6   As stated above, there are numerous issues with the allocation

7   and size of the Cash Fund.  This $35 million fund will be used not

8   only to compensate the class, but to pay any attorneys' fees and

9   administrative costs.  The Settlement Agreement contemplates an

10  award of attorneys' fees of $20 million and a Notice Fund of

11  $500,000, which, if approved, would leave less than $15 million in

12  the Cash Fund for class members.  In addition, all administrative

13  costs would be paid out of the Class Fund, and the parties have not

14  provided an estimate of these costs.

15  Furthermore, to recover under the Settlement Agreement's

16  hardship provision, a class member must allege and document a

17  "special hardship" of at least $2500.  The parties do not define

18  special hardship, nor do they state how the supporting

19  documentation filed will be reviewed.[4]  The Court cannot approve

20  the Settlement unless it includes language clearly defining what a

21  "special hardship" is, how it differs from ordinary damages, what

22  type of documentation is necessary, and how that documentation will

23  be reviewed.  In addition, the Court orders the parties to address

24  

25  [4] The only guidance on what constitutes a "special hardship" is
26  provided in the proposed Claim Form.  Question 10 instructs
    claimants to "describe any special hardships you suffered, and
    include any supporting documents." Claim Form at 3.  The Claim
27  Form continues: "For example, did you lose a home or a job?  Did
28  you lose excessive money purchasing Quixtar products?"  Id.

23

**United States District Court**
For the Northern District of California

the following questions in supplemental briefing.  Each response
should be supported by evidence filed with the Court.

- How many members of the class are eligible to recover
  initial registration fees under the Settlement?  That is
  -- how many paid the original registration fee and did
  not continue participation in Quixtar?

- How many members of the proposed class are eligible to
  recover under the "hardship" provision of the settlement?

- What is the estimated amount of administrative costs to
  be paid out of the Cash Fund?

- What is the estimated cost of Class Notice?

- What is the estimated cost of Plaintiffs' counsel's
  expenses, excluding attorneys' fees?

- What is the amount of the initial registration fee that
  is recoverable under § 6.1.1 of the Settlement Agreement?

- What is the parties' justification for capping the total
  recovery of initial registration fees at $5 million?

- What is the average award to class members who can
  demonstrate hardship?

- If the Court opted against awarding special compensation
  to the named Plaintiffs (as contemplated by § 12.4 of the
  Settlement Agreement), how would the named Plaintiffs
  recover under the Settlement?

In sum, much more information is needed for the Court to
determine if the proposed Settlement is reasonable and fair.  In
lieu of submitting additional briefing, the parties may submit a
revised Settlement Agreement that addresses the Court's concerns.

### C.   **Adequacy of Proposed Notice**

The Court also takes issue with the Proposed Notice.  Notice to the class must provide:

> the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort. The notice must concisely and clearly state in plain, easily understood language: the nature of the action; the definition of the class certified; the class claims, issues, or defenses; that a class member may enter an appearance through counsel if the member so desires; that the court will exclude from the class any member who requests exclusion, stating when and how members may elect to be excluded; and the binding effect of a class judgment on class members under Rule 23(c)(3).

Fed. R. Civ. P. 23(c)(2)(B).

Too little is known about the parties' proposed Notice Plan to determine if it is the best notice practicable under the circumstances.  For instance, the parties state that class members will be notified by mail and/or e-mail, but they do not state how many will be notified using each method.  Because the class includes members who served as IBOs as long ago as 2003, it is likely that much of Quixtar's contact information for these IBOs is outdated.  Without more information about the Notice Plan, the Court cannot find that the notice constitutes a reasonable effort to reach all members; nor can it conclude that the ninety-day period for class members to file Claim Forms or opt out is fair.

As to the text of the Notice, the Court finds that it does not clearly communicate the broad binding effect of the Settlement. The Notice provides:

> Persons falling within the definition of the Settlement Class who do not file valid and

**United States District Court**
For the Northern District of California

1               timely requests for exclusion will be (1) bound

2               by any final Consent Judgment dismissing the
             action on the merits with prejudice; (2)

3               permanently barred and enjoined from
             commencing, prosecuting or participating in

4               recovery in any direct or representative
             action, or any action in any other capacity,

5               asserting or relating to any of the Released
             Claims, <u>as defined in the Settlement Agreement</u>.

6               Persons falling within definition of the
             Settlement Class who do file valid and timely

7               requests for exclusion from Settlement Class
             will have no right to participate in the Cash

8               Fund or the Product Credit.

9  Proposed Notice at 4 (emphasis added).

10       Thus, to learn the scope of claims released in this

11  Settlement, class members must first acquire the Settlement

12  Agreement and then read through the forty-two page document.  The

13  Settlement Agreement is not written in "plain, easily understood

14  language."  It is a highly technical legal document, and many of

15  the Settlement Agreement's key terms are contained in its

16  definitions section, <u>see</u> § 1; this is not where a layperson would

17  look for the key terms of an agreement.

18       Furthermore, some of the language in the Notice is misleading.

19  For instance, the Notice identifies the Product Credit Fund as the

20  "$21 Million Product Credit Fund," but does not state that this $21

21  Million figure was calculated using the alleged retail value of the

22  Quixtar products.

23       In the December 3, 2010 Amendment, the parties amend the

24  Settlement Agreement to require those seeking to object to the

25  Settlement to not only file notice of intent to appear with the

26  Claims Administrator, but also serve his or her objections upon

27  lead counsel for Plaintiffs and Quixtar and include "documentary

28

proof that he, or she or it is a member of the Settlement Class, and states the basis for the objections." December 3, 2010 Amendment ¶ 3. The Court rejects this additional step as an unnecessary burden on class members seeking to object to the Settlement.

For these reasons, the Court orders the parties to submit a Notice Plan with its supplemental briefing. This Notice Plan should provide detailed information on how the parties seek to provide the best notice to the class practicable under the circumstances. The parties should provide estimates as to how many class members' current mailing information is known and unknown, and provide the evidentiary basis for these estimates. The parties should provide estimates as to how many class members will be notified via mail and e-mail. The parties should provide details as to how they plan to effect timely notice on class members for whom no current contact information exists. Furthermore, the parties should submit a proposed Notice and Summary of Notice that, <u>in clear and plain language</u>, communicates to class members their rights and responsibilities under the proposed settlement and explains how to exercise those rights. The proposed Notice and Summary of Notice should also clearly state the expected cash amount to be disbursed to class members after attorneys' fees and all administrative costs are paid.

## V.   CONCLUSION

For the foregoing reasons, the Court DEFERS ruling on the parties' Motion for Settlement, and CONTINUES the hearing on this

**United States District Court**
For the Northern District of California

1    Motion to 10:00 A.M., April 8, 2011, in Courtroom 1, 17th Floor,

2    United States Courthouse, 450 Golden Gate Avenue, San Francisco,

3    California.

4         The Court ORDERS Plaintiffs Jeff Pokorny, Larry Blenn, and

5    Kenneth Busiere and Quixtar Inc., et al. to file supplemental

6    briefing on the Motion.  Plaintiffs' supplemental brief is due

7    March 11, 2011.  Defendants may file a brief in response on or

8    before March 18, 2011.  These briefs should comply with Civil Local

9    Rules 3-4 and 7-4 and be no greater than twenty-five pages in

10   length.  The factual allegations in these briefs should be

11   supported with sworn declarations and documentary evidence.[5]

12

13        IT IS SO ORDERED.

14

15   Dated:  December 29, 2010          _____

16                                      UNITED STATES DISTRICT JUDGE

17

18

19

20

21

22

23

24   _____

25   [5] The Court takes issue with the parties' multiple untimely

26   amendments to their Motion for Settlement, one of which was filed
     two days before the scheduled hearing.  The parties' Motion was

27   essentially a first draft.  The Court will not accept another first
     draft; nor will it accept amendments or additional documents filed

28   after these dates absent good cause.