# Exhibit E to Settlement Agreement: Second Amended Complaint

David W. Shapiro, Esq.
BOIES, SCHILLER & FLEXNER LLP
1999 Harrison Street, Suite 900
Oakland, California 94612
Telephone: (510) 874-1000
Facsimile: (510) 874-1460
E-mail: dshapiro@bsfllp.com
California Bar Number: 219265

*Additional attorneys on following page*

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Jeff Pokorny, Larry Blenn, and Kenneth Busiere, on behalf of themselves and those similarly situated, | **CASE NO. C 07-0201 SC** |
| Plaintiffs, | **[PROPOSED] SECOND AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL** |
| v. | |
| Quixtar, Inc., | <u>CLASS ACTION</u> |
| Defendant. | |

1          Additional counsel:

2   David Boies, Esq. (*Pro Hac Vice*)
    BOIES, SCHILLER & FLEXNER LLP
3   333 Main Street
    Armonk, NY 10504
4   Telephone: (914) 749-8200
5   Facsimile: (914) 749-8300
    E-mail: dboies@bsfllp.com
6
7   Stuart H. Singer, Esq. (*Pro Hac Vice*)
    Carlos M. Sires, Esq. (*Pro Hac Vice*)
8   Sigrid S. McCawley, Esq. (*Pro Hac Vice*)
    BOIES, SCHILLER & FLEXNER LLP
9   401 East Las Olas Boulevard, Suite 1200
    Fort Lauderdale, Florida 33301
10  Telephone: (954) 356-0011
11  Facsimile: (954) 356-0022
    E-mail: ssinger@bsfllp.com
12  E-mail: csires@bsfllp.com
    E-mail: smccawley@bsfllp.com
13
14  Willie E. Gary, Esq. (*Pro Hac Vice*)
    Maria Sperando, Esq. (*Pro Hac Vice*)
15  GARY, WILLIAMS, FINNEY, LEWIS,
    WATSON & SPERANDO
16  221 East Osceola Street
    Stuart, Florida 34994
17  Telephone: (772) 283-8260
18  Facsimile: (772) 220-3343
    E-mail: weg@williegary.com
19  E-mail: mps@williegary.com
    E-mail: mad@williegary.com
20

21

22

23

24

25

26

27

28

**CLASS ACTION COMPLAINT**

Plaintiffs Jeff Pokorny, Larry Blenn, and Kenneth Busiere, on behalf of themselves and those similarly situated, sue defendant Quixtar, Inc. ("Quixtar"), and allege as follows:

**Nature of Action**

1.    This is an action for injunctive relief and to recover damages caused by defendant Quixtar's operation of an illegal scheme.  This scheme is fraudulent because it induces individuals to invest in products and marketing tools and to recruit new victims into the scheme with the false promise of enormous profits.  The illegal scheme here consists of two separate, but related businesses: Quixtar, Inc., a multilevel marketing business, and the "BSM Corporations," which are a group of businesses and their owners that sell purported motivational "business support" materials and services ("BSM") to distributors of Quixtar's products.  New entrants into the illegal scheme are effectively required to invest money to buy products from Quixtar and "tools and functions" from the BSM Corporations.  Because Quixtar distributors (referred to as "Independent Business Owners" (or "IBO's" by Quixtar)) most often do not sell products to consumers who are not also distributors, they can obtain a return on their investment in the Quixtar program only by recruiting new distributors who will then buy products (and recruit more distributors who will buy products), which purchases result in "bonuses" to the recruiting distributor.

**Type of Action**

2.    This is an action brought, on behalf of a national class of distributors, pursuant to the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.* ("RICO"), unfair and deceptive practices acts enacted in the fifty states and the District of Columbia and common law fraud.  The plaintiffs seek damages and injunctive relief.

### **Parties**

3.      Plaintiff Jeff Pokorny ("Pokorny") is, and at all material times was, an individual who resides in the county of Alameda, in the state of California.  Pokorny entered into a Registration Agreement with Amway and became an Amway distributor on or about October 1994.  He later became a Quixtar distributor when the Amway organization launched Quixtar, at which time all Amway distributors in the United States were converted to Quixtar distributors.  While a distributor, Pokorny was in the World Wide DreamBuilders' "line of sponsorship" run by Ron Puryear and Georgia Lee Puryear.  Pokorny operated his Quixtar distributorship under the name "Pokorny Enterprises."

4.      Plaintiff Larry Blenn ("Blenn") is, and at all material times was, an individual who resides in the county of San Joaquin, in the state of California.  On or about May 4, 2005, Blenn signed a Quixtar Business Name Change form and became a Quixtar distributor.  The Business Name Change form did not contain an arbitration provision.  Blenn was not given a copy of the Rules of Conduct upon signing the Business Name Change Form.  Blenn does not recall signing any other paperwork with Quixtar.  While a distributor, Blenn was in the World Wide DreamBuilders' "line of sponsorship" run by Ron Puryear and Georgia Lee Puryear.  Blenn operated his Quixtar distributorship under the name "Blenn Enterprises."

5.      Plaintiff Kenneth Busiere ("Busiere") is, and at all material times was, an individual citizen who resides in the county of Los Angeles in the state of California.  Busiere entered into the Quixtar Registration Agreement and became an "IBO" on or about October 2005.  Busiere was in the World Wide Dream Builders' "line of sponsorship," run by Ron and Georgia Lee Puryear.

6.      Defendant Quixtar, Inc. ("Quixtar") is, and at all relevant times was, a corporation organized under the laws of the state of Virginia, with its principal place of

business in the state of Michigan, and doing business regularly throughout the United States, including in the state of California. Quixtar transacts its business in the Northern District of California in accordance with 18 U.S.C. § 1965(a) and (b) and California Code of Civil Procedures § 410.10. Defendant Quixtar is the successor-in-interest of the Amway Corporation ("Amway"), which did business in the state of California and in this District.

### Jurisdiction and Venue

7.    Defendant Quixtar is subject to the jurisdiction of this Court. Defendant Quixtar has at all relevant times been engaged in continuous and systematic business in this State, has designated agents for service of process in this State, and has committed tortious acts in this State. The actions giving rise to this lawsuit were taken by defendant Quixtar at least in part in California. Plaintiffs Pokorny, Blenn, and Busiere are citizens of California. In accordance with 18 U.S.C. § 1965(a) and (b), the defendant Quixtar is subject to this Court's jurisdiction in that they "transact affairs" in the Northern District of California and "the ends of justice require that other parties residing in any other district be brought before the Court, the Court may cause such parties to be summoned, and process for the purpose may be served in any judicial district of the United States by the marshal thereof." 18 U.S.C. § 1965(a) and (b). In accordance with California's long-arm statute, California Code of Civil Procedure § 410.10, this Court has personal jurisdiction over the defendant Quixtar.

8.    Because plaintiffs assert claims pursuant to the Racketeer Influenced Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 – 1968, this Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331. This Court may exercise supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over the state law claims of the fifty states and the District of Columbia.

9.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and (c) and 18 U.S.C. § 1965(a) and (b) because a substantial number of the acts and transactions that gave rise to the claims of the plaintiffs and the plaintiff class occurred within this District; defendant Quixtar did, or solicited, business, and transmitted communications by mail or wire relating to their illegal scheme in this district; transacted their affairs, and/or resided within California and this judicial district; plaintiff Pokorny is a resident of this district, and defendant Quixtar's wrongful acts occurred in this District and have directly impacted the general public of this district; and the ends of justice require that parties residing in other districts be brought before this Court.

## The Arbitration Agreement

10.      Before becoming Quixtar distributors, prospective distributors, including plaintiffs and members of the class, were required to sign Quixtar's Registration Agreements.  In very small print buried in the Registration Agreement there is an arbitration provision.  The arbitration provision is provided on a "take-it-or-leave-it" basis with no opportunity for negotiation.  The prospective distributors received no explanation of the arbitration provision and would not have been permitted to become Quixtar distributors unless they signed the Registration Agreement which contains the offending and unenforceable arbitration provision.  As a result of the unequal bargaining positions, the hidden terms and the overall harshness of the adhesive arbitration provision, defendant Quixtar's arbitration provision is procedurally unconscionable. Plaintiffs do not assert that the entire Registration Agreement is unconscionable; rather they assert that the arbitration provision contained in Quixtar's Registration Agreement is unconscionable.

11.      Defendant Quixtar's arbitration provision is also permeated with substantively unconscionable terms as demonstrated by the following examples, which are not exhaustive.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

12.     The arbitration provision incorporates Quixtar's Rules of Conduct.  (*See* Ex. 1, Quixtar's IBO Registration Agreement ("Authorization and Agreement").)  The Rules of Conduct grant Quixtar the power to unilaterally modify the arbitration provision at anytime, thereby rendering the arbitration provision illusory.  More specifically, the Rules of Conduct provide that  "[i]n order to preserve the goals and purposes of the IBO Plan, the corporation reserves to itself the sole right to adopt, amend, modify, supplement or rescind any or all of these Rules . . . ."  Defendant Quixtar's unilateral right to modify renders the arbitration agreement substantively unconscionable.

13.     Defendant Quixtar's arbitration provision is also substantively unconscionable to the extent it provides arbitrators biased by virtue of Quixtar's ability to "train" the arbitrators who are to resolve disputes.

14.     Defendant Quixtar's arbitration provision subjects distributors to prohibitively expensive arbitration fees thereby rendering the agreement substantively unconscionable.  Quixtar's arbitration agreement requires an individual to pay "location" costs for the arbitration and hearing costs that total $18,000.00 for a three day trial. These excessive hearing fees work to preclude distributors from vindicating their rights. While rules do provide for indigent relief, the likelihood of being able to establish indigency is difficult and the decision rests with the Case Administrator.

15.     The Quixtar arbitration agreement arbitrarily provides a two year statute of limitation for any claims brought by a distributor against Quixtar.  This provision severely limits a distributor's right where, as in this case, the plaintiffs are seeking relief under a federal statute that provides a four year statute of limitations.

16.     In addition, Quixtar's arbitration provision purports to restrict a distributor's right to bring a class action.  This class action restriction further renders the arbitration provision substantively unconscionable.

17.     Finally, Quixtar's mandatory pre-arbitration "conciliation" process also renders the arbitration provision substantively unconscionable.  This lengthy and onerous process is designed to stifle claims against Quixtar.  In fact, the Rules of this "conciliation" process require the distributor to submit his claim to Quixtar to allow Quixtar, the offending party, to resolve the claim.

18.     Because Quixtar's arbitration provision is unconscionable, the claims of the plaintiffs and the class are not subject to arbitration and this action is properly before this Court.

## The Nature of Illegal Schemes

## Quixtar and the BSM Corporations Operations Constitute an Illegal Scheme

19.     Quixtar and the BSM Corporations operate a fraudulent scheme. Together, they recruit people to become Quixtar distributors, entice them to purchase Quixtar products and related "tools and functions" through material false statements and omissions, and then distribute the proceeds of product sales to new recruits based almost exclusively on participants' recruitment of new victims, rather than on the sale of products to retail users of Quixtar's products.  As a result of investing in the scheme, plaintiffs and the class have suffered millions of dollars in losses.

20.     The defendant Quixtar, BSM Corporations and their owners have operated and promoted the fraudulent scheme through the use of the United States mail and interstate wire communications.  Through the creation and operation of the illegal scheme, defendant Quixtar specifically intended to, and did in fact, defraud the distributors, including plaintiffs and the members of the class.

21.     The first part of the illegal scheme consists of a multi-level marketing business run by Quixtar.  At the bottom rung of the operation is a network of IBOs. Quixtar induces new recruits to join the Quixtar program through material false representations that such recruits will be able to re-sell Quixtar products for a profit.

Quixtar purports to sell its consumer products through the IBOs, but in fact few of Quixtar's products are ever sold to anyone other than the IBOs, and IBOs are not financially rewarded by Quixtar or its affiliated companies for selling the products to consumers. The prices IBOs pay for Quixtar's products (and associated costs) are so high that any profit on retail sales is virtually impossible. In practice, 95% of Quixtar's products are not sold to retail consumers, but rather to the IBOs. Because the IBOs are Quixtar's actual customers and consumers of its products, Quixtar requires an ever expanding network of so-called distributors (IBOs) in order to keep Quixtar afloat.

22.    Quixtar's lowest level distributors are instructed not to waste their time on marketing and selling the Quixtar products to actual retail consumers, but instead to focus on consuming the products themselves and recruiting others to be distributors. Quixtar provides its distributors with lists of products they should purchase for their own use in order to turn their home into a "300 PV Home" (a PV is point system by which distributors earn "bonuses"). (See Ex. 2, The 300 PV Home flyer.) Quixtar products would be difficult to sell to consumers unaffiliated with Quixtar in any event because they are sold by Quixtar at inflated prices when compared to similar products sold in the retail marketplace.

23.    New distributors are assigned to an existing "line of sponsorship" to which the recruiting distributor already belongs. The lines of sponsorship include a hierarchy of distributors that start with the newly-recruited distributors and proceed by seniority up to a senior distributor who heads the line of sponsorship. Junior (or "downline") distributors purchase products from more senior (or "upline") distributors within their line of sponsorship, as well as the "tools and functions" described below. Bonuses are paid to upline distributors based on sales of Quixtar products and "tools and functions" to downline distributors.

24.     The fraudulent schemes operates with the following lines of sponsorship, which are associated with Quixtar:

Bill and Peggy Britt, Inc.;

D & B Yager Enterprises, Inc.;

Puryear Enterprises, Inc.;

The Foley Corporation of America;

Larry and Pamela Winters;

Louis Martin Chavez and Maria D. Chavez;

Ambassador Mrkt Itl;

JEV Inc.;

IBA, Inc.;

Floor International, Inc.;

Rick and Sue Setzer;

S and H Enterprises, Inc.;

George and Melody Peintner Revlilv Trust;

Teambuilders Leadership, Inc.; and

Johnson Unlimited, Inc.

(*See generally*, Ex. 3, Quixtar Facts, available at http://www.quixtarfacts.com/ quixtarandloas.html.)

25.     The second part of the defendant Quixtar's illegal scheme consists of a group of businesses that sell "tools and functions" purportedly to help downline distributors sell the Quixtar products. These "tools and functions" businesses are operated by the BSM Corporations.

26.     The "tools and functions" businesses sell "tools" that purport to help market and sell Quixtar products and "functions" that consist of motivational meetings and events. The tools include tapes, CDs and videos, which contain information that

BSM Corporations and their owners, with Quixtar's knowledge and consent, represent are essential to success as a distributor. Quixtar distributors who operate BSM Corporations and are compensated on Quixtar's sales of products to other lower level distributors within their lines of sponsorship, the majority of their revenue is derived from the "tools and functions" business of their BSM Corporations. Lower level distributors in the lines of sponsorship are effectively required to purchase the "tools and functions" from the BSM Corporations. Distributors are told that the "tools and functions" are necessary to help them become successful Quixtar distributors. For example, the starter kit for new IBOs, which is distributed by Quixtar, states unequivocally: "As with any business, there will obviously be an investment involved. You will need "tools" to build your business successfully." (*See* Ex. 4, IBO Starter Kit at 15 (emphasis added).) The starter kit provided by Quixtar to new distributors includes a list of tools that are recommended for purchase by all new distributors. The total cost of this initial set of tapes and materials is $434.94. (*Id.* at 16.)

27.      Quixtar tells distributors that, despite their cost, the tools are necessary to be successful. Indeed, during the few months that Plaintiff Busiere was an IBO, he purchased over $500.00 in tools.

28.      The "functions" aspect of the business includes numerous costly mandatory meetings, "training" sessions and weekend functions for IBOs. For example, someone who is affiliated with the defendant Quixtar told plaintiff Busiere that attending the functions and purchasing the tools were necessary to the business and would result in the realization of tremendous wealth. As a result, plaintiff Busiere purchased a ticket and attended the Anaheim Dream Weekend. (*See* Ex. 5, World Wide Dream Builder LLC's, Dream Night 2006 ticket stub.)

29.      In truth, the BSM Corporations' and the defendant Quixtar's statements about the need for tools and functions are materially false. These "tools and functions"

1  do not help the distributors sell Quixtar products to end consumers at retail.  Few Quixtar

2  products are sold to consumers; instead, most are purchased by Quixtar distributors for

3  their own use, and to the extent distributors do sell the Quixtar products, any profit is

4  eliminated by the costs of buying the "tools and functions."

5       30.     The only value of the "tools and functions" products to lower level

6  distributors is that some of the material teaches them how to recruit new distributors, to

7  whom they can sell Quixtar products and, thus, from whom they can earn "bonuses."  In

8  fact, the IBO Starter Kit sold by World Wide Group contains a section specifically

9  designed to teach IBOs how to recruit new IBOs.  For example, the section "Invite Your

10  Prospects" provides:

11       Inviting your prospects is where it starts to get fun…
        Tips:  Be in a hurry and keep it simple. The most common mistake is
12       saying too much … "Hi _____ this is _____. Are you going to be
        home tomorrow night? Great I just got back from a seminar that explained
13       how to create an income by using the technology of the internet. I grabbed
        you some information (tape/video/CD) because I thought you might be
14       interested…."

15
    (See Ex. 4, IBO Starter Kit at 11.)
16
         31.     In truth, distributors are recruited to defendant Quixtar because Quixtar
17
    omits to inform the distributors that they are entering into an illegal scheme, which is a
18
    material omission.  Quixtar also makes material false representations that distributors can
19
    significantly supplement their incomes, or even become rich and retire, by becoming
20
    Quixtar distributors despite the fact that Quixtar knows, but omits to tell distributors, that
21
    approximately 99% of Quixtar's distributor network has lost significant savings as a
22
    result of buying products from Quixtar and "tools and functions" from BSM
23
    Corporations.
24
         32.     The ownership of the "tools and functions" businesses demonstrates the
25
    close association between defendant Quixtar, the owners of the BSM Corporations, and
26

27
28

their affiliated lines of sponsorship.  For example, below are some of the BSM

Corporations, their owners and affiliated lines of sponsorship:

| BSM Business Name | Owners | Affiliated Independent Business |
|---|---|---|
| Britt Worldwide, LLC | Bill and Peggy Britt | Bill and Peggy Britt, Inc. |
| InterNET Services Corporation | Yager Family Trust, Dex Yager, Birdie Yager, Jeff Yager, Steve Yager and Doyle Yager | D & B Yager Enterprises, Inc. |
| Worldwide Dreambuilders | Ron Puryear, Geogia Lee Puryear, James Puryear, Jr., and Kelly Lee Puryear | Puryear Enterprises, Inc. |
| eFINITY | Tim Foley and Foley Children's Trust | The Foley Corporation of America |
| Leadership Team Development, Inc. | | Larry and Pamela Winters |
| Vision Global, LLC | Chavez | Luis Martin Chavez and Maria D. Chavez |
| Network 21  International, Inc. | Jim Dornan, Nancy Dornan, Heather Dornan, David Dornan and Julie Ann Dornan | Ambassador Mrkt Itl |
| MarkerNET, Inc., d/b/a MarkerMan Productions | Joseph Victor, Kathleen Victor, Stephen Victor and Joseph Victor III | JEV Inc. |
| UR Association | Rex Renfrow and Betty Jo Renfrow | IBA, Inc. |
| International Networking Association, Inc. | James Floor and Margaret Floor | Floor International, Inc. |

| **BSM Business Name** | **Owners** | **Affiliated Independent Business** |
|---|---|---|
| Setzer International, Inc./Team 100 | | Rick and Sue Setzer |
| Proalliance | Hal and Susan Gooch | S and H Enterprises, Inc. |
| World Information Network | George Peintner and Melody Peintner | George and Melody Peintner Revlily Trust |
| Team Builders Business Development, LLC and Team Builders Personal Development, LLC | Suzanne Ledbetter | Teambuilders Leadership, Inc. |
| GlobalNet | Leif and Bonnie Johnson | Johnson Unlimited, Inc. |

This group of "tools and functions" businesses and their owners will be collectively referred to as "BSM Corporations."

33.      While Quixtar and the BSM Corporations independently perpetrate a fraud on distributors, they also have a symbiotic relationship that furthers their ability to carry on the illegal scheme and have agreed to work together to promote and perpetuate the illegal scheme.

34.      By way of example, Quixtar's "Achieve Magazine," which is distributed by Quixtar to distributors through the United States mail, promotes the owners of the BSM Corporations' tools businesses.  The January 2001 issue of Achieve Magazine contains a joint promotional statement by Ron and Georgia Lee Puryear, who head the World Wide DreamBuilders line of sponsorship, and Doug DeVos Quixtar's Chief Operating Officer.  The joint statement provides:

> We are now more convinced than ever that the largest business is yet to be built . . . . We believe it could just as easily be someone who possesses a

dream and reads this Achieve Magazine for the first time, perhaps listens to a motivating tape, attends a function and begins to build their dream by showing the plan and sharing their dream with others.

(*See* Ex. 6, Achieve Magazine, January/February 2001 issue at 3.)  The following pages of the Quixtar Achieve Magazine promote the World Wide Group's "tools" business with advertisements for tapes, books and videos sold by Puryears and the World Wide Group. (*Id.* at 14.)

35.     Defendant Quixtar and BSM Corporations continue to send plaintiffs and class members unsolicited advertisements and other materials in an effort to recruit them to join and/or continue participating in the Quixtar program.  For example, in a December 31, 2006 e-mail to Busiere, World Wide Dream Builders encouraged Busiere to renew his IBO status and said he would "go into 2007 with 2006's success and a renewed commitment to fight for our financial freedom!"  (Ex. 7, December 31, 2006 e-mail from Chris and Michelle Arcebal of World Wide Dream Builders to Plaintiff Busiere.)  On December 18, 2006, Busiere received a letter from World Wide Dream Builders soliciting him to renew his Quixtar business, claiming, "one of the most profitable things you can do this year is to renew your Quixtar business by December 31, 2006."  (Ex. 8, December 18, 2006 letter from Chris and Michelle Arcebal of World Wide Dream Builders to Plaintiff Busiere.)

36.     Defendant Quixtar's scheme violates the federal RICO and mail and wire statutes and the California Penal Code § 327 because it is a fraudulent scheme.  Accordingly, even if defendant Quixtar can establish compliance with the FTC's decision in *In re Amway Corp.*, 93 F.T.C. 618 (1979), which it cannot as explained below, the scam nevertheless violates the federal mail and wire statutes and the California Penal Code § 327.

37.     Defendant Quixtar and BSM Corporations have attempted to mask their conduct behind a 25 year old FTC order, in *Amway*, which held that Quixtar's predecessor company, Amway, did not violate the FTC Act.  Defendant Quixtar and the BSM Corporations actions do constitute a scheme to defraud under federal law, and do not even meet the requirements described in the Amway order.

38.     In *Amway*, the FTC ruled that Amway did not violate the FTC Act because it adopted and purportedly enforced certain rules that were intended to avoid the characteristics of an FTC Act violation.

39.     The FTC held that a direct marketing business like Amway would not be in violation of the Act if the sponsor of the business did not violate the "initial investment" rule, the "70%" rule, the "buyback" rule, and the "10 customer" rule, all of which are described in more detail below.

40.     The FTC reasoned in *Amway* that:

> The Amway system is based on retail sales to consumers.  Respondents have avoided the abuses of pyramid schemes by (1) not having a 'headhunting' fee; (2) making product sales a precondition to receiving the performance bonus; (3) buying back excessive inventory; and (4) requiring that products be sold to consumers Amway's buy-back, 70% and ten customer rules deter unlawful inventory loading . . . .

*Id.* at [107-109].  Accordingly, if any one of these rules is not followed, then the business at issue may be deemed an illegal scheme.

41.     On its website, defendant Quixtar denies that its business is an illegal scheme, citing the FTC in *Amway*.  (*See* Ex. 9, http://www.ibofact.com/Quixtar-Questions-22QuixtarQuestions.htm#question%205.)  Contrary to the pronouncements on its website, defendant Quixtar operates an illegal scheme, and its rules and policies are a sham, meant to give the appearance that defendant Quixtar complies with the rules described in *Amway*, but which are routinely ignored in practice.

42.     **The Initial Investment Rule**:  The FTC decision noted that illegal schemes involve a payment or initial disbursement by a new participant in exchange for the right to sell products and the right to receive rewards, in return for recruiting other participants into the program and which are unrelated to sale of product to the ultimate user.  The FTC found that Amway did not require such an investment because "the Amway system does not involve an 'investment' inventory by a new distributor.  A kit of sales literature costing only $15.60 is the only requisite."  *In re Amway Corp.*, 93 F.T.C. 618, [107] (1979).  Today, however, defendant Quixtar and the BSM Corporations require a significant investment by a new distributor.  Each new Quixtar distributor is effectively required to make an initial investment of thousands of dollars through the purchase of Quixtar products and through the purchase of the "tools and functions" materials.  For example, the starter kit for new IBOs, which is distributed by Quixtar, states unequivocally: "As with any business, there will obviously be an investment involved.  You *will need* 'tools' to build your business successfully."  (*See* Ex. 4, IBO Starter Kit at 15 (emphasis added).)  Quixtar's Achieve Magazine for May/June 2006 encourages existing IBOs to have new registrants purchase products at the same time they register:

> Activation: The biggest factor affecting activation is whether an IBO buys products at registration.  Quixtar's data says that IBOs who register with PV are much likelier to order products after registration. *To impact activation: promote the purchase of products with every registration.*

(*See* Ex. 10, *Four Signs of Business Health*, Achieve Magazine, May/June 2006 issue at 8.)  While Quixtar's initial sign up fee is $117.00, in practice, defendant Quixtar and BSM Corporations require an initial investment by a new distributor in an average amount of between $2000 and $4000 in the first twelve months, through the purchase of products and the "tools and functions" materials.

---

43.     **The "70%" Rule**:  In the *Amway* decision, the FTC explained the 70% rule as follows: "[t]o ensure that distributors do not attempt to secure the performance bonus solely on the basis of purchases, Amway requires that, to receive a performance bonus, distributors must resell at least 70% of the products they have purchased each month.... Amway enforces the 70% rule." *Amway*, 93 F.T.C. 618 at [72-75].  Quixtar has a 70% rule in the Quixtar Business Reference Guide:

> An IBO must sell at least 70% of the total amount of products purchased during a given month in order to receive the Performance Bonus or recognition due on all the products purchased, if the IBO fails to sell at least 70%, then such IBO may be paid that percentage of Performance Bonus measured by the amount of products actually sold, rather than the amount of products purchased, and recognized accordingly.

(*See* Ex. 11, Business Reference Guide at D-19 (Rules of Conduct 4.18).)  In practice, Quixtar does not enforce the 70% rule and allows product purchases for self-consumption by IBOs and sales to the downline distributors to count toward the 70% retail sales.  (*See* Ex. 12, January 20, 2004 Memo from Ron Mitchell of Quixtar's Rules Administration Office.)  Thus, Quixtar also violates the 70% rule of the *Amway* decision.

44.     **The "Buyback" Rule**:  In the *Amway* decision, the FTC described the buyback rule as follows:  "Amway, the Direct Distributor or the sponsoring distributor will buy back any unused marketable products from a distributor whose inventory is not moving or who wishes to leave the business . . . .  Amway enforces the buy-back rule . . . ."  *Amway*, 93 F.T.C. 618 at [72-75].  Quixtar's buyback rule set forth in Section D-22 of the Rules of Conduct Rule 5.3.6 provides that:

> IBOs are required to purchase back from any of their personally registered IBOs who are resigning their IBO, upon their request, any unused currently marketable products and/or currently marketable literature and merchandising or business-building aids…The IBO shall offer to repurchase said products, literature, and merchandising or business-building aids at a price mutually agreeable to the departing IBO.

1  (*See* Ex. 11, Business Reference Guide at D-22.)  In practice, however, defendant Quixtar

2  does not enforce the buyback policy for its products.  First, its rule provides that the

3  buyback price will be "mutually agreeable," and, in practice the lower level distributor is

4  at the mercy of whatever price its upline distributor decides to pay for the returned

5  inventory, which is typically a fraction of the original price paid by the distributor.

6  Second, distributors are uniformly discouraged from asking for a buyback.  Therefore,

7  distributors are left with thousands of dollars of inventory that cannot be sold on the retail

8  market.  Third, the buyback rule applies only to "resigning" IBOs.  Therefore, when an

9  IBO purchases Quixtar products and is unhappy with the product or has purchased too

10  much product, Quixtar is not required to buy back the products from a current IBO.  In

11  addition, while Rule 5.3.6.1.2 provides that the buyback rule "is not intended to prohibit

12  buy-back or exchange of products, literature, or merchandising and business-building

13  aids upon mutual agreement between an IBO and one of his or her personally registered

14  IBOs under circumstances other than those wherein an IBO has elected to resign," there

15  is no requirement that Quixtar buy back any product.  (*See* Ex. 11, Business Reference

16  Guide at D-22.)  Thus, there is no guarantee that a current IBO can return the products,

17  and that lack of a guarantee violates the Amway buy-back rule.  Most products sold to

18  distributors are never bought back by Quixtar, regardless of the desires of the lower level

19  distributors.

20      45.  The BSM Corporations' buyback rule for its "tools and functions" sales is

21  similarly illusory.  The policy provides for a refund on "commercially reasonable" terms,

22  but those terms are dictated by the BSM Corporations.  In practice, the BSM

23  Corporations either refuse to buy-back any "tools and functions" materials or pay only a

24  fraction of the original purchase price as compensation.  While defendant Quixtar

25  instructs distributors that the "tools and functions" materials are necessary, defendant

26

27

28

Quixtar's Rules of Conduct 5.3.6.3 provides that for these purchases "the corporation cannot assist in procuring such refund." (*See* Ex. 11, Business Reference Guide at D-22.)

46.    **The Ten Customer Rule**:  The "ten customer rule" approved by the FTC in *Amway* provided that "distributors may not receive a performance bonus unless they prove a sale to each of ten different retail customers during each month. . . . The ten customer rule is enforced by Amway and the Direct Distributors. . . ." *Amway*, 93 F.T.C. 618 at [72-75].  The FTC added:  "Amway's ten-customer rule deters inventory loading by sponsoring distributors." Id. at [142-147].  Defendant Quixtar does not enforce the ten customer rule and, indeed, tacitly approves systematic noncompliance with it.

47.    First, by defendant Quixtar's own definition, sales to individuals who are affiliated with defendant Quixtar in some manner, and who are thus not retail customers, count as sales to customers, contrary to what the FTC *Amway* Order contemplated. Quixtar's Member/Client Volume Rule in the Rules of Conduct Section D-19 Rule 4.22 provides:

> In order to obtain the right to earn a Performance Bonus on downline volume during a given month, an IBO must: (a) make not less than one sale to each of 10 different retail customers (*e.g., Members or Clients*); or (b) have at least 50 PV of sales to any number of retail customers; or (c) have $100 at Member/Client Volume Cost.  Member/Client Volume Rule Cost shall mean the published IBO cost for all items or any orders sold to a Member or Client, or the actual price paid to Partner Stores by Members or Clients.  If applicable, Partner Store Member/Client Volume Rule Cost is applied in the month when the Corporation credits Partner Store Volume to an IBO's business.

The Rules of Conduct define the terms "member" and "client" as follows:

> Member: 'A registered customer, who for a fee may purchase products and services at preferred pricing and be entitled to an array of other member benefits.'

> Client: 'A retail customer registered with Quixtar who has the ability to purchase directly.'

(*See* Ex. 8, Business Reference Guide at E-3 and E-5.)  Quixtar by its own rule does not require IBOs to sell products to retail customers unaffiliated with the scheme in order to qualify for a bonus.  Accordingly, Quixtar's business plan violates the FTC's ten customer rule because it does not require distributors to sell products to any true unaffiliated retail customers.

48.     Second, defendant Quixtar does not even enforce the ten customer rule as written.  In order to appear to enforce this rule, defendant Quixtar created a "self-reporting" system for distributors to certify that they comply with this policy.  Defendant Quixtar knows that this rule is not followed and that the BSM Corporations uniformly instruct the downline distributors to "check" the ten customer box on their reporting form, regardless of whether they have made ten sales to retail customers.  Plaintiff Busiere was instructed by his upline not to worry about this rule.

49.     Defendant Quixtar and the BSM Corporations are aware of, approve, promote, and facilitate the systematic noncompliance with or breach of, the rules that purportedly protect against the operation of an illegal scheme, as discussed in the Amway C Order.

### Class Action Allegations

50.     This action is brought by plaintiffs as a class action pursuant to Federal Rule of Civil Procedure 23.

51.     Plaintiffs Pokorny and Blenn seek relief on behalf of themselves and a nationwide class of all persons who were defendant Quixtar distributors from January 2003 until the present and who were injured as a result of defendant Quixtar's illegal scheme (the "class").  Excluded from the class are the defendant, their employees, family members, and affiliates.

52.    Plaintiffs Pokorny, Blenn, and Busiere also seek relief for themselves and the same national class pursuant to the unfair and deceptive practices acts enacted in the fifty states and the District of Columbia and common law fraud.

53.    Plaintiffs Pokorny, Blenn, and Busiere further seek to pursue a private attorney general action for injunctive relief on behalf of the people of California, and they satisfy the applicable standing and class action requirements, as described herein.

54.    The members of the class number in the thousands and joinder of all Class members in a single action is impracticable.

55.    There are questions of law and/or fact common to the class and subclass, including but not limited to:

a.    Whether defendant Quixtar was operating an unlawful scheme;

b.    Whether distributors paid money to defendant Quixtar in exchange for (i) the right to sell a product and (ii) the right to receive, in return for recruiting others in to the program, rewards which were unrelated to the sale of the product to retail consumers;

c.    Whether distributors were required to make an investment into the illegal scheme;

d.    Whether defendant Quixtar enforced the 70% rule;

e.    Whether defendant Quixtar enforced the buy-back rule;

f.    Whether defendant Quixtar enforced the ten customer rule;

g.    Whether defendant Quixtar omitted to inform plaintiffs and the plaintiff class that they were entering into an illegal scheme where over 90% of participants lose money;

h.    Whether defendant Quixtar engaged in acts of mail and/or wire fraud in direct violation of RICO;

1              i.       Whether and to what extent the conduct has caused injury to the

2      plaintiff and the plaintiff class;

3              j.       Whether defendant Quixtar's conduct constitutes an unlawful,

4      unfair and/or deceptive trade practice under state laws;

5              k.       Whether defendant Quixtar's conduct constitutes unfair

6      competition under state laws; and

7              l.       Whether defendant Quixtar's conduct constitutes fraud.

8      56.     These and other questions of law and/or fact are common to the class, and

9      predominate over any question affecting only individual class members.

10     57.     The plaintiffs' claims are typical of the claims of the class in that plaintiffs

11     were distributors for defendant Quixtar and lost money as a result of the illegal scheme.

12     58.     The plaintiffs will fairly and adequately represent the interests of the class

13     in that plaintiffs' claims are typical of those of the class and plaintiffs' interests are fully

14     aligned with those of the class.  The plaintiffs have retained counsel who is experienced

15     and skilled in complex class action litigation.

16     59.     Class action treatment is superior to the alternatives, if any, for the fair and

17     efficient adjudication of the controversy alleged herein, because such treatment will

18     permit a large number of similarly-situated persons to prosecute their common claims in

19     a single forum simultaneously, efficiently and without unnecessary duplication of

20     evidence, effort, and expense that numerous individual actions would engender.

21     60.     The plaintiffs know of no difficulty likely to be encountered in the

22     management of this action that would preclude its maintenance as a class action.

23                              **FIRST CLAIM FOR RELIEF**
       **(Judgment Declaring Quixtar's Arbitration Agreement Unconscionable)**

24

25     61.     Plaintiffs Pokorny, Blenn, and Busiere re-allege the foregoing paragraphs

26     as though fully set forth herein.

27
28

62. Plaintiffs Pokorny, Blenn, and Busiere, and the class do not claim the Quixtar Registration Agreement is unconscionable, but do claim the arbitration provision contained within the Registration Agreement is procedurally and substantively unconscionable.

63. Defendant Quixtar's Registration Agreement contains an arbitration provision.

64. Defendant Quixtar's arbitration provision was presented to plaintiffs and the plaintiff class on a "take it or leave it basis." The plaintiffs and plaintiff class were not given any opportunity to negotiate the terms of the arbitration provision. As such, the arbitration provision is procedurally unconscionable.

65. Defendant Quixtar's arbitration provision is permeated with substantively unconscionable terms examples of which, while not exhaustive, are as follows:

66. Defendant Quixtar's arbitration provision incorporates Quixtar's Rules of Conduct. Defendant Quixtar's Rules of Conduct grant Quixtar the power to unilaterally modify the terms of the arbitration provision at any time, thereby rendering the arbitration provision illusory. Defendant Quixtar's unilateral right to modify the arbitration provision renders the arbitration agreement substantively unconscionable.

67. Defendant Quixtar's Rules of Conduct provide an inherently biased arbitrator training and arbitrator selection process. Forcing IBOs to arbitrate in an inherently biased arbitral forum renders the arbitration provision substantively unconscionable.

68. Defendant Quixtar's Rules of Conduct require arbitration to take place in the J.A.M.S. arbitral forum. The J.A.M.S. arbitral forum requires an individual IBO to pay "location" costs that total $18,000.00 for a three day trial. Most distributors and class members, who have each already lost thousands of dollars during their involvement with defendant Quixtar, do not have the financial means to pay these excessive hearing fees.

Accordingly these prohibitively expensive arbitration costs preclude distributors from vindicating their rights and render Quixtar's arbitration provision substantively unconscionable.

69.     Defendant Quixtar's arbitration provision contains an arbitrary two year statute of limitations provision for any claims brought by an IBO against Quixtar.  Here, plaintiffs Pokorny, Blenn, and Busiere seek relief on behalf of themselves and a class of similarly situated distributors under the RICO statute which contains a four year statute of limitations.  Defendant Quixtar's arbitrary limitations period severely restricts an IBO's right to bring statutory claims and is therefore, substantively unconscionable.

70.     Defendant Quixtar's arbitration provision and Rules of Conduct prevent an IBO from bringing a class action in arbitration.  The distributors have all lost money through their Quixtar involvement and are unable to afford to bring individual claims in arbitration.  Accordingly, Quixtar's class action prohibition renders the arbitration provision substantively unconscionable.

71.     Defendant Quixtar's Rules of Conduct provide a mandatory pre-arbitration "conciliation process."  The intent of this "process" is to stifle claims against Quixtar. The Rules of Conduct provide that the distributor must submit his claim to Quixtar, and allow Quixtar, the offending party, to resolve the claim.  This biased pre-arbitration requirement is intended to deter distributors from indicating their rights.  Accordingly, Quixtar's pre-arbitration conciliation process is substantively unconscionable.

72.     Accordingly, the Court should declare that Quixtar's arbitration provision is procedurally and substantively unconscionable and that the plaintiffs' claims are properly before this Court.

### SECOND CLAIM FOR RELIEF
### (RICO 18 U.S.C. § 1962(a))

73.    The Quixtar/BSM Enterprise is an association in fact of entities and individuals, within the meaning of "enterprise" as defined in 18 U.S.C. § 1961(4).  It is composed of defendant Quixtar and BSM Corporations.

74.    From at least January 2003 and continuing until the present, both dates being approximate and inclusive, the defendant Quixtar and BSM Corporations were members of the Quixtar/BSM Enterprise.

75.    From at least January 2003 and continuing until the present, both dates being approximate and inclusive, the defendant Quixtar and BSM Corporations associated together and with others for the purpose of, among other things, executing a scheme to defraud through a pattern of racketeering consisting of distinct acts of mail and wire fraud.  The association in fact of the defendant Quixtar and BSM Corporations constituted an "enterprise" as defined by Title 18, United States Code Section 1961(4). The Quixtar/BSM Enterprise engaged in and affected interstate and foreign commerce. Among other things, the Quixtar/BSM Enterprise transacts business through the use of the United States mails and the use of interstate telephone wires.  The Quixtar/BSM Enterprise advertises, markets, and sells goods and services throughout the United States.

76.    Defendant Quixtar is distinct from the Quixtar/BSM Enterprise.  The defendant Quixtar has perpetrated particular racketeering acts, but the defendant Quixtar is a separate entity from the Quixtar/BSM Enterprise.

77.    The pattern of racketeering activity alleged below is distinct from the Quixtar/BSM Enterprise.  Each act of racketeering activity is distinct from the Quixtar/BSM Enterprise in that each is a separate offense committed by an entity or individual while the Quixtar/BSM Enterprise is an association of entities and individuals. The Quixtar/BSM Enterprise has the common purpose of distributing products and "tools and functions" materials.  The Quixtar/BSM Enterprise has an ongoing structure and/or

1    organization supported by personnel and/or associates with continuing functions or

2    duties.

3        78.     To further their goals, which were to (a) earn money through fraudulent

4    means, (b) entice individuals to purchase products from defendant Quixtar and "tools and

5    functions" materials from BSM Corporations by giving such individuals the false

6    impression that they would be able to recruit others to purchase defendant Quixtar

7    products, and (c) reap large profits for themselves based on false representations,

8    members of the Quixtar/BSM Enterprise engaged in various forms of wrongful activity,

9    including (a) mail fraud, (b) wire fraud, and (c) conspiracy.

10        79.     By reason of defendant Quixtar's pattern of racketeering activity, plaintiffs

11   Pokorny, Blenn, and Busiere and the class have been injured and have lost millions of

12   dollars.  Defendant Quixtar's acts of mail and wire fraud were a proximate cause of the

13   injuries that plaintiffs and the class suffered.

14        80.     From at least January 2003 and continuing until the present, both dates

15   being approximate and inclusive, within the Northern District of California and

16   elsewhere, the defendant Quixtar, in association with the Quixtar/BSM Enterprise did

17   knowingly, willfully and unlawfully conduct and participate, directly and indirectly, in

18   the conduct of the affairs of that enterprise through a pattern of racketeering activity.

19        81.     The racketeering acts set out below, and others, all had the same pattern

20   and similar purpose of defrauding plaintiffs and the class for the benefit of defendant

21   Quixtar and BSM Corporations.  Each racketeering act was related, had a similar

22   purpose, involved the same or similar participants and methods of commission and had

23   similar results affecting similar plaintiffs and the class.  The racketeering acts of mail and

24   wire fraud were also related to each other in that they were part of the Quixtar/BSM

25   Enterprise's goal to fraudulently induce plaintiffs and the class to join the illegal scheme

26   and cause others to join the scheme.

27

28

82.     Defendant Quixtar's wrongful conduct has been and remains part of defendant Quixtar's ongoing way of doing business and constitutes a continuing threat to the property of plaintiffs and the class.  Without the repeated acts of mail and wire fraud, defendant Quixtar's fraudulent scheme would not have succeeded.

83.     Revenue gained from the pattern of racketeering activity, which constitutes a significant portion of the total income of defendant Quixtar, was reinvested in the operations of the Quixtar/BSM Enterprise for the following purposes: (a) to expand the operations of the Quixtar/BSM Enterprise through additional false and misleading advertising and promotional materials aimed at recruiting new distributors; (b) to facilitate the execution of the illegal scheme; and (c) to convince current distributors to recruit new distributors, execute the illegal scheme, and purchase defendant Quixtar products and "tools and functions" materials.  The plaintiffs and the class were injured by the reinvestment of the racketeering income into the Quixtar/BSM Enterprise because they invested millions of dollars of their own money through their purchase of Quixtar products and "tools and functions" materials.

84.     For the purpose of executing the scheme, and attempting to do so, the defendant Quixtar and the BSM Corporations knowingly and recklessly placed and caused to be placed in the United States mail, or took or received therefrom, matters or things to be sent to or delivered by the United States mail consisting of, among other things, defendant Quixtar and the BSM Corporations products and literature, "tools and functions" tapes and literature, money, and correspondence related to the Quixtar/BSM Enterprise.  It was reasonably foreseeable that these mailings or receipts would take place in furtherance of the fraudulent scheme.  In addition, defendant Quixtar and the BSM Corporations  knowingly and recklessly placed or caused to be placed these and other misleading information and material on websites on the Internet and sent these misleading materials through interstate wire communications, including defendant's

"CommuniKate" system, which includes both interstate telephone and facsimile communications.

85.     In connection with promoting their illegal scheme, the defendant Quixtar and the BSM Corporations mailed product and "tools and functions" invoices, letters, promotional materials, brochures, products and checks to plaintiffs and the class and received communications between and among themselves by and through the United States mail, in all fifty states and the District of Columbia, in violation of 18 U.S.C. § 1341.

86.     Defendant Quixtar and the BSM Corporations engaged in wire fraud, in violation of 18 U.S.C. § 1343, by, among other things, knowingly and recklessly transmitting or causing to be transmitted by means of wire communications, in interstate and foreign commerce, materials promoting defendant's fraudulent scheme on Internet web sites, by facsimile and telephone, including promotional materials, registration information, product information, "tools and functions" information, and invoices.  The defendant Quixtar and BSM Corporations maintain websites on the Internet where IBOs can and do purchase products and "tools and functions" materials.  Quixtar maintains a website at the address www.quixtar.com. The defendant Quixtar sent and received these interstate wire communications to and from all fifty states and the District of Columbia.

87.     The pattern of racketeering activity through which the affairs of the Quixtar/BSM Enterprise were conducted and in which the defendant Quixtar and others participated consisted of the following:

### Racketeering Act Number One

88.     On or about January 2, 2005, plaintiff Blenn received, through the United States mail, a Quixtar Achieve Magazine Special Issue featuring the "New Qualifiers of 2004," which promoted the Quixtar/BSM Enterprise and contained material false representations regarding the success that could be achieved through Quixtar by

purchasing products and recruiting others to do the same. As a result of his receipt of the Achieve Magazine and the representations contained therein, plaintiff Blenn purchased Quixtar products, "tools and functions" materials, and recruited others to do the same. Plaintiff Blenn continued to receive Quixtar magazines and catalogs through the United States mail during the first week of every month that he was a registered IBO. The Quixtar magazines and catalogs were sent on a monthly basis to plaintiff Blenn with the purpose and intent of promoting Quixtar's illegal scheme. All in violation of 18 U.S.C. § 1341.

### Racketeering Act Number Two

89.     On or about February 1, 2005, the defendant Quixtar distributed Quixtar information by interstate wire transmissions over the world wide web. On that date, plaintiff Blenn reviewed information on Quixtar's web site. The Quixtar web sites promoted the fraudulent scheme and contained material false representations regarding the wealth that could be achieved by agreeing to be an IBO. As a result of the representations on the web site, plaintiff Blenn maintained his position as an IBO and continued to order Quixtar products and recruit others to do the same. All in violation of 18 U.S.C. § 1343.

### Racketeering Act Number Three

90.     On or about December 9, 2000, plaintiff Pokorny purchased a subscription for Quixtar's "CommuniKate" telephone and fax system and paid a monthly fee for the Quixtar CommuniKate message system until September 2006. From December 2000 through September 2006, plaintiff Pokorny received invoices from Quixtar on a monthly basis through the United States mail in violation of 18 U.S.C. § 1341. Thereafter, plaintiff Pokorny received interstate telephone and facsimile messages daily from BSM Corporations outside of California, affiliated with the World Wide Dream Builders Line of Sponsorship, until he terminated his IBO distributorship. These messages included

material false representations regarding the necessity of the "tools and functions" materials and false representations regarding the tremendous wealth opportunity that could be realized by being an IBO. All in violation of 18 U.S.C. § 1343.

91.    To the extent proof of reliance is legally required, in engaging in the aforementioned wire and mail fraud, defendant Quixtar and the BSM Corporations knew that plaintiffs and the class would reasonably rely on defendant Quixtar's and BSM Corporations' representations and omissions which would result in the plaintiffs and the class joining the fraudulent scheme and purchasing the products and "tools and functions" materials.

92.    Defendant Quixtar and the BSM Corporations knew that the misrepresentations and omissions described above in promoting and executing the fraudulent scheme were material because they caused the plaintiffs and the class to join and participate in the illegal scheme.

93.    Had plaintiffs and the class known that defendant Quixtar and BSM Corporations were promoting a fraudulent scheme, they would not have joined the scheme.

94.    Defendant Quixtar's acts of mail and wire fraud were a proximate cause of the injuries that plaintiffs and the class suffered. By reason of defendant Quixtar's pattern of fraudulent conduct, plaintiffs and the class lost millions of dollars.

95.    Under 18 U.S.C. § 1964(c), plaintiffs Pokorny and Blenn and the class are entitled to treble their general and special compensatory damages, plus interest, costs and attorney's fees.

### THIRD CLAIM FOR RELIEF
### (RICO 18 U.S.C. § 1962(c))

96.    96.    Plaintiffs Pokorny and Blenn re-allege the foregoing paragraphs as though fully set forth herein.

97.     Defendant Quixtar is associated with the Quixtar/BSM Enterprise.  In violation of 18 U.S.C. § 1962(c), defendant Quixtar conducted and/or participated in the conduct of the affairs of the Quixtar/BSM Enterprise, including, but not limited to, participation in activities in furtherance of defendant Quixtar's fraudulent scheme, through the pattern of racketeering activity alleged in the Second Claim for Relief.

98.     As a direct and proximate result of defendant's violation of 18 U.S.C. § 1962(c), plaintiffs Pokorny and Blenn and the class were induced to, and did, become distributors in defendant's illegal scheme and purchased millions of dollars of defendant Quixtar products and "tools and functions" materials and recruited others to do the same. Plaintiffs Pokorny and Blenn and the class were injured by defendant Quixtar's unlawful conduct.  The funds used to purchase the Quixtar products and the "tools and functions" materials constitute property of plaintiffs Pokorny and Blenn and the plaintiff class within the meaning of 18 U.S.C. § 1964(c).

99.     Under 18 U.S.C. § 1964(c), plaintiffs Pokorny and Blenn and the plaintiff class are entitled to treble their general and special compensatory damages, plus interest, costs and attorney's fees.

**FOURTH CLAIM FOR RELIEF**
**(RICO 18 U.S.C. § 1962(d))**

100.     Plaintiffs Pokorny and Blenn re-allege the foregoing paragraphs as though fully set forth herein.

101.     Defendant Quixtar and BSM Corporations agreed to work together in a symbiotic relationship to carry on the illegal scheme.  In accordance with that agreement, defendant Quixtar and BSM Corporations conspired to violate 18 U.S.C. § 1962(a) and (c), in violation of 18 U.S.C. § 1962(d).

102.     As a direct and proximate result of defendant's violation of 18 U.S.C. § 1962(d), plaintiffs Pokorny and Blenn and the class were injured by defendant Quixtar's

1   unlawful conduct. The funds used to purchase the Quixtar products and the "tools and

2   functions" materials constitute property of the plaintiffs and the class under 18 U.S.C. §

3   1964(c).

4       103.    Under 18 U.S.C. § 1964(c), plaintiffs Pokorny and Blenn and the plaintiff

5   class are entitled to treble their general and special compensatory damages, plus interest,

6   costs and attorney's fees.

7                           **FIFTH CLAIM FOR RELIEF**
                  **(Unfair and Deceptive Practices Claims Under State Laws)**
8

9       104.    The plaintiffs and the subclass re-allege the foregoing paragraphs as

10  though fully set forth herein.

11      105.    Defendant Quixtar is engaged in ongoing and continuous unlawful, unfair,

12  and fraudulent business acts or practices, and unfair, deceptive, untrue and misleading

13  advertising. The acts or practices alleged herein constitute a pattern of behavior, pursued

14  as wrongful business practice that has victimized and continues to victimize thousands of

15  consumers.

16      106.    Defendant Quixtar's promotion and operation of an illegal scheme is

17  unethical, oppressive and unscrupulous in that defendant Quixtar and the BSM

18  Corporations are duping consumers out of millions of dollars through their illegal

19  scheme.

20      107.    Defendant Quixtar's business practice is fraudulent in that they have

21  deceived the public by misrepresenting the nature of their business. For example,

22  defendant Quixtar has made numerous misrepresentations about the income that can be

23  realized by becoming a distributor and have failed to inform the public that they are

24  openly an illegal scheme. Consumers have relied, and continue to rely on defendant

25  Quixtar's misrepresentations and omissions to their detriment.

26

27

28

108.    Defendant Quixtar engaged in false, unfair and misleading business practices, consisting of false advertising and materially misleading omissions that were likely to deceive the public and include, but are not limited to:

a.    Defendant Quixtar's failing to disclose to consumers that they were entering into an unlawful scheme;

b.    Defendant Quixtar's misrepresenting the amount of money that a distributor would earn;

c.    Defendant Quixtar's misrepresenting that purchasing the "tools and functions" materials was necessary in order to be a successful distributor; and

d.    Defendant Quixtar's misrepresenting that distributors would not need to engage in retail sales to make money and instead would earn the promised revenue by simply self-consuming products and convincing others to do the same.

109.    Defendant Quixtar's marketing and promotion of the illegal scheme constitutes misleading, unfair and fraudulent advertising in connection with their false advertising to induce consumers to join the illegal scheme.  Defendant Quixtar knew or should have known, in the exercise of reasonable care, that the statements they were making were untrue or misleading and did deceive members of the public.  Defendant Quixtar knew or should have known, in the exercise of reasonable care, that Consumers, including plaintiffs, would rely, and did in fact rely on defendant's misrepresentations and omissions.

110.    Defendant Quixtar's business practices are "unfair business practices" in that Quixtar engaged in a practice that offends established public policy, and/ or is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.

111.    Defendant Quixtar's business practices are "fraudulent" in that members of the public are deceived and continue to be deceived by the business practice.

112.    Defendant Quixtar has engaged in unfair or deceptive acts or practices in violation of the unfair trade practice laws of each of the following states and the District of Columbia listed below:

Cal. Bus. & Prof. Code § 17200, *et seq.*

Ala. Code § 8-19-1, *et seq.*

Alaska Stat. § 45.50.471, *et seq.*

Ariz. Rev. Stat. § 44-1522, *et seq.*

Ark. Code § 4-88-101, *et seq.*

Colo. Rev. Stat. § 6-1-105, *et seq.*

Conn. Gen. Stat. § 42-110b, *et seq.*

6 Del. Code § 2511, *et seq.*

D.C. Code § 28-3901, *et seq.*

Fla. Stat. § 501.201, *et seq.*

Ga. Stat. §10-1-392, *et seq.*

Haw. Rev. Stat. § 480, *et seq.*

Idaho Code § 48-601, *et seq.*

815 ILCS § 505, *et seq.*

Iowa Code § 714.16, *et seq.*

Kan. Stat. § 50-623, *et seq.*

Ky. Rev. Stat. § 367.110, *et seq.*

La. Rev. Stat. § 51:1401, *et seq.*

5 Me. Rev. Stat. § 207, *et seq.*

Md. Corn. Law Code § 13-101, *et seq.*

Mass. Gen. L. Ch. 93A, *et seq.*

Mich. Stat. § 445.901, *et seq.*

Minn. Stat. § 8.31, *et seq.*

1    Vernon's Missouri Stat. § 407.010, *et seq.*

2    Mont. Code § 30-14-101, *et seq.*

3    Neb. Rev. Stat. § 59-1601, *et seq.*

4    Nev. Rev. Stat. § 598.0903, *et seq.*

5    N.H. Rev. Stat. § 358-A:1, *et seq.*

6    N.J. Rev. Stat. § 56:8-1, *et seq.*

7    N.M. Stat § 57-12-1, *et seq.*

8    N.Y. Gen. Bus. Law § 349, *et seq.*

9    N.C. Gen. Stat. § 75-1.1, *et seq.*

10   N.D. Cent. CODE § 51-15-01, *et seq.*

11   Ohio Rev. Stat. § 1345.01, *et seq.*

12   Okla. Stat. 15 § 751, *et seq.*

13   Or. Rev. Stat. § 646.605, *et seq.*

14   73 Pa. Stat. § 201-1, *et seq.*

15   R.I. Gen. Laws. § 6-13.1-1, *et seq.*

16   S.C. Code Laws § 39-5-10, *et seq.*

17   S.D. code Laws § 37-24-1, *et seq.*

18   Tenn. Code § 47-18-101, *et seq.*

19   Tex. Bus. & Corn. Code § 17.41, *et seq.*

20   Utah Code. § 13-11-1, *et seq.*

21   9 Vt. § 2451, *et seq.*

22   Va. Code § 59.1-196, *et seq.*

23   Wash. Rev. Code. § 19.86.010, *et seq.*

24   West Virginia Code § 46A-6-101, *et seq.*

25   Wyoming Stat. §40-12-105, *et seq.*

26

27

28

113.    Plaintiffs and members of the Class have been injured in their business and property by reason of defendant Quixtar's unfair or deceptive acts.  Their injury is of the type that the unfair and deceptive practices acts of the fifty states and the District of Columbia were designed to prevent and directly results from defendant Quixtar's unlawful conduct.

## SIXTH CLAIM FOR RELIEF
### (Common law fraud)

114.    The plaintiffs and the subclass re-allege the foregoing paragraphs as though fully set forth above.

115.    Defendant Quixtar fraudulent acts as set forth above constitute knowing false statements made to plaintiffs and plaintiff class for the purpose of inducing their participation in the fraudulent scheme set forth above, and include, but are not limited to:

a.    Defendant Quixtar's failing to disclose to consumers that they were entering into an unlawful scheme;

b.    Defendant Quixtar's misrepresenting the amount of money that a distributor would earn;

c.    Defendant Quixtar's misrepresenting that purchasing the "tools and functions" materials was necessary in order to be a successful distributor; and

d.    Defendant Quixtar misrepresenting that distributors would not need to engage in retail sales to make money and instead would earn the promised revenue by simply self-consuming products and convincing others to do the same.

116.    Plaintiffs and plaintiff class justifiably relied on the statements made by defendant Quixtar; and

117.    Plaintiffs and plaintiff class have suffered injury as a result of defendant Quixtar fraudulent actions.

## PRAYER FOR RELIEF

118.   The named plaintiffs and the plaintiff class request the following relief:

a.   Judgment declaring defendant Quixtar's arbitration provision unconscionable and unenforceable;

b.   Certification of the class;

c.   A jury trial and judgment against defendant Quixtar;

d.   Damages in the amount of the financial losses incurred by plaintiffs Pokorny and Blenn and by the class as a result of defendant Quixtar's conduct and for injury to their business and property, all as a result of defendant Quixtar's violations of § 1964(a), (c) and (d) and that such sum be trebled in accordance with 18 U.S.C. § 1964(c);

e.   Restitution and disgorgement of monies, pursuant to the unfair and deceptive practices laws of the fifty states and the District of Columbia;

f.   Temporary and permanent injunctive relief enjoining defendant Quixtar  and BSM Corporations working in concert with defendant Quixtar from further unfair, unlawful, fraudulent and/or deceptive acts, including, but not limited to, false advertising;

g.   The cost of suit including reasonable attorneys' fees in accordance with 18 U.S.C. § 1964(c) and otherwise provided by law;

h.   For general, compensatory and exemplary damages in an amount yet to be ascertained; and

i.   For such other damages, relief and pre- and post-judgment interest as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial as provided by Rule 38(a) of the Federal Rules of Civil Procedure.

Dated: November 3, 2010                    Respectfully submitted,

PROPOSED SECOND AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

36

1

2
                   BOIES, SCHILLER & FLEXNER LLP

3

4
            By:  /s/ David W. Shapiro
                David W. Shapiro

5
                California Bar No. 219265

6
                1999 Harrison Street, Suite 900
                Oakland, California 94612

7
                Tel.: (510) 874-1000
                Fax: (510) 874-1460

8

9
                Stuart H. Singer (*Pro Hac Vice*)
                Carlos M. Sires (*Pro Hac Vice*)

10
                401 East Las Olas Boulevard

11
                Suite 1200
                Ft. Lauderdale, FL 33301

12
                Tel.: (954) 356-0011
                Fax: (954) 356-0022

13

14
                Willie E. Gary (*Pro Hac Vice*)

15
                GARY, WILLIAMS, FINNEY,
                LEWIS, WATSON & SPERANDO

16
                221 E. Osceola St.
                Stuart, FL 34994

17
                Tel.: (772) 283-8260

18
                Fax: (772) 220-3343

19

20

21

22

23

24

25

26

27

28