Stuart H. Singer, Esq. (*Pro Hac Vice*)
Carlos M. Sires, Esq. (*Pro Hac Vice*)
Sigrid S. McCawley, Esq. (*Pro Hac Vice*)
BOIES, SCHILLER & FLEXNER LLP
401 East Las Olas Boulevard, Suite 1200
Fort Lauderdale, Florida 33301
Telephone: (954) 356-0011
Facsimile: (954) 356-0022
E-mail: ssinger@bsfllp.com
E-mail: csires@bsfllp.com
E-mail: smccawley@bsfllp.com

David Boies, Esq. (*Pro Hac Vice*)
BOIES, SCHILLER & FLEXNER LLP
333 Main Street
Armonk, NY 10504
Telephone: (914) 749-8200
Facsimile: (914) 749-8300
E-mail: dboies@bsfllp.com

David W. Shapiro (CA SBN 219265)
BOIES, SCHILLER & FLEXNER LLP
1999 Harrison Street, Suite 900
Oakland, California 94612
Telephone: (510) 874-1000
Facsimile: (510) 874-1460
E-mail: dshapiro@bsfllp.com

Willie E. Gary, Esq. (*Pro Hac Vice*)
Maria Sperando, Esq. (*Pro Hac Vice*)
Tricia P. Hoffler (*Pro Hac Vice*)
GARY, WILLIAMS, FINNEY, LEWIS,
WATSON & SPERANDO
221 East Osceola Street
Stuart, Florida 34994
Telephone: (772) 283-8260
Facsimile: (772) 220-3343
E-mail: weg@williegary.com
E-mail: mps@williegary.com
E-mail: tph@williegary.com

*Attorneys for Plaintiffs Jeff Pokorny, Larry Blenn and Kenneth Busiere*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| Jeff Pokorny, Larry Blenn, and Kenneth Busiere, on behalf of themselves and those similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>Quixtar, Inc., James Ron Puryear Jr., Georgia Lee Puryear, and World Wide Group, L.L.C., Britt Worldwide L.L.C., American Multimedia Inc., Britt Management, Inc., Bill Britt and Peggy Britt,<br><br>Defendants. | **CASE NO. C 07-02001 SC**<br><br>**PLAINTIFFS' MEMORANDUM IN RESPONSE TO THE COURT'S ORDER REQUIRING SUPPLEMENTAL BRIEFING** |

B O I E S ,   S C H I L L E R   &   F L E X N E R   L L P
O A K L A N D ,   C A L I F O R N I A

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

B O I E S ,   S C H I L L E R   &   F L E X N E R   L L P
O A K L A N D ,   C A L I F O R N I A

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ............................................................................................................. 1

Background ...................................................................................................................... 1

    A.    Factual Background ............................................................................... 1

    B.    Procedural Background ......................................................................... 1

    C.    The Proposed Settlement ...................................................................... 2

DISCUSSION ................................................................................................................... 3

    A.    Class Certification ................................................................................ 3

        1.    Numerosity ............................................................................... 4

        2.    Commonality and Typicality ................................................... 4

        3.    Adequacy of Representation ..................................................... 4

            a.    There Are No Significant Conflicts of Interest ........... 4

            b.    Plaintiffs are Represented by Qualified and Competent Counsel ................ 7

        4.    Predominance and Superiority .................................................. 8

    B.    Fairness of the Settlement .................................................................. 11

        1.    Economic Relief ..................................................................... 13

            a.    Product Credit ............................................................. 15

            b.    Cash Fund ................................................................... 18

            c.    Special Hardship Fund ................................................ 20

        2.    Injunctive Relief ..................................................................... 22

    3.    Adequacy of Proposed Notice ........................................................ 24

Conclusion .................................................................................................................... 25

CERTIFICATE OF SERVICE ...................................................................................... 27

# TABLE OF AUTHORITIES

Cases

*Beattie v. CenturyTel, Inc.,*
  511 F.3d 554 (6th Cir. 2007) .................................................................. 10

*Blackie v. Barrack,*
  524 F.2d 891 (9th Cir. 1975) ................................................................ 4, 5

*Blackwell v. SkyWest Airlines, Inc.,*
  245 F.R.D. 453 (S.D. Cal. 2007) ............................................................. 5

*Browning v. Yahoo! Inc.,*
  2007 WL 4105971 (N.D. Cal. Nov. 16, 2007) ....................................... 15

*Chavez v. Blue Sky Natural Beverage Co.,*
  268 F.R.D. 365 (N.D.Cal. 2010) ............................................................ 10

*Chin v. DaimlerChrysler Corp.,*
  461 F.Supp.2d 279 (D.N.J. 2006) .......................................................... 13

*Chun-Hoon v. McKee Foods Corp.,* No. 05-0620,
  2009 WL 3349549 (N.D. Cal. Oct. 15, 2009) ....................................... 11

*Class Plaintiffs v. City of Seattle,*
  955 F.2d 1268 (9th Cir. 1992) ............................................................... 11

*Curiale v. Lenox Group, Inc.,*
  2008 WL 4899474 (E.D. Pa. Nov. 14, 2008) ........................................ 16

*D'Amato v. Deutsche Bank,*
  236 F.3d 78 (2d Cir. 2001) .................................................................... 12

*Dembski v. Fairchild Industries,*
  No. 88-2953, 1989 WL 159510 (E.D.N.Y. Dec. 18 1989) .................... 12

*Dewey v. Volkswagen of America,*
  728 F.Supp.2d 546 (D.N.J. 2010) .......................................................... 14

*Dukes v. Walmart Stores, Inc.,*
  603 F.3d 571 (9th Cir. 2010) ................................................................... 4

*Ellis v. Naval Air Rework Facility,*
  87 F.R.D. 15 (N.D. Cal. 1980).............................................................. 12

*Equal Rights Center v. Washington Metropolitan Area Transit Authority,*
  573 F. Supp.2d 205 (D.D.C. 2008) ........................................................ 16

*Fujita v. Sumitomo Bank,*
  70 F.R.D. 406 (N.D. Cal. 1975) .............................................................. 6

B O I E S ,   S C H I L L E R   &   F L E X N E R   L L P
O A K L A N D ,   C A L I F O R N I A

*Hanlon v. Chrysler Corp.*,
  150 F.3d 1011 (9th Cir. 1998) .................................................................................11

*Harris v. Palm Springs Alpine Estates*,
  329 F.2d 909 (9th Cir. 1964) ..................................................................................... 4

*Horton v. Leading Edge Marketing, Inc.*,
  2007 WL 2472046 (D. Colo. Aug. 28, 2007).........................................................16

*In re Amway Corp.*,
  93 F.T.C. 618 (1979)................................................................................................22

*In re Austrian & German Bank Holocaust Litig.*,
  80 F. Supp. 2d 164 (S.D.N.Y. 2000)......................................................................11

*In re Compact Disc Minimum Advertised Price Antitrust Litigation*,
  216 F.R.D. 197 (D. Me. 2003)................................................................................16

*In re Conseco Life Ins. Co. Cost of Ins. Litigation*,
  No. 04-1610, 2005 WL 5678842 (C.D.Cal. Apr. 26, 2005)...................................10

*In re FedEx Ground Package System, Inc., Employment Practices Litigation*,
  No. 3:05-527, 2008 WL 7764456 (N.D. Ind. Mar. 25, 2008) .................................. 5

*In re Inter-Op Hip Prosthesis Liab. Litig.*,
  204 F.R.D. 359 (N.D. Ohio 2001) ..........................................................................11

*In re MetLife Demutualization Litig.*,
  689 F.Supp.2d 297 (E.D.N.Y. 2010) ..................................................................5, 15

*In re Pet Food Products Liability Litig.*,
  629 F.3d 333 (3d Cir. 2010) ...........................................................................passim

*In re Phenylpropanolamine (PPA) Products Liability Litigation*,
  227 F.R.D. 553 (W.D. Wash. 2004) .......................................................................21

*In re Portal Software, Inc. Sec. Litig.*,
  No. 03-5238, 2007 WL 1991529 (N.D. Cal. Jun. 30 2007)....................................11

*In re Syncor*,
  516 F.3d 1095 (9th Cir. 2008)................................................................................11

*In re Tableware Antitrust Litig.*,
  484 F. Supp. 2d 1078 (N.D. Cal. 2007) ..................................................................11

*In re TJX Companies Retail Sec. Breach Litigation*,
  584 F.Supp.2d 395 (D. Mass. 2008) .......................................................................21

*In re Toys "R" Us Antitrust Litig.*,
  191 F.R.D. 347 (E.D.N.Y. 2000).............................................................................15

*In re Veeco Instruments Inc. Securities Litigation*,
  2007 WL 4115809 (S.D.N.Y. 2007).......................................................................14

*In re Vioxx Products Liability Litigation*,
  650 F.Supp.2d 549 (E.D. La. 2009)........................................................................13

B O I E S ,   S C H I L L E R   &   F L E X N E R   L L P
O A K L A N D ,   C A L I F O R N I A

iii

*In re Wells Fargo Home Mortg. Overtime Pay Litigation,*
   527 F.Supp.2d 1053 (N.D. Cal. 2007) ........................................................................ 5

*In re Zyprexa Products Liability Litigation,*
   424 F.Supp.2d 488 (E.D.N.Y. 2006) .......................................................................13

*Ingram v. The Coca-Cola Co.,*
   200 F.R.D. 685 (N.D. Ga. 2001) ..............................................................................13

*Krzesniak v. Cendant Corp.,*
   No. 05-156, 2007 WL 1795703 (N.D. Cal. Jun. 20, 2007) ..................................... 5

*Lewis v. Anderson,*
   692 F.2d 1267, 1270 (9th Cir. 1982) .......................................................................14

*Maddock v. KB Homes, Inc.,*
   248 F.R.D. 229 (C.D. Cal 2007) .............................................................................. 5

*Mateo v. M/S KISO,* 805 F. Supp. 761,
   771 (N.D. Cal. 1992) .................................................................................................. 8

*Murray v. GMAC Mortgage Corporation,*
   434 F.3d 948 (7th Cir.2006) ....................................................................................11

*Nguyen v. FundAmerica, Inc.,*
   No. 90-2090, 1990 WL 165251 (N.D. Cal. Aug. 20 1990) ..................................... 7

*Officers for Justice v. Civil Serv. Comm'n,*
   688 F.2d 615 (9th Cir. 1982) ...................................................................................12

*Perez v. Asurion Corp.,*
   501 F. Supp. 2d 1360, 1374 (S.D. Fla. July 26, 2007) ...........................................16

*Petrovic v. Amoco Oil Co.,*
   200 F.3d 1140 (8th Cir. 1999) ..............................................................................5, 15

*Reibstein v. Rite Aid Corp.,*
   --- F.Supp.2d --- , 2011 WL 192512 (E.D. Pa. 2011) ............................................13

*Reppert v. Marvin Lumber and Cedar Co.,*
   359 F.3d 53 (1st Cir. 2004) ....................................................................................... 3

*Rodriguez v. West Publ'g Corp.,*
   563 F.3d 948 (9th Cir. 2009) ...................................................................................12

*Savoie v. Merchants Bank,*
   84 F.3d 52 (2d Cir. 1996) .........................................................................................14

*Seijas v. Republic of Argentina,*
   606 F.3d 53 (2nd Cir. 2010) .....................................................................................10

*Snyder v. Shearer,*
   575 F. Supp. 156 (D. Iowa 1983)14

B O I E S ,   S C H I L L E R   &   F L E X N E R   L L P
O A K L A N D ,   C A L I F O R N I A

*Staton v. Boeing Co.*,
   327 F.3d 938 (9th Cir. 2003) ............................................................ 11, 12, 13, 21

*Summerfield v. Equifax Information Services LLC*,
   264 F.R.D. 133 (D.N.J. 2009) .............................................................................. 11

*Trew v. Volvo Cars of North America*,
   2007 WL 2239210 (E.D. Cal. 2007) .................................................................... 14

*Vista Healthplan, Inc. v. Warner Holdings Co. III, Ltd.*,
   246 F.R.D. 349 (D.D.C. 2007) ............................................................................ 16

*Wade v. Kirkland*,
   118 F.3d 667 (9th Cir. 1997) ................................................................................. 6

*Walsh v. Nev. Dep't of Human Res.*,
   471 F.3d 1033 (9th Cir. 2006) ............................................................................... 5

*Wetzel v. Liberty Mut. Ins. Co.*,
   508 F.2d 239 (3d Cir. 1975) .................................................................................. 5

*Wiener v. Dannon Co., Inc.*,
   255 F.R.D. 658 (C.D. Cal. 2009) ........................................................................... 8

*Wofford v. Safeway Stores, Inc.*,
   78 F.R.D. 460 (N.D. Cal. 1978) ............................................................................. 6

*Xiufang Situ v. Leavitt*,
   240 F.R.D. 551 (N.D. Cal. 2007) ........................................................................... 8

<u>Rules</u>

Fed. R. Civ. P. 23 ...................................................................................................... 3, 4, 8

<u>Other Authorities</u>

8 Newberg on Class Actions § 24:48 ............................................................................. 6

BOIES, SCHILLER & FLEXNER LLP
OAKLAND, CALIFORNIA

**INTRODUCTION**

On November 3, 2010, the parties jointly moved this Court for an order preliminarily approving a Class Action Settlement Agreement ("Initial Settlement Agreement"), directing notice to the class, and scheduling a fairness hearing. *See* Dkt. No. 141, Joint Mot. for Prelim. Approval of Initial Settlement Agreement. On December 29, 2010, the Court entered an order ("Preliminary Order") in which it requested that the parties submit supplemental briefing, including evidentiary support, to address a number of issues. *See* Dkt. No. 157, Prelim. Order. As provided for by the Court in its Order, the parties have revised the Settlement Agreement in certain respects and executed an Amended Settlement Agreement ("ASA"). *See* Dkt. No. 162-2, ASA; *see also* Exh. I, Singer Decl. (attaching redlines between Initial Settlement Agreement and ASA). Plaintiffs believe that the ASA is in the best interest of the Class and that it should be approved. In this Memorandum, Plaintiffs identify the changes made in the ASA and address the questions and concerns raised in the Court's Preliminary Order.

**BACKGROUND**

**A.      Factual Background**

The Court's Preliminary Order accurately sets forth the factual background of this case. *See* Dkt. No. 157, Prelim. Order at 2-3. The Court notes that the First Amended Complaint alleges that a registration fee of $117 was required to become a Quixtar IBO. *See id.* at 2. However, based on Quixtar's representations and further investigation, the registration fee charged by Quixtar during the class period ranged from $40 to $62, inclusive of insurance and of membership in the association for IBOs (IBOA). *See* Exh. G, Alexander Decl. at ¶10 (to be docketed separated by Defendants' counsel).

**B.      Procedural Background**

The Court's Preliminary Order sets forth this case's procedural background to date. *See* Dkt. No. 157, Prelim. Order at 3-4. While the parties propose a settlement before "an answer has been filed, before discovery has commenced, and before a class certification motion has been filed and ruled upon," *id.* at 3-4, the proposed settlement follows pre-suit investigation, litigation before this Court and the Court of Appeals over the unconscionability of Quixtar's

1

B O I E S ,   S C H I L L E R   &   F L E X N E R   L L P
O A K L A N D ,   C A L I F O R N I A

1  alternative dispute resolution mechanism, and an extended mediation process during which the

2  parties exchanged both factual information and legal positions.  *See* Exh. K, Weinstein Decl. at

3  ¶ 13.

4  **C.    The Proposed Settlement**

5      The Court's Preliminary Order describes the Initial Settlement Agreement.  *See* Dkt.

6  No. 157, Prelim. Order at 4-10.  The ASA differs from the Initial Settlement Agreement in

7  several respects, including the following:

8      The Cash Fund, while remaining the same in amount, has been revised to (1) provide

9  cash payments of up to twenty percent of a former IBO's Verifiable BSM Expenditures (not to

10  exceed $2,000 per Claimant) and (2) provide product packages of $75 retail (an estimated cost

11  of $48.16 to Quixtar) to those former IBOs who did not renew their registration and did not

12  previously obtain a refund of the registration fee.  *See* Dkt. No. 162-2, ASA at § 6.1.2; Exh. G,

13  Alexander Decl. at ¶ 17.  These provisions replace the distribution of the cash fund to

14  Claimants set forth in  the Initial Settlement Agreement.

15      The Special Hardship fund has been maintained but clarified to provide that former

16  IBOs are eligible for payments under that provision if they can demonstrate (1) a $10,000 loss

17  from their IBO business or (2) that they filed for personal bankruptcy because of their

18  participation in Quixtar.  *See* Dkt. No. 162-2, ASA at § 6.1.2.  The ASA also specifies that

19  proof in the form of tax returns or bankruptcy filings or similar documentation is required to

20  qualify for a Special Hardship payment.  *Id.*  Upon review of their claims by a Special Master,

21  Special Hardship claimants will be entitled to recover up to 20% of their documented losses, up

22  to $10,000.  *Id.* § 6.1.2.a.  The ASA provides for an overall limit of $5 million for Special

23  Hardship awards, subject to modification by the Court once the number of claims is known.  *Id.*

24  at § 6.1.2.f.

25      The injunctive relief provisions are clarified and strengthened in the ASA regarding

26  Quixtar's obligations under the Consent Decree with respect to disclosures, training, bonus

27  payments and quality control over BSM.  *Id.* ¶ 5.1; *see also* Dkt. No. 162-6, Proposed Consent

28  Judgment.  The injunctive relief provisions are discussed below.

B O I E S ,   S C H I L L E R   &   F L E X N E R   L L P

O A K L A N D ,   C A L I F O R N I A

1       The language in the Initial Settlement Agreement which provided that Quixtar would

2   not object to Plaintiffs' request for attorneys fees has been deleted, and the ASA simply

3   provides that such requests will be made at the time of final approval in accordance with

4   established Ninth Circuit law on attorneys' fee awards based on a percentage of a common

5   fund.  *See* Dkt. No. 162-2, ASA at § 12.1.

6       The release language was not changed in the ASA, but Plaintiffs wish to clarify certain

7   limitations on the scope of the release.  The Court stated that the Settlement Agreement's

8   release of liability provision is "extremely broad."  Dkt. No. 157, Prelim. Order at 10 n.3.

9   However, the language quoted in the Preliminary Order reflected only Quixtar's originally

10  proposed release language.  Plaintiffs' counsel insisted upon, and obtained, several carve-outs

11  that substantially limited the scope of that release.   *See* Exh. K, Weinstein Decl. at ¶ 11

12  (explaining that the specific language of the release was the subject of intense, good faith

13  bargaining between the parties).  Thus, the ASA specifically provides that the release does *not*

14  extend to disputes concerning bonuses, payments, defective products, workplace

15  discrimination, sexual harassment, health care plans, pension plans, and anything else "entirely

16  unrelated to any of the claims, issues, or factual allegations raised" in any of Plaintiffs'

17  complaints.  *See* Dkt. No. 162-2, ASA at § 1.31.  This release language, when considered

18  together with the carve-outs, is no broader than standard class action release language.  *See,*

19  *e.g., In re Pet Food Products Liability Litig.*, 629 F.3d 333, 356 (3d Cir. 2010); *Reppert v.*

20  *Marvin Lumber and Cedar Co.*, 359 F.3d 53, 59 (1st Cir. 2004).

21      Finally, in describing the notice provisions of the Initial Settlement Agreement, the

22  Court stated that the parties had "not filed a Notice Plan with the Court."  *See* Dkt. No. 157,

23  Prelim. Order at 9.  This has now been remedied with a detailed notice plan and expert

24  declarations attesting to its sufficiency.  *See* Exh. A, Holland Decl.; Exh. B, Wheatman Decl.

25                              **DISCUSSION**

26  **A.    Class Certification**

27      As discussed in detail in the Preliminary Order, Rule 23(a) of the Federal Rules of Civil

28  Procedure provides four requirements for class certification: numerosity, commonality,

typicality, and adequacy of representation. *See* Dkt. No. 157, Prelim. Order at 11-12. In addition, the predominance and superiority tests of Rule 23(b)(3) must be satisfied. *Id.* at 11-12 (*quoting Dukes v. Walmart Stores, Inc.*, 603 F.3d 571, 580 (9th Cir. 2010)).

### 1. Numerosity

The Court directed the parties to submit additional briefing on the size of the class, along with supporting evidence. *See* Dkt. No. 157, Prelim. Order at 12. The proposed class definition includes all persons who are now or who were, at any time from January 1, 2003, through the date of this Court's preliminary approval of the Settlement Agreement, (i) a Quixtar IBO, (ii) a legal entity through which an IBO conducted a Quixtar-related business, or (iii) a purchaser of Business Support Materials. Quixtar's records show that there are approximately 2,430,335 current and former IBOs within the putative class, of whom 305,264 are current IBOs. *See* Exh G, Alexander Dec. at ¶ 4. In view of the large size of the class, Plaintiffs submit that the numerosity requirement is satisfied because joinder of all parties would be impracticable, difficult, and inconvenient. *See* Dkt. No. 157, Prelim. Order at 12 (quoting *Harris v. Palm Springs Alpine Estates*, 329 F.2d 909, 913-14 (9th Cir. 1964)).

### 2. Commonality and Typicality

The Court has provisionally found that the commonality and typicality tests are satisfied and has not requested any additional information about these issues. *See* Dkt. No. 157, Prelim. Order at 13.

### 3. Adequacy of Representation

Named plaintiffs fairly and adequately represent a class if they (1) do not have conflicts of interest with the proposed class and (2) are represented by qualified and competent counsel. *Id.* at 14 (*quoting Dukes*, 603 F.3d at 614). The Court requested supplemental briefing on both of these points.

#### a. There Are No Significant Conflicts of Interest

Only a conflict of interest that is "apparent, imminent, and on an issue at the very heart of the suit" will disqualify a named plaintiff from representing the class. *Blackie v. Barrack*,

B O I E S ,   S C H I L L E R   &   F L E X N E R   L L P

O A K L A N D ,   C A L I F O R N I A

1    524 F.2d 891, 909-10 (9th Cir. 1975); *see also Petrovic v. Amoco Oil Co.*, 200 F.3d 1140, 1145

2    (8th Cir. 1999) (only "stark conflicts" create an adequacy issue); *In re MetLife Demutualization*

3    *Litig.*, 689 F.Supp.2d 297, 351 (E.D.N.Y. 2010) (same).   Named plaintiffs may represent a

4    class even if there exist conflicts that are "peripheral, and substantially outweighed by the class

5    members' common interests." *Blackie*, 524 F.2d at 909-10.  The Court was concerned about

6    potential conflicts of interest because different IBOs within the class were compensated

7    differently, *see* Dkt. No. 157, Prelim. Order at 15, and the proposed injunctive relief would

8    only benefit current IBOs, *id.* at 21.   The Court directed the Named Plaintiffs to submit

9    declarations stating in detail "the nature and amount of their alleged injuries." *Id.* at 16.

10        Although all three Named Plaintiffs are former IBOs, this does not prevent them from

11   adequately representing current IBOs.[1]   The fact that Class Members will obtain varying relief

12   is "not unusual," as "[a]lmost every settlement will involve different awards for various class

13   members." *Pet Food*, 629 F.3d at 346.  For example, in employment discrimination cases,

14   although there is an arguable conflict between current employees and former employees, who

15   would derive no benefit from injunctive relief, "[s]everal courts have held . . . that former

16   employees are adequate representatives of current employees in class actions seeking, at least

17   in part, declaratory and/or injunctive relief," particularly where, as here, there is no evidence of

18   actual antagonism between such class members. *Maddock v. KB Homes, Inc.*, 248 F.R.D. 229,

19   238 (C.D. Cal 2007); *accord Wetzel v. Liberty Mut. Ins. Co.*, 508 F.2d 239, 247-48 (3d Cir.

20   1975); *In re Wells Fargo Home Mortg. Overtime Pay Litigation*, 527 F.Supp.2d 1053, 1064

21   (N.D. Cal. 2007); *Krzesniak v. Cendant Corp.*, No. 05-156, 2007 WL 1795703, *11 (N.D. Cal.

22   Jun. 20, 2007); *Blackwell v. SkyWest Airlines, Inc.*, 245 F.R.D. 453, 465 (S.D. Cal. 2007); *In re*

23   *FedEx Ground Package System, Inc., Employment Practices Litigation*, No. 3:05-527, 2008

---

[1] Plaintiffs note that Jeff Pokorny was an IBO at the time the action was filed in January 2007, *see* Exh. F, Vanderven Decl. at ¶ 22.a, and thus satisfies the Article III standing requirement for seeking injunctive relief that benefits current Quixtar IBOs.  *Dukes v. Wal-Mart Stores, Inc.*, 603 F.3d 571, 623 (9th Cir. 2010) (*en banc*) (standing is determined as of the date the complaint is filed); *Walsh v. Nev. Dep't of Human Res.*, 471 F.3d 1033, 1037 (9th Cir. 2006) (same).

WL 7764456, *5-*6 (N.D. Ind. Mar. 25, 2008); *Wofford v. Safeway Stores, Inc.*, 78 F.R.D. 460, 489-90 n.6 (N.D. Cal. 1978); *Fujita v. Sumitomo Bank*, 70 F.R.D. 406, 410-11 (N.D. Cal. 1975); *see also* 8 Newberg on Class Actions § 24:48.

This is an even stronger case for a finding of adequacy of representation than those arising in the employment context, as it is highly unlikely that a current IBO would make the allegations in the Complaint while remaining part of Quixtar's organization.  Thus, it is appropriate for a former IBO to be able to represent the current IBO class members during lengthy litigation in light of the "inherently transitory" nature of individuals' participation as Quixtar IBOs.  *See* Exh. G, Alexander Decl. at ¶ 4 (of the 2,430,335 people who joined Quixtar since 2003, only 305,264 remain).  Where claims are "so inherently transitory that the trial court will not have even enough time to rule on a motion for class certification before the proposed representative's individual interest expires," then "the action qualifies for an exception to mootness even if there is no indication that . . . current class members may again be subject to the acts that gave rise to the claims." *Wade v. Kirkland*, 118 F.3d 667, 669 (9th Cir. 1997).  The three Named Plaintiffs have actively participated in the mediation sessions and negotiations and they have aggressively sought injunctive relief and other measures that will benefit current IBOs.  *See* Exh. C, Pokorny Decl. at ¶ 13; Exh. D, Blenn Decl. at ¶¶ 12; Exh. E, Busiere Decl. at ¶ 10.  They should be deemed adequate representatives of the entire Settlement Class.

The Court also noted potential conflicts between the Named Plaintiffs and their own "downline" and "upline" IBOs.  Each Named Plaintiff is a former IBO, and each has been injured as a result of Quixtar's and the other defendants' challenged conduct.  *See* Exh. C, Pokorny Decl. at ¶¶ 4-7; Exh. D, Blenn Decl. at ¶¶ 4-9; Exh. E, Busiere Decl. at ¶¶ 4-7.  Mr. Pokorny was recruited by his mother, and he only recruited two others to join.  *See* Exh. C, Pokorny Decl. at ¶¶ 3, 6.  Mr. Blenn was recruited by friends of his mother-in-law, and he only recruited one person, his wife's sister.  *See* Exh. D,  Blenn Decl. at ¶¶ 3, 6.  Mr. Busiere was recruited by his girlfriend and did not recruit anyone else to join Quixtar.  Exh. E, Busiere Decl. at ¶¶ 3, 6.  None of the Named Plaintiffs has a claim against his upline, and none is aware of

1   any claims against him by any of his former downlines.  *See* Exh. C, Pokorny Decl. at ¶¶ 3, 7;
2   Exh. D, Blenn Dec. at ¶¶ 3, 6; Exh. E, Busiere Decl. at ¶¶ 3, 6.  In any event, the existence of
3   potential claims against uplines or downlines is inherent in pyramid scheme litigation and is not
4   a "disabling conflict" that warrants denial of class certification.  *Nguyen v. FundAmerica, Inc.*,
5   No. 90-2090, 1990 WL 165251, *2 (N.D. Cal. Aug. 20 1990).

6   **b.     Plaintiffs are Represented by Qualified and Competent Counsel**

7   The Court ordered supplemental briefing on the adequacy of class counsel, as no
8   attorney declarations had been filed.  Accordingly, accompanying this memorandum are
9   declarations from Stuart Singer of Boies Schiller & Flexner, LLP ("Boies Schiller") and Tricia
10  P. Hoffler of Gary, Williams Parenti, Finney, Lewis, McManus, Watson & Sperando ("Gary
11  Law").  *See* Exh. I, Singer Decl.; Exh. J, Hoffler Decl.

12  The Boies Schiller firm and its attorneys working on this matter have substantial
13  experience in class action litigation as well as in suits involving the federal RICO laws and
14  fraud claims under state and federal law.  *See* Exh. I, Singer Decl. at ¶¶ 3-11.  The attorneys at
15  Gary Law also have substantial experience in litigating class actions, including cases for
16  employment discrimination throughout the United States.  *See* Exh. J, Hoffler Decl. at ¶ 5.
17  Boies Schiller and Gary Law have investigated the claims in this action, have initiated this
18  litigation based on that work (rather than simply filing copycat lawsuits or following a
19  government investigation), and have successfully litigated the issues of setting aside Quixtar's
20  alternative dispute resolution procedures as unconscionable before this Court and the Ninth
21  Circuit Court of Appeals.  Over the course of four years of litigation, Boies Schiller and Gary
22  Law have invested thousands of hours of attorney time and incurred expenses of approximately
23  $470,000.  *See* Exh. I, Singer Decl. at ¶¶ 12; Exh. J, Hoffler Decl. at ¶ 7.  Plaintiffs' counsel do
24  not have any conflicts with the Class and are prepared to prosecute this complex action through
25  resolution, either by settlement or through continued litigation.  *See* Exh. I, Singer Decl. at ¶
26  12; Exh. J, Hoffler Decl. at ¶ 8.

27  Boies Schiller's and Gary Law's experience and resources are sufficient to satisfy the
28  adequacy requirements of Rule 23(a) and Rule 23(g).  *See Xiufang Situ v. Leavitt*, 240 F.R.D.

7

1   551, 562 (N.D. Cal. 2007); *Wiener v. Dannon Co., Inc.*, 255 F.R.D. 658, 672 (C.D. Cal. 2009).

2   In the absence of affirmative evidence that Plaintiffs' chosen counsel is inadequate, the

3   plaintiffs' choice should be respected.  *See Mateo v. M/S KISO*, 805 F. Supp. 761, 771 (N.D.

4   Cal. 1992).   This Court should therefore find that the class is represented by qualified and

5   competent counsel.

        **4.        Predominance and Superiority**

7            As the Court noted, Rule 23 requires heightened judicial scrutiny of proposed

8   settlements to "protect absentees by blocking unwarranted or overbroad class definitions" and

9   proof that the class action is "superior to other available methods for fairly and effectively

10  adjudicating the controversy."  *See* Dkt. No. 157, Prelim. Order at 16-17.  The Court ordered

11  Plaintiffs' counsel to submit a sworn declaration stating the basis for the statement that there is

12  no other litigation brought by individual class members asserting against Quixtar the range of

13  claims at issue in this case.  *Id.* at 17-18.  The Court also ordered supplemental briefing on the

14  range of claims within the class.  *Id.* at 18.  Plaintiffs have responded to the Court's directives

15  through several declarations filed with this Memorandum.  *See. e.g.*, Exh. C, Pokorny Decl.;

16  Exh. D, Blenn Decl.; Exh. E, Busiere Decl.; Exh. F, VanderVen Decl. (to be docketed

17  separated by Defendants' counsel); Exh. H, Coffman Decl.; Exh. I, Singer Decl.

18           With respect to other pending litigation, Quixtar has identified two pending lawsuits

19  involving Quixtar and former IBOs.  *See* Exh. F, VanderVen Decl. at ¶¶ 17-19.  The first

20  lawsuit is captioned *Jann G. Newton, William P. Newton, and Interactive Marketing System,*

21  *L.C. v. Amway Corp, f/k/a Quixtar Inc., James McAnarney, Marcia McAnarney,* George

22  *Peinter and Melody Peinter*, and was filed in state court in Kansas.  Plaintiffs Jann and William

23  Newton (former IBOs) and their corporation, Interactive Marketing, allege that Amway/Quixtar

24  wrongfully terminated them, breached their contract with plaintiffs, and engaged in other

25  wrongful acts.  The Kansas state court has granted the defendants' motion to compel

26  arbitration.  The second lawsuit, *Amway Corp. v. Scott E. Johnson*, was filed in Texas state

27  court.  Mr. Johnson filed a counterclaim alleging, among other things, that as an IBO he "paid

28  exorbitant amounts for 'tools' . . ." and that IBOs upline of Johnson, with the company's

B O I E S ,   S C H I L L E R   &   F L E X N E R   L L P
O A K L A N D ,   C A L I F O R N I A

1   knowledge, misrepresented the business opportunity to him.[2]   The court granted Amway's

2   motion to compel arbitration of the counterclaim.  If plaintiffs do not exercise their opt-out

3   rights, the plaintiffs' claims in these two lawsuits would be precluded under the release set forth

4   in the ASA.  *See* Exh. J, VanderVen Dec. ¶¶ 18-19.

5          Plaintiffs' counsel have examined public databases -- including Westlaw, Google, and

6   Pacer -- to confirm Quixtar's representations and have not identified  any other pending cases

7   against defendants that would appear to be covered by the ASA release.  *See* Exh. I, Singer

8   Decl. at ¶ 13.  Plaintiffs suggest that the absence of other individual cases involving these

9   issues supports the superiority of the class action approach to these issues.

10         The Court also expressed concern that the release is "not limited to claims premised on

11  the allegation that Quixtar is a fraudulent pyramid scheme."  Dkt. No. 157, Prelim. Order at 17.

12  As discussed above, the release protects Quixtar against claims that "were or could have been

13  asserted" in the complaint, as is standard in litigation settlements, including class action

14  settlements.  *See, e.g., Pet Food*, 629 F.3d at 356.  However, the release specifically excludes

15  disputes concerning bonuses, payments, defective products, workplace discrimination, sexual

16  harassment, health care plans, pension plans, and anything else "entirely unrelated to any of the

17  claims, issues, or factual allegations raised" in any of Plaintiffs' complaints.  *See* Dkt. No. 162-

18  2, ASA at § 1.31.  Plaintiffs submit that these carve-outs adequately protect class members

19  against the release of any claims not related to this lawsuit.

20         With respect to the range of claims of Class Members, Plaintiffs have submitted

21  declarations on the number of claimants who have a claim for registration fees and the range of

22  those claims.  Exh. G, Alexander Decl at ¶¶ 4, 7-8.  We also have submitted a declaration from

23  Neutral Expert Chad W. Coffman on the range of potential claims of class members with

24  respect to BSM purchases.  Mr. Coffman estimates, based on data submitted by the BSM

25  companies, that the average amount of BSM purchases by class members who purchased any

26

---

27  [2] Mr. Johnson already is aware of the present litigation.  He is the former IBO who wrote the
    Court a letter dated March 13, 2011.  The Court forwarded the letter to Plaintiffs' counsel on
28  March 18, 2011.

B O I E S ,   S C H I L L E R   &   F L E X N E R   L L P
O A K L A N D ,   C A L I F O R N I A

1   BSM is between $950 and $1300.  Exh. H, Coffman Decl. at ¶ 16.   The average for class

2   members who spent over $100 on BSM is between $1100 and $1500.  *Id.* at ¶ 19.  Mr Coffman

3   estimates that 357,000 to 490,000 class members spent over $100 on BSM.  *Id.* at ¶ 16.

4       Each of the three Named Plaintiffs has the following losses from BSM purchases:

5   $121.63 for Mr. Busiere, $403 for Mr. Blenn, and $6662 for Mr. Pokorny.   In the absence of

6   this settlement, each would have a claim for registration fee refunds, from $40 to $62 annually

7   (Mr. Blenn and Mr. Busiere quit within their first year; Mr. Pokorny remained an IBO for over

8   ten years).  Also, Mr. Blenn's involvement with Quixtar led to Chapter 7 bankruptcy, and he

9   lost his home, job and two cars.

10      Given the daunting costs that the Named Plaintiffs and most other Class Members

11  would face if they pursued such claims individually, a class action is superior.  *See, e.g., Seijas*

12  *v. Republic of Argentina*, 606 F.3d 53, 58 (2nd Cir. 2010) (where "proceeding individually

13  would be prohibitive for class members with small claims," the "class action device is

14  frequently superior to individual actions"); *Beattie v. CenturyTel, Inc.*, 511 F.3d 554, 567 (6th

15  Cir. 2007) ("a small possible recovery would not encourage individuals to bring suit, thereby

16  making a class action a superior mechanism for adjudicating this dispute"); *Chavez v. Blue Sky*

17  *Natural Beverage Co.*, 268 F.R.D. 365, 379 (N.D.Cal. 2010) ("the class action is superior to

18  maintaining individual claims for a small amount of damages").  Of course those individuals

19  with large claims have the right to opt-out from the settlement but, since most claims are small,

20  a class action remains superior to other methods of adjudication.  *See Murray v. GMAC*

21  *Mortgage Corporation*, 434 F.3d 948, 953 (7th Cir.2006) ("When a few class members'

22  injuries prove to be substantial, they may opt out and litigate independently.  Only when all or

23  almost all of the claims are likely to be large enough to justify individual litigation is it wise to

24  reject class treatment altogether." (citations omitted)).[3]

25

26      [3] *See also Summerfield v. Equifax Information Services LLC*,  264 F.R.D. 133, 141
    (D.N.J. 2009) (quoting *Murray*);  *In re Conseco Life Ins. Co. Cost of Ins. Litigation*, No. 04-
27  1610, 2005 WL 5678842, *9 (C.D.Cal. Apr. 26, 2005) (certifying class but allowing opt outs
    "because some plaintiffs with large claims may prefer to pursue actions individually").

28

B O I E S ,   S C H I L L E R   &   F L E X N E R   L L P
O A K L A N D ,   C A L I F O R N I A

1    For these reasons, the Court should find that common issues predominate and that a

2    class action is a superior form of resolving the claims against Quixtar.

3    **B.    <u>Fairness of the Settlement</u>**

4    As the Court noted, when the parties to a putative class action reach a settlement

5    agreement prior to class certification, "courts must peruse the proposed compromise to ratify

6    both the propriety of the certification and the fairness of the settlement," "assess whether a

7    class exists," and determine whether the proposed settlement "is fundamentally fair, adequate,

8    and reasonable."  Dkt. No. 157, Prelim. Order at 11 (*quoting Hanlon v. Chrysler Corp.*, 150

9    F.3d 1011, 1026 (9th Cir. 1998) and *Staton v. Boeing Co.*, 327 F.3d 938, 952 (9th Cir. 2003)).

10   Of course, at this preliminary stage, the Court need not make a final fairness determination, and

11   it should grant preliminary approval if satisfied that the proposed settlement "contains some

12   merit, is within the range of reasonableness required for a settlement offer, or is presumptively

13   valid."  *In re Tableware Antitrust Litig.*, 484 F. Supp. 2d 1078, 1079 (N.D. Cal. 2007) (internal

14   citations omitted); *Chun-Hoon v. McKee Foods Corp.*, No. 05-0620, 2009 WL 3349549, *2

15   (N.D. Cal. Oct. 15, 2009); *In re Portal Software, Inc. Sec. Litig.*, No. 03-5238, 2007 WL

16   1991529, *5 (N.D. Cal. Jun. 30 2007).

17   In evaluating the ASA, the Court should consider the strong judicial policy favoring the

18   voluntary conciliation and settlement of complex class action litigation.  *In re Syncor*, 516 F.3d

19   1095, 1101-02 (9th Cir. 2008) (citing *Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615,

20   624 (9th Cir. 1982)); *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992).

21   While the Court has discretion to approve a proposed settlement, it should give "proper

22   deference to the private consensual decision of the parties."  *Hanlon v. Chrysler Corp.*, 150

23   F.3d 1011, 1027 (9th Cir. 1998); *Rodriguez v. West Publ'g Corp.*, 563 F.3d 948, 965 (9th Cir.

24   2009).  When a settlement is negotiated at arms' length by experienced counsel, there is a

25   presumption that it is fair and reasonable.  *See In re Inter-Op Hip Prosthesis Liab. Litig.*, 204

26   F.R.D. 359, 380 (N.D. Ohio 2001); *In re Austrian & German Bank Holocaust Litig.*, 80 F.

27   Supp. 2d 164, 173-74 (S.D.N.Y. 2000), *aff'd sub nom. D'Amato v. Deutsche Bank*, 236 F.3d 78

28   (2d Cir. 2001); *Ellis v. Naval Air Rework Facility*, 87 F.R.D. 15, 18 (N.D. Cal. 1980)

11

B O I E S ,   S C H I L L E R   &   F L E X N E R   L L P

O A K L A N D ,   C A L I F O R N I A

B O I E S ,   S C H I L L E R   &   F L E X N E R   L L P
O A K L A N D ,   C A L I F O R N I A

1   (settlement reached after hard-fought negotiations by experienced counsel entitled to

2   "considerable weight"), *aff'd*, 661 F.2d 939 (9th Cir. 1981)

3        Plaintiffs did not achieve all of their goals in the mediation and negotiations but, after

4   hard bargaining, they reached an agreement that they can recommend to the Court and to absent

5   Class Members as a fair and reasonable compromise.  Plaintiffs' counsel have great confidence

6   in the merits of the case but also have a responsibility to the Class to take into account the fact

7   that, no matter how strong Plaintiffs' counsel believes the case to be, a jury or a court may not

8   agree.  Moreover, this case has already been delayed for years by appeals and, if it does not

9   settle, Class Members would likely have to wait a number of additional years to obtain

10  economic and injunctive relief.

11       The Court accurately observed that pre-certification class settlements are given a

12  "higher standard" of judicial scrutiny to ensure that the proposal is "fair, reasonable, and

13  adequate to all concerned."  Dkt. No. 157, Prelim. Order at 19 (*quoting Staton*, 327 F.3d at 950

14  and *Hanlon*, 150 F.3d at 1026).  Plaintiffs recognize that the Court has identified a number of

15  valid concerns.  In the ASA, the parties have made certain changes to address the Court's

16  concerns.

17       One concern that is not valid, however, is that the settlement resulted from any

18  collusion.  *See* Dkt. No. 157, Prelim. Order at 19-20.  In this case, attorneys' fees were not

19  discussed at all until after the substantive provisions of the settlement had been agreed to.  *See*

20  Exh. K, Weinstein Decl. at ¶¶ 17, 22.  Further, the parties have now deleted this provision from

21  the ASA, even though the inclusion of such a provision is not grounds for denial of settlement

22  approval.  *See Ingram v. The Coca-Cola Co.*, 200 F.R.D. 685, 693-94 (N.D. Ga. 2001)

23  (approving a settlement with a "no objection to fees motion" provision, even though the fee

24  negotiation was not "the very last item on the table," where the settlement was the product of

25  contentious negotiations before an experienced mediator); *Dembski v. Fairchild Industries*, No.

26  88-2953, 1989 WL 159510, *21-22 (E.D.N.Y. Dec. 18 1989) ("Although the settlement

27  provides that the defendants will not object to paying plaintiffs legal fees . . . , I find-based on

28  the chief negotiators' affidavits stating that the amount of the fees were not negotiated until

B O I E S ,   S C H I L L E R   &   F L E X N E R   L L P

O A K L A N D ,   C A L I F O R N I A

1    agreement was reached on all substantive aspects-that such problems did not arise in this

2    case").

3          The amount of a fee award is, of course, up to the Court, regardless of Defendants'

4    position on the matter.  In fact, courts well recognize that settling defendants are only interested

5    in "buying peace" and thus give little or no weight to their failure to object.  *Reibstein v. Rite*

6    *Aid Corp.*, --- F.Supp.2d --- , 2011 WL 192512, *14 (E.D. Pa. 2011).[4]  If the ASA is approved,

7    Plaintiffs' counsel intend to seek an award of attorneys fees' and expenses under the Ninth

8    Circuit's common fund approach, pursuant to which the Court determines an appropriate fee

9    based on a benchmark percentage (25% in the Ninth Circuit) of the benefits to the class.  *See*

10   *Staton v. Boeing Co.*, 327 F.3d 938, 968 (9th Cir. 2003).  The value of injunctive relief may

11   only be considered as part of the size of the fund "where the value to individual class members

12   of benefits deriving from injunctive relief can be accurately ascertained."  *Id.* at 974.

13   Otherwise, courts may only "consider the value of the injunctive relief obtained as a 'relevant

14   circumstance' in determining what percentage of the common fund class counsel should

15   receive as attorneys' fees, rather than as part of the fund itself."  *Id.*[5]

16   **1.    Economic Relief**

17         The Court noted that the proposed settlement did not treat all class members equally.

18   *See* Dkt. No. 157, Prelim. Order at 20.  While it is not necessary that all class members be

19   treated identically, the parties have sought to improve the equity of the distribution of the

20   economic relief in the ASA by taking into account the fact that Class Members have varying

21   _____

22   [4] *See also In re Vioxx Products Liability Litigation*, 650 F.Supp.2d 549, 560 (E.D. La. 2009)
     ("The defendant is buying peace and is generally disinterested in how the fund is divided so
23   long as it does not jeopardize the settlement." (*quoting In re Zyprexa Products Liability
     Litigation*, 424 F.Supp.2d 488, 491-92 (E.D.N.Y. 2006)).
24

25   [5] In considering the value of injunctive relief with respect to changes instituted by defendants
     since a suit was filed, the Court may award fees where, as here the suit was a substantial cause
26   or a "catalyst" for the changes made by Quixtar.  *See* Dkt. No. 162-2, ASA at ¶ 12.2; *see, e.g.,
     Savoie v. Merchants Bank*, 84 F.3d 52, 56-57 (2d Cir. 1996);  *Lewis v. Anderson*, 692 F.2d
27   1267, 1270 (9th Cir. 1982); *Trew v. Volvo Cars of North America*, 2007 WL 2239210, *4 (E.D.
     Cal. 2007); *Chin v. DaimlerChrysler Corp.*, 461 F.Supp.2d 279, 283-84 (D.N.J. 2006)
28   (applying Cal. Law); *Snyder v. Shearer*, 575 F. Supp. 156, 158-59 (D. Iowa 1983).

13

types and amounts of losses from their participation in Quixtar and structuring the economic relief accordingly.  The ASA provides for three different types of economic relief, which are tailored to the different amounts and types of damages Class Members may have incurred and which are discussed in detail below.  Under the ASA, the three Named Plaintiffs would have the following claims:  Mr. Blenn would receive $80 (20% of $403 paid for BSM), a $75 product bundle, and a hardship claim in an amount up to $10,000 to be determined by the Special Master because he filed for Chapter 7 bankruptcy and lost his home, job, and two cars because of his involvement with Quixtar.  *See* Exh. D,  Blenn Decl. at ¶¶ 4-10.  Mr. Pokorny would receive $1,332 (20% of $6,662 paid for BSM).  *See* Exh. C, Pokorny Decl. at ¶¶ 4-7.  Mr. Busiere would receive $24 (20% of $121.63 paid for BSM) plus a $75 product bundle. *See* Exh. E, Busiere Decl. at ¶¶ 4-7.

To the extent there remain any disparities in the ASA's treatment of Class Members, Plaintiffs submit that they are rational, fair and reasonable.  "[V]aried relief among class members with differing claims in class settlements is not unusual.  Almost every settlement will involve different awards for various class members."  *Pet Food*, 629 F.3d at 346 (quotations omitted) (approving settlement even though the "vast majority" of the fund would go to class members with certain types of claims, while others' claims were capped); *see also Petrovic v. Amoco Oil Co.*, 200 F.3d 1140, 1145 (8th Cir. 1999) (approving settlement where class members' compensation was based on the location of their property, with those in Zone A receiving the largest recovery, those in Zone B a lesser recovery, and those in Zone C receiving no recovery except the right to claim compensation from a "special circumstances" fund); *Dewey v. Volkswagen of America*, 728 F.Supp.2d 546, 579-80 (D.N.J. 2010) (approving settlement even though some class members received nothing but "preventative care information" about their vehicles).  "A plan of allocation is fair, reasonable and adequate as long as it has a reasonable, rational basis." *In re Veeco Instruments Inc. Securities Litigation*, 2007 WL 4115809, *13 (S.D.N.Y. 2007) (quotations omitted).  The "adequacy of an allocation plan turns on whether counsel has properly apprised itself of the merits of all claims, and whether the proposed apportionment is fair and reasonable in light of that information." *Id.*

B O I E S ,   S C H I L L E R   &   F L E X N E R   L L P

O A K L A N D ,   C A L I F O R N I A

1    *See In re MetLife Demutualization Litigation*, 689 F.Supp.2d 297, 351 (E.D.N.Y. 2010) (not all

2    class members need be treated equally in a settlement, as long as any disparate treatment is

3    "justified by a demonstration that the favored class members have different claims or greater

4    damages").

5    **a.    Product Credit**

6    First, approximately 1,408,297 of the 2,430,235 Class Members dropped out of Quixtar

7    during their first year. *See* Exh. G, Alexander Decl. at ¶¶ 4, 7-8. Under the ASA, those Class

8    Members who were involved for just one year or less and have not received a refund of their

9    registration fee will be eligible to receive a product package worth $75 retail (and an

10   approximate cost of $48.16 to Quixtar). *See* Dkt. No. 162-2, ASA at § 6.2.1. By contrast, the

11   Initial Settlement Agreement provided a $50 cash payment to former IBOs who left Quixtar

12   within one year and who had not received a registration fee refund. *See* Exh. I, Singer Decl. at

13   Exh. 2 (redlines between Initial Settlement Agreement and ASA). Based on Rust Consulting's

14   estimate of a likely 15% claims rate, *see* Exh. A, Holland Decl. at ¶ 14, the 265,000 available

15   packages should be sufficient to meet the expected claims of 211,245 applicants (15% of the

16   1,408,297 eligible former IBOs who quit after one-year).

17   The Court correctly noted that the $21 million value of the Product Credit Fund is based

18   on Quixtar's retail price for the products and that Plaintiffs have alleged that Quixtar's products

19   are overpriced. *See* Dkt. No. 157, Prelim. Order at 21-22. Quixtar has produced sworn

20   testimony in a declaration that the cost to it of producing these goods would be $13,348,880, or

21   approximately 63.65% of retail value. *See* Exh. G, Alexander Decl. at ¶¶ 14-17. Courts have

22   approved use of retail value in other cases involving product distribution. *See, e.g., Browning*

23   *v. Yahoo! Inc.*, 2007 WL 4105971, at *4, *5 (N.D. Cal. Nov. 16, 2007) (free credit scores

24   valued at retail prices); *In re Toys "R" Us Antitrust Litig.*, 191 F.R.D. 347, 349, 352 (E.D.N.Y.

25   2000) (accepting $57 million valuation of settlement including toys valued at retail and

26   manufacturer's list prices); *see also Vista Healthplan, Inc. v. Warner Holdings Co. III, Ltd.*,

27   246 F.R.D. 349, 355, 362 (D.D.C. 2007) (in approving settlement, valuing *cy pres* product

28   donation based on retail prices); *Curiale v. Lenox Group, Inc.*, 2008 WL 4899474, at *10 (E.D.

15

B O I E S ,  S C H I L L E R  &  F L E X N E R  L L P
O A K L A N D ,  C A L I F O R N I A

1   Pa. Nov. 14, 2008) (approving settlement partially consisting of free product valued at retail

2   prices); *Perez v. Asurion Corp.*, 501 F. Supp. 2d 1360, 1374, 1382-83 (S.D. Fla. July 26, 2007)

3   (approving settlement partially consisting of vouchers for new phones valued at retail prices);

4   *Horton v. Leading Edge Marketing, Inc.*, 2007 WL 2472046, at *2, *4 (D. Colo. Aug. 28,

5   2007) (approving settlement partially consisting of free books valued at retail prices); *Equal

6   Rights Center v. Washington Metropolitan Area Transit Authority*, 573 F. Supp. 2d 205, 208-

7   209 (D.D.C. 2008) (approving settlement partially consisting of subway tickets valued at price

8   offered to the public). Plaintiffs also recognize that here, where there are issues concerning the

9   overpricing of Quixtar's product at retail, use of retail value may be more problematic.

10   Plaintiffs submit that using cost figures with a modest 15%-20% enhancement would be a fair

11   way to value the product fund. *See In re Compact Disc Minimum Advertised Price Antitrust

12   Litigation*, 216 F.R.D. 197 (D. Me. 2003) (valuing products at 20% below retail).

13       The Court also took issue with the Settlement Agreement's provision that empowered

14   Judge Weinstein to make *cy pres* distributions in the event of a surplus. This provision has

15   been changed to give this power to the Court. *See* Dkt. No. 162-2, ASA at §§ 6.1.5, 6.2.4.

16       Finally, the Court asked several questions about the Product Credit Fund. Plaintiffs

17   respond to these questions as follows:

19       *Q*: How many members of the proposed class are eligible to

20       receive a product bundle from Quixtar? *A*: The settlement

21       agreement has been amended so that every class member who is a

22       former IBO, who left Quixtar within a year, and who did not

23       receive a registration fee refund, is entitled to a product bundle.

24       *See* Dkt. No. 162-2, ASA at § 6.2. The product fund would be

25       used to reimburse these former IBOs for the amount they paid in

26       registration fees. According to Quixtar, there are approximately

27       1,408,297 former IBOs in the class who left Quixtar within one

28       year. *See* Exh. G, Alexander Decl. at ¶ 4, 7-8.

B O I E S ,   S C H I L L E R   &   F L E X N E R   L L P
O A K L A N D ,   C A L I F O R N I A

1

2   *Q:* What is the average cost to Quixtar of each $100 "product

3   bundle"?  *A*: Under the ASA, the product bundles will have an

4   average value of $75 retail.  According to Quixtar, its average cost

5   per bundle is $48.16.  *See* Exh. G, Alexander Decl. at ¶ 14-17.

6

7   *Q:*  The Settlement provides that "Quixtar's actual out-of-pocket

8   shipping and handling charges" related to sending the product

9   bundles "shall be paid from the Cash Fund."  *See* Dkt. No. 162-2,

10  ASA at § 6.2.6.  What is the estimated cost of shipping and

11  handling per product bundle?  *A*: According to Quixtar, shipping

12  and handling will cost $4.69 per bundle, or a total of $1,300,678

13  for shipping approximately 277,200 bundles.  *See* Exh. G,

14  Alexander Decl. at ¶ 18.

15

16  *Q:*  The product bundles are limited to "Artistry skincare,

17  HomeCare (limited to two bundles, each of which may be capped

18  at not less than 30,000 claims per bundle), or Nutrilite vitamin,

19  mineral, or supplement products."  *See* Dkt. No. 162-2, ASA at §

20  6.2.1. On what basis did the parties conclude that these products

21  were an adequate award for the class?  *A*: Plaintiffs agreed to

22  these products because they are popular and offer claimants a

23  choice between different types of products.  *See* Exh. I, Singer Dec

24  at ¶ 14; *see also* Exh. G, Alexander Decl. at ¶ 16.

25

26  *Q:*  The product bundles are only available to class members who

27  purchased $100 or more in BSMs. What is the average amount of

28  BSMs purchased by class members who purchased any BSMs?  *A:*

B O I E S ,   S C H I L L E R   &   F L E X N E R   L L P

O A K L A N D ,   C A L I F O R N I A

1   The settlement agreement has been modified so that products are

2   used to compensate former IBOs who are class members, who left

3   Quixtar within one year, and who have not received a refund of

4   his/her registration fees.  *See* Dkt. No. 162-2, ASA at § 6.2.

5   Assuming the Court would have a similar question regarding the

6   ASA, we note that, the average amount of BSM purchased by class

7   members who bought BSM is between $950 and $1,300.  *See* Exh.

8   H, Coffman Dec. ¶ 6.  Average BSM spending by IBOs who spent

9   more than $100 on BSM is between $1,100 and $1,500.  *Id.* at ¶

10   19.

11       **b.       Cash Fund**

12       Second, Class Members who spent more than $100 on BSM are entitled to a cash award

13   of up to 20% of their Verifiable BSM Expenditures, with the percentage reduced or increased

14   *pro rata* if necessary.  *See* Dkt. No. 162-2, ASA at § 6.1.2.   By contrast, under the Initial

15   Settlement Agreement, these Class Members would have received a product bundle. *See* Exh. I,

16   Singer Decl. at Exh. 2 (redline between ASA and Initial Settlement Agreement).   Between

17   357,000 and 490,000 former IBOs purchased more than $100 of BSM, and these IBOs spent an

18   average between $1,100 and $1,500 on BSM.   *See* Exh. H, Coffman Decl. at ¶ 16.   By

19   providing a percentage recovery for BSM expenditures, rather than a fixed product package

20   irrespective of the amount spent by a Class member on BSM, as was the case under the Initial

21   Settlement Agreement, Plaintiffs believe the ASA achieves greater equity among the Class.

22   The Court asked several questions about the Cash Fund, to which the Plaintiffs respond as

23   follows:

24

25       *Q*: How many members of the class are eligible to recover initial

26       registration fees under the Settlement? That is – how many paid

27       the original registration fee and did not continue participation in

28       Quixtar?  *A*: Under the ASA, every former IBO who is a member

of the class who left Quixtar within one year, and who has not previously received a refund of registration fees, is entitled to a product bundle as recovery for registration fees.   According to Quixtar, there are approximately 1,408,029 former IBOs in the class who left Quixtar within one year.  *See* Exh. G, Alexander Decl. at ¶ 4, 7-8.

*Q*: What is the estimated amount of administrative costs to be paid out of the Cash Fund, including notice costs?  *A*:  Notice and claims administration will cost approximately $1,077,00.  *See* Exh. A, Holland Decl. at ¶15.  The only additional administrative costs are those associated with a Special Master's handling of the Special Hardship claims; those costs are estimated at between $200,000 and $3000,000.  Exh. K, Weinstein Decl. at ¶ 18.

*Q*: What is the estimated cost of Plaintiffs' counsel's expenses, excluding attorneys' fees?  *A*:  Plaintiffs' counsels' expenses are approximately $470,000.  *See* Exh. I, Singer Decl. at ¶ 12; Exh. J, Hoffler Decl. ¶ 7.

*Q*:  What is the amount of the initial registration fee that is recoverable under § 6.1.1 of the Settlement Agreement?  *A*: During the class period, the amount ranged from $40 to $62.  *See* Exh. G, Alexander Decl. at ¶ 10.

*Q*:  What is the parties' justification for capping the total recovery of initial registration fees at $5 million?  *A*: This cap has been deleted in the ASA.  *See* Dkt. No. 162-2, ASA at § 6.2.  There is a

19

B O I E S ,   S C H I L L E R   &   F L E X N E R   L L P

O A K L A N D ,   C A L I F O R N I A

cap of $5 million on special hardship payments in the ASA, subject to revision by the Court, which is intended to preserve a balance between payments to the individuals, more numerous in number, with smaller losses and the relatively smaller number believed to be eligible for a greater hardship award.

*Q*: If the Court opted against awarding special compensation to the named Plaintiffs (as contemplated by § 12.4 of the Settlement Agreement), how would the Named Plaintiffs recover under the Settlement?  *A*: As mentioned above, in the absence of any special compensation, the three named plaintiffs would have claims in the following amounts, subject to possible *pro rata* adjustments:  Mr. Blenn would receive $80 (20% of $403 paid for BSM), a product pack, and a hardship claim (amount up to $10,000 to be determined by the Special Master) because he filed for Chapter 7 bankruptcy and lost his home, job, and two cars.  *See* Exh. D, Blenn Decl. at ¶¶ 4-10.  Mr. Pokorny would receive $1,332 (20% of $6,662 paid for BSM).  *See* Exh. C, Pokorny Decl. at ¶¶ 4-7. Mr. Busiere would receive $24 (20% of $121.63 paid for BSM) plus a product pack. *See* Exh. E, Busiere Decl. at ¶¶ 4-7.

c.      **Special Hardship Fund**

Finally, Class Members who suffered a "special hardship" will be eligible to apply for a cash award of up to $10,000.  To qualify, Class Members must show that they filed for personal bankruptcy or lost at least $10,000 because of their involvement with Quixtar.  While there are no data reflecting the number of Class Members who are eligible for Special Hardship awards, those numbers will become known through the claims process.

The Court indicated it could not approve the "special hardship" provision of the Settlement Agreement unless it was revised to include "language clearly defining what a 'special hardship' is, how it differs from ordinary damages, what type of documentation is necessary, and how that documentation will be reviewed." Dkt. No. 157, Prelim. Order at 23. The ASA has been amended in response. It now provides that individuals are eligible for a Special Hardship payment equal to 20% of their losses, up to $10,000, if they (1) filed for bankruptcy because of their involvement with Quixtar or (2) can document losses of at least $10,000. *See* Dkt. No. 162-2, ASA § 6.1.2. These eligibility requirements, coupled with details about the type of documentation required, *id.* at § 6.1.2.c provide a clearer standard, both for the Class and for the Special Master. There is a $5 million presumptive ceiling on the special hardship fund, *id.* at ¶ 6.1.2.f, which is designed to preserve a balance between the categories of payments provided for in the Settlement, but which is subject to adjustment by the Court upon review of the actual claims submitted.

The Special Hardship Fund, is consistent with other settlements that have used a claims arbitrator or special master to manage a claims process as part of a class settlement or judgment. *See, e.g., Pet Food*, 629 F.3d at 339; *Staton*, 327 F.3d at 948; *In re Phenylpropanolamine (PPA) Products Liability Litigation*, 227 F.R.D. 553, 569 (W.D. Wash. 2004); *In re TJX Companies Retail Sec. Breach Litigation*, 584 F.Supp.2d 395, 400 n.10 (D. Mass. 2008).

The Court asked questions about the Special Hardship Fund, to which Plaintiffs respond as follows:

> ***Q:*** How many members of the proposed class are eligible to recover under the "hardship" provision of the settlement? ***A***: Quixtar and Plaintiffs are unable to provide an estimate of the number of potential hardship claims. *See* Exh. F, VanderVen Decl. at ¶¶ 20-21. Based on the large number of former IBOs who drop out during the first year, and the average amount IBOs purchased

B O I E S ,   S C H I L L E R   &   F L E X N E R   L L P
O A K L A N D ,   C A L I F O R N I A

1   of BSM, Plaintiffs believe that this is a relatively limited number
2   compared to the overall size of the class.

3

4   *Q*: What is the average award to class members who can
5   demonstrate hardship? *A*: The ASA provides a cap of $10,000 on
6   hardship awards, *See* Dkt. No. 162-2, ASA at § 6.1.2.a, but it is not
7   possible at this time to know what the average amount of an award
8   may be.

9

2.      **Injunctive Relief**

The Court raised certain issues about the valuation of the injunctive relief.  Quixtar now
has provided a declaration detailing the basis for its $100 million estimate.  *See* Exh. G,
Alexander Decl. at ¶¶ 11-13.  As stated in the ASA, this lawsuit motivated several reforms
initiated by Quixtar after the filing of the lawsuit.  *See* Dkt. No. 162-2, ASA at § 12.2.  These
reforms did not commence until after the filing of this class lawsuit, even though the issues
surrounding Quixtar's business have existed for many years.  *See In re Amway Corp.*, 93 F.T.C.
618 (1979).  The injunctive relief in the settlement extends these changes and insures that they
are not discontinued after the settlement of these claims.  Exh. I, Singer Decl. at ¶ 15.  As set
forth in § 5.1 of the ASA, the proposed injunctive relief which benefits Class Members obliges
Quixtar to, *inter alia*:

- not compensate IBOs primarily for the act of recruiting others and to condition
  bonuses on sales to end users, and not require any IBO to purchase or maintain
  any specified amount of inventory;

- Maintain policies prohibiting acts or practices which require a person to buy
  BSM as a condition to becoming an IBO and prohibiting acts or practices which
  discourage buy backs of product on commercially reasonable terms;

- reduce prices over 2007 levels  by an average of 5%;

- increase the registration fee refund period from 30 days to 90 days;

B O I E S ,   S C H I L L E R   &   F L E X N E R   L L P

O A K L A N D ,   C A L I F O R N I A

- disclose important information on the application form, including:

  o   refund policies,

  o   the fact that income figures are based on gross rather than net income,

  o   the availability of training in marketing and merchandising,

  o   the availability of an on-line retail product price schedule, and

  o   the fact that product and BSM purchases are optional.

- provide an additional $7 million annually in free training to IBOs, including legal compliance requirements; and

- maintain and enforce quality control over BSMs, which shall includes standards that BSMs shall not include material false and misleading statements.

*See* Dkt. No. 162-2, ASA at ¶ 5.1; *see also* Dkt. No. 162-6, Proposed Consent Judgment.  The injunctive relief has been clarified and strengthened in several respects regarding the subjects of training, product buy backs, bonus payments, and quality control.  Ex. I, Singer Decl at ¶ 15-16; *id.* at Exh. 2 (showing the differences between the original agreement and the ASA). Plaintiffs believe the injunctive relief contained in the ASA is a substantial accomplishment for the class.

     With respect to the Court's specific questions about the Settlement Agreement's injunctive relief, Plaintiffs respond as follows:

          *Q*:  What is the basis for the parties' estimate that the injunctive relief in the Settlement has a value of $100 million to the class?  *A*: Quixtar's basis for its estimate of the value of the reforms it has initiated since the institution of the litigation is set forth in the Alexander Declaration, Exhibit G at ¶¶ 11-13.  The injunctive relief provisions ensure that these reforms at least continue during the period provided for in the Consent Decree, generally four years.

B O I E S ,  S C H I L L E R  &  F L E X N E R  L L P

O A K L A N D ,  C A L I F O R N I A

1    *Q:*  How many members of the proposed class stand to benefit

2    from the proposed injunctive relief?  That is – how many members

3    of the proposed class are still active Quixtar IBOs?  *A*: 305,264.

4    *See* Exh. G, Alexander Decl. at ¶ 4.  Quixtar states that active

5    Quixtar IBOs are not the only ones to have benefitted from the

6    proposed injunctive relief because 946,804 class members (those

7    who were IBOs between 2008 and the present) could benefit from

8    Amway's price reductions, training, and other forms of non-

9    restitutionary relief.  *See* Exh. G, Alexander Decl. at ¶ 5.

10   *Q:*   Do any of the Named Plaintiffs plan to continue their

11   relationships with Quixtar?  *A*:  No.  *See* Exh. C, Pokorny Decl. at

12   ¶ 6; Exh. D, Blenn Decl. at ¶ 10; Exh. E,  Busiere Decl. at ¶ 8.

13

14       **3.    Adequacy of Proposed Notice**

15       As the Court noted, class members are entitled to the "best notice practicable under the

16   circumstances."  Dkt. No. 157, Prelim. Order at 25.   The Court directed that a Notice Plan be

17   provided, along with additional information about the plan.   *Id.*    The parties have now

18   submitted revised Notice and Summary of Notice forms, which seek to make the terms of this

19   complex settlement as intelligible in plain English as is possible.   *See* Dkt. No. 162-3, Class

20   Notice; Dkt. No. 162-4, Summary Notice.  Exh. B, Wheatman Decl. at ¶¶ 29-35.  The Notices

21   state explicitly that the $21 million valuation of the Product Fund is derived from the alleged

22   retail value of the products. *See* Dkt. No. 162-3, Class Notice; Dkt. No. 162-4, Summary

23   Notice.   They disclose that an attorneys' fee award would be sought under Ninth Circuit

24   standards, which use a benchmark of 25% of the economic relief, subject to possible

25   enhancement based on the injunctive relief value.  *Id.*  The ASA also eliminates the previous

26   requirement of service of objections and supporting documentation on lead counsel for

27   Plaintiffs and Quixtar.  *Id.*

28

B O I E S ,   S C H I L L E R   &   F L E X N E R   L L P
O A K L A N D ,   C A L I F O R N I A

B O I E S ,   S C H I L L E R   &   F L E X N E R   L L P

O A K L A N D ,   C A L I F O R N I A

1   With respect to the additional notice information that the Court requested, Rust

2   Consulting has been informed by Quixtar that email addresses are available for 1.08 million

3   class members and that mailing addresses are available for all but 56,000 of the 2.4 million

4   class members.  *See* Exh. A, Holland Decl. at ¶ 5.  Class members with no email addresses and

5   those to whom email notice is rejected will be sent postcard notice via U.S. mail, with

6   addresses verified through the National Change of Address database.  *Id.* at ¶¶ 5-9; *see also*

7   Exh. B, Wheatman Decl. at ¶¶ 15-20.  Rust will search databases and take additional measures

8   if any postcard notice mailings are returned as not deliverable.  *Id.*  Notice will also be provided

9   via advertisements in Family Circle, Ladies' Home Journal, and TV Guide in an effort to reach

10  those class members for whom no email or postal address information is available, and those

11  for whom Quixtar's information is inaccurate.  *See* Exh. A, Holland Decl. at ¶ 12; Exh. B,

12  Wheatman Decl. at ¶¶ 23-24.  A toll-free phone number and an information website will also be

13  established.  Wheatman Dec. ¶¶ 27-28; Holland Dec. ¶¶ 10-11.

14  Dr. Shannon Wheatman, a highly qualified notice expert who has been involved with

15  some of the largest and most complex class action notification programs, has considered the

16  proposed notice program in detail and concluded that it will reach over 80% of the class,

17  deliver notice that will capture the attention of class members, and "provide them with the

18  information necessary to understand their rights and options."  Exh. B, Wheatman Decl. at ¶ 39.

19  It is the "best notice practicable under the circumstances" and complies fully with

20  constitutional and legal requirements.  *Id.* ¶¶ 38-41.

21  ## CONCLUSION

22  For the reasons stated above and in Plaintiffs' original brief, Plaintiffs respectfully ask

23  this court to certify the Settlement Class, appoint Plaintiffs' counsel as Class Counsel,

24  preliminarily approve the ASA, order that the Proposed Notice be sent to the Settlement Class,

25  and schedule a Settlement Hearing on final approval of the Settlement Agreement.

26

27

28

1   Dated:  April 29, 2011                    Respectfully submitted,

2

3                            By:  /s/ Stuart Singer

4                            *Attorney for Plaintiffs*

5                            Stuart H. Singer, Esq. (*Pro Hac Vice*)

6                            Carlos M. Sires, Esq. (*Pro Hac Vice*)

7                            Sigrid S. McCawley, Esq. (*Pro Hac Vice*)

8                            BOIES, SCHILLER & FLEXNER LLP
401 East Las Olas Boulevard, Suite 1200

9                            Fort Lauderdale, Florida 33301
Telephone: (954) 356-0011

10                         Facsimile: (954) 356-0022
E-mail: ssinger@bsfllp.com

11                         E-mail: csires@bsfllp.com
E-mail: smccawley@bsfllp.com

12                         David W. Shapiro (CA SBN 219265)
BOIES, SCHILLER & FLEXNER LLP

13                         1999 Harrison Street, Suite 900
Oakland, California 94612

14                         Telephone:  (510) 874-1000
Facsimile:  (510) 874-1460

15                         E-mail: dshapiro@bsfllp.com

16                         David Boies, Esq. (*Pro Hac Vice*)
BOIES, SCHILLER & FLEXNER LLP

17                         333 Main Street
Armonk, NY 10504

18                         Telephone:  (914) 749-8200
Facsimile:  (914) 749-8300

19                         E-mail:  dboies@bsfllp.com

20                         Willie E. Gary, Esq. (*Pro Hac Vice*)
Maria Sperando, Esq. (*Pro Hac Vice*)

21                         Tricia P. Hoffler (*Pro Hac Vice*)
GARY, WILLIAMS, FINNEY, LEWIS,

22                         WATSON & SPERANDO
221 East Osceola Street

23                         Stuart, Florida 34994
Telephone:  (772) 283-8260

24                         Facsimile:  (772) 220-3343
E-mail:  weg@williegary.com

25                         E-mail:  mps@williegary.comE-mail: E-mail: tph@williegary.com

26

27                         *Attorney for Plaintiffs*

28

*BOIES, SCHILLER & FLEXNER LLP*
*OAKLAND, CALIFORNIA*

B O I E S ,   S C H I L L E R   &   F L E X N E R   L L P

O A K L A N D ,   C A L I F O R N I A

**CERTIFICATE OF SERVICE**

I hereby certify that on this 29th day of April 2011, the foregoing has been served via

the CM/ECF system on counsel for Defendants at the following address:

| | |
|---|---|
| Cedric C. Chao<br>William L. Stern<br>James M. Schurz<br>MORRISON & FOERSTER LLP<br>425 Market Street<br>San Francisco, California 94105-2482<br>Telephone: (415) 268-7000<br>Facsimile: (415) 268-7522<br>cchao@mofo.com<br>wstern@mofo.com<br><br>*Attorneys for Defendant Quixtar Inc.* | Donald W. Carlson<br>Edward F. Donohue<br>CARLSON, CALLADINE & PETERSON, LLP<br>353 Sacramento Street, 16th Floor<br>San Francisco, CA 94111<br>Telephone: (415) 391-3911<br>Facsimile: (415) 391-3898<br>dcarlson@ccplaw.com<br>edonohue@ccplaw.com<br><br>*Additional counsel for Defendants James Ron Puryear, Georgia Lee Puryear, World Wide Group, L.L.C.* |
| James R. Sobieraj<br>Ralph J. Gabric<br>Julie L. Leichtman<br>BRINKS HOFER GILSON & LIONE<br>455 N. Cityfront Plaza Drive<br>Chicago, Illinois 60611<br>Telephone: (312) 321-4200<br>Facsimile: (312) 321-4299<br>jsobieraj@usebrinks.com<br><br>*Attorneys for Defendant Quixtar Inc.* | J. William Blue, Jr.<br>NORTHEN BLUE, L.L.P.<br>1414 Raleigh Road, Suite 435<br>The Exchange At Meadowmont<br>Chapel Hill, NC 27517<br>Telephone: (919) 968-4441<br>Facsimile: (919) 942-6603<br>jwb@nbfirm.com<br><br>*Additional counsel for Defendants World Wide Group, L.L.C., American Multimedia Inc., Britt Management, Inc., Bill Britt, Peggy Britt* |
| C. Matthew Andersen<br>WINSTON & CASHATT<br>1900 Bank of America Bldg.<br>601 W. Riverside<br>Spokane, WA 99201<br>Telephone: (509) 838-6131, (800) 332-0534<br>Facsimile: (509) 838-1416<br>cma@winstoncashatt.com<br><br>*Additional counsel for Defendants James Ron Puryear, Georgia Lee Puryear, World Wide Group, L.L.C.* | Benjamin K. Riley<br>HOWREY LLP<br>525 Market Street, Suite 3600<br>San Francisco, CA 94105-2708<br>Telephone: (415) 848-4900<br>Facsimile: (415) 848-4999<br>rileyb@howrey.com<br><br>*Additional counsel for Defendants World Wide Group, L.L.C., American Multimedia Inc., Britt Management, Inc., Bill Britt, Peggy Britt* |

/s/_____Stuart Singer_____

*Attorney for Plaintiffs*

CASE NO. C 07-0201 SC        PLAINTIFFS' MEMORANDUM IN RESPONSE TO THE COURT'S ORDER REQUIRING SUPPLEMENTAL BRIEFING