CEDRIC C. CHAO (CA SBN 76045)
WILLIAM L. STERN (CA SBN 96105)
JAMES M. SCHURZ (CA SBN 145874)
S. RAJ CHATTERJEE (CA SBN 177019)
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California 94105-2482
Telephone: 415.268.7000
Facsimile: 415.268.7522
E-mail: cchao@mofo.com
E-mail: wstern@mofo.com

JAMES R. SOBIERAJ (*Pro Hac Vice*)
BRINKS HOFER GILSON & LIONE
455 N. Cityfront Plaza Drive
Chicago, Illinois 60611
Telephone: 312.321.4200
Facsimile: 312.321.4299
E-mail: jsobieraj@usebrinks.com

Attorneys for Defendant
QUIXTAR INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

JEFF POKORNY, LARRY BLENN and KENNETH BUSIERE on behalf of themselves and those similarly situated,

Plaintiffs,

v.

QUIXTAR INC., *et al.*,

Defendants.

Case No. C 07-00201 SC

**QUIXTAR, INC.'S SUBMISSION IN RESPONSE TO THE JULY 20, 2011 ORDER REQUIRING SUPPLEMENTAL BRIEFING**

Date: TBD
Time: TBD
Court: 1, 17th Floor
Judge: Honorable Samuel Conti

## TABLE OF CONTENTS

**Page(s)**

I. INTRODUCTION ..... 1

II. CHANGES UNDERTAKEN BY QUIXTAR AND THE EXTENT TO WHICH THOSE CHANGES WERE A RESULT OF THIS LITIGATION ..... 1

- A. Increased Period for Registration Fee Refunds ..... 2
- B. Price Reductions for Products ..... 3
- C. Increased Training for IBOs ..... 3
- D. Quixtar's Maintenance and Enforcement of Quality Control Over BSMs ..... 4
- E. Monitoring of Consent Judgment Compliance ..... 6
- F. Changes to Quixtar's Arbitration Agreement with Its IBOs ..... 6
- G. Additional Disclosures in IBO Registration Materials ..... 6

III. CONSIDERATION OF A POSSIBLE $75 CREDIT TO FORMER IBOS ..... 7

- A. The Product Bundles Represent a Mix of Proven, Desirable Products ..... 7
- B. There Is Sufficient Variety Offered by the Product Bundles ..... 9
- C. The Offer of Product Bundles Would Create a More Positive Class Member Experience Than a Product Credit ..... 11

IV. CONCLUSION ..... 13

## I. INTRODUCTION

Quixtar Inc. hereby responds to the Court's July 20, 2011 Order Requiring Supplemental Briefing. The Court directed two inquiries to Quixtar:

1. "Quixtar shall provide an explanation of what changes it has undertaken specifically as a result of the instant litigation"; and

2. "The parties shall address whether providing class members with a $75 credit redeemable for any Quixtar products of their choice would render the proposed settlement fairer to class members."

Quixtar understands that plaintiffs' counsel is preparing a response to the Court's questions concerning the Notice Plan, and Quixtar stands ready to provide input to plaintiffs prior to their submission and to separately comment on plaintiffs' submission should that become necessary.[1]

## II. CHANGES UNDERTAKEN BY QUIXTAR AND THE EXTENT TO WHICH THOSE CHANGES WERE A RESULT OF THIS LITIGATION

This action was filed on January 10, 2007. Settlement discussions began in October 2008, resulting in the original Class Action Settlement Agreement submitted to the Court in November 2010, and ultimately in the Amended Class Action Settlement Agreement ("Settlement Agreement") currently before the Court. The Settlement Agreement includes injunctive relief provisions that identify certain changes to Quixtar's business that Quixtar has undertaken or agreed to undertake. Some of the changes were not contemplated prior to this lawsuit, and they would not have been made or agreed to but for this litigation. Other changes, however, were

[1] This Submission is supported by the concurrently filed Declarations of Ray Alexander and Gary VanderVen. Mr. VanderVen has provided two previous declarations in connection with the proposed settlement of this case, on April 29, 2011 (Dkt. No. 164) and May 20, 2011 (Dkt. No. 172), and Mr. Alexander has provided one previous declaration in connection with the proposed settlement, on April 29, 2011 (Dkt. No. 165). Mr. VanderVen's April 29 Declaration is cited herein as "VanderVen First Decl.," his May 20 Declaration is cited herein as "VanderVen Second Decl.," and his concurrently filed Declaration in support of this Submission is cited herein as "VanderVen Third Decl." Mr. Alexander's April 29 Declaration is cited herein as "Alexander Decl." and his concurrently filed Declaration in support of this Submission is cited herein as "Alexander Supp. Decl."

under consideration prior to the lawsuit, and some had already been initiated, but the lawsuit motivated Amway to agree to the changes reflected in the Settlement Agreement, and to place them under the power of a court injunction. The parties negotiated the following language in the Settlement Agreement: "Quixtar stipulates that certain reforms in its business instituted after the filing of this action have been motivated by this Action." (Settlement Agreement § 12.2.)[2] To respond to the Court's question, Quixtar sets forth below the injunctive relief portions of the Settlement Agreement and other relevant changes to Quixtar's business, a brief factual background regarding those issues, and the relationship between the changes and the instant litigation.[3]

### A. Increased Period for Registration Fee Refunds

Quixtar agreed to modify the IBO Registration Agreement to provide not less than a 90-day refund period for registration fees, with the 90-day period beginning when Quixtar receives the fee from or on behalf of the IBO. (Settlement Agreement § 5.1.1.)

This formal commitment to a 90-day refund period was a direct result of the lawsuit. (Alexander Supp. Decl. ¶ 22.)

Before this lawsuit was filed, if an IBO resigned and requested a refund within 30 days of registration, his registration fee was automatically refunded. (*Id.*) If an IBO resigned more than 30 days after registration, the IBO could make a written refund request, which was evaluated on an individual basis. (*Id.*)

The commitment to put a 90 day refund period in writing was not under consideration by Amway prior to this lawsuit. (*Id.*)

---

[2] The Court noted that the Parties, in their April 29, 2011, and May 20, 2011 submissions, described the causal relationship between Quixtar's business changes and the initiation of this lawsuit in different terms. (*See* Dkt. No. 163 at 13 n.5 and Dkt. No. 171 at 19 n.18.)

[3] Independent of the question regarding the causal nexus between the business changes and the instant litigation, the economic value ascribed to each injunctive relief provision is set forth in the Alexander Declaration, filed on April 29, 2011 (Dkt. No. 165).

**B. Price Reductions for Products**

Quixtar has agreed that, for a 24-month period beginning on June 30, 2011, it will maintain a price reduction that averages at least 5% from January 2007 pricing levels to distributors across Quixtar-branded products for existing SKUs, excluding freight. (Settlement Agreement § 5.1.4.)

Before the lawsuit, Quixtar was considering potential price adjustments on certain product lines, but the timing and extent of the price adjustments had not been finalized. (Alexander Supp. Decl. ¶ 24.) Management approved an initial proposal for price reductions in June 2008. (*Id.*) Further changes were made after June 2008. (*Id.*) This lawsuit motivated Amway to place Amway's commitment to the broad range of price reductions reflected in the Settlement Agreement under the power of a court injunction. (*Id.*) The proposed injunction commits Quixtar to maintain those price reductions for at least two years after June 30, 2011. (Settlement Agreement § 5.1.4.) In the absence of the injunction, Quixtar would have had more flexibility to phase in reductions and/or to target only certain products, and greater ability to adjust prices upward in response to a variety of possible changes in market conditions. (Alexander Supp. Decl. ¶ 25.) Quixtar is unaware of any other competitor in the direct selling industry in the United States whose ability to raise prices for the next two years is limited in the way that Quixtar is limited by the proposed injunction in this case. (*Id.*)

**C. Increased Training for IBOs**

The Settlement Agreement requires Quixtar, for a 24-month period beginning on June 30, 2011, to increase its training budget for products, product merchandising, business skills, and compliance with certain obligations under the Settlement Agreement by an average of at least $7 million over 2007 levels. (Settlement Agreement § 5.1.5.)

Prior to the lawsuit, Quixtar made preparations for improving and expanding its training regimen for IBOs. (Alexander Supp. Decl. ¶ 27.) In 2007, Quixtar spent approximately $6 million on training. (*Id.*) Management approved an initial proposal for additional spending on training in June 2008. (*Id.*) Some adjustments were made after June 2008. (*Id.*) The lawsuit motivated Quixtar to move forward with this additional training, and to agree to the proposed

injunction, which commits Quixtar to spend more than double the amount that it spent on IBO training in 2007 for at least two years after June 30, 2011. (*Id.*) In the absence of the injunction, Quixtar would have had more flexibility to phase in training levels, and to adjust them in response to a variety of possible changes in market conditions. (*Id.* ¶ 28.) Quixtar is unaware of any other competitor in the direct selling industry in the United States who has made this level of commitment of free training for its distributor force or whose ability to adjust distributor training levels for the next two years is limited in the way that Quixtar is limited by the proposed injunction in this case. (*Id.*)

**D. Quixtar's Maintenance and Enforcement of Quality Control Over BSMs**

The Settlement Agreement requires Quixtar to maintain and enforce quality control over BSM Companies affiliated with Quixtar to ensure that BSMs comply with the standards and policies in the Settlement Agreement, including standards designed to prevent misrepresentations regarding the Quixtar business. (Settlement Agreement § 5.1.6.)

Before this lawsuit was filed, Quixtar began taking steps to exert quality control over BSMs. (VanderVen Third Decl. ¶ 7.) Quixtar had negotiated agreements with IBOs and BSM Companies independently of this lawsuit. (*Id.* ¶ 6.) Nevertheless, this lawsuit motivated Quixtar to enhance the implementation of further quality control measures:

- Before the lawsuit, Rule 7 of the Quixtar Rules of Conduct prohibited IBOs from using or distributing BSM that discussed the IBO plan unless the BSM was expressly authorized by Amway. (*Id.* ¶ 6(a).) Rule 7 also prohibited IBOs from offering to sell BSM to prospects and further restricted the content of BSM used with or distributed to prospects. (*Id.*)
- In October 2003, Quixtar introduced a concept for an enhanced quality control program for BSM companies called Professional Development Accreditation Program ("PDAP") to the Board of the IBOAI, a trade association representing the interests of IBOs. (*Id.* ¶ 6(b).) The plan was further developed over the next several months, and a detailed plan was presented at IBOAI Board meetings in June 2004 and recommended for adoption by Board vote in October 2004. (*Id.*)

IBOs and BSM Companies who volunteered to participate in PDAP were subject to more extensive BSM review than under Rule 7, and those who were accredited under the program received a license to use the PDAP accreditation seal on their materials. (*Id.*)

- Prior to the filing of the lawsuit, two BSM companies had become accredited organizations under PDAP. (*Id.* ¶ 6(c).)
- In mid-2007, after this lawsuit was filed, Quixtar announced that in order to be eligible for the 2008 discretionary bonus program, all IBOs above a certain level would have to be accredited under PDAP or become part of an accredited system by the end of the 2008 fiscal year. (*Id.* ¶ 6(d).) Amway paid approximately $130 million in new bonuses to motivate IBOs to become accredited under PDAP. (Alexander Decl. ¶ 13(d), Dkt. No. 165.) Amway also lost over 40,000 distributors whose IBO leaders refused to bring their BSM companies in compliance with PDAP standards. (VanderVen Third Decl. ¶ 6(d).)
- By 2008, over one hundred BSM companies and IBOs became accredited under PDAP, although the program remained voluntary. (*Id.* ¶ 6(e).)
- By 2010, Quixtar had made further improvements to its quality control efforts over BSM being sold by BSM Companies to other IBOs. (*Id.* ¶ 6(f).) These improvements were rolled out in a new program called Accreditation Plus, whose release coincided with the expiration of the PDAP agreements. (*Id.*) Further details of the Accreditation Plus program are set forth in the VanderVen First Declaration at ¶¶ 8-13, filed on April 29, 2011 (Dkt. No. 164).

As demonstrated by the facts set forth above, Quixtar began to implement quality control over BSMs prior to the lawsuit. (VanderVen Third Decl. ¶ 7.) However, the lawsuit increased Quixtar's motivation to enhance and improve its quality controls, which Quixtar did during the course of this litigation. (*Id.*) And, the proposed injunction commits Quixtar (and the BSM Companies) to maintain quality control. (Settlement Agreement § 5.1.6.)

**E. Monitoring of Consent Judgment Compliance**

The Settlement Agreement requires Quixtar to submit to monitoring of compliance with the terms of the Settlement Agreement and the anticipated Consent Judgment through annual meetings with Class Counsel. (Settlement Agreement § 5.1.7.)

This commitment was undertaken as a specific result of this lawsuit. (Alexander Supp. Decl. ¶ 30.)

**F. Changes to Quixtar's Arbitration Agreement with Its IBOs**

Quixtar modified its alternative dispute resolution rules, set forth in Rule 11 of the Quixtar Rules of Conduct, including its arbitration agreement with its IBOs, as a direct result of this litigation. (VanderVen Third Decl. ¶ 8.)

In their First Amended Complaint, the plaintiffs alleged that Quixtar's arbitration agreement with IBOs was unenforceable. (Dkt. No. 97 at ¶ 20.) Shortly after receiving the Complaint in this action, Quixtar and other named defendants filed a motion to dismiss or, alternatively, to stay this action and to compel compliance with Quixtar's arbitration agreement with the plaintiffs. (VanderVen Third Decl. ¶ 8.) On March 31, 2008, this Court denied that motion. (Dkt. No. 115.) Quixtar and the other named defendants appealed that denial to the Ninth Circuit Court of Appeals, which affirmed. (VanderVen Third Decl. ¶ 9.) As a result of the rulings from this Court and the Ninth Circuit obtained by the plaintiffs, Quixtar substantially modified its arbitration agreement with IBOs. (*Id.* ¶ 10.)

**G. Additional Disclosures in IBO Registration Materials**

The Settlement Agreement requires Quixtar to make enhanced disclosures to IBOs in its registration materials. (Settlement Agreement § 5.1.2.) The Settlement Agreement provides that the application form that new IBOs are required to execute to register as a Quixtar IBO shall disclose the following information: (1) that income figures provided to potential IBOs represent gross, not net income; (2) the availability of certain free company-provided training for IBOs in marketing and merchandising; (3) Quixtar's refund policies for products purchased by IBOs; (4) the availability of a retail product price list schedule accessible on-line; and (5) that product purchases and BSM purchases are optional. (*Id.*)

The specific disclosures in the application form, as required by the Settlement Agreement, are a direct result of this litigation. (VanderVen Third Decl. ¶ 12.)

## III. CONSIDERATION OF A POSSIBLE $75 CREDIT TO FORMER IBOS

The Settlement Agreement creates a Product Credit Fund. Under this fund, eligible class members (former IBOs who did not renew their IBO status after the initial term and did not receive a refund of their IBO registration fee) would receive a free product bundle worth approximately $75 retail (or a prorated bundle if approved claims exceed $21 million). As explained in the Alexander Declaration (Dkt. No. 165) and the concurrently filed Alexander Supplemental Declaration, and as further detailed below, the product bundles contain some of Amway's most popular products. However, the Court expressed concern that "class members may not want skincare, home care or vitamin products," and asked the parties to consider if it would be "fairer to class members" to provide eligible class members with a $75 credit redeemable for any Quixtar products.

After thorough consideration, Quixtar believes that allowing class members to redeem the $75 credit for any products of their choosing would have unintended adverse consequences, and that the class is better served by a choice among product bundles. Quixtar reached that conclusion after analyzing the following three criteria:

1. *Are class members likely to want the product bundles?*

2. *Do product bundles provide class members with a sufficient variety of product options?*

3. *Which alternative would create the more positive class member experience?*

Quixtar's analysis with respect to each of these criteria is set forth below.

### A. The Product Bundles Represent a Mix of Proven, Desirable Products

There are several reasons why it is highly likely that the class members will find the product bundles desirable. First, many people become Amway IBOs because they like Amway's high-quality products. In fact, some former IBOs remain loyal Amway customers long after they stop building their Amway businesses. (Alexander Supp. Decl. ¶ 5.) In addition, Amway seeks input from IBOs on product offerings and development to ensure that Amway is offering products

that IBOs like to use and sell. Thus, Amway's multiple product lines are designed with IBOs and their customers in mind. (*Id.* ¶ 6.)

Second, Amway's commitment to producing high-quality products is reflected in its significant investments in research and development, its rigorous quality assurance testing, and its approach to manufacturing. (Alexander Supp. Decl. ¶ 7.) Amway has over 65 research and development labs, and hundreds of full-time employees working on product development, including many with advanced degrees. Between 1993 and 2006, Amway invested more than $500 million in research and development. This commitment to product improvements and advancement is reflected in the more than 900 patents owned by Amway, and has led to the creation of many unique products. (VanderVen Second Decl. ¶ 3, Dkt. No. 172.)

Amway manufactures over 450 of its own products in Amway's extensive facilities located in Michigan and California. (Alexander Supp. Decl. ¶ 7(a).) These products go through rigorous quality assurance testing before they are sold in the United States, Canada, and throughout the world. For example, the NUTRILITE® brand is the only global vitamin and mineral brand to grow, harvest, and process plants on company-owned certified organic farms. The ingredients used in NUTRILITE® products undergo extensive research, testing, and formulating. (*Id.* ¶ 7(b).) The high-quality of Amway's products is just one of the reasons why the product bundles provide eligible class members with real value.

Third, the eight product bundles identified in the Settlement Agreement (hereafter the "original product bundles") consist of some of Amway's most popular products (*id.* ¶ 9), as evidenced by the following facts:

- Amway's ARTISTRY® product line is among the world's top five, largest-selling, premium skincare brands. (Alexander Decl. ¶ 16, Dkt. No. 165.) Product Bundles 2, 3, and 5 contain at least one ARTISTRY® product. (Alexander Decl. Ex. A at 23, 34, 50, Dkt. No. 165.)
- The NUTRILITE® product line is the leading brand of vitamin, mineral, and dietary supplement. (Alexander Decl. ¶ 16, Dkt. No. 165.) Each of the original

product bundles contains at least one NUTRILITE® product. (Alexander Decl., Ex. A at 14, 23, 34, 45, 50, 59, 69, 78, Dkt. No. 165.)

- The NUTRILITE DOUBLE X® product in Product Bundle 4 is Amway's second best-selling product. (Alexander Supp. Decl. ¶ 11.)
- The LEGACY OF CLEAN® product line has offered environmentally responsible products for over 50 years. (Alexander Decl. ¶ 16, Dkt. No. 165.) Product Bundles 7 and 8 contain at least one LEGACY OF CLEAN® product. (Alexander Decl. Ex. A at 69, 78, Dkt. No. 165.)
- Each of the original product bundles contains at least one of Amway's Top 50 product sellers, and a number of bundles contain two or more top sellers. (Alexander Supp. Decl. ¶ 10.)
- None of the bundles contain overstocked, discontinued, or non-conforming products. (Alexander Supp. Decl. ¶ 12.)

Given these facts, it is reasonable to expect that class members will find the Amway product bundles meaningful and fair compensation.

**B. There Is Sufficient Variety Offered by the Product Bundles**

As explained above, the original eight product bundles contain a mix of Amway's most popular products. However, to meet the Court's expressed concern that not all eligible class members may be interested in these product offerings, Amway proposes adding four more product bundles to the Product Credit Fund: a Weight Management bundle (Bundle 9), a Personal Care bundle (Bundle 10), an Energy bundle (Bundle 11), and a Sports bundle (Bundle 12).

- The Weight Management bundle would include the NUTRILITE® Invisifiber Powder and the NUTRILITE® Carb Blocker 2. Both of these products are in Amway's list of Top 50 selling products and are specifically formulated for healthy weight management. See Exhibit 1 to the concurrently filed Alexander Supplemental Declaration for a more complete description of the Weight

Management bundle. The suggested retail price for this bundle is $77.30. (Alexander Supp. Decl. ¶ 14 and Ex. 1 thereto.)

- The Personal Care bundle would include Amway's new line of BODY BLENDS Naturals Shampoo, Conditioner, Body Wash, and Body Lotion, as well as Amway's popular GLISTER® toothpaste, BODY SERIES® Roll-On Deodorant and BODY SERIES® Hand Sanitizer. See Exhibit 2 to the concurrently filed Alexander Supplemental Declaration for a more complete description of the Personal Care bundle. The suggested retail price for this bundle is $74.37. (Alexander Supp. Decl. ¶ 15 and Ex. 2 thereto.)
- The Energy bundle would include Amway's No. 1 selling product, XS® Energy drink, as well as another Top 10 selling product, NUTRILITE® Twist Tubes (Sports), and NUTRILITE® Energy Bars. See Exhibit 3 to the concurrently filed Alexander Supplemental Declaration for a more complete description of the Energy bundle. The suggested retail price for this bundle is $73.88. (Alexander Supp. Decl. ¶ 16 and Ex. 3 thereto.)
- The Sports bundle would include the NUTRILITE® Energy Bar (a top 50 product), the NUTRILITE® ROC20 Sports Drink Mix, and the NUTRILITE® Restore Drink Mix. See Exhibit 4 to the concurrently filed Alexander Supplemental Declaration for a more complete description of the Sports bundle. The suggested retail price for this bundle is $76.60. (Alexander Supp. Decl. ¶ 17 and Ex. 4 thereto.)

By offering up to 25,000 of each of the twelve bundles through the $21 Million Product Credit Fund, it is even more likely that eligible class members will find the product bundles to be fair compensation.

**C. The Offer of Product Bundles Would Create a More Positive Class Member Experience Than a Product Credit**

A third consideration is which of the two alternatives would create a more positive class member experience. By this measure, the product bundles option emerges as the better alternative.

First, no one who has ordered a product likes to be told it is temporarily out of stock. Yet, that is more likely to happen with the product credit alternative than with the product bundles and, depending on the product and whether a disproportionate number of class members opt for it, the resulting wait could be a matter of several months or longer. (Alexander Supp. Decl. ¶ 19(a).)

In designing the content and number of product bundles, Amway considered the availability of the products and source materials so as to minimize the risk of delays in filling orders. While Amway manufactures hundreds of the products it sells, it also sources some products from third parties. Most of the products that make up the product bundles are manufactured by Amway, rather than third parties. By limiting the number of each type of product bundle and including in those bundles a number of products manufactured by Amway, Amway can reduce the risk of substantial delays due to inventory issues. (*Id.*) Shifting to a $75 product credit option, if such an option were created, risks creating inventory control issues, particularly if class members have the ability to order products manufactured by third parties over which Amway has no control rather than products manufactured by Amway. (*Id.*)

Second, while a $75 credit may be easy for a retail chain like Macy's to implement, it is problematic for Amway's product ordering system and would have unintended negative consequences to the overall settlement structure. First, the Amway.com website (where IBOs and customers can view and order products over the Internet) is not designed to accommodate a gift card or redemption certificate. It would cost Amway approximately $300,000-$400,000 to add sufficient functionality to the current website, so that the website or a specially created portion of the website could accommodate the acceptance and processing of class member redemption certificates. (*Id.* ¶ 19(b).) Whether those costs were charged against the value of the

Product Credit Fund or the Cash Fund, the ultimate result would be less compensation for the class members.

In addition to the costs involved in redesigning Amway's website to accommodate this special ordering mechanism, it would take several months to create, test, and implement the source code necessary to implement this functionality. (*Id.* ¶ 19(c).) This could cause a delay in providing relief to the class members and result in frustration for class members. (*Id.*)

Moreover, moving the ordering system "offline" so that class members submit orders manually would not eliminate these technical hurdles or costs. Order fulfillment is a computerized process at Amway. Some technical functionality would need to be added to the ordering system to accommodate these redemption certificates and additional personnel would need to be utilized to input the paper orders submitted by class members. (*Id.* ¶ 19(d).)

Offering class members a $75 credit has another downside, in that class members may find that it is difficult to select and order a specific combination of products that totals $75.00. The popularity of "gift baskets" and other pre-selected gift packages on retail websites is evidence that consumers value the convenience of ordering pre-selected product bundles. By providing class members with a variety of product bundles that are intended to satisfy different product interests, Amway has attempted to strike a balance between choice and convenience. (*Id.* ¶ 19(e).)

<u>Finally</u>, the content of the product bundles was selected with shipping costs in mind, since shipping costs are paid out of the Cash Fund. (*Id.* ¶ 19(f).) If class members are permitted to select any assortment of products and choose products with higher shipping costs, that will have a negative impact on the amount of money available in the Cash Fund for distribution to class members. (*Id.*)

Amway wants the redemption process to be a positive experience for the class members, who are former IBOs but who may choose to do business with Amway again in the future, either as customers or distributors. Given the totality of these factors and for the reasons stated in the parties' prior submissions, Amway believes that the product bundles provide the eligible class

members with meaningful compensation and that a $75 product credit or redemption certificate does not provide a better or "fairer" alternative.

## IV. CONCLUSION

For the foregoing reasons, as well as the reasons set forth in Quixtar's and Plaintiffs' previous submissions to the Court in support of the proposed settlement, Quixtar respectfully asks the Court to preliminarily approve the proposed settlement.

Dated: October 18, 2011

Respectfully submitted,

CEDRIC C. CHAO
WILLIAM L. STERN
JAMES M. SCHURZ
SOMNATH RAJ CHATTERJEE
MORRISON & FOERSTER LLP

JAMES R. SOBIERAJ
BRINKS HOFER GILSON & LIONE

By: */s/ Cedric C. Chao*
Cedric C. Chao

Attorneys for Defendant
QUIXTAR INC.