David W. Shapiro (CA SBN 219265)
BOIES, SCHILLER & FLEXNER LLP
1999 Harrison Street, Suite 900
Oakland, California 94612
Telephone: (510) 874-1000
Facsimile: (510) 874-1460
E-mail: dshapiro@bsfllp.com

David Boies, Esq. (Pro Hac Vice)
BOIES, SCHILLER & FLEXNER LLP
333 Main Street
Armonk, NY 10504
Telephone: (914) 749-8200
Facsimile: (914) 749-8300
E-mail: dboies@bsfllp.com

Stuart H. Singer, Esq. (Pro Hac Vice)
Carlos M. Sires, Esq. (Pro Hac Vice)
Sigrid S. McCawley, Esq. (Pro Hac Vice)
BOIES, SCHILLER & FLEXNER LLP
401 East Las Olas Boulevard, Suite 1200
Fort Lauderdale, Florida 33301
Telephone: (954) 356-0011
Facsimile: (954) 356-0022
E-mail: ssinger@bsfllp.com
E-mail: csires@bsfllp.com
E-mail: smccawley@bsfllp.com

Willie E. Gary, Esq. (*Pro Hac Vice*)
Maria Sperando, Esq. (*Pro Hac Vice*)
Tricia P. Hoffler, Esq. (*Pro Hac Vice*)
GARY, WILLIAMS, FINNEY, LEWIS,
WATSON & SPERANDO
221 East Osceola Street
Stuart, Florida 34994
Telephone: (772) 283-8260
Facsimile: (772) 220-3343
E-mail: weg@williegary.com
E-mail: mps@williegary.com
E-mail: tph@williegary.com

*Attorneys for Plaintiffs Jeff Pokorny, Larry Blenn and Kenneth Busiere*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| Jeff Pokorny, Larry Blenn, and Kenneth Busiere, on behalf of themselves and those similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>Quixtar, Inc., James Ron Puryear Jr., Georgia Lee Puryear, and World Wide Group, L.L.C., Britt Worldwide L.L.C., American Multimedia Inc., Britt Management, Inc., Bill Britt and Peggy Britt,<br><br>Defendants. | **CASE NO. C 07-02001 SC**<br><br>**PLAINTIFFS' SUPPLEMENTAL BRIEF IN SUPPORT OF JOINT MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENT AGREEMENT** |

1

## **<u>TABLE OF CONTENTS</u>**

2

<u>Page</u>

3   TABLE OF AUTHORITIES ................................................................................................... ii

4       1.    Attorneys' Fees ....................................................................................................... 1

5       2.    Named Plaintiffs' Compensation ........................................................................... 4

6       3.    Value of Injunctive Relief ....................................................................................... 6

7       4.    Business Changes Resulting from the Litigation .................................................... 8

8       5.    Product Fund ......................................................................................................... 10

9       6.    Reach Percentage of Email Notifications ............................................................. 10

10      7.    Notice of Attorneys' Fees ..................................................................................... 12

11      8.    Summary Notice Instructions ............................................................................... 12

12      9.    Mediator Fees ....................................................................................................... 13

13  CONCLUSION ............................................................................................................... 13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

i

CASE NO. C 07-0201 SC        PLAINTIFFS' SUPPLEMENTAL BRIEF IN SUPPORT OF JOINT MOTION FOR
                             PRELIMINARY APPROVAL OF SETTLEMENT AGREEMENT

1

## **TABLE OF AUTHORITIES**

2

Page

3

**Cases**

4

5

*Browning v. Yahoo! Inc.*,
   No. C04-01463 HRL, 2006 WL 3826714 (N.D. Cal. Dec. 27, 2006).................................11

6

*Browning v. Yahoo! Inc.*,
   No. C04-01463 HRL, 2007 WL 4105971 (N.D. Cal. Nov. 16, 2007)................................... 2

7

8

*Chavez v. Netflix Inc.*,
   162 Cal. App. 4th 42 (Cal. Ct. App. 2008).................................................................11, 12

9

10

*Children's Hosp. & Med. Ctr. v. Bonta*,
   97 Cal. App. 4th 740 (2002) ...................................................................................... 4

11

*Chin v. DaimlerChrysler Corp.*,
   461 F. Supp. 2d 279 (D.N.J. 2006) (applying Cal. Law) ...................................... 9

12

13

*Fleet Inv. Co. v. Rogers*,
   620 F.2d 792 (10th Cir.1980) ........................................................................ 8

14

15

*In re American Investors Life Ins. Co. Annuity Marketing and Sales Practices Litigation*,
   263 F.R.D. 226 (E.D. Pa. 2009)........................................................................... 5

16

*In re Currency Conversion Fee Antitrust Litigation*,
   263 F.R.D. 110 (S.D.N.Y. 2009) ................................................................... 4

17

18

*In re Domestic Air Transp.*,
   148 F.R.D. 297 (N.D. Ga. 1993)..................................................................... 5

19

20

*In re Dun & Bradstreet*,
   130 F.R.D. 366 (S.D. Ohio 1990)................................................................... 5

21

*In re Lease Oil Antitrust Litigation (No. II)*,
   186 F.R.D. 403 (S.D. Tex. 1999).................................................................... 4

22

23

*In re NASDAQ Market–Makers Antitrust Litig.*,
   187 F.R.D. 465 (S.D.N.Y. 1998) ................................................................... 4

24

25

*In re Rio Hair Naturalizer Prod. Liab. Litig.*,
   No. MDL 1055, 1996 WL 780512 (E.D. Mich. Dec. 20, 1996) ........................... 8

26

*In re Sony SXRD Rear Projection Television Class Action Litigation*,
   No. 06 Civ. 5173(RPP), 2008 WL 1956267 (S.D.N.Y. May 1, 2008)..................................11

27

28

*Klamath Siskiyou Wildlands Center v. Babbitt*,
   105 F. Supp. 2d 1132 (D. Or. 2000)..................................................................10

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Oregon Environmental Council v. Kunzman*,
   817 F.2d 484 (9th Cir. 1987) ......................................................................................... 9, 10

*Pokorny v. Quixtar*,
   601 F.3d 987 (9th Cir. 2010) ............................................................................................ 7

*Reab v. Elec. Arts, Inc.*,
   214 F.R.D. 623 (D. Colo. 2002) ...................................................................................... 11

*Savoie v. Merchants Bank*,
   84 F.3d 52 (2d Cir. 1996) ............................................................................................ 9, 10

*Staton v. Boeing Co.*,
   327 F.3d 938 (9th Cir. 2003) ............................................................................................ 2

*Todd v. Retail Concepts, Inc.*,
   No. 3:07-0788, 2008 WL 3981593 (M.D. Tenn. Aug. 22, 2008) ......................................... 11

*Trew v. Volvo Cars of North America*,
   No. Civ. S-05-1379 RRB EFB, 2007 WL 2239210 (E.D. Cal. July 31, 2007) ...................... 9

*Trujillo v. City of Ontario*,
   No. EDCV 04-1015- VAP (SGLx), 2009 WL 2632723 (C.D. Cal. Aug. 24, 2009) .............. 5

*Van Vranken v. Atlantic Richfield Co.*,
   901 F. Supp. 294 (N.D. Cal. 1995) .................................................................................... 5

On November 3, 2010, the parties filed a Joint Motion in which they sought preliminary approval of a Class Action Settlement Agreement.  *See* Dkt. No. 141, Joint Mot. re: Settlement Agreement.  On December 29, 2010, the Court entered an Order in which it requested that the parties submit supplemental briefing and evidentiary materials to address a number of issues.  *See* Dkt. No. 157, First Order Requesting Suppl. Briefing.  Over the next few months, the parties made substantial changes to the settlement agreement and the class notice plan.  On April 29, 2011, they submitted to the Court an Amended Settlement Agreement ("ASA") and a Joint Motion in which they sought preliminary approval of the ASA.  *See* Dkt. No. 162, Joint Mot. re: ASA; Dkt. No. 162–2, ASA.  The parties also submitted briefing and evidentiary materials in response to the Court's previous order.  *See, e.g.*, Dkt. Nos. 163, Pl. Br. in Support of Joint Mot. re ASA; Dkt. No. 171, Def. Br. in Support of Joint Mot. re: ASA.  The Court held a hearing on June 24, 2011.  *See* Dkt. No. 191, Minute Entry.  On July 20, 2011, it issued an Order deferring a ruling on the Joint Motion and requiring the parties to submit additional briefing and evidence.  *See* Dkt. No. 196, Second Order Requesting Suppl.  In a subsequent Order, the Court asked for information about one additional matter (mediator fees).  *See* Dkt. No. 201, Order Regarding Supplemental Briefing.  These issues are addressed below.

## 1.     **Attorneys' Fees**

The Court expressed concern over the "apparent disproportion" between the size of the Cash Fund and the amount of attorneys' fees that plaintiffs' counsel intended to request.  Dkt. No 196, Order at 3.  Plaintiffs' counsel believes that an award of up to $20 million in attorneys' fees is justifiable based on the combination of economic relief ($34 million cash fund plus $21 million retail value of product fund) and the substantial injunctive relief (both quantifiable and not quantifiable in terms of dollar amount) provided in the proposed settlement.  As discussed below, we have submitted a declaration from Terry Goddard, former attorney general of Arizona, attesting to the importance of this case having been brought and the reforms provided through the injunctive relief, including reforms to the dispute resolution process resulting from the case affecting all class members.  This is not simply a $34 million or even a $55 million

1   settlement.  Nonetheless, recognizing the Court's concerns regarding the relationship of

2   attorneys' fees to the $34 million cash fund from which such fees and other expenses must be

3   paid, Plaintiffs' counsel will not seek an attorneys' fees award in excess of $15 million in

4   connection with final approval of the ASA.

5       An award of this magnitude is fully in line with the Ninth Circuit's common fund

6   approach, pursuant to which the Court determines an appropriate fee based on a 25%

7   benchmark percentage of the benefits to the class.  *See Staton v. Boeing Co.*, 327 F.3d 938,

8   968 (9th Cir. 2003).  Twenty-five percent of the $55 million in economic relief would support

9   an award of $13.75 million.[1]  The value of injunctive relief may be considered as part of the

10  size of the fund "where the value to individual class members of benefits deriving from

11  injunctive relief can be accurately ascertained," but, even if such value cannot be measured, the

12  courts may "consider the value of the injunctive relief obtained as a 'relevant circumstance' in

13  determining what percentage of the common fund class counsel should receive as attorneys'

14  fees, rather than as part of the fund itself."  *Id.*

15      As discussed below, the injunctive relief in the settlement, whether quantified at $100

16  million as Quixtar has done or simply viewed as a "relevant circumstance," easily justifies

17  enhancement of the benchmark percentage.  Indeed, an award of $15 million will constitute

18  approximately 27% of the $55 million in economic relief; as such, the significant injunctive

19  relief obtained here would, at most, result in an enhancement of only 2% above the benchmark.

20  Plaintiffs' counsel recognize that it is the Court, in connection with final approval of the

21  settlement, that ultimately will decide what constitutes an appropriate fee.  At present, the

22  Court is only asked to approve the settlement on a preliminary basis, with clear notice to the

23  proposed class that attorneys' fees not to exceed $15 million will be requested.

24

25  _____

26  [1] The case law supports reliance on the retail value of the free products, *see, e.g.*, *Browning v. Yahoo! Inc.*, No. C04-01463 HRL, 2007 WL 4105971, at *4, *5 (N.D. Cal. Nov. 16, 2007), and

27  other cases cited in Dkt. No. 163 at 15-16.  If only the $13,348,000 cost to Quixtar of the products (Dkt. No. 163 at 15) is considered, 25% of the economic relief, apart from injunctive

28  relief, would amount to $11,387,000.

Although the amount of attorneys' fees is to be determined at the time of final approval, the Court ordered Plaintiffs' counsel to "provide documentation of attorney and staff hours spent on the case, with associated billing rates." Dkt. No. 196, Order at 1. Plaintiffs have therefore submitted declarations from each of the two law firms reflecting the total number of billable hours on the case. For Boies, Schiller and Flexner ("BSF") that lodestar amount of attorneys' fees, utilizing the billing rates for the most current period during which work was performed, is $5,237,459. Ex. 1, Declaration of Stuart H. Singer ("Singer Decl.") ¶ 7.[2] This amount is based upon hourly rates that are either at or below the attorneys' standard hourly rates for 2011. *Id.* Gary, Williams, Finney, Lewis, Watson & Sperando (the "Gary Firm"), has estimated their lodestar on the case, on a conservative basis and utilizing comparable rates, to be $1,021,950. Ex. 2, Decl. of Willie E. Gary ("Gary Decl.") ¶ 15.[3]

These amounts reflect the substantial work on this matter over a period of six years, from the pre-suit investigation of the claims, to the successful litigation of the enforceability of the dispute resolution provisions in this Court and the Ninth Circuit, and through a two-year mediation process which included extensive work, including the exchange of documents and other information and the preparation of legal briefs. Singer Decl. ¶ 9. Of course, these amounts do not include the substantial additional fees that will be incurred in connection with the settlement approval process and the monitoring obligations of the settlement. *Id.* As Judge Weinstein noted, "[w]ithout a doubt, this action presented complicated legal, factual, and practical issues, and it was procedurally one of the most challenging that [he] ha[s] ever encountered." Dkt. No. 163-9, Weinstein Decl. ¶ 6.

---

[2] BSF's lodestar if rates for different years are used, rather than the most current year, would be $4,804,902, or approximately $430,000 less than the total lodestar amount using most current rates. Singer Decl. ¶ 8.

[3] Counsel plan to submit their detailed billing records for review by the court in connection with their attorneys' fee application at the time of final approval. If the Court requests, those detailed records will be submitted before that time. At such time they are submitted, Plaintiffs may request that they be allowed to be filed under seal or for *in camera* review, as they may contain information that reflects attorney work product. Singer Decl. ¶ 5.

3

CASE NO. C 07-0201 SC          PLAINTIFFS' SUPPLEMENTAL BRIEF IN SUPPORT OF JOINT MOTION FOR
PRELIMINARY APPROVAL OF SETTLEMENT AGREEMENT

In addition, Plaintiffs have submitted the declaration of the Honorable Charles Renfrew in support of the reasonableness of the attorneys' fees contemplated being requested in this matter. Ex. 3, Declaration of Charles B. Renfrew at ¶¶ 14-38. Expert testimony on the reasonableness of an attorney fee request is admissible and routinely considered. *See, e.g., Children's Hosp. & Med. Ctr. V. Bonta*, 97 Cal. App. 4th 740, 782-83 (2002); *In re Lease Oil Antitrust Litigation (No. II)*, 186 F.R.D. 403, 445 (S.D. Tex 1999). Judge Renfrew in his declaration notes that "even if viewed conservatively, the injunctive relief provided easily could justify a percentage enhancement of the 25% benchmark sufficient to support an attorneys' fee in the $15 million range." *Id*. ¶ 20. With respect to the check on a percentage fee award by examining lodestar, Judge Renfrew states that that the lodestar multiplier for a $15 million fee is 2.42, which he believes is justified because this case was "complex and difficult," and there was "not a government case that precedes this case and on which the Plaintiffs could attach this case." *Id.* ¶ 38. *See, e.g., In re NASDAQ Market–Makers Antitrust Litig.,* 187 F.R.D. 465, 489 (S.D.N.Y. 1998) ( "multipliers of between 3 and 4.5 have become common"), and cases cited therein; *In re Currency Conversion Fee Antitrust Litigation*, 263 F.R.D. 110, 129 (S.D.N.Y. 2009) ("[T]his is not a case where plaintiffs' counsel can be cast as jackals to the government's lion, arriving on the scene after some enforcement or administrative agency has made the kill. They did all the work on their own.").

The Court also ordered Plaintiffs' counsel to "provide an explanation of how the attorneys' fees will be allocated among the law firms involved." Dkt. No. 196, Order at 4. Plaintiffs' counsel have agreed that the attorneys' fees awarded should be allocated 65% to BSF and 35% to the Gary firm. Singer Decl. ¶ 12; Gary Decl. ¶ 18.

## 2. Named Plaintiffs' Compensation

The Court ordered Plaintiffs' counsel to "provide an explanation of the work, efforts, and hours spent by the named plaintiffs as a result of their involvement in the case." Dkt. No. 196, Order at 4. As reflected in the accompanying declaration of Sigrid McCawley and the previously submitted declarations from each of the named plaintiffs, the named plaintiffs in this

1   action have devoted hundreds of hours, attended half  of the ten mediation sessions, conducted

2   research and investigation, and consulted extensively with counsel.  Mr. Pokorny has devoted

3   an estimated 278 hours to the case, Mr. Blenn 248 hours, and Mr. Busiere 233 hours.  Ex. 5,

4   Declaration of Sigrid McCawley ("McCawley Decl.") ¶¶ 7-9.  The named plaintiffs provided

5   valuable input in connection with the proposed  settlement structure that provides economic

6   compensation for IBOs who registered but then withdrew during their first year, for IBOs who

7   purchased a substantial amount of business support materials, and a hardship fund for those

8   IBOs who suffered special damages.  In addition, each of the named plaintiffs provided input

9   on the injunctive relief elements of the settlement.  McCawley Decl. ¶¶ 5-11.

10          In view of all the circumstances, Plaintiffs' counsel submits that a request for incentive

11  compensation of up to $20,000 per individual named plaintiff is appropriate for representatives

12  who have been involved over a multi-year period in litigation of this type, and that awards of

13  such magnitude are fully in line with the case law.  *See, e.g., Trujillo v. City of Ontario,* No.

14  EDCV 04-1015- VAP (SGLx), 2009 WL 2632723, *5 (C.D. Cal. Aug. 24, 2009) ($30,000

15  bonus to the class representatives); *Van Vranken v. Atlantic Richfield Co.,* 901 F. Supp. 294,

16  300 (N.D. Cal. 1995) ($50,000 to class representative); *In re American Investors Life Ins. Co.*

17  *Annuity Marketing and Sales Practices Litigation*, 263 F.R.D. 226, 245 (E.D. Pa. 2009)

18  (aggregate award of $115,000); *In re Domestic Air Transp.,* 148 F.R.D. 297, 357-58 (N.D. Ga.

19  1993) (aggregate $142,500 to class representatives); *In re Dun & Bradstreet,* 130 F.R.D. 366,

20  373-74 (S.D. Ohio 1990) ($35,000 to $55,000 to each class representatives out of an $18

21  million fund).[4]

22

23

24

25  [4] The factors to be evaluated in determining an incentive award to class representatives are:  (1)
    the risk to the class representative in commencing the suit, both financial and otherwise, (2) the
26  notoriety and personal difficulties encountered by the class representative; (3) the amount of
    time and effort spent by the class representative; (4) the duration of the litigation and (5) the
27  personal benefit (or lack thereof) enjoyed by the class representative as a result of the litigation.
    *Trujillo v. City of Ontario*, *supra* at *5.
28

5

CASE NO. C 07-0201 SC        PLAINTIFFS' SUPPLEMENTAL BRIEF IN SUPPORT OF JOINT MOTION FOR
                             PRELIMINARY APPROVAL OF SETTLEMENT AGREEMENT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### 3.   <u>Value of Injunctive Relief</u>

The injunctive relief provided in the settlement is substantial.  Part of it is quantifiable, in the form of price reductions, enhanced training, and costs of quality control, and Quixtar has quantified that these aspects of the injunctive relief have a cost to Quixtar of approximately $100 million.  Dkt. No. 165, Alexander Decl. ¶¶ 11-13.  Other important elements of injunctive relief, such as the restrictions on compensation of IBOs based on recruitment, and the responsibility of Quixtar for statements in business support materials, are not quantifiable with a dollar amount but have significant value in combating the issues described in the complaint. Ex. 3, Goddard Decl. ¶¶ 11-16.

As a whole, according to Attorney General Goddard, "the injunctive relief obtained in this proposed settlement is even more valuable than the substantial economic relief." *Id*. ¶ 9.  It will "change the corporate culture of Quixtar, set a new standard of practice in the direct marketing community, and go a long way toward preventing in the future the abuse of IBO recruits that is alleged in the Complaint." *Id.*

The injunctive relief provided by the settlement goes to the heart of the wrongdoing alleged by Plaintiffs, which is a system geared toward recruiting other IBOs rather than merchandising product.  Under the ASA, among other things, Quixtar may not compensate IBOs primarily for such recruitment.  Dkt. No. 162-2 ASA ¶ 5.1.3.  Quixtar also has agreed to make clear that its references to the income an IBO may expect—which is a key tool for recruitment—are to gross, rather than net, income, *id*. ¶ 5.1.2, and also agreed to increase (from 30 days to 90 days) the period during which an IBO may withdraw from Quixtar with a full refund of the registration fee.  *Id*. ¶ 5.1.1.  This change will complement the change mandating clearer income disclosures by providing IBOs a longer period of time to end their association with Quixtar without loss of their entry fee if Quixtar does not meet expectations (or if buyer's remorse sets in).  Goddard Decl. ¶ 12.

Existing IBOs are benefitted by the agreement of Quixtar to reduce prices, to significantly increase expenditures to train IBOs in marketing and merchandising, to enforce

1  BSM quality control, and to submit to monitoring of its compliance with the terms of the ASA.

2  Dkt. No. 162-2 ASA ¶¶ 5.14-5.17.  A merchandising rather than recruiting perspective is aided

3  by Quixtar's agreement to post online its entire product price list, thereby allowing IBOs to

4  compare Quixtar's pricing with that of comparable retailers.  *Id.* ¶ 5.12.  The price reductions

5  mandated by the ASA serve this role as well.  *Id.* ¶ 5.14.

6      A particularly important  aspect of the injunctive relief is the obligation undertaken by

7  Quixtar to be accountable for representations made by authorized BSM businesses.  As part of

8  the injunctive relief, Quixtar and the BSMs companies will be required to make clear that

9  BSMs are in fact optional, contrary to the prevailing implication that BSMs are necessary to

10  achieving success as an IBO.  *Id.* ¶ 5.1.3; Dkt. No. 97 First Amended Complaint ¶¶ 42-45.

11  BSM companies will also be prohibited from discouraging the buy-back of products from IBOs

12  who wish to leave Quixtar, minimizing the "cost" to an IBO of leaving the organization and

13  making that choice a more viable option.  Dkt. No. 162-2 ASA ¶¶ 5.13.  Quixtar may be held

14  legally responsible if it has not taken appropriate measures under the ASA to stop any false or

15  misleading representations by these multiple independent BSM Companies.  *Id.* ¶ 5.1.6.

16      In addition, as a result of the decision of  this Court, and affirmed by the Ninth Circuit,

17  Quixtar's dispute resolution process has been substantially reformed, as Quixtar itself

18  acknowledges.  *See* Dkt. No. 203, Quixtar Response at 6; *Pokorny v. Quixtar*, 601 F.3d 987,

19  994 (9th Cir. 2010).  These and the other above-described reforms, all motivated by this suit

20  and preserved by the Court's decision and settlement, have substantial, if not quantifiable,

21  value.  Goddard Decl. ¶ 9-16.

22      The Court asked Plaintiffs' counsel "whether they will continue to support the proposed

23  settlement if the Court assigns zero economic value to the proposed injunctive relief."  Dkt. No.

24  196, Order at 5.  The answer is yes, counsel would still support the settlement, because we

25  believe that the injunctive relief provides important value and protection to those class

1  members who choose to remain IBOs as well as to future IBOs.[5]  As stated by former Attorney

2  General Goddard, the injunctive relief terms are "potentially transformative, not just for

3  Quixtar, but for its entire direct marketing community."  *Id.* ¶ 16.

4  **4.  Business Changes Resulting from the Litigation**

5  The Court ordered Quixtar to "provide an explanation of what changes it has

6  undertaken specifically as a result of the instant litigation."  Dkt. No. 196, Order at 5.  Quixtar

7  has filed its response to this question and has largely admitted that, although it "contemplated"

8  making certain of the changes before the initiation of this suit, the lawsuit was a factor in

9  causing the reforms to be instituted, that it motivated and accelerated such changes, and that

10  none of the changes had been implemented prior to the suit.  Dkt. No. 203, Quixtar Response at

11  2-7; Dkt. No. 204, Vanderven Decl. ¶¶ 5-12; Dkt. No. 205, Alexander Decl. ¶¶ 20-30.  We

12  believe there can be little doubt that Quixtar's decision to institute these changes to its business

13  practices after the filing of this litigation challenging those very practices was not a mere

14  coincidence.

15  Quixtar unconditionally admits that the increased period for registration fee refunds, the

16  amendments to its ADR rules, the additional disclosures in the IBO registration materials, and

17  the monitoring commitments all specifically and directly arose as a result of this suit.  Dkt. No.

18  203, Quixtar Response at 2, 6-7.  The price reductions and training expansion had been

19  "considered" prior to the suit, but even the "initial proposal" for each of these reforms was not

20  approved until June 2008, well after the January 2007 filing of this suit, and the suit admittedly

21  was a factor in Quixtar's decision to move forward with these measures.  *Id.* at 3-4.  The June

22  28 initial approval date was after the Court's March 2008 order striking down Quixtar's ADR

23  ---
[5] Although future IBOs are technically not members of the plaintiff class, the Court in its fee
24  decision may consider the settlement's benefits to the entire public.  *Fleet Inv. Co. v. Rogers,*
620 F.2d 792, 794 (10th Cir.1980) (discussing how the "value of an attorney's services is not
25  only measured by the amount of the recovery to plaintiff, but also the non-monetary benefit
accruing to others, in this case, the public at large from his successful vindication of a national
26  policy to protect consumers"); *In re Rio Hair Naturalizer Prod. Liab. Litig.,* No. MDL 1055,
1996 WL 780512, at *18 (E.D. Mich. Dec. 20, 1996) (recognizing "benefit to society" factor in
27  awarding attorneys' fees in class action litigation and that such compensation is necessary to
attract counsel to accept such cases and enforce federal and state laws).

28

1  program as unenforceable, which meant that Quixtar knew it would have to defend this action

2  on its merits.

3         With respect to BSM Company quality control, although Quixtar says it "began taking

4  steps" to exert quality control over BSMs prior to this suit, only after this suit was filed did

5  Quixtar make accreditation a prerequisite to eligibility for a discretionary bonus.  Moreover, it

6  was not until 2010 that Quixtar rolled out its Accreditation Plus program, and this suit

7  admittedly "increased Quixtar's motivation to enhance and improve its quality controls.  *Id.* at

8  4-5.  Of course, only through the injunctive relief is Quixtar legally responsible in the future for

9  assuring, in accordance with the terms of the ASA, that the BSM materials not contain false

10  and misleading statements.

11        Quixtar has confirmed in a sworn declaration that the proposed injunctive relief has a

12  value of approximately $100 million.  Dkt. No. 165, Alexander Decl. ¶¶ 11-13.  The settlement

13  can only have such a value if the changes reflected in the injunctive relief were in substantial

14  part the result of the litigation – otherwise, if they were unrelated to the litigation, defendants

15  could not say under oath that the settlement – and it is the settlement and not the reforms that

16  are being valued – has a $100 million value.  Quixtar did not, in reaching the $100 million

17  figure, attribute all of its costs to the settlement.  For example, in its $100 million estimate,

18  Quixtar allocated to the settlement only 30% of the value of its price reductions, and only 10%

19  of the value of its quality control reforms.  *Id.* ¶¶ 13(b) & 13(d).

20        In considering the value of injunctive relief with respect to changes instituted by

21  defendants since a suit was filed, the Court may award fees where, as Quixtar concedes was the

22  case here, the suit was a "material factor" or a "catalyst" for the changes made by Quixtar; the

23  litigation need not be the sole or even the predominant factor.  *See, e.g., Oregon Environmental*

24  *Council v. Kunzman*,  817 F.2d 484, 497 (9th Cir. 1987); *Savoie v. Merchants Bank*, 84 F.3d

25  52, 56-57 (2d Cir. 1996); *Trew v. Volvo Cars of North America*, No. Civ. S-05-1379 RRB EFB,

26  2007 WL 2239210, *4 (E.D. Cal. July 31, 2007); *Chin v. DaimlerChrysler Corp.*, 461 F. Supp.

27  2d 279, 283-84 (D.N.J. 2006) (applying Cal. Law).

28

CASE NO. C 07-0201 SC        PLAINTIFFS' SUPPLEMENTAL BRIEF IN SUPPORT OF JOINT MOTION FOR
                                        PRELIMINARY APPROVAL OF SETTLEMENT AGREEMENT

1   As a factual matter, as outlined above, each and every one of the changes referenced by

2   Quixtar admittedly was not implemented until after the initiation of this lawsuit in January

3   2007. Many were not made or increased to current levels until after the proposed settlement

4   was being discussed, and some were not even implemented until after the settlement agreement

5   was executed. Dkt. No. 203, Quixtar Response at 2-7. Defendants could have instituted these

6   reforms years ago but did not do so until they were sued. This chronology alone establishes a

7   presumption that, at the very least, the lawsuit was a "material factor" in defendants' decision

8   to implement these reforms. *See, e.g., Oregon Environmental Council,* 817 F.2d at 497;

9   *Savoie,* 84 F.3d at 57; *Klamath Siskiyou Wildlands Center v. Babbitt,* 105 F. Supp. 2d 1132,

10  1139 (D. Or. 2000).

11  **5.    Product Fund**

12  The Court asked the parties "whether providing class members with a $75 credit

13  redeemable for any Quixtar products of their choice would render the proposed settlement"

14  more fair to the Class Members than the existing settlement proposal, which provides class

15  members who left Quixtar within one year a product bundle worth $75 retail. Dkt. No. 196,

16  Order at 6. Given the enhanced choice class members would have with such a credit, plaintiffs

17  see advantages to such a provision. However, this would require a modification to the terms of

18  the settlement agreement, and Quixtar's brief sets forth reasons why such a provision would be

19  problematic for the defendants. Dkt. No. 203, Quixtar Response at 7, 11-13. Plaintiffs note

20  that Quixtar has added several additional product bundle choices to the mix, *id.* at 7-11

21  (increasing the number of choices to 12); and we believe that, with these additions, class

22  members are provided with a substantial amount of product choice.

23  **6.    Reach Percentage of Email Notifications**

24  The Court asked for "expert analysis demonstrating that the likely 'reach percentage' of

25  email notifications is comparable to that of postcard notifications, or a notice plan that provides

26  for postcards to be sent to all class members for whom mailing addresses are available." Dkt.

27  No. 196, Order at 7. Unfortunately, to the extent that the Court is seeking information as to the

28

percentage of email recipients who will actually read or scan an email they receive, Plaintiffs'

experts are unable to provide an answer.  Although the U.S. Postal Service has conducted

surveys on the "read or scan" percentage of postal mailings (surveys on which Plaintiffs'

expert, Dr. Shannon Wheatman, commented in her prior declaration, Dkt. No. 163-2), no

similar research has been done with respect to email.  Ex. 6, Supplemental Declaration of

Shannon R. Wheatman ¶ 5.a.v.

As done in other cases, Rust Consulting, the proposed notice provider, would inform

ISPs in advance of the notice and take other steps to minimize the chance that the notice would

be rejected or sent to a "spam filter."  Ex. 7, Supplemental Declaration of David C. Holland

("Holland Decl.) ¶ 7.  Postcard notice would be sent if emailings fail.  *Id.* ¶ 10.  The estimated

email fail rate is less than 20%.  *Id.* ¶ 9.  But there is no guarantee that any specific percentage

of the emails that are delivered will be read or scanned.  However, the proposed notice plan

includes paid advertisements in popular publications, to minimize the risk that a class member

might not receive notice because he or she misses the email notice, and Dr. Wheatman

estimates that the overall notice program will reach at least 80% of the class members.

Wheatman Decl. ¶ 5-8.

Email notice has been approved in many federal and state class actions, particularly

where, as here, the defendants regularly use the internet to communicate with class members

and thus the class can be presumed familiar with email.  *See, e.g.,* cases cited in Holland Decl.

¶ 5; cases cited in Wheatman Decl. ¶ 4; *Browning v. Yahoo! Inc.*, No. C04-01463 HRL, 2006

WL 3826714 (N.D. Cal. Dec. 27, 2006) (email notice held appropriate because Yahoo! users

were "familiar and comfortable with e-mail and the Internet"); *In re Sony SXRD Rear*

*Projection Television Class Action Litigation*, No. 06 Civ. 5173(RPP), 2008 WL 1956267

(S.D.N.Y. May 1, 2008); *Todd v. Retail Concepts, Inc.*, No. 3:07-0788, 2008 WL 3981593

(M.D. Tenn. Aug. 22, 2008); *Chavez v. Netflix Inc.*, 162 Cal. App. 4th 42 (Cal. Ct. App. 2008).

*Contra, e.g., Reab v. Elec. Arts, Inc.*, 214 F.R.D. 623, 630-631 (D. Colo. 2002).

1    If the Court so orders, Plaintiffs will of course send postcard notice instead of email

2  notice to all class members with an available postal mailing address.  This would increase the

3  cost of notice by approximately $224,640, Holland Decl. ¶ 11, if the notices are mailed before

4  the forthcoming postal rate hike of January 22, 2012.[6]

5         **7.       Notice of Attorneys' Fees**

6          The Court requested that all notice documents contain a section clearly labeled

7  "Attorneys' Fees" that states, in prominent text, the actual dollar amount that Plaintiffs' counsel

8  intends to request from the Court.  Dkt. No. 196, Order at 7-8.  This has been done in the

9  revised notices, which now all include the requested heading and language separately and in

10  bold text.  Specifically, the language in the notice reads:  "**Attorneys' Fees**.  **The Plaintiffs'**

11  **attorneys anticipate seeking fees of $15,000,000 (15 million dollars).  Any awarded**

12  **attorneys' fees and costs will be paid from the Cash Settlement Fund.**"  Wheatman Decl.,

13  Exhs. 2-5.

14        **8.       Summary Notice Instructions**

15         The Court requested that the Summary Notices provide instructions as to how recipients

16  can object to the settlement and how they can opt out of the class.  In accord with the Federal

17  Judicial Center model (Wheatman Decl., Ex. 1), the notices have been revised to state, in bold

18  text, that "The detailed notice, available at www.QuixtarClass.com or by calling 1-800-000-

19  0000, explains how to exclude yourself or object."  Wheatman Decl. Exhs. 2-4.  Full details

20  about the objection/exclusion procedure simply would not fit on a postcard or in the proposed

21  half-page ads, unless the font is reduced to an unacceptably small size.  *Id.* ¶ 5.c.iii.  If the

22  Court so orders, Plaintiffs will reduce the font size and include the full details, but we submit

23  that the reference to the web page is preferable.  *See* Wheatman Decl. ¶¶ 15.c; *Chavez v. Netflix*

24  *Inc.*, 162 Cal. App. 4th 42 (Cal. Ct. App. 2008) (summary notice directing class members to a

25  web site for further information held "perfectly acceptable").

26

27  _____

28  [6] *See* U.S. Postal Service, JANUARY 22, 2012 MAILING SERVICES PRICE CHANGE,
    http://about.usps.com/news/national-releases/2011/pr11_factsht_pricechng_1018.pdf.

**9      Mediator Fees**

The Court's supplemental order asked whether the parties' mediator, Judge Daniel Weinstein of JAMS, will be compensated from the settlement fund if the settlement is approved and, if so, the Plaintiffs were directed to "provide the Court with appropriate documentation setting forth the compensation Judge Weinstein will receive and a detailed accounting of his services rendered." Dkt. No. 201, Order at 2.  The parties have agreed to divide the cost for the services of Judge Weinstein (and the rest of his JAMS team, which includes Michelle Yoshida and Jed Melnick, highly experienced mediators in their own right, and Chad Coffman, a neutral expert consultant), 50% to be paid by Plaintiffs and 50% to be paid by Defendants.  Singer Decl. ¶ 13.  The JAMS mediation services are provided on an hourly basis, with JAMS entitled to payment in full even if the settlement is not approved.  *Id*.  If the settlement is approved, Plaintiffs would include their share of the JAMS invoices for reimbursement as costs from the cash settlement fund.  *Id*.  As of this filing, Plaintiffs' 50% share of the JAMS fees is $210,319.99  *Id*.  We have submitted the JAMS invoices detailing the services provided by Judge Weinstein and his team.  *Id*., Ex. E.  Their services included eleven days of live mediation sessions, preparation and follow-up study and research, and the work of Mr. Coffman in conducting and analyzing a survey responding to the Court's questions about the BSM companies.  *Id*. ¶ 13; Dkt. No. 163-9 Weinstein Decl. ¶¶ 6-22; Dkt. No. 163-6 Coffman Decl. ¶¶ 1-19.

**CONCLUSION**

For the reasons set forth in prior papers, and above, Plaintiff requests that this Court grant preliminarily approval of the proposed Amended Settlement Agreement.


Dated:  November 16, 2011                                    Respectfully submitted,


                                                            By:  /s/ Stuart Singer
                                                              *Attorney for Plaintiffs*

Stuart H. Singer, Esq. (*Pro Hac Vice*)
Carlos M. Sires, Esq. (*Pro Hac Vice*)
Sigrid S. McCawley, Esq. (*Pro Hac Vice*)
BOIES, SCHILLER & FLEXNER LLP
401 East Las Olas Boulevard, Suite 1200
Fort Lauderdale, Florida 33301
Telephone: (954) 356-0011
Facsimile: (954) 356-0022
E-mail: ssinger@bsfllp.com
E-mail: csires@bsfllp.com
E-mail: smccawley@bsfllp.com

David W. Shapiro (CA SBN 219265)
BOIES, SCHILLER & FLEXNER LLP
1999 Harrison Street, Suite 900
Oakland, California 94612
Telephone:  (510) 874-1000
Facsimile:  (510) 874-1460
E-mail:  dshapiro@bsfllp.com

David Boies, Esq. (*Pro Hac Vice*)
BOIES, SCHILLER & FLEXNER LLP
333 Main Street
Armonk, NY 10504
Telephone: (914) 749-8200
Facsimile: (914) 749-8300
E-mail:dboies@bsfllp.com

Willie E. Gary, Esq. (*Pro Hac Vice*)
Maria Sperando, Esq. (*Pro Hac Vice*)
Tricia P. Hoffler, Esq. (*Pro Hac Vice*)
GARY, WILLIAMS, FINNEY, LEWIS,
WATSON & SPERANDO
221 East Osceola Street
Stuart, Florida 34994
Telephone: (772) 283-8260
Facsimile: (772) 220-3343
E-mail:  weg@williegary.com
E-mail:  mps@williegary.com
E-mail:   tph@williegary.com

*Attorney for Plaintiffs*

1

**<u>CERTIFICATE OF SERVICE</u>**

2

I hereby certify that on November 16, 2011, the foregoing was served via the CM/ECF

3

system on counsel for Defendants at the following address:

4

| | |
|---|---|
| Cedric C. Chao<br>William L. Stern<br>James M. Schurz<br>MORRISON & FOERSTER LLP<br>425 Market Street<br>San Francisco, California 94105-2482<br>Telephone: (415) 268-7000<br>Facsimile: (415) 268-7522<br>cchao@mofo.com<br>wstern@mofo.com<br><br>*Attorneys for Defendant Quixtar Inc.* | Donald W. Carlson<br>Edward F. Donohue<br>CARLSON, CALLADINE & PETERSON, LLP<br>353 Sacramento Street, 16th Floor<br>San Francisco, CA 94111<br>Telephone: (415) 391-3911<br>Facsimile: (415) 391-3898<br>dcarlson@ccplaw.com<br>edonohue@ccplaw.com<br><br>*Additional counsel for Defendants James<br>Ron Puryear, Georgia Lee Puryear,<br>World Wide Group, L.L.C.* |
| James R. Sobieraj<br>Ralph J. Gabric<br>Julie L. Leichtman<br>BRINKS HOFER GILSON & LIONE<br>455 N. Cityfront Plaza Drive<br>Chicago, Illinois 60611<br>Telephone: (312) 321-4200<br>Facsimile: (312) 321-4299<br>jsobieraj@usebrinks.com<br><br>*Attorneys for Defendant Quixtar Inc.* | J. William Blue, Jr.<br>NORTHEN BLUE, L.L.P.<br>1414 Raleigh Road, Suite 435<br>The Exchange At Meadowmont<br>Chapel Hill, NC 27517<br>Telephone: (919) 968-4441<br>Facsimile: (919) 942-6603<br>jwb@nbfirm.com<br><br>*Additional counsel for Defendants World<br>Wide Group, L.L.C., American<br>Multimedia Inc., Britt Management, Inc.,<br>Bill Britt, Peggy Britt* |
| C. Matthew Andersen<br>WINSTON & CASHATT<br>1900 Bank of America Bldg.<br>601 W. Riverside<br>Spokane, WA 99201<br>Telephone: (509) 838-6131, (800) 332-0534<br>Facsimile: (509) 838-1416<br>cma@winstoncashatt.com<br><br>*Additional counsel for Defendants James<br>Ron Puryear, Georgia Lee Puryear,<br>World Wide Group, L.L.C.* | Benjamin K. Riley<br>HOWREY LLP<br>525 Market Street, Suite 3600<br>San Francisco, CA 94105-2708<br>Telephone: (415) 848-4900<br>Facsimile: (415) 848-4999<br>rileyb@howrey.com<br><br>*Additional counsel for Defendants World<br>Wide Group, L.L.C., American<br>Multimedia Inc., Britt Management, Inc.,<br>Bill Britt, Peggy Britt* |

25

26

/s/_____Stuart Singer_____
*Attorney for Plaintiffs*

27

28

CASE NO. C 07-0201 SC       PLAINTIFFS' SUPPLEMENTAL BRIEF IN SUPPORT OF JOINT MOTION FOR
PRELIMINARY APPROVAL OF SETTLEMENT AGREEMENT