David W. Shapiro (CA SBN 219265)
BOIES, SCHILLER & FLEXNER LLP
1999 Harrison Street, Suite 900
Oakland, California 94612
Telephone: (510) 874-1000
Facsimile: (510) 874-1460
E-mail: dshapiro@bsfllp.com

David Boies, Esq. (*Pro Hac Vice*)
BOIES, SCHILLER & FLEXNER LLP
333 Main Street
Armonk, NY 10504
Telephone: (914) 749-8200
Facsimile: (914) 749-8300
E-mail: dboies@bsfllp.com

Stuart H. Singer, Esq. (*Pro Hac Vice*)
Carlos M. Sires, Esq. (*Pro Hac Vice*)
Sigrid S. McCawley, Esq. (*Pro Hac Vice)*
BOIES, SCHILLER & FLEXNER LLP
401 East Las Olas Boulevard, Suite 1200
Fort Lauderdale, Florida 33301
Telephone: (954) 356-0011
Facsimile: (954) 356-0022
E-mail: ssinger@bsfllp.com
E-mail: csires@bsfllp.com
E-mail: smccawley@bsfllp.com

Willie E. Gary, Esq. (*Pro Hac Vice*)
GARY, WILLIAMS, PARENTI,
WATSON & GARY, P.L.
221 East Osceola Street
Stuart, Florida 34994
Telephone: (772) 283-8260
Facsimile: (772) 220-3343
E-mail: weg@williegary.com

*Attorneys for Plaintiffs Jeff Pokorny, Larry Blenn and Kenneth Busiere*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| Jeff Pokorny, Larry Blenn, and Kenneth Busiere, on behalf of themselves and those similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>Quixtar, Inc.,<br><br>Defendant. | **CASE NO. C 07-0201 SC**<br><br>**PLAINTIFFS' MOTION, NOTICE AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR FINAL APPROVAL OF SETTLEMENT, AND PROPOSAL FOR DISTRIBUTION OF EXCESS**<br><br>DATE: November 16, 2012<br>TIME: 10:00 a.m.<br>CTRM: The Honorable Samuel Conti |

1

**<u>TABLE OF CONTENTS</u>**

2

<u>Page</u>

3

TABLE OF AUTHORITIES ................................................................................... iii

4

MOTION AND NOTICE.......................................................................................1

5

MEMORANDUM OF POINTS AND AUTHORITIES .............................................1

6

7

I.     BACKGROUND.............................................................................................2

8

     A.     The Litigation ....................................................................................2

9

     B.     The Settlement Agreement ................................................................3

10

           1.     Monetary And Product Benefits To Class Members .................4

11

           2.     Injunctive Relief.......................................................................4

12

     C.     Notice to Class ..................................................................................5

13

     D.     Proposed Distribution of Excess .......................................................7

14

           1.     Estimated Excess ......................................................................7

15

           2.     Proposal For Excess Distribution.............................................8

16

II.     ARGUMENT ................................................................................................9

17

     A.     The Settlement Is Entitled to a Presumption of Fairness ...................10

18

     B.     The Class Settlement Is Fair, Adequate, And Reasonable...................10

19

           1.     Strength Of Plaintiffs' Case ....................................................10

20

           2.     The Risk, Expense, Complexity, and Likely Duration of Further Litigation ................................................................11

21

22

           3.     The Risk of Maintaining Class Action Status Throughout the Trial........11

23

           4.     The Amount Offered in the Settlement ...................................12

24

25

           5.     The Extensive Investigation and Informal Discovery That Were Completed Before the Settlement Was Reached Favor Final Approval ..13

26

           6.     The Recommendation and Views of Experienced Class Counsel Supports Final Approval .......................................................14

27

28

i

7. Governmental Input Into the Settlement Agreement ..............................14

8. The Positive Reaction of the Class Members to the Settlement Supports Final Approval ................................................................15

C. The Objections to The Settlement Lack Merit ....................................................17

1. Product Benefits ........................................................................................17

2. Documentation Of Losses .........................................................................19

3. Disclosure Of Cy Pres Recipient..............................................................20

4. Use of Judge Charles B. Renfrew's, Terry Goddard's and Judge Daniel Weinstein's Declarations ................................................................22

5. Distinction Between Current and Former IBOs ........................................23

6. *Pro Se* Objectors.......................................................................................24

a. The Settlement Is Too Low or Too High ......................................24

b. 2003 Cut-Off Date.........................................................................25

CONCLUSION ..................................................................................................................25

1

# **TABLE OF AUTHORITIES**

2

Page

3

## **Cases**

4

*Agency Holding Corp. v. Malley-Duff & Assocs., Inc.,*

5
   483 U.S. 143 (1987) ................................................................................................... 25

6

*Browning v. Yahoo! Inc.,*
   No. C04-01463 HRL, 2007 WL 4105971 (N.D. Cal. Nov. 16, 2007) ................................... 18

7

*Churchill Vill., L.L.C. v. Gen. Elec.,*

8
   361 F.3d 566 (9th Cir. 2004) ................................................................................ 14, 16

9

*Class Plaintiffs v. City of Seattle,*
   955 F.2d 1268 (9th Cir. 1992) ................................................................................ 9, 14

10

*Collado v. Toyota Motor Sales, U.S.A., Inc.*

11
   Nos. CV10–3113–R, CV–10–3124–R, 2011 WL 5506080 (C.D. Cal. Oct. 17, 2011) ..... 16, 17

12

*Curiale v. Lenox Group, Inc.,*

13
   No. 07-1432, 2008 WL 4899474 (E.D. Pa. Nov. 14, 2008) ................................................. 18

14

*D'Amato v. Deutsche Bank,*

15
   236 F.3d 78 (2d Cir. 2001) ................................................................................... 10

16

*Dennis v. Kellogg,*
   687 F.3d 1149 (9th Cir. 2012) ................................................................................ 21

17

*Dennis v. Kellogg*

18
   Nos. 11–55674, 11–55706, 2012 WL 3800230 (9th Cir. Sept. 4, 2012) ......................... 21, 22

19

*Edwards v. The First Am. Corp.,*

20
   385 F. App'x 629 (9th Cir. 2010) ................................................................................ 20

21

*Ellis v. Naval Air Rework Facility,*
   87 F.R.D. 15(N.D. Cal. 1980) ................................................................................ 10

22

*Equal Rights Ctr. v. Washington Metro. Transit Auth.,*

23
   573 F. Supp. 2d 205 (D.D.C. 2008) ................................................................................ 18

24

*In re AT&T Mobility Wireless Data Serv. Sales Tax Litig.,*
   789 F. Supp. 2d 935 (N.D. Ill. 2011) ................................................................................ 23

25

*In re Austrian & German Bank Holocaust Litig.,*

26
   80 F. Supp. 2d 164 (S.D.N.Y. 2000) ................................................................................ 10

27

28

iii

CASE NO. C 07-0201 SC   PLAINTIFFS' MOTION, NOTICE AND MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF MOTION FOR FINAL APPROVAL OF SETTLEMENT …

*In re Chicken Antitrust Litig.*,
   669 F.2d 228 (5th Cir.1982) ................................................................................. 13

*In re Heritage Bond Litig.*,
   No. 02-ML-1475-DT (RCX), 2005 WL 1594389 (C.D. Cal. June 10, 2005) .................... 12, 25

*In re Inter-Op Hip Prosthesis Liab. Litig.*,
   204 F.R.D. 359, 380 (N.D. Ohio 2001) .................................................................. 10

*In re Mego Fin. Corp. Sec. Litig.*,
   213 F.3d 454 (9th Cir. 2000) ................................................................................ 13

*In re NASDAQ Market–Makers Antitrust Litig.*,
   187 F.R.D. 465 (S.D.N.Y. 1998) ........................................................................... 16

*In re Omnivision Tech., Inc.*,
   559 F. Supp. 2d 1036 (N.D. Cal. 2008) ............................................................ 11, 13, 25

*In re Pacific Enters. Sec. Litig.,*,
   47 F.3d 373 (9th Cir. 1995) ................................................................................. 14

*In re Packaged Ice Antitrust Litig.*,
   No. 08-MDL-01952, 2011 WL 6209188 (E.D. Mich. Dec. 13, 2011) ........................... 16, 17

*In re Pet Food Products Liability Litig.*,
   629 F.3d 333 (3d Cir. 2010) ................................................................................. 23

*In re Syncor ERISA Litig.*,
   516 F.3d 1095 (9th Cir. 2008) ............................................................................... 9

*In re TD Ameritrade Account Holder Litig.*,
   Nos. C 07–2852 SBA, C 07–4903 SBA, 2011 WL 4079226 (N.D. Cal. Sept. 13, 2011) ....... 20

*In re Toys "R" Us Antitrust Litig.*,
   191 F.R.D. 347 (E.D.N.Y. 2000) ........................................................................... 18

*In re Veritas Software Corp. Sec. Litig.*,
   No. C-03-0283 MMC, 2005 WL 3096079 (N.D. Cal. Nov. 15, 2005) ........................... 14-15

*Jermyn v. Best Buy Stores, L.P.*,
   No. 08 Civ. 214 CM, 2012 WL 2505644 (S.D.N.Y. 2012) ........................................... 16

*Linney v. Cellular Alaska P'ship*,
   No. C-96-3008 DLJ, 1997 WL 450064 (N.D. Cal. July 18, 1997) ............................ 9, 10, 12

*Linney v. Cellular Alaska P'ship*,
   151 F.3d 1234 (9th Cir. 1998) ........................................................................... 12, 13

*Marshall v. Holiday Magic, Inc.*,
   550 F.2d 1173 (9th Cir. 1977) ........................................................................... 14, 15

iv

*Nat'l Rural Telecomm. Coop. v. DIRECTV, Inc.*,
  221 F.R.D. 523 (C.D. Cal. 2004) ................................................................. 14, 15

*Officers for Justice v. Civil Serv. Comm'n*,
  688 F.2d 615 (9th Cir. 1982) ....................................................................... 9, 11

*Parks v. Portnoff Law Assoc.*,
  243 F. Supp. 2d 244 (E.D. Pa. 2003) ................................................................ 17

*Pelletz v. Weyerhaeuser Co.*,
  255 F.R.D. 537 (W.D. Wash. 2009) .................................................................. 15

*Perez v. Asurion Corp.*,
  501 F. Supp. 2d 1360 (S.D. Fla. 2007) ......................................................... 17, 18

*Pokorny v. Quixtar, Inc.*,
  601 F.3d 987 (9th Cir. 2010) ............................................................................ 2

*Stoetzner v. U.S. Steel Corp.*,
  897 F.2d 115 (3d Cir. 1990) ............................................................................ 16

*Touhey v. United States*,
  No. EDCV 08-01418-VAP (RCx), 2011 WL 3179036 (C.D. Cal. July 25, 2011) .................. 17

*Vista Healthplan, Inc. v. Warner Holdings Co. III, Ltd.*,
  246 F.R.D. 349 (D.D.C. 2007) .......................................................................... 18

*White v. Experian Info. Solutions, Inc.*,
  803 F. Supp. 2d 1086 (C.D. Cal. 2011) ......................................................... 15, 17

**Statutes**

18 U.S.C. §1961. .............................................................................................. 2

28 U.S.C. § 1715 ............................................................................................. 15

**Rules**

FED. R. CIV. P. 23(e) .......................................................................................... 1

FED. R. CIV. P. 23(e)(2) ...................................................................................... 9

FED. R. CIV. P. 26(A)(2)(D)(i) .............................................................................. 22

FED. R. EVID. 408 ............................................................................................ 23

FED. R. EVID. 408(2) ........................................................................................ 23

1   **MOTION AND NOTICE**

2   TO:   ALL PARTIES AND THEIR ATTORNEYS OF RECORD

3       PLEASE TAKE NOTICE that pursuant to an order of this Court dated February 21, 2012,

4   on November 16, 2012 at 10:00 a.m., in the Courtroom of the Honorable Samuel Conti, United

5   States Senior District Judge, Northern District of California, at the Phillip Burton United States

6   Courthouse, 450 Golden Gate Avenue, San Francisco, California, Plaintiffs will bring on for

7   hearing this Motion for Final Approval of Settlement and Proposal for Distribution of Excess.

8   **MEMORANDUM OF POINTS AND AUTHORITIES**

9       Pursuant to Fed. R. Civ. P. 23(e), Plaintiffs respectfully move this Court for final approval

10   of the Class Action Amended Settlement Agreement ("ASA") between the Class and defendant

11   Quixtar. Dkt. No. 162-2. As discussed in detail below, the ASA, which was preliminarily

12   approved by the Court, is fair, reasonable and adequate. After this Court granted preliminary

13   approval, notice was sent to all Class Members, the notice reached over 97% of the Class, over

14   65,000 claims were filed, there were only 18 objections (.00086% of the Class), and only 260

15   opt-outs to the settlement (.0123% of the Class). The agreement should receive final approval.

16       As the number of claims filed was less than anticipated, there will be a substantial amount

17   left in the $21 million Product Fund and the $34 million Cash Fund. The exact amounts will not

18   be known until the claims are evaluated, expenses are paid, and attorneys' fees and incentive

19   compensation are awarded. Under the ASA, this Court is authorized to determine how the excess

20   will be distributed, with the proviso that no cash or products shall revert to Quixtar, and that

21   everything be distributed "for the benefit of the class or as *cy pres*." Although this decision is up

22   to the Court, Plaintiffs and Quixtar recommend that the excess product and cash be distributed to

23   the class, as opposed to a *cy pres* distribution to any charity or other third party. To accomplish

24   this in a fair manner, the parties propose that class members be sent a supplemental notice, which

25   advises them of expanded eligibility for benefits and potentially greater recoveries than stated in

26   the original notice. Details of the proposed supplemental notice and excess distribution are set

27   forth herein.

28

1

CASE NO. C 07-0201 SC   PLAINTIFFS' MOTION, NOTICE AND MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF MOTION FOR FINAL APPROVAL OF SETTLEMENT …

# I.      **BACKGROUND**

## A.      **The Litigation**

The present litigation began in January 2007.  Following extensive pre-suit investigation and research conducted by Class Counsel, Jeff Pokorny and Larry Blenn, both former Quixtar IBOs, filed suit against Quixtar and other Defendants under 18 U.S.C. §1961 *et. seq*. (Racketeer Influenced and Corrupt Organizations Act), state unfair competition laws, and common law fraud seeking damages and injunctive relief.  Dkt. No. 1, Compl. at ¶ 2.  Plaintiffs alleged that Quixtar operated a pyramid scheme that incentivized IBOs to recruit other distributors instead of selling merchandise.  *See Id.* ¶¶ 1, 35-37.  Plaintiffs further alleged that Quixtar induced IBOs to spend excessively on business support materials ("BSMs") (such as books, tapes, and meetings) and priced products too high to support retail sales to unaffiliated consumers.  *Id.* ¶¶ 1, 39-41.  A third Plaintiff, Kenneth Busiere, joined the action in August 2007.  Dkt. No. 97, First Amended Compl. After the Court preliminarily approved the parties' ASA, Plaintiffs' filed their Second Amended Complaint on February 29, 2012.  *See* Dkt. No. 218.

Quixtar and the other Defendants separately filed motions to dismiss the action and to compel arbitration and conciliation pursuant to the arbitration provisions in the IBO registration agreements.  Dkt. Nos. 28, 32, 36.  This Court, however, found the conciliation and arbitration provisions unconscionably slanted in Quixtar's favor and held them unenforceable.  Dkt. No. 115.  On April 20, 2010, the Ninth Circuit affirmed.  *See Pokorny v. Quixtar, Inc.*, 601 F.3d 987 (9th Cir. 2010).

While the appeal was pending before the Ninth Circuit, the parties began an extended mediation process under the guidance of Judge Weinstein, an experienced mediator, and his team. The mediation sessions took place over the course of two years and entailed nine in-person sessions lasting a total of twelve days, as well as numerous email, telephonic and other communications among the parties and the mediator's team.  Dkt. No. 224-2, Weinstein Decl. ¶¶13-17.  The process included a detailed discussion of claims, comprehensive briefing, the involvement of experts for both sides and a neutral expert, and the exchange of a substantial amount of requested information through informal discovery.  *Id.* ¶ 13, n.1.  On November 3,

2010, the parties jointly moved this Court for an order preliminarily approving a settlement agreement, directing notice to the Class, and scheduling a fairness hearing.  Dkt. No. 141, Joint Mot. for Preliminary Approval of Initial Settlement Agreement.

In response, the Court ordered three rounds of supplemental briefing and evidentiary submissions.  The parties addressed the Court's concerns in the ASA.  On February 21, 2012, the Court granted preliminary approval of the ASA.  Dkt. No. 216.  In the Preliminary Approval Order, the Court conducted an initial evaluation of the ASA and determined that it was sufficiently fair, reasonable, and adequate to be within the range of approval.  *Id.* § III.  The Court also provisionally certified the class, approved the parties' proposed notice program, and appointed Rust Consulting to serve as Claims Administrator.  *Id.* § II.

**B.      The Settlement Agreement**

The ASA provides Class Members with the opportunity to share in a $34 million Cash Fund, a $21 million (retail value) Product Fund, and the benefits of injunctive relief that, in the words of former Arizona Attorney General Terrence Goddard, will "change the corporate culture of Quixtar, set a new standard of practice in the direct marketing community, and go a long way toward preventing in the future the abuse of IBO recruits that is alleged in the Complaint."  Dkt. No. 224-1, Goddard Decl. at ¶ 9.

Specifically, the ASA provides the following economic relief:  (1) for former IBOs that did not renew their membership in Quixtar after the first year and did not receive a refund of the registration fee paid to become an IBO, $75 (retail value) in free products; (2) for former IBOs that spent at least $100 on Business Support Materials ("BSM"), up to 20% of verifiable expenses for  these materials; and (3) for former IBOs who lost more than $10,000 from operating their Quixtar business or that filed for personal bankruptcy due to their recruitment into and operation of their Quixtar business, up to 20% of Quixtar losses or $10,000, whichever is less.

The ASA also authorizes this Court to determine the disposition of remaining amounts in the Cash Fund or the Product Fund after all claims have been satisfied.  No cash or products may revert to Quixtar, and any excess must be "distributed by the Court, with input from Quixtar and Plaintiffs, for the benefit of the class or as *cy pres*."  ASA 6.1.5, 6.2.4.

1            1.      Monetary And Product Benefits To Class Members

2         The ASA includes a $34 Million Cash Fund that provides cash payments of up to 20

3   percent of a former IBO's Verifiable BSM Expenditures (not to exceed $2,000 per Claimant).

4   *See* Dkt. No. 162-2, ASA § 6.1.1.  Between 357,000 and 490,000 former IBOs are eligible for

5   such cash payments.  Dkt. No. 163-6, Coffman Decl. at ¶ 16.

6         The Cash Fund sets aside $5 million in a Special Hardship fund for former IBOs who lost

7   more than $10,000 from operating their Quixtar business or that filed for personal bankruptcy

8   because of their participation in Quixtar.  ASA § 6.1.2.  These Class Members are eligible to

9   receive a cash award of up to $10,000.  *Id.*

10        The ASA further provides $21 Million in free products to the Class.  ASA § 6.2.1.  The

11  free products are distributed in product bundles of $75 (retail value) to former IBOs who did not

12  renew their registration and did not previously obtain a refund of the registration fee.  *Id.*

13  Approximately 1,408,297 Class Members are eligible for product distributions.  Dkt. No. 165,

14  Alexander Decl. at ¶¶ 4, 7-8.

15            2.      Injunctive Relief

16        The ASA provides injunctive relief, which Quixtar estimates has a value of $100 million.

17  Dkt. No. 165, Alexander Decl. at ¶¶ 11-13.  As set forth in § 5.1 of the ASA, the injunctive relief

18  obliges Quixtar to, *inter alia*:

19        •   not compensate IBOs primarily for the act of recruiting others and to condition
20            bonuses on sales to end users, and not require any IBO to purchase or maintain any
              specified amount of inventory;

21        •   maintain policies prohibiting acts or practices which require a person to buy BSM as
22            a condition to becoming an IBO and prohibiting acts or practices which discourage
              buy backs of product on commercially reasonable terms;

23        •   reduce prices over 2007 levels by an average of 5%;

24        •   increase the registration fee refund period from 30 days to 90 days;

25        •   disclose important information on the application form, including:

26            o   refund policies,
              o   the fact that income figures are based on gross rather than net income,
27            o   the availability of training in marketing and merchandising,

28

4

○ the availability of an online retail product price schedule, and
○ the fact that product and BSM purchases are optional;

• provide an additional $7 million annually in free training to IBOs, including legal compliance requirements; and

• maintain and enforce quality control over BSMs, which shall include standards that BSMs shall not include material false and misleading statements.

*See* Dkt. No. 162-2, ASA § 5.1.

In sum, the injunctive relief provides for free training for IBOs in marketing and merchandising, and requires price reductions and changes in the bonus structure **to facilitate the focus on selling products rather than recruiting distributors**. *Id.*; Dkt. No. 224-1, Goddard Decl. ¶ 13. Moreover, clear notice of the refund policy for products purchased, posting of the entire product price list online, and a clear statement that purchases of Business Support Materials are optional are all mandated. Dkt. No. 224-1, Goddard Decl. ¶ 11. The injunction requirement that Quixtar be responsible for insuring that approved business support materials not contain false or misleading information "goes a long way towards controlling irresponsible or inaccurate statements made to attract or retain Quixtar IBOs." *Id.* Goddard Decl. at ¶ 14.

Quixtar unconditionally admits that the increased period for registration fee refunds, the amendments to its ADR rules, the additional disclosures in the IBO registration materials, and the monitoring commitments all specifically and directly arose as a result of this suit. Dkt. No. 203, Quixtar Response at 2, 6-7.

**C.    Notice to Class**

The notice plan was jointly developed by the parties in conjunction with Rust Consulting, Inc., a nationally renowned claims administrator with extensive experience in class action matters. The notice plan was revised several times to ensure clarity and to address concerns raised by this Court. The revised plan was approved by the Court in its Preliminary Approval Order as the best notice practicable under the circumstances. Dkt. No. 216 at p.4.

Each element of the Court-approved notice plan has now been implemented. Pursuant to the plan, Rust Consulting received a database of over 2.99 million potential class members from Quixtar. Ex. 1, Declaration of Jason M. Stinehart ("Stinehart Decl.") ¶ 4. Initial notice of the

proposed settlement was disseminated to all on April 16, 2012.  *Id*, ¶¶ 5-6.  Postcard notices were mailed to 1,631,662 potential class members, and email notices were sent to 1,365,058 potential class members.  *Id*.  For all postcard notices that were returned as undeliverable, Rust Consulting attempted to obtain a more current mailing address by running an address trace.  *Id*. ¶5.  For email notices, Rust Consulting employed a number of techniques in order to minimize the number of email notices caught by spam filters, including notifying ISPs and IP providers of the emails in advance and sending the emails in batches over time.  *Id*. ¶ 6.  In an effort to reach those class members for whom no email or postal address information could be obtained, notice was also provided via advertisements in Family Circle, Ladies' Home Journal, and TV Guide.  *Id.* ¶ 7.

In July 2012, Plaintiffs requested that the Court enter an order authorizing the Claims Administrator to send a reminder notice via email to ensure that class members were aware of the deadline for filing claims.  Dkt. No. 228.  The Court granted Plaintiff's motion, Dkt. No. 232, and a reminder notice was sent to all for whom an email address was available on July 30, 2012.  *Id*. ¶ 6.

Rust Consulting also created and maintained the Settlement Website, which contained printer–friendly versions of the notice and claim forms.  *Id*. ¶ 8.  The internet address of the Settlement Website appeared in the mailed postcard and emailed notices, and potential class members had the ability to file a claim online, via the Settlement Website.  Additionally, the mailed postcard notice and the email notice provided a toll free number to contact Rust Consulting and/or class counsel to obtain answers to questions about the settlement and to request that a full length notice form be mailed to them.

The Claims Administrator estimates that notice reached approximately 97% of the putative class members.  *Id*. ¶ 6.  In total, 65,451 claims have been filed, compared to just 18 objections and 260 opt out requests.  *Id*. ¶¶ 10, 12.  48,908 class members filed claims for product bundles, 18,225 filed claims for BSM expenditures, and 5,940 filed "special hardship" claims.  *Id*. ¶ 10.

1

**D.      Proposed Distribution of Excess**

2

    1.      Estimated Excess

3

The estimated overall response rate from all former IBOs (regardless of eligibility) was

4

approximately 3% rather than the 15% that the Claims Administrator had previously projected. [1]

5

The exact amount of the excess in each fund is not yet known, but we can offer estimations.

6

The Cash Fund totals $34 million.  Claims for BSM expenditures, which totaled over $50

7

million, if paid at the maximum rate set forth in the ASA (20% with a $2,000 cap), would require

8

$6.25 million of this amount.  Payments for "hardship" claims are capped under the ASA at a

9

total of $5 million.  Actual expenses to date for notice and administration plus estimated future

10

expenses are to be $2.1 million.  Any award by this Court of attorneys' fees and expenses and

11

incentive compensation would also be paid from the Cash Fund.  Plaintiffs have moved for $15

12

million in fees, $600,000 in expenses, and $60,000 ($20,000 for each of the three named

13

plaintiffs) in incentive compensation.  If this motion is granted in its entirety, there would be

14

approximately $4.9 million left in the Cash Fund after all claims are paid, assuming all BSM

15

claims are found to be valid and the Special Master awards "hardship" awards up to the $5

16

million cap.

17

The Product Fund totals $21 million (based on retail value of the products).  Only class

18

members who were former IBOs and resigned from Quixtar within less than one year are eligible

19

to receive products under the terms of the ASA.  Each claimant is entitled to a $75 value bundle

20

of products.  About 49,000 class members have filed to receive a product bundle.  This means

21

that products in the amount of $3.67 million have been claimed, which means there will be an

22

excess of about $17.33 million.

23

24

25

[1] Stinehart Decl. ¶ 10.  The response rate from *eligible* class members is undeterminable but significantly higher.  The 3% figure is based on the 65,451 total claims divided by 2,125,071,

26

which Quixtar stated was the number of former IBOs in the class.  Dkt. No 165, Alexander Decl. ¶ 4.  But not all former IBOs were eligible to file claims.  For example, IBOs who stayed with

27

Quixtar for more than one year were not eligible to claim a registration fee refund.  See also Dkt. No. 163-6, Coffman Decl. ¶¶16-18 (estimating between 357,000 and 490,000 class members

28

eligible for BSM expense refund claim).

7

2.       Proposal For Excess Distribution

Plaintiffs and Quixtar jointly propose that the Court distribute the entirety of the excess to class members as follows (the "Joint Proposal").  First, the Claims Administrator shall be instructed to send an additional notice for the purpose of allowing additional claims to be filed to all former IBO class members.  This notice (the "Supplemental Notice") shall be substantially in the form of the attached Exhibits 2 (email notice), 3 (postcard), and 4 (website).[2]

With respect to the Cash Fund, the Supplemental Notice will advise former IBOs who have not already filed a claim for BSM expenditures that they can file a claim for an additional 60-day period, and they may do so with only their own signed statement as evidentiary support. The notice will also state explicitly that the final percentage will be adjusted pro rata based on the number of claims, and the amount of the payment may be greater (although possibly lower) than 20%.

With respect to the Product Fund, the Supplemental Notice will advise former IBOs who have not already filed a claim for a product bundle that they may file a claim within an additional 60-day period, and that they may do so regardless of the length of time they were IBOs (thus lifting the prior restriction of eligibility to those who left Quixtar within one year).  They will also be advised that the retail value of each product bundle may be increased depending on the number of supplemental claims received since the excess products will be distributed pro rata to all eligible.  New claimants will be advised that they likely will receive a product bundle of approximately $150 in value; however, it may be greater (although possibly lower) than that, depending on the number of new claims.  These changes increase the pool of eligible product claimants by about 1,000,000.

Under the Joint Proposal, after submission of claims in response to the Supplemental Notice, the evaluation of claims by the Claims Administrator and Special Master, and the payment of administrative expenses and awarded attorney's fees and incentive compensation, the

_____

[2] The Supplemental Notice program will cost $ 308,740, Stinehart Decl ¶ 14, which would be paid from the Cash Fund.

1    Court would adjust the payout percentages and/or the "special hardship" cap so that all cash and

2    products are distributed to class members as equitably as possible. The ASA provides that the

3    Court may adjust the $5 million "cap" on hardship claims and may direct the distribution of

4    excess cash and products. ASA §§ 6.1.5, 6.2.4.

5    **II.    ARGUMENT**

6        Federal law favors settlements in class actions. *In re Syncor ERISA Litig.*, 516 F.3d 1095,

7    1101-02 (9th Cir. 2008) (citing *Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615, 624 (9th

8    Cir. 1982)); *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992). Settlements

9    are afforded a presumption of fairness where experienced class counsel are involved and the

10   settlement is reached through arm's-length negotiations after relevant discovery has taken place.

11   *Linney v. Cellular Alaska P'ship*, No. C-96-3008 DLJ, WL 450064, *5 (N.D. Cal. July 18, 1997),

12   *aff'd*, 151 F.3d 1234 (9th Cir. 1998).

13       When considering a motion for final approval, the court's inquiry is whether the

14   settlement is "fair, reasonable, and adequate." FED. R. CIV. P. 23(e)(2). As the Ninth Circuit

15   emphasized in *Officers for Justice,* the district court must scrutinize the settlement simply "to the

16   extent necessary to reach a reasoned judgment that the agreement is not the product of fraud or

17   overreaching by, or collusion between, the negotiating parties, and that the settlement, taken as a

18   whole, is fair, reasonable and adequate to all concerned." *Officers for Justice*, 688 F.2d at 625.

19   The court's determination "will involve the balancing of several factors," which under Ninth

20   Circuit law include: (1) the strength of the plaintiff's case; (2) the risk, expense, complexity and

21   likely duration of further litigation; (3) the risk of maintaining a class action; (4) the amount

22   offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (7)

23   the presence of a governmental participant; and (8) the reaction of the class members of the

24   proposed settlement. *City of Seattle*, 955 F.2d 1268, 1291 (quoting *Officers for Justice,* 688 F.2d

25   at 625).

26       Plaintiffs' settlement with Quixtar was the product of extensive arm's length negotiations

27   that occurred after pre-suit investigation and entailed detailed informal discovery and is therefore

28   entitled to a presumption of fairness. However, even without this presumption, the settlement

should be approved.  Each of the factors considered by the Ninth Circuit weighs in favor of approval and none of the arguments raised by the small number of class members that submitted written objections justifies rejecting the settlement.

### A.    The Settlement Is Entitled to a Presumption of Fairness

"The involvement of experienced class action counsel and the fact that the settlement agreement was reached in arm's length negotiations, after relevant discovery had taken place create a presumption that the agreement is fair." *Linney*, 1997 WL 450064 at *5, *aff'd*, 151 F.3d at 1234.  *See also Ellis v. Naval Air Rework Facility*, 87 F.R.D. 15, 18 (N.D. Cal. 1980) (settlement reached after hard-fought negotiations by experienced counsel entitled to "considered weight"), *aff'd*, 661 F.2d 939 (9th Cir. 1981); *In re Inter-Op Hip Prosthesis Liab. Litig.*, 204 F.R.D. 359, 380 (N.D. Ohio 2001); *In re Austrian & German Bank Holocaust Litig.*, 80 F. Supp. 2d 164, 173-74 (S.D.N.Y. 2000), *aff'd sub nom. D'Amato v. Deutsche Bank*, 236 F.3d 78 (2d Cir. 2001).  Each of these factors is present here.  Class Counsel are well-informed and have extensive experience in class action litigation.  The settlement was the product of "extremely intensive, arm's length negotiations between informed parties and their strong advocates" that involved nine in-person mediation sessions (lasting 12 days) over a period of two years.  Dkt. No. 224-2, Weinstein Decl. ¶ 13.  Although there was no formal discovery conducted, significant information was exchanged between the parties during the mediation process, allowing for an adequate evaluation of the settlement.  Dkt. No. 141-1, Singer Decl. ¶ 5.

### B.    The Class Settlement Is Fair, Adequate, And Reasonable

Each of the factors considered by the Ninth Circuit supports approval of the settlement.

#### 1.    Strength Of Plaintiffs' Case

Plaintiffs are confident in the strength of their case even though this action presents a number of novel and complex issues of fact and law (including class certification) which must be overcome before Plaintiffs could prevail.  Quixtar has argued that Plaintiffs' claims are meritless for a multitude of procedural and substantive reasons.  Plaintiffs have considered the risks involved in these and other issues being litigated in reaching the proposed settlement.

2.   The Risk, Expense, Complexity, and Likely Duration of Further Litigation

This case was filed in 2007 and has already involved extensive motion practice both before this Court and the Ninth Circuit Court of Appeals.  If the settlement is not approved, Plaintiffs anticipate that discovery will involve hundreds of thousands (if not millions) of pages of documents, depositions throughout the country, and testimony from several experts. Discovery and trial will likely take several years, with several years' worth of appellate proceedings to follow.  The expense and time of additional litigation, combined with the risk, is a strong indication that the proposed settlement is fair, adequate and reasonable.  *See Officers for Justice*, 688 F.2d at 625  ("[I]t is the very uncertainty of outcome in litigation and avoidance of wasteful and expensive litigation that induce consensual settlements.  The proposed settlement is not to be judged against a hypothetical or speculative measure of what might have been achieved by the negotiators.").  As Judge Weinstein notes, "litigation would have been protracted in this case.  Litigating just the arbitration and mediation provisions took over two years.  The parties had to consider that there was a risk that the case would have to undergo multiple additional processes, including additional Motions to Dismiss, Class Certification, protracted and costly nationwide discovery, Summary Judgment motions, and a trial that would be lengthy and unpredictable and most likely subject to lengthy appeal."  Dkt. No. 224-2, Weinstein Decl. ¶ 14.

3.   The Risk of Maintaining Class Action Status Throughout the Trial

Quixtar has agreed to certification of the proposed class for settlement purposes only, and has reserved the right to challenge class certification if the settlement is not approved.  Plaintiffs strongly believe certification of the class is proper, but denying the proposed settlement presents the risk that the class would not get certified, thereby depriving putative class members of their opportunity to recover.  This factor weighs in favor of approving the proposed settlement.  *See In re Omnivision Tech., Inc.*, 559 F. Supp. 2d 1036, 1041 (N.D. Cal. 2008) ("[I]f the Court were to refuse certification, the unrepresented potential plaintiffs would likely lose their chance at recovery entirely.").

11

CASE NO. C 07-0201 SC      PLAINTIFFS' MOTION, NOTICE AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR FINAL APPROVAL OF SETTLEMENT …

4.    The Amount Offered in the Settlement

As noted previously, Plaintiffs believe the proposed settlement is an excellent result that will greatly benefit the class members in terms of economic relief (cash and products), and class members and the public as a whole as a result of injunctive relief that will change the way in which Quixtar conducts business.  The direct economic relief is $55 million, and the injunctive relief has been described as "even more valuable than the substantial economic relief."  Goddard Decl. ¶ 9; Dkt. No. 224-2, Weinstein Decl. ¶ 20.  The injunctive relief reduces Quixtar's prices, extends the time period from 30 to 90 days in which an IBO can obtain a refund of the initial enrollment fee, requires better clarity in the application form disclosures, provides changes in the bonus structure to facilitate a focus on selling products rather than recruiting distributors, and requires that Quixtar insure that approved business support materials not contain false or misleading information.  This represents a substantial recovery for class members, and, in light of the risk and expense of continued litigation, constitutes a fair and reasonable settlement of the claim.

Although the proposed settlement should not be measured in terms of what class members could have recovered had they prevailed at trial, *see Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1242 (9th Cir. 1998) ("The proposed settlement is not to be judged against a hypothetical or speculative measure of what *might* have been achieved by the negotiators."), the settlement in this case constitutes a substantial percentage of the relief which could have been obtained.  Former IBOs who lost up to $50,000 in BSM expenditures and "special hardships" will likely recover 20% of their losses (and potentially more if the Joint Proposal for distribution of the excess is adopted, see *supra*).  Former IBOs who left Quixtar within a year will receive product bundles (including Quixtar's most popular and useable products) comparable to the registration fee they paid (and all former IBOs will be eligible for a potentially larger product bundle if the Joint Proposal is adopted).  Using the 20 percent figure as a benchmark for this settlement, that percentage exceeds the percentage approved in numerous other cases.  *See In re Heritage Bond Litig.*, No. 02-ML-1475-DT (RCX), 2005 WL 1594389, at *8-9 (C.D. Cal. June 10, 2005) (noting that an award of 23% of the class' net loss "is significantly above the average securities class

1   action settlement when measured as a percentage of losses recovered" and noting that the median

2   percentage was 2.3%); *In re Omnivision Tech., Inc.*, 559 F. Supp. 2d 1036, 1042 (N.D. Cal. 2008)

3   (approving a settlement of just over 9% of the maximum potential recovery).

4                    5.       The Extensive Investigation and Informal Discovery That Were
                              Completed Before the Settlement Was Reached Favor Final Approval
5

6           In analyzing the extent of discovery completed and the stage of the proceedings, the court

7   evaluates whether "the parties have sufficient information to make an informed decision about

8   settlement." *Linney*, 151 F.3d at 1239.  The court may consider the extent of both formal and

9   informal discovery, as well as information obtained about the case through other means.  *See In*

10  *re Mego Fin. Corp. Sec. Litig.,* 213 F.3d 454, 459 (9th Cir. 2000) (class counsel's significant

11  investigation, research, and work with experts throughout the litigation supported approval of the

12  settlement, even absent extensive formal discovery); *Linney,* 151 F.3d at 1239 (quoting *In re*

13  *Chicken Antitrust Litig.,* 669 F.2d 228, 241 (5th Cir.1982) ("'[F]ormal discovery is not a

14  necessary ticket to the bargaining table' where the parties have sufficient information to make an

15  informed decision about settlement.").

16          Plaintiffs in this case had ample information to evaluate the strength of the case, as well as

17  the reasonableness and adequacy of the settlement.  Class Counsel's work on the case

18  commenced in 2006 with a comprehensive pre-suit investigation of Plaintiffs' claims.  Dkt. No.

19  163-7, Singer Decl., ¶ 2.  During the mediation process, which took place over the course of two

20  years, the parties conducted informal discovery that involved an exchange of information that

21  typically only occurs through formal discovery.  Dkt. No. 163-9, Weinstein Decl., ¶13.

22  Additionally, the process included a detailed discussion of the claims and comprehensive briefing

23  by the parties, and evaluations conducted by a neutral expert consultant.  *Id*., Weinstein Decl.,

24  ¶13 at fn.1; Dkt. No 163-6, Coffman Decl. at ¶ 9.  In light of the exhaustive investigation of the

25  factual and legal bases for Plaintiffs' claims, this factor weighs in favor of approval.

26

27

28

6.     The Recommendation and Views of Experienced Class Counsel Supports
Final Approval

The support of experienced counsel favors approving a class action settlement.  *See City of Seattle*, 955 F.2d at 1291; *Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 566, 576-77 (9th Cir. 2004).  In considering the adequacy of the terms of a settlement, the district court should rely upon the judgment of experienced counsel for the parties.  *Nat'l Rural Telecomm. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 528 (C.D. Cal. 2004) ("Great weight is accorded to the recommendation of counsel, who are most closely acquainted with the facts of the underlying litigation.") (internal quotation marks and citations omitted).  This reliance is predicated on the fact that "[p]arties represented by competent counsel are better positioned than courts to produce a settlement that fairly reflects each party's expected outcome in the litigation." *In re Pacific Enters. Sec. Litig.,* 47 F.3d 373, 378 (9th Cir. 1995).

Here, the experience and views of counsel support approval of the settlement.  Class Counsel have significant experience in class action litigation as well as well as in suits involving the federal RICO laws and fraud claims under state and federal law.  Dkt. No. 163-7, Singer Decl. ¶¶ 3-11; Dkt. No. 163-8, Hoffler Decl. ¶5.   After thoroughly investigating Plaintiffs' claims, considering the strength of the case, and evaluating the complex risks of litigation, Class Counsel concluded that the settlement was fair and would provide substantial benefits to the class.  Dkt. No. 163-7, Singer Decl. ¶ 17.  Class Counsel's views are shared by Judge Weinstein, a highly experienced class action mediator, who agrees that the proposed settlement is fair, reasonable and adequate.  Dkt. No. 163-9, Weinstein Decl. ¶ 23.

7.     Governmental Input Into the Settlement Agreement

Another factor that the Court may consider in evaluating the fairness of a settlement is the presence of a governmental participant which "serves to protect the interest of the class members." *See Marshall v. Holiday Magic, Inc.*, 550 F.2d 1173, 1178 (9th Cir. 1977).  In cases in which there is no indication that any governmental entity participated in the settlement, courts have held that this factor favors neither approval nor disapproval of the settlement. *E.g., In re*

1    *Veritas Software Corp. Sec. Litig.*, No. C-03-0283 MMC, 2005 WL 3096079 (N.D. Cal. Nov. 15,

2    2005) *vacated in part*, 496 F.3d 962 (9th Cir. 2007).

3        Here, no state attorney general objected to the settlement, even though each state's

4    attorney general was notified of the settlement pursuant to 28 U.S.C. § 1715.  Dkt. No. 171 at p.

5    6.  This is a factor favoring approval.  *See Pelletz v. Weyerhaeuser Co.*, 255 F.R.D. 537, 543

6    (W.D. Wash. 2009) (approving settlement after considering, among other factors, "the fact that

7    no governmental agent has responded to the proposed settlement, despite the class settlement

8    notifications sent to the appropriate federal and state officials.").

9        In response to the notice, representatives of the Texas Attorney General's Office

10   contacted the parties and played an important and constructive role that led to a number of

11   changes in the ASA and consent judgment in response to their comments.  As a matter of policy

12   the Texas Attorney General's office does not take a position with respect to whether the

13   settlement should be approved.

14              8.    The Positive Reaction of the Class Members to the Settlement Supports Final
                      Approval

15

16       Finally, the settlement has received a positive response from the Class.  A court may

17   appropriately infer that a class action settlement is fair, adequate, and reasonable when few class

18   members object to it.  *Marshall*, 550 F.2d at 1178; *see also White v. Experian Info. Solutions,*

19   *Inc.*, 803 F. Supp. 2d 1086, 1099 (C.D. Cal. 2011) ("Although several groups have pursued their

20   objections with notable vigor, the total number of objectors and/or opt-outs is small when

21   compared with the number of class members who responded favorably.").  "It is established that

22   the absence of a large number of objections to a proposed class action settlement raises a strong

23   presumption that the terms of a proposed class settlement action are favorable to the class

24   members."  *DIRECTV, Inc.,* 221 F.R.D. at 528-29.

25       In the instant action, 65,451 class members have filed claims, and this number is likely to

26   increase substantially if the Joint Proposal is adopted.  Yet, only 260 putative class members have

27   elected to opt out of the settlement, and only 18 have filed objections.  In a class action settlement

28

1    of this size, some objections are to be expected.  *See In re NASDAQ Market–Makers Antitrust*

2    *Litig.,* 187 F.R.D. 465, 478 (S.D.N.Y. 1998) ("In litigation involving a large class, it would be

3    extremely unusual not to encounter objections.").    The objection and exclusion rates relative to

4    the number of class members who responded favorably weigh strongly in favor of approval.  *See*

5    *Stoetzner v. U.S. Steel Corp.,* 897 F.2d 115, 118-19 (3d Cir. 1990) (approving settlement where

6    "only" 29 objections were made in a 281-member class); *Collado v. Toyota Motor Sales, U.S.A.,*

7    *Inc.,* Nos. CV10–3113–R, CV–10–3124–R, 2011 WL 5506080 (C.D. Cal. Oct. 17, 2011)

8    (approving settlement of 239,670 class members, where 11,403 filed timely claims, 105 members

9    opted out, and 22 members objected).  Collectively, the number of opt outs and objections

10   amounts to just .4% of those that have filed claims and just .013% of the total number of IBOs to

11   whom notice was sent.  Courts have approved settlements where the percentage of objectors was

12   much higher than this amount.  *See*, *e.g., Gen. Elec.*, 361 F.3d at 577 (approving settlement where

13   545 people out of an initial notice pool of 90,000 objected to the settlement or excluded

14   themselves).[3]

15         While the Joint Proposal (if adopted) should increase the claim response rate

16   substantially, even a 3% response rate is in line with the response rates of other class action

17   settlements requiring proof of claim procedures.  According to an empirical study of class action

18   settlement response rates, in almost half of the cases studied fewer than 10% of class members

19   filed claims.  2 Newberg on Class Actions, Appendix 8-4 (3d ed. 1992).  In several cases studied,

20   the response rate was less than 1%.  *Id.*; *see also Jermyn v. Best Buy Stores, L.P.*, No. 08 Civ. 214

21   CM, 2012 WL 2505644, at *6 (S.D.N.Y. 2012) (settlements that require class members to file a

22   claim "regularly yield response rates of 10 percent or less"); *In re Packaged Ice Antitrust Litig.,*

23   No. 08-MDL-01952, 2011 WL 6209188 (E.D. Mich. Dec. 13, 2011) (recognizing that the

24   percentage of claims filed "is not dispositive and is frequently less than 5%").  Courts have found

25   ──────────────

26   [3] We have been advised that Quixtar will say in its brief that statements of support for Quixtar
     from 8 objectors and 22 opt outs "suggest that a sizeable portion of the class may be in

27   disagreement with the claims Plaintiffs assert."  As these few supporting statements are *de
     minimus* in light of the 65,451 claims for benefits from other class members, Plaintiffs obviously

28   disagree with Quixtar's position on this point.

1    that the class reacted positively and approved class action settlements in cases involving similar

2    and lesser response rates.  *Touhey v. United States*, No. EDCV 08-01418-VAP (RCx), 2011 WL

3    3179036 (C.D. Cal. July 25, 2011) (approving settlement and finding positive reaction where

4    response rate was 2%); *In re Packaged Ice Antitrust Litig.,* 2011 WL 6209188 (approving

5    settlement and finding favorable class reaction with a 1% response rate); *Perez v. Asurion Corp.*,

6    501 F. Supp. 2d 1360, 1377-78 (S.D. Fla. 2007) (approving settlement and finding favorable class

7    reaction with a response rate of approximately 1.1%); *Parks v. Portnoff Law Assoc.,* 243 F. Supp.

8    2d 244, 251 (E.D. Pa. 2003) (approving settlement and finding favorable class reason where the

9    response rate was 2%).[4]

10        **C.    The Objections to The Settlement Lack Merit**

11        Below we address the objections of Maria H. Wong and Maria E. Juarez, who are

12    represented by counsel.[5]  We then address the written objections submitted by the *pro se*

13    objectors that were not asserted by Wong and Juarez.[6]

14            1.    Product Benefits

15        Wong and Juarez object to the distribution of products to Class Members provided by the

16    settlement because this "does not make the aggrieved class member whole, and does nothing to

17    disgorge Defendant's ill-gotten profits."  Dkt. No. 235, Objections of Wong and Juarez to

18

19

20

21    [4] *See also Collado*, 2011 WL 5506080 (approving settlement with response rate of approximately
      4.75%); *White*, 803 F. Supp. 2d at 1099-100 (approving settlement and finding that class

22    members' overall view of the settlement was positive where 5% of the people who received
      notice responded while only .2% of those who responded objected or opted out).

23    [5] We have been advised that Quixtar will be briefing additional arguments why the objections

24    should be overruled.  Plaintiffs join those arguments.  Certain objectors oppose an award of
      attorneys' fees and incentive awards.  These objections will be addressed in our reply brief in

25    support of our Motion for Award of Attorneys' Fees, Expenses and Incentive (Dkt. No. 224), due
      on October 26, 2012. *See* Dkt. No. 216, Order at 6.

26    [6] Pro se objectors who filed timely objections are Michael Hambruch; Michelle and Robert

27    Szynskie; Deanna Jaramillo; Sandra Frazier; Grant Nagata (Nagata Business Group); Bruce and
      Mary Miller; Gary Gentry; Richard and Loreen Eckenwiler; Zechariah Fritz; William J. Cullins;
      P. Shane and Evelyn Hayes; Frank and Jeanie Akridge (Freedom Consultants LLC); Jeremy

28    Thomas; Virgil and Darlene Hill; Mike and Evie Bitondo; and Dennis Obado.

1   Proposed Settlement ("Wong Objections") at ¶¶ 2, 4.[7]   Settlements rarely make the plaintiffs

2   whole, and this settlement imposes a substantial multi-million dollar expense upon Quixtar,

3   which estimates that the estimated cost of the injunctive relief and economic relief exceeds $155

4   million.

5       Established case law does not support the objection to product benefits.  Courts have

6   repeatedly approved the use of product credit in compensating class members.  *See, e.g.*,

7   *Browning v. Yahoo! Inc.*, No. C04-01463 HRL, 2007 WL 4105971, *3-*4 (N.D. Cal. Nov. 16,

8   2007) (approving settlement agreement providing injunctive relief and product compensation of

9   free credit scores); *In re Toys "R" Us Antitrust Litig.*, 191 F.R.D. 347, 349 (E.D.N.Y. 2000)

10  (approving an almost $57 million settlement providing toys and cash: toys worth $36.6 million

11  and $20.3 million in cash); *Vista Healthplan, Inc. v. Warner Holdings Co. III, Ltd.*, 246 F.R.D.

12  349, 355 (D.D.C. 2007) (approving settlement agreement providing hormonal contraceptive

13  products ); *Curiale v. Lenox Group, Inc.*, No. 07-1432, 2008 WL 4899474, *10 (E.D. Pa. Nov.

14  14, 2008) (approving settlement agreement providing option of product distribution or vouchers

15  to be used in a future purchase); *Perez*, 501 F. Supp. 2d at 1374 (approving settlement agreement

16  providing phone cards and vouchers for new phones); *Equal Rights Ctr. v. Washington Metro.*

17  *Transit Auth.*, 573 F. Supp. 2d 205, 208-09 (D.D.C. 2008) (approving settlement agreement

18  providing subway tickets).  Notably, the objectors have not cited a single case supporting the

19  objection.

20      In assessing objections that the products provided in *Browning* "had little value," this

21  Court noted that "perhaps most importantly, these objections do not sufficiently consider the

22  value of the remedial relief offered or the considerable risks involved with continued litigation."

23  *Browning*, 2007 WL 4105971, at *5.  Similarly, the objectors here fail to consider the value of

24  the injunctive relief and the Cash Fund provided by the ASA and the risks of continued litigation.

25  _____

26  [7] Two objectors – Michael Hambruch and Mary J. Miller – object to the content of the product
    bundles.  Class members eligible to receive a product bundle have twelve different options that

27  include Quixtar's top-selling and most popular products.  Given the wide variety of products
    offered and the otherwise positive reaction of class members to the product bundles, these two

28  objections do not justify rejecting the settlement.

1  The objectors also fail to consider that eligibility for the Product Fund was amended in

2  response to the Court's concern for the equitable treatment of the Class. *See* Dkt. No. 157,

3  Prelim. Order at p. 20. The Court was concerned that under the initial settlement agreement,

4  IBOs who suffered losses less than $2,500 would only receive a product bundle, but those IBOs

5  who paid the initial registration fee and did not participate would be refunded their $117 fee. *Id*.

6  As a result, Plaintiffs sought to improve the equity of the distribution of economic relief and

7  restructured the settlement accordingly by providing greater relief to IBOs who suffered greater

8  harm.

9  Finally, if the Court adopts the Joint Proposal, the value of the product bundles, and the

10  number of class members claiming them, is likely to increase substantially.

### 2. Documentation Of Losses

12  Wong and Juarez object to the requiring of documentary evidence for the verification of

13  losses, including hardship losses. Notably, the objectors have again not cited a single case

14  supporting the objection. In fact, established case law supports documentation requirements for

15  class disbursements from a cash fund.

16  First, Wong and Juarez object to Class Members requesting relief from the Cash Fund

17  having to provide documentary evidence of BSM expenditures because many of them "will not

18  have retained receipts of old credit card statements proving their losses." Dkt. No. 235, Wong

19  Objections at p. 5. This objection will be moot if this Court adopts the Joint Proposal, which

20  addresses the objection and expressly does not require receipts or statements. Moreover, there

21  has never been a requirement that these Class Members provide such receipts and credit card

22  statements. The ASA and the Notice previously sent to the Class explicitly allow for "other proof

23  of purchase as documentation." *See* Dkt. No. 162-2, ASA § 6.1.1 ("The Claims Administrator

24  may accept receipts, credit card records, **or other proof of purchase as documentation**")

25  (emphasis added); Dkt. No. 212-1, Long Form Notice ¶11 ("These expenses must be verified

26  with receipts, credit card statements, **or other similar forms of proof of purchase**") (emphasis

27  added). In fact, in July 2012, the Claim Form and the class informational web page were updated

28  to note that the Claims Administrator may accept a "signed statement" verifying losses. Stinehart

1  Decl. ¶ 8.  At the same time, Class Members who called Boies, Schiller & Flexner LLP and Rust
2  Consulting with questions regarding the submission of their claims were similarly advised.  *Id.*

3      Second, Wong and Juarez object that their 1099 forms would be viewed by "total
4  strangers."  They write that once a Class Member seeking Cash Fund relief submits a claim,
5  "Defendant is permitted to utilize the class member's 1099 documents to verify that no income
6  was made from each class member's Quixtar business."  Dkt. No. 235, Wong Objections at p. 5.
7  But it is the payor (here Quixtar) that prepares 1099 forms, so these forms contain no info of
8  which Quixtar is not aware.  And while a court-appointed Special Master may request that
9  Quixtar provide a class member's 1099 form to verify losses, if the class member so consents,
10  Quixtar has no role in the verification process.  Dkt. No. 162-2, ASA §§ 6.1.2, 6.1.6.  Since a
11  1099 form shows how much money Quixtar paid to a class member, review of the form is
12  appropriate to determine whether a class member sustained compensable losses.

13      Third, Wong and Juarez also object to the requirement that Special Hardship claimants
14  provide "personal and sensitive documentation."  Dkt. No. 235, Wong Objections at p. 5.
15  However, requiring verification of hardship losses for the recovery of a significant amount of
16  money—in this case up to $10,000—is the only prudent way to assess the validity  of such
17  claims.

18      As would be expected, case law supports documentation requirements for class
19  disbursements from a cash fund.  *See Edwards v. The First Am. Corp.*, 385 F. App'x 629, 631
20  (9th Cir. 2010) ("The second two factors clearly do not defeat class certification; every class
21  action requires identification of class members, and most require individual proof of loss"); *In re*
22  *TD Ameritrade Account Holder Litig.*, Nos. C 07–2852 SBA, C 07–4903 SBA, 2011 WL
23  4079226, at *13 (N.D. Cal. Sept. 13, 2011) (overruling settlement objection to a requirement that
24  class members submit documentation to support their claim).

25          3.      Disclosure Of Cy Pres Recipient

26      Wong and Juarez argue that the settlement fails because the class members have not been
27  informed of the *cy pres* recipient.  Dkt. No. 235, Wong Objections at p. 8.  This objection will be
28  moot if the Court adopts the Joint Proposal, which calls for all excess cash and products to be

20

1  distributed to class members, with no *cy pres* distribution at all.  In any event, even if the Court

2  rejects or modifies the Joint Proposal and orders a *cy pres* distribution, the objectors' legal

3  analysis is incorrect.

4      Even if any remaining funds are distributed as *cy pres*, the provisions of the ASA, which

5  entrust the Court to select a recipient, are fully in accord with Ninth Circuit precedent.  The Ninth

6  Circuit's decision in *Dennis v. Kellogg*, Nos. 11–55674, 11–55706, 2012 WL 3800230 (9th Cir.

7  Sept. 4, 2012) does not support the objectors' contention that "specific charity must be identified

8  and analyzed by the Court prior to the final fairness hearing."  Dkt. No. 235, Wong Objections at

9  p. 8.[8]  In *Kellogg*, the Ninth Circuit reviewed a class settlement that settled claims for false

10  advertising under which any remaining funds would "be donated to unidentified charities chosen

11  by the parties and approved by the Court pursuant to the cy pres doctrine" *after* the decision on

12  appeal, thus requiring a second appeal on objections to the selected charity.  *Id.* at *3.  Kellogg

13  agreed to distribute, "pursuant to the *cy pres* doctrine, $5.5 million 'worth' of specific food items

14  to charities that feed the indigent."  *Id.*  The Ninth Circuit concluded that the *cy pres* distribution

15  to charities that feed the indigent had no "nexus" with the underlying false advertising claims.  *Id.*

16  at *6.  Additionally, the court expressed concern that neither the cash nor product *cy pres*

17  recipients had been identified by the time of its review, restricting the Court's ability to

18  "undertake the searching inquiry" required and forcing the objectors to commence a second

19  appeal after the later decision identifying the recipients.  *Id.* at *7.

20      Unlike in *Kellogg*, the *cy pres* recipient contemplated in the ASA here – if a *cy pres*

21  distribution is made (and there will be none if the Joint Proposal is adopted) – will be identified

22

23

24

25

26  _____

27  [8] The objectors cite to *Dennis v. Kellogg Co.*, 687 F.3d 1149, Nos. 11–55674, 11–55706, 2012
WL 2870128 (9th Cir. July 13, 2012).  This opinion was withdrawn and superseded by 2012 WL

28  3800230 (9th Cir. Sept. 4, 2012).

1    by this Court prior to or in the final judgment.[9]  Thus, the *Kellogg* Court's concerns regarding the

2    ability of the appellate court to review the *cy pres* distribution and the possibility of multiple

3    appeals after a final judgment are not implicated.  Contrary to the objectors' assertions, *Kellogg*

4    did not hold that the recipient must be identified by the parties and analyzed by the District Court

5    prior to the final fairness hearing.

6              4.      Use of Judge Charles B. Renfrew's, Terry Goddard's and Judge Daniel
                       Weinstein's Declarations
7

8         Wong and Juarez raise several objections to the submission of declarations by Judge

9    Charles B. Renfrew, Terry Goddard, and Judge Daniel Weinstein Declarations.

10        First, the Objectors claim that the submissions are improper because Class Counsel have

11   not designated them as experts.  Dkt. No. 235, Wong Objections at p. 12.  However, there is no

12   obligation to designate an expert for the purpose of a motion.  In any event, Fed. R. Civ. P.

13   26(A)(2)(D)(i) requires that expert witness and reports disclosed "least 90 days before the date set

14   for trial or for the case to be ready for trial."  Class Counsel submitted the declarations of Judge

15   Renfrew, Mr. Goddard, and Judge Weinstein well in advance of 90 days prior to the final fairness

16   hearing.

17        The Objectors also maintain that the declarations should be disregarded as biased because

18   "these individuals are being compensated by counsel."  Dkt. No. 235, Wong Objections at p. 11.

19   The same objection could be made as to almost all experts and is without merit.

20

21   _____

22   [9] If the Court declines to adopt the Joint Proposal and concludes that a *cy pres* distribution is
     more appropriate, Plaintiffs propose that the excess cash and products be distributed to the
23   Consumer Protection division of the National State Attorney Generals Program at Columbia Law
     School, which provides assistance to state attorneys' generals "in protecting consumers from
24   misinformation, scams, and negligence*," see* www.law.columbia.edu/center_program/ag/
     policy/consumer, the National Consumers League, which "represents consumers and workers on
25   marketplace and workplace issues," www.natlconsumersleague.org, and/or the Consumer
     Federation of America, which "works to advance pro-consumer policies on a variety of issues,"
26   www.consumerfed.org.  In the interest of full disclosure, we note that James Tierney, who is
     Director of the Columbia program, and an instructor  at Columbia Law School, also is counsel
27   with Boies, Schiller & Flexner.  A distribution to any or all of these programs would satisfy the
     *Kellogg* requirement that the recipient have a nexus with the Plaintiffs' claims.
28

1    Finally, the Objectors argue that the declarations are "not admissible" under Federal Rule

2    of Evidence 408.  However, Rule 408 only bars "conduct or a statement made during

3    compromise negotiations about the claim" where such evidence is used "*to prove or disprove the*

4    *validity or amount of a disputed claim or to impeach by a prior inconsistent statement or a*

5    *contradiction.*"  FED. R. EVID. 408(2).  These declarations were not submitted for impeachment

6    purposes or to disprove the validity of a disputed claim.

7              5.    Distinction Between Current and Former IBOs

8    Wong and Juarez argue that there is no rational reason not to offer monetary relief or

9    products to current IBOs.  Dkt. No. 235 at 6.[10]

10    As Wong and Juarez recognize, the injunctive relief benefits current IBOs through highly

11    advantageous changes in Quixtar's business practices, including price discounts.  Indeed, the

12    extensive injunctive relief is for the exclusive benefit of current IBOs; this relief does not benefit

13    former IBOs at all.  There is no requirement that a class action settlement must treat every class

14    member equally.  *In re Pet Food Products Liability Litig.*, 629 F.3d 333, 346 (3d Cir. 2010)

15    ("varied relief among class members with differing claims in class settlements is not unusual").

16    All that is required is a "rational basis" for any distinctions.  *In re AT&T Mobility Wireless Data*

17    *Serv. Sales Tax Litig.*, 789 F. Supp. 2d 935, 979 (N.D. Ill. 2011) ("[T]here is no rule that

18    settlements benefit all class members equally as long as the settlement terms are rationally based

19    on legitimate considerations") (internal quotation and citation omitted) (ellipses omitted).

20    Here, there is a plain and rational distinction:  those IBOs who have opted to remain with

21    Quixtar would likely find it more difficult to recover damages.  In addition, the current IBOs

22    receive all the benefits of the substantial injunctive relief.  Thus, the objection lacks merit.

23

24

25

26

27
_____

28    [10] Similarly, P. Shayne Hayes argues that he should not be excluded from receiving money or
     products even though he remains a Quixtar IBO.

CASE NO. C 07-0201 SC    PLAINTIFFS' MOTION, NOTICE AND MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF MOTION FOR FINAL APPROVAL OF SETTLEMENT …

1

6. *Pro Se* Objectors

2

a. *The Settlement Is Too Low or Too High*

3      Michael Hambruch, Mike and Evie Bitondo, and Virgil and Darlene Hill maintain that the

4 amount of money that Quixtar is required to pay under the agreement is too low.[11]  The crux of

5 their objections is that the settlement does not punish Quixtar harshly enough for its unlawful

6 conduct.  In contrast, eight other objectors[12] maintain that the amount Quixtar is required to pay is

7 too high, because they personally believe that Quixtar has not engaged in any unlawful conduct.

8      As noted above, Plaintiffs strongly believe in the merits of their case.  Quixtar, however,

9 has vigorously contested Plaintiffs' allegations.  Ultimately, the ASA was the product of

10 extensive and intense arms-length negations.  Although neither side achieved all of their goals,

11 Class Counsel concluded—taking into account the complex issues involved and the risks

12 associated with continued litigation—that the settlement is a fair result that provides substantial

13 benefits to the class.  Additionally, the injunctive relief obliges Quixtar to change its business

14 practices in a manner that provides substantial benefits to IBOs.  Objections that the benefits are

15 not enough, or too much, should be overruled.

16      The Bitondos also object to the allocation of the cash fund between those that suffered

17 "special hardship" losses and those that suffered lesser losses.  The Bitondos argue that IBOs that

18 suffered "special hardship" losses should be able to recover 100% of their losses and that the cash

19 fund should first be allocated to cover 100% of all hardship losses before any cash or product is

20 used to compensate other IBOs.  The Bitondos fail to appreciate that settlements necessarily

21 reflect a compromise.  In this case, Class Members who suffered a special hardship loss will be

22 able to recover 20% of their losses or $10,000, whichever is less.  The amounts recovered may be

23 substantially higher if the Joint Proposal is adopted.  This compares favorably to recovery in

24

─────────────────

25

[11] The Hills separately argue that the settlement amount is insufficient to pay all claims made by
26 IBOs.  This objection is factually incorrect.

27

[12] William J. Cullins, Michelle Szynskie, Frank and Jeanie Akridge (Freedom Consultants),
28 Zechariah Fritz, Richard Eckenwiler, Sandra Frazier, Grant Nagata, and Deanna Jaramillo.

24

1    other cases.  *See In re Heritage Bond Litig.*, No. 02-ML-1475-DT (RCX), 2005 WL 1594389, at

2    *8-9 (C.D. Cal. June 10, 2005) (noting that an award of 23% of the class' net loss "is

3    significantly above the average securities class action settlement when measured as a percentage

4    of losses recovered" and noting that the median percentage was 2.3%); *In re Omnivision Tech.,*

5    *Inc.*, 559 F. Supp. 2d 1036, 1042 (N.D. Cal. 2008) (approving a settlement of just over 9% of the

6    maximum potential recovery).

7            Moreover, the settlement was structured to ensure equity by providing greater relief to

8    IBOs who suffered greater harm.  Accordingly, class members who suffered a "special hardship"

9    are eligible to receive a larger recovery relative to other class members.

10                              b.        *2003 Cut-Off Date*

11           The Bitondos object on the basis of the Class Period and argue that IBOs who incurred

12   losses prior to 2003 should be permitted to recover.  According to the written objection and loss

13   documentation submitted by the Bitondos, they incurred significant Quixtar (Amway) losses in

14   1991 and 1992.

15           Again, the settlement was the product of extensive and intense arms-length negotiations.

16   Part of the process entailed determining the start date for the class period, which was necessarily

17   impacted by the four-year statute of limitations for civil RICO claims.  *Agency Holding Corp. v.*

18   *Malley-Duff & Assocs., Inc.*, 483 U.S. 143, 156 (1987).  In light of the pertinent statute of

19   limitations and the compromises required in every settlement, the parties acted reasonably and

20   fairly by selecting on January 1, 2003 (four years prior to the filing of the suit) as the beginning

21   of the class period.

22                                  **CONCLUSION**

23           For the reasons stated above, the settlement is fair, adequate, and reasonable and Plaintiffs

24   respectfully request that this Court grant final approval to the ASA, adopt the Joint Proposal for

25   the distribution of excess cash and products, and enter the proposed Consent Judgment.

26   Dated:  October 12, 2012                        Respectfully submitted,

27

28                                                     By:  /s/ Stuart Singer
                                                         *Attorney for Plaintiffs*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

David W. Shapiro (CA SBN 219265)
BOIES, SCHILLER & FLEXNER LLP
1999 Harrison Street, Suite 900
Oakland, California 94612
Telephone:  (510) 874-1000
Facsimile:   (510) 874-1460
E-mail:  dshapiro@bsfllp.com

Stuart H. Singer, Esq. (*Pro Hac Vice*)
Carlos M. Sires, Esq. (*Pro Hac Vice*)
Sigrid S. McCawley, Esq. (*Pro Hac Vice*)
BOIES, SCHILLER & FLEXNER LLP
401 East Las Olas Boulevard, Suite 1200
Fort Lauderdale, Florida 33301
Telephone: (954) 356-0011
Facsimile: (954) 356-0022
E-mail: ssinger@bsfllp.com
E-mail: csires@bsfllp.com
E-mail: smccawley@bsfllp.com

David Boies, Esq. (*Pro Hac Vice*)
BOIES, SCHILLER & FLEXNER LLP
333 Main Street
Armonk, NY 10504
Telephone:  (914) 749-8200
Facsimile:   (914) 749-8300
E-mail:  dboies@bsfllp.com

Willie E. Gary, Esq. (*Pro Hac Vice*)
Maria Sperando, Esq. (*Pro Hac Vice*)
Tricia P. Hoffler, Esq. (*Pro Hac Vice*)
GARY, WILLIAMS, FINNEY, LEWIS,
WATSON & SPERANDO
221 East Osceola Street
Stuart, Florida 34994
Telephone:  (772) 283-8260
Facsimile:   (772) 220-3343
E-mail:  weg@williegary.com
E-mail:  mps@williegary.com
E-mail:  tph@williegary.com

*Attorney for Plaintiffs*

1

## CERTIFICATE OF SERVICE

2        I hereby certify that on October 12, 2012 the foregoing was served via the **CM/ECF**

3    system on counsel for Defendants at the following address:

4    | Cedric C. Chao | Donald W. Carlson |
     | William L. Stern | Edward F. Donohue |
5    | James M. Schurz | CARLSON, CALLADINE & PETERSON, LLP |
     | MORRISON & FOERSTER LLP | 353 Sacramento Street, 16th Floor |
6    | 425 Market Street | San Francisco, CA 94111 |
     | San Francisco, California 94105-2482 | Telephone: (415) 391-3911 |
7    | Telephone: (415) 268-7000 | Facsimile: (415) 391-3898 |
     | Facsimile: (415) 268-7522 | dcarlson@ccplaw.com |
8    | cchao@mofo.com | edonohue@ccplaw.com |
     | wstern@mofo.com | |
9    | | *Additional counsel for Defendants James* |
     | *Attorneys for Defendant Quixtar Inc.* | *Ron Puryear, Georgia Lee Puryear,* |
10   | | *World Wide Group, L.L.C.* |

11   | James R. Sobieraj | J. William Blue, Jr. |
     | Ralph J. Gabric | NORTHEN BLUE, L.L.P. |
12   | Julie L. Leichtman | 1414 Raleigh Road, Suite 435 |
     | BRINKS HOFER GILSON & LIONE | The Exchange At Meadowmont |
13   | 455 N. Cityfront Plaza Drive | Chapel Hill, NC 27517 |
     | Chicago, Illinois 60611 | Telephone: (919) 968-4441 |
14   | Telephone: (312) 321-4200 | Facsimile: (919) 942-6603 |
     | Facsimile: (312) 321-4299 | jwb@nbfirm.com |
15   | jsobieraj@usebrinks.com | |
     | | *Additional counsel for Defendants World* |
16   | *Attorneys for Defendant Quixtar Inc.* | *Wide Group, L.L.C., American* |
     | | *Multimedia Inc., Britt Management, Inc.,* |
17   | | *Bill Britt, Peggy Britt* |

18   | C. Matthew Andersen | Benjamin K. Riley |
     | WINSTON & CASHATT | HOWREY LLP |
19   | 1900 Bank of America Bldg. | 525 Market Street, Suite 3600 |
     | 601 W. Riverside | San Francisco, CA 94105-2708 |
20   | Spokane, WA 99201 | Telephone: (415) 848-4900 |
     | Telephone: (509) 838-6131, (800) 332- | Facsimile: (415) 848-4999 |
21   | 0534 | rileyb@howrey.com |
     | Facsimile: (509) 838-1416 | |
22   | cma@winstoncashatt.com | *Additional counsel for Defendants World* |
     | | *Wide Group, L.L.C., American* |
23   | *Additional counsel for Defendants James* | *Multimedia Inc., Britt Management, Inc.,* |
     | *Ron Puryear, Georgia Lee Puryear,* | *Bill Britt, Peggy Britt* |
24   | *World Wide Group, L.L.C.* | |

25                                                              /s/ Stuart Singer
                                                              *Attorney for Plaintiffs*
26

27

28

1      I certify that the additional parties (Objectors) were served the foregoing on October 12,

2 2012 at the following addresses:

| Via CM/ECF & U.S. Mail | Via U.S. Mail |
|---|---|
| Joseph Darrell Palmer (SBN 125147)<br>E-Mail: darrell.palmer@palmerlegalteam.com<br>Law Offices of Darrell Palmer PC<br>603 North Highway 101, Ste A<br>Solana Beach, California 92075<br>Telephone: (858) 792-5600<br>Facsimile: (858) 792-5655<br><br>Christopher A. Bandas (*Pro Hac Vice* Pending)<br>E-Mail: cbandas@bandaslawfirm.com<br>Bandas Law Firm, PC<br>500 N. Shoreline Avenue, #1020<br>Corpus Christi, Texas 78401<br>Telephone: (361) 698-5200<br>Facsimile: (361) 698-5222<br><br>*Attorneys for Objectors Maria H. Wong and Maria E. Juarez* | Michael Hambruch  (*Objector*)<br>125 Grandview Ave.<br>Buffalo, NY  14223 |
| | **Via U.S. Mail**<br><br>Michelle and Robert Szynskie (*Objector*) (*Objector*)<br>P.O. Box 1101<br>Frederick, CO  80530 |
| | **Via U.S. Mail**<br><br>Deanna Jaramillo (*Objector*)<br>4 Day Lily<br>Peralta, NM  87042 |
| | **Via U.S. Mail**<br><br>Dennis Obado (*Objector*)<br>1034 Edpas Road<br>New Brunswick, NJ  08901 |
| **Via U.S. Mail**<br><br>Sandra Frazier (*Objector*)<br>1504 Tyler Circle, Apt. 49<br>Woodbridge, VA  22191 | **Via U.S. Mail**<br><br>Grant Nagata (*Objector*)<br>Nagata Business Group<br>793 Ainaola Drive<br>Hilo, HI  96720 |
| **Via U.S. Mail**<br><br>Bruce and Mary Miller (*Objector*)<br>948 McClellan Street<br>Lake Orion, MI  48362 | **Via U.S. Mail**<br><br>Gary Gentry (*Objector*)<br>135 County Road 4380<br>Decatur, TX  76234 |
| **Via U.S. Mail**<br><br>Richard and Loreen Eckenwiler (*Objector*)<br>19163 Briarwood Lane<br>Clinton Twp, MI  48036 | **Via U.S. Mail**<br><br>Zechariah Fritz (*Objector*)<br>P.O. Box 39<br>Rye, CO  81069 |
| **Via U.S. Mail**<br><br>William J. Cullins (*Objector*)<br>17837 1st Avenue So., #201<br>Normandy Park, WA  98148 | **Via U.S. Mail**<br><br>P. Shane Hayes (*Objector*)<br>22393 Maple Street<br>St. Clair Shores, MI  48081 |

CASE NO. C 07-0201 SC    PLAINTIFFS' MOTION, NOTICE AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR FINAL APPROVAL OF SETTLEMENT …

| | |
|---|---|
| <u>Via U.S. Mail</u><br><br>Frank and Jeanie Akridge (*Objector*)<br>Freedom Consultants LLC<br>2009 Macarthur Drive, Bldg. 8, Suite 1<br>Alexandria, LA  71303 | <u>Via U.S. Mail</u><br><br>Jeremy Daniel Thomas (*Objector*)<br>2151 Methodist Camp Loop<br>Minden, LA  71055 |
| <u>Via U.S. Mail</u><br><br>Virgil and Darlene Hill (*Objector*)<br>4717 Olive Branch Stonelick Rd.<br>Batavia, OH  45103 | <u>Via U.S. Mail</u><br><br>Mike & Evie Bitondo<br>2020 Darwin Road<br>Pinckney, MI  48169 |

/s/ Stuart Singer
*Attorney for Plaintiffs*