CEDRIC C. CHAO (CA SBN 76045)
WILLIAM L. STERN (CA SBN 96105)
RAYMOND M. HASU (CA SBN 200058)
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California 94105-2482
Telephone: 415.268.7000
Facsimile: 415.268.7522
E-mail: cchao@mofo.com
E-mail: wstern@mofo.com
E-mail: rhasu@mofo.com

JAMES R. SOBIERAJ (*Pro Hac Vice*)
BRINKS HOFER GILSON & LIONE
455 N. Cityfront Plaza Drive
Chicago, Illinois 60611
Telephone: 312.321.4200
Facsimile: 312.321.4299
E-mail: jsobieraj@usebrinks.com

Attorneys for Defendant
QUIXTAR INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| JEFF POKORNY, LARRY BLENN and KENNETH BUSIERE on behalf of themselves and those similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>QUIXTAR INC.,<br><br>Defendant. | Case No.   C 07-00201 SC<br><br>**QUIXTAR INC.'S MEMORANDUM IN SUPPORT OF JOINT MOTION FOR FINAL APPROVAL OF SETTLEMENT, ADOPTING PROPOSAL FOR DISTRIBUTION OF EXCESS, ADOPTING PROPOSED CONSENT JUDGMENT, AND DISMISSAL OF ALL CLAIMS WITH PREJUDICE**<br><br>Date:   November 16, 2012<br>Time:   10:00 a.m.<br>Court:   1, 17th Floor<br>Judge:   Honorable Samuel Conti |

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................................................................ii

I. INTRODUCTION .................................................................................................................. 1

II. THE CLAIMS RATE WEIGHS IN FAVOR OF APPROVING THE SETTLEMENT. .......................................................................................................................... 1

    A. The Claims Rate Is Within The Normal Range For Class Action Settlements. ............................................................................................................... 2

    B. The Actual Claims Rate Supports The Fairness Of The Settlement. ..................... 3

    C. The Claims Rate Does Not Suggest Defects In The Settlement. ........................... 5

III. THE COURT SHOULD OVERRULE THE OBJECTIONS OF CLASS MEMBERS. ............................................................................................................................ 5

    A. Objections To The Amount Of Relief Provided To The Class. ............................ 6

    B. Objections To The Form or Allocation Of Relief Provided To Class Members........................................................................................................................ 7

    C. Objections To The Composition Of The Product Bundles .................................... 9

    D. Objections To Documentation Requirements For Cash Claims. ......................... 10

    E. Objections To The *Cy Pres* Provisions Of The Settlement Agreement. ................................................................................................................. 11

    F. The Objections of Ms. Wong and Ms. Juarez Should Be Overruled On Additional Grounds. ........................................................................................ 11

IV. THE COURT SHOULD APPROVE THE PARTIES' PROPOSED DISTRIBUTION OF UNCLAIMED SETTLEMENT PROCEEDS. ............................ 14

V. CONCLUSION .................................................................................................................... 16

**TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*Browning v. Yahoo! Inc.*,
  2007 WL 4105971 (N.D. Cal. Nov. 16, 2007) ........................................................................ 6

*Conroy v. 3M Corp.*,
  2006 U.S. Dist. LEXIS 96169 (N.D. Cal. Aug. 10, 2006) ..................................................... 13

*Ersler v. Toshiba America, Inc.*,
  2009 WL 454354 (E.D.N.Y. Feb. 24, 2009) .......................................................................... 4

*Feder v. Elec. Data Sys. Corp.*,
  248 Fed. Appx. 579 (5th Cir. Sept. 15, 2007) ...................................................................... 12

*Fulford v. Logitech, Inc.*,
  Case No. 08-cv-2041 MMC, 2010 U.S. Dist. LEXIS 29042 (N.D. Cal. Mar. 5, 2010) ........... 6

*Gemelas v. Dannon Co.*,
  No. 1:08-CV-236, slip op. (N.D. Ohio Aug. 31, 2010) ........................................................ 13

*Hanlon v. Chrysler Corp.*,
  150 F.3d 1011 (9th Cir. 1998) ..................................................................................... 3, 4, 6, 7

*Hartless v. Clorox Co.*,
  273 F.R.D. 630 (S.D. Cal. 2011) ........................................................................................... 11

*In re Cathode Ray Tube Antitrust Litig.*,
  2012 WL 1319881 (N.D. Cal. Apr. 16, 2012) ...................................................................... 12

*In re Delphi Corp. Sec. Litig.*,
  248 F.R.D. 483 (E.D. Mich. 2008) ....................................................................................... 13

*In re Initial Public Offering Sec. Litig.*,
  721 F. Supp. 2d 210 (S.D.N.Y. 2010) ................................................................................... 13

*In re Magsafe Apple Power Adapter Litigation*,
  Case No. C-09-1911 JW (N.D. Cal. Sept. 20, 2011) ............................................................ 10

*In re Mego Fin. Corp. Sec. Litig.*,
  213 F.3d 454 (9th Cir. 2000) .................................................................................................. 6

*In re Packaged Ice Antitrust Litig.*,
  2011 WL 6209188 (E.D. Mich. Dec. 13, 2011) .................................................................. 3, 4

*In re Serzone Products Liability Litig.*,
  231 F.R.D. 221 (S.D. W. Va. 2005) ................................................................................... 3, 5

*In re UnitedHealth Group PSLRA Litig.*,
    643 F. Supp. 2d 1107 (D. Minn. 2009) .................................................................................... 13

*In re Visa Check/MasterMoney Antitrust Litig.*,
    297 F. Supp. 2d 503 (E.D.N.Y. 2003) ...................................................................................... 6

*In re Uponor, Inc., F1807 Plumbing Fittings Products Liability Litig.*,
    2012 U.S. Dist. LEXIS 130140 (D.Minn. Sept. 11, 2012) ...................................................... 12

*In re: Wal-Mart Wage and Hour Employment Practices Litig.*,
    2010 U.S. Dist. LEXIS 21466 (D. Nev. Mar. 8, 2010.) ........................................................... 13

*Kent v. Hewlett-Packard Co.*,
    2011 U.S. Dist. LEXIS 106825 (N.D. Cal. Sept. 20, 2011) .................................................... 12

*Larson v. Spring Nextel Corp.*,
    2010 WL 234934 (D.N.J. Jan. 15, 2010), *vacated on other grounds*,
    *Larson v. AT&T Mobility LLC*, 687 F.3d 109 (3d Cir. 2012) .................................................. 5

*Officers for Justice v. Civil Serv. Comm'n*,
    688 F.2d 615 (9th Cir. 1982) ..................................................................................................... 7

*Rodriguez v. West Publishing Corp.*,
    563 F.3d 948 (9th Cir. 2009) ................................................................................................... 11

*San Francisco NAACP v. San Francisco Unified School Dist.*,
    59 F. Supp. 2d 1021 (N.D. Cal. 1999) .................................................................................... 12

*Turner v. G.E. Co.*,
    2006 WL 2620275 (M.D. Fla. Sept. 13, 2006) ....................................................................... 10

*Wal-Mart Stores, Inc. v. Visa U.S.A.*,
    396 F.3d 96 (2d Cir. 2005) ........................................................................................................ 6

*Walter v. Hughes Communications, Inc.*,
    2011 WL 2650711 (N.D. Cal. July 6, 2011) ............................................................................. 3

**OTHER AUTHORITIES**

Fed. R. Civ. P. 23(e) ............................................................................................................................ 1

Barbara J. Rothstein & Thomas E. Willging, Federal Judicial Center, *Managing Class
    Action Litigation: A Pocket Guide for Judges* (2005) ............................................................. 13

Geoffrey P. Miller & Lori S. Singer, *Nonpecuniary Class Action Settlements*, 60 Law &
    Contemporary Problems 97 (Autumn 1997) .......................................................................... 13

## I. INTRODUCTION

Pursuant to Rule 23(e), Fed. R. Civ. P., Defendant Quixtar Inc. ("Quixtar") respectfully submits this memorandum of points and authorities in support of Plaintiffs' and Quixtar's Joint Motion for Final Approval of Settlement, Adopting Proposal for Distribution of Excess, Adopting Proposed Consent Judgment, and Dismissal of All Claims with Prejudice ("Joint Motion"). Quixtar's prior briefing in connection with the proposed settlement extensively discussed the reasons why the settlement should be approved, with particular emphasis on the fairness of the settlement to the class in light of the risks of continued litigation. (Dkt. No. 144 at 9-11; Dkt. No. 171 at 6-15.) Rather than belabor those points, this brief focuses on three specific issues that have arisen following the Court's February 21, 2012 Order granting preliminary approval of the settlement. Those issues are: (1) the claim filing rate of settlement class members; (2) the objections submitted by settlement class members; and (3) the parties' proposed distribution of unclaimed portions of the settlement fund.

## II. THE CLAIMS RATE WEIGHS IN FAVOR OF APPROVING THE SETTLEMENT.

The settlement offers three types of payment to class members: (a) class members who left Quixtar without renewing after their initial term with the Company may receive a free bundle of Quixtar products (valued at approximately $75 retail) to be chosen from 12 different product configurations; (b) class members who left Amway and had net losses on business support materials ("BSM") over $100 may receive cash in an amount equal to 20% of the class member's losses, up to a maximum of $2,000; and (c) class members who left Amway and filed bankruptcy or lost at least $10,000 due to operating a Quixtar business may receive a "hardship" cash award in an amount equal to 20% of a class member's losses (up to a maximum award of $10,000).[1]

The Claims Administrator sent an initial notice of the settlement to approximately three million potential members of the settlement class. (Declaration of Jason M. Stinehart Regarding

---

[1] The settlement also provides for substantial injunctive relief that has benefitted and will benefit class members who remain with Quixtar.

QUIXTAR'S MEM. ISO MOT. FOR FINAL APPROVAL OF SETTLEMENT     1
CASE NO. C 07-00201 SC
sf-3198912

Notice and Claims Administration ("Stinehart Decl.") ¶ 4.) As indicated in the notice, class members who wished to receive payment from the settlement cash and/or product funds were required to submit a claim postmarked no later than August 17, 2012. In July 2012, pursuant to this Court's Order (Dkt. No. 232), the Claims Administrator sent a new round of "reminder" notices to class members via email. (Stinehart Decl. ¶ 6.) As of the date of this submission, the Claims Administrator has received timely claims from 65,451 class members. (Stinehart Decl. ¶ 10.) These claims break down as follows:

- 48,908 class members filed claims for Quixtar product;
- 18,225 class members filed claims for cash based on BSM losses; and
- 5,940 class members filed hardship claims.[2]

(*Id.*) These figures reflect a claims rate that is lower than the 15% rate that was projected by the Claims Administrator during the preliminary approval phase. (Dkt. No. 163-1 at ¶ 14.) For example, approximately 3.5% of class members eligible to receive free Quixtar product submitted a claim for such product, based on data submitted previously to the Court.[3] Similarly, based on previously submitted data, between 3.7% and 5.3% of class members eligible for cash payments based on BSM losses submitted claims for such payments.[4]

Below, Quixtar offers several observations regarding these claims rates.

### A. The Claims Rate Is Within The Normal Range For Class Action Settlements.

The number of claims filed in this case was substantial. Although the claims rate was below the Claims Administrator's initial projections, that was just a projection. Compared to

---

[2] The sum of these three categories is greater than the total number of class members who submitted claims because some class members filed claims seeking payment from more than one category.

[3] As of April 29, 2011, approximately 1,408,297 class members were eligible to receive free product from the settlement. (Dkt. 165 at ¶ 8.)

[4] As of April 29, 2011, between 357,000 and 490,000 class members purchased more than $100 in BSM. (Dkt. No. 163-6 at ¶¶ 16, 18.) But this data does not reflect class members who suffered *net losses* on BSM over $100. (*Id.* at ¶ 17.) It is therefore likely that the actual number of class members eligible for this category of relief is below this range, and the claims rate correspondingly higher.

other class action settlements, these actual claims rate is not unusual. As this Court recently acknowledged, "average claims submission rates in similar class actions [i.e., consumer class actions] are typically ten percent or less." *Walter v. Hughes Communications, Inc.*, 2011 WL 2650711, at *13 (N.D. Cal. July 6, 2011). The Court cited several cases involving claims rates between 0.1% and 4.3 %. *Id.*; *see also In re Packaged Ice Antitrust Litig.*, 2011 WL 6209188, at *14 (E.D. Mich. Dec. 13, 2011) (noting that claims rate is "frequently less than 5%").

### B. The Actual Claims Rate Supports The Fairness Of The Settlement.

In assessing a settlement's fairness, courts consider (among other factors) the strength of the plaintiffs' case and reaction of the class to the proposed settlement. *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998). A low claims rate can indicate that class members "do not feel aggrieved" by the alleged misconduct for which they are being offered compensation. *See, e.g., In re Serzone Products Liability Litig.*, 231 F.R.D. 221, 235 (S.D. W. Va. 2005).

As explained in Quixtar's previous briefing, class members had good reason to conclude that they were not aggrieved. (Dkt. No. 171 at 7-12.) Among other things, class members would have known that—contrary to the allegations of the named plaintiffs—product and BSM purchases by IBOs were always voluntary, that there were mechanisms in place for the return of unsold product, that there were rules against inventory loading, and that IBOs were compensated not for recruiting other IBOs, but for sales to ultimate customers. (*Id.*) Class members would have also known that Quixtar made no promises to them regarding profits and that Quixtar cautioned IBOs regarding the possibility of incurring significant business expenses, and knew from their own experience that Quixtar's products are competitively priced and high quality. (*Id.* at 9-12.)[5]

A review of the objections and opt-outs corroborates this. Eighteen class members submitted objections to the settlement. Eight of them (nearly half) "objected" on the ground that Plaintiffs' claims lack merit. (*See* Stinehart Decl. Ex. F (objections of Cullins, Eckenwiller,

---

[5] Plaintiffs would also face considerable obstacles in obtaining certification of a litigation class, for the reasons set forth in Quixtar's prior briefing. (Dkt. No. 171 at 13-15.)

Frazier, Freedom Consultants, Fritz, Jaramillo, Nagata, and Szynskie).) For example, one objector stated that the lawsuit is "frivolous" and that he "will be honored to testify in court" in support of Quixtar. (*Id.* (Cullins objection).) Others called the lawsuit "wrong and immoral" and "ridiculous." (*Id.* (Eckenwiller and Frazier objections).) Another attested that there was no illegal scheme by Quixtar, that its representations were accurate, and that its products were priced fairly. (*Id.* (Nagata objection).)[6]

Class members who opted out expressed similar views. Of the 260 opt-out requests that were timely submitted, 56 disclosed a reason for the action. Twenty-one stated that their reason for opting out was the lack of merit in Plaintiffs' claims. (*See id.* Ex. E.) For example, one stated that the lawsuit is "superfluous and inane." (*Id.* (Sybert opt-out request).) Others stated that the allegations are false, that Amway is the best-run company in America, and that Amway did nothing wrong. (*Id.* (Deibert, Howard, and Desimone opt-out requests).)

Under these circumstances, the claims rate certainly does not suggest that the settlement is unfair. To the contrary, it suggests that a sizeable portion of the class may be in disagreement with the claims Plaintiffs assert. This would suggest that Quixtar would have strong defenses on the merits if this action were to proceed to trial. But that is no reason to deny approval. If anything, it weighs in favor of approving the settlement under *Hanlon*.[7]

Even if the Court were to view this claims rate as low, courts have repeatedly held that a low claims rate does not indicate a negative reaction by the class where, as here, there are relatively few objections and opt-outs. *See, e.g., Ersler v. Toshiba America, Inc.*, 2009 WL 454354, at *2 (E.D.N.Y. Feb. 24, 2009) (holding that the "reaction of the class . . . supports final approval" where the claims rate was 2.6% and there were only 16 objections and ten opt-outs by the 265,000 class members); *Packaged Ice*, 2011 WL 6209188, at *14 (finding that reaction of

---

[6] As discussed below in Section III, the low number of objections is itself strong evidence of the fairness of the settlement.

[7] Quixtar understands that Plaintiffs do not fully share this view. For precisely that reason, Quixtar believes it important and necessary to submit this separate brief.

QUIXTAR'S MEM. ISO MOT. FOR FINAL APPROVAL OF SETTLEMENT 4
CASE NO. C 07-00201 SC
sf-3198912

1  the class to settlement was positive, despite claims rate of "just under 1%," where there were no
2  objections and few opt-outs).

3    **C.  The Claims Rate Does Not Suggest Defects In The Settlement.**

4    It would be wrong to assume that the claims rate reflects any infirmity in the class notice.
5  Here, class notice was overwhelmingly direct notice—via email and U.S. mail. There were two
6  email notices. The Class Administrator estimates that the initial notice alone resulted in a 97%
7  reach (Stinehart Decl. ¶ 6)—an unusually high percentage.

8    Courts recognize that the "response rate is not by itself a factor to determining the strength
9  or weakness of a notice campaign." *Larson v. Spring Nextel Corp.*, 2010 WL 234934, at *6 n.14
10 (D.N.J. Jan. 15, 2010), *vacated on other grounds*, *Larson v. AT&T Mobility LLC*, 687 F.3d 109
11 (3d Cir. 2012). Instead, "the adequacy of notice is measured by whether notice reached Class
12 Members and gave them an opportunity to participate, not by actual participation." *Serzone*,
13 231 F.R.D. at 236. Here, there can be no reasonable dispute that the class was provided the best
14 notice practicable under the circumstances.

15   Nor does the claims rate suggest that the claims submission process was too burdensome
16 or cumbersome. The process could not have been simpler or more streamlined. Class members
17 could submit claims online, and many did. (Stinehart Decl. ¶ 10.) For two of the three categories
18 of relief—product and cash based on BSM losses—no documentation was required and claimants
19 were so advised; for these claims, a class member did not need to do anything further. Hardship
20 claimants were requested to submit tax forms or similar documentation of their losses. This is a
21 reasonable requirement, in light of the potentially large cash awards available to claimants. The
22 claim form itself was a two-page document approved by the Court that could be completed in a
23 matter of minutes (aside from the time necessary to calculate any claimed losses).

24 **III.  THE COURT SHOULD OVERRULE THE OBJECTIONS OF CLASS MEMBERS.**
25   As noted, there were 18 objectors to the settlement, of whom eight repudiated the claims
26 against Quixtar. Only ten objectors took issue with the settlement's fairness to the class. Those
27 ten objections account for only .0003% of all class members. Courts routinely find that such low
28 objection rates support the fairness of the proposed settlement. As one court put it:

> [A] certain number of objections are to be expected in a class action with an extensive notice campaign and a potentially large number of class members. *If only a small number of objections are received, that fact can be viewed as indicative of the adequacy of the settlement.*

*In re Visa Check/MasterMoney Antitrust Litig.*, 297 F. Supp. 2d 503, 511 (E.D.N.Y. 2003) (emphasis added); *see also in re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 459 (9th Cir. 2000) (low number of objections supported finding that settlement was fair); *Wal-Mart Stores, Inc. v. Visa U.S.A.*, 396 F.3d 96, 118 (2d Cir. 2005) (18 objections out of five million class members was evidence of "overwhelming[] . . . approval"); *Fulford v. Logitech, Inc.*, Case No. 08-cv-2041 MMC, 2010 U.S. Dist. LEXIS 29042, at *12 (N.D. Cal. Mar. 5, 2010) (where 12 of 82,000 class members objected and ten opted out, "[s]uch an overwhelmingly positive reaction of the Class Members affected by the Settlement supports its approval").

The ten objections to the fairness of the settlement fall into several categories. Each is addressed below.[8]

### A. Objections To The Amount Of Relief Provided To The Class.

Three class members object to the amount of relief provided by the settlement. Objectors Mike and Evie Bitondo assert that the settlement amount is too low because it is a "miniscule fraction" of the sales of Quixtar and the BSM companies. (Stinehart Decl. Ex. F (Bitondo objection).) Similarly, Objector Michael Hambruch asserts that the settlement amounts are "quite low," and Objector Virgil Hill states that the cash and product funds seem "very low" and need to be "increased substantially." (*Id.* (Hambruch and Hill objections).)

The Court should overrule these objections. None of them considers the substantial risk that the class could receive nothing at all in the absence of a settlement. In light of that risk, "complaining that the settlement should be 'better' . . . is not a valid objection." *Browning v. Yahoo! Inc.*, 2007 WL 4105971, at *5 (N.D. Cal. Nov. 16, 2007); *see also Hanlon*, 150 F.3d at

---

[8] Several objectors challenge the amount of attorneys' fees being sought by Class Counsel, and one challenges the requested amount of compensation to the named Plaintiffs and Plaintiffs' submission of three declarations concerning the fairness of the settlement. Quixtar anticipates that Plaintiffs will address these issues in their separate submission.

1027 (the inquiry "is not whether the final product could be prettier, smarter or snazzier, but whether it is fair, adequate and free from collusion"); *Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615, 625 (9th Cir. 1982) ("[t]he proposed settlement is not to be judged against a hypothetical or speculative measure of what *might* have been achieved by the negotiators"). The nature of settlement and compromise is that each plaintiff necessarily receives less than what he or she *may* have obtained *if* he or she ultimately prevailed on the merits. *Hanlon*, 150 F.3d at 1027 ("Of course it is possible . . . that [a] settlement could have been better. But this possibility does not mean the settlement presented [is] not fair, reasonable or adequate").

### B. Objections To The Form or Allocation Of Relief Provided To Class Members.

Several class members object on the grounds that those class members eligible only for product bundles should instead receive cash, or that the settlement proceeds should be distributed differently among class members. Specifically:

- Mr. and Ms. Bitondo assert that settlement proceeds should be entirely in cash and should be shifted to hardship claimants, who should be compensated at 100% of their losses. (Stinehart Decl. Ex. F (Bitondo objection).)
- Objector P. Shane Hayes maintains an IBO account and, as a current IBO, is ineligible to receive cash or product under the terms of the settlement. He objects to being "excluded" from the settlement. (*Id*. (Hayes objection).)
- Objector Jeremy Thomas did not renew with Quixtar after his initial term, and is therefore eligible to receive a product bundle, but he does not want any of the available product bundles and instead wants a cash refund of his registration fee. (*Id*. (Thomas objection).)
- Objectors Maria Wong and Maria Juarez assert that class members eligible for product bundles should instead receive cash, because the products offered by Quixtar are "aging inventory" that Quixtar is attempting to move off its books. Ms. Wong and Ms. Juarez also argue that current IBOs should be eligible to receive payment from the settlement funds. (Dkt. No. 235 at 4, 6.)

These objections suffer from the same flaw as the objections discussed above regarding the amount of the settlement. The settlement is a compromise of disputed claims, not a wish list intended to satisfy the personal preferences of every class member. Thus, the fact that some class members may desire cash rather than product does not in any way undermine the fairness of the settlement. The products included in the available bundles are among the top brands in their respective industries and, as such, offer proven value to class members. (*See* Dkt. No. 165 at ¶ 16; Dkt. No. 205 at ¶¶ 9-18.) Contrary to the unsupported allegations of Ms. Wong and Ms. Juarez, these are not unwanted, aging products that Quixtar is trying to get off its books. To the contrary, almost every bundle contains at least one of Quixtar's best-selling products, and many contain two or more such leading sellers. (*See* Dkt. No. 205 at ¶¶ 9-18.) Indeed, because the products included in the bundles are in such great demand and move so quickly, it is likely that the products that ultimately get shipped to claimants have not yet been manufactured.

The objections based on the allocation of settlement proceeds likewise fail. The settlement reflects a good faith effort by the parties to equitably distribute the benefits of the settlement to all class members. The parties reasonably concluded that cash and product payments should be restricted to former IBOs, because class members who have elected to remain with Quixtar are less likely to feel aggrieved by Quixtar, and thus less likely to consider themselves entitled to compensation. Contrary to Mr. Hayes's objection, however, current IBOs are not at all excluded from the settlement. Rather, they receive the benefit of the injunctive relief provisions of the settlement, which Quixtar conservatively valued at $100 million. The objectors ignore these points.

Similarly, the objection of Mr. and Ms. Bitondo is not well taken. They assert that hardship claimants should have priority over all other class members and should be compensated for 100% of their claimed losses. But, again, the fairness of the settlement must be assessed in light of the interests of all class members, not a favored few. The Bitondos contend that hardship claimants suffered the worst losses but ignore the fact that they are eligible for, by far, the largest awards—each hardship claimant is entitled to a maximum recovery of $10,000, compared to a maximum recovery of $2,000 for class members claiming BSM losses and $75 (in product) for

1 class members who never renewed their registrations with Quixtar. Those limits reasonably
2 balance the parties' wish to allow class members to receive awards proportionate to their losses
3 with the need to accommodate the interests of the entire class.

### C. Objections To The Composition Of The Product Bundles

Two objectors express dissatisfaction with the composition of the product bundles. Objector Michael Hambruch asserts that there should be a greater variety of products and that class members should be allowed the "flexibility" to substitute other products. Objector Mary Miller states that most bundles include nutritional supplements or personal care products, which she does not want, and suggests two alternative bundles consisting of laundry products.

*First*, Quixtar has already addressed the issue of allowing class members to "customize" the product bundles according to his or her preferences. (Dkt. No. 205 at ¶ 19.) As Quixtar explained, this would create significant inventory control problems, delay delivery of product to class members, and cause Quixtar to incur approximately $300,000–$400,000 in costs to add website functionality sufficient to accommodate customized product bundles. (*Id*.) In light of these drawbacks, allowing class members to choose from a number of pre-configured bundles properly balances choice and convenience.

*Second*, Quixtar took pains to provide a broad range of product bundles. Quixtar initially proposed eight bundles, then expanded the list to 12, all selected from the Company's top products. (*See* Dkt. No. 205 at ¶¶ 9-18.) The bundles include a variety of leading skincare, nutritional supplement, energy drink, home care, and personal care products. (*Id*.) Indeed, two of them offer the exact laundry products that Ms. Miller wishes to receive—her only complaint is that those bundles include other products that she does not want. Given the need to offer pre-configured bundles, however, it is impossible to offer bundles that perfectly match the tastes of every class member. Out of the approximately 49,000 class members who selected product bundles, only Mr. Hambruch and Ms. Miller expressed any concern about the range of available products. This strongly suggests that Quixtar succeeded in offering bundles that were sufficiently diverse to appeal across the spectrum of eligible class members.

### D. Objections To Documentation Requirements For Cash Claims.

Two objectors challenge the documentation requirements of the cash claims. Objector Gary Gentry states that he has not been an IBO for some time, that he no longer has the appropriate documents, and that it is unfair to require documentation "after this long." (Stinehart Decl. Ex. F (Gentry objection).) Ms. Wong and Ms. Juarez argue that many class members have not retained the required documentation, and that many would refuse to provide such "sensitive and personal" information to the Claims Administrator. (Dkt. No. 235 at 5.) They assert that the documentation requirements will deter would-be claimants.

These objections are unavailing. Evidence of a class member's losses is a standard requirement in class action settlements. *See, e.g., Turner v. G.E. Co.*, 2006 WL 2620275, at *7 (M.D. Fla. Sept. 13, 2006) (requirement that class members submit proof of purchase is a "reasonable administrative procedure which does not impose an undue burden on any Settlement Class Member"). Such evidence is essential to prevent fraudulent claims by individuals who would otherwise be able to loot the settlement funds by claiming compensation for losses they never incurred. Another court in this District recently recognized this principle. In *In re Magsafe Apple Power Adapter Litigation*, Case No. C-09-1911 JW (N.D. Cal. Sept. 20, 2011), Judge Ware issued an order permitting class members to submit claims without a proof of purchase. The defendant moved for reconsideration, arguing that such proof was necessary to prevent improper claims. Judge Ware agreed, granted the motion, and reinstituted the proof of purchase requirement. *Id.*, slip op. at 1-2. It is especially appropriate to require documentation here, given the likelihood that fewer than one out of six class members meet the criteria for receiving a cash payment. (Dkt. No. 163-6 ¶¶16-18 (estimating that between 357,000 and 490,000 class members purchased $100 or more of BSM during the class period and that between 144,000 and 198,000 class members spent at least $2,5000 on BSM).) None of the objectors challenges those

eligibility criteria. But without any means to verify a claimant's purported losses, there would be no way to reasonably confirm that settlement proceeds are directed to their intended recipients.[9]

### E. Objections To The *Cy Pres* Provisions Of The Settlement Agreement.

Ms. Wong and Ms. Juarez object to the *cy pres* provisions of the Settlement Agreement on the ground that any *cy pres* recipient(s) of unclaimed funds are not identified. (Dkt. No. 235 at 6-8.) The Ninth Circuit has rejected this argument, holding that identification of *cy pres* recipients is not ripe until it is determined that there will be unclaimed funds. *Rodriguez v. West Publishing Corp.*, 563 F.3d 948, 966 (9th Cir. 2009); *Hartless v. Clorox Co.*, 273 F.R.D. 630, 642 (S.D. Cal. 2011). As the court in *Hartless* explained, "Determining the recipient after the claims process is a logical procedure as the amount of unclaimed funds, if any, may affect the choice of charitable organization. Moreover, if no funds remain, the court and the parties would waste unnecessary time litigating a non-issue." 273 F.R.D. at 642. Here, the Settlement Agreement provides that settlement proceeds may be distributed as *cy pres* only if there is cash or product remaining after all approved claims have been satisfied and all administrative expenses paid. (Dkt. No. 162-2 at ¶¶ 6.1.6, 6.2.4.) Alternatively, unclaimed funds may be distributed for the benefit of the class. (*Id.*)

In addition, the parties have agreed to a plan for distributing all unclaimed settlement proceeds to class members. (*See* Section IV, *infra*.) If the Court approves this proposal, there will by no *cy pres*, and this objection will be moot.

### F. The Objections of Ms. Wong and Ms. Juarez Should Be Overruled On Additional Grounds.

Apart from the defects discussed above, the objections of Ms. Wong and Ms. Juarez fail for additional reasons.

---

[9] Ms. Wong and Ms. Juarez state that a claimant seeking compensation for losses on BSM will recover nothing if he or she received any income at all from sales of BSM. (Dkt. No. 235 at 5.) This is incorrect. A class member is eligible for payment if he or she spent at least $100 more on BSM than he or she earned from BSM sales. (Dkt. No. 162-2 at ¶¶ 1.37, 6.1.1.)

*First*, neither provides any evidence that she is a member of the class, and therefore fails to carry her burden to establish standing to object to the settlement. *See, e.g., Feder v. Elec. Data Sys. Corp.*, 248 Fed. Appx. 579, at *2 (5th Cir. Sept. 15, 2007) (right to object to a class action settlement "must rest on something more than . . . bare assertions" of class membership). They do not, for example, attach copies of any email or postcard notice sent to them by the Claims Administrator. Nor do they disclose the unique claimant number that would have appeared on any notice sent to them or the dates of their involvement with Quixtar. They do not even disclose their addresses or telephone numbers—which might allow Quixtar to determine whether they are class members—despite the assurance in the first paragraph of their submission that that such information may be found "at the conclusion of these objections." (Dkt. No. 235 at 2.) Absent such disclosures, Ms. Wong and Ms. Juarez lack standing to object. *See, e.g., Kent v. Hewlett-Packard Co.*, 2011 U.S. Dist. LEXIS 106825, at *7 (N.D. Cal. Sept. 20, 2011) ("Because they are not members of the class, [the objectors] lack standing to object"); *San Francisco NAACP v. San Francisco Unified School Dist.*, 59 F. Supp. 2d 1021, 1032 (N.D. Cal. 1999) ("nonclass members have no standing to object to the settlement of a class action"); *In re Uponor, Inc., F1807 Plumbing Fittings Products Liability Litig.*, 2012 U.S. Dist. LEXIS 130140, at *8-*9 (D.Minn. Sept. 11, 2012) (finding that objections filed by Mr. Palmer were in "bad faith" because, among other reasons, they were submitted on behalf of individuals who were not class members).

*Second*, their objections are lodged by "serial objectors." Messrs. Bandas and Palmer—the attorneys representing Ms. Wong and Ms. Juarez—have been found to be serial objectors to class action settlements. This Court recently found that Mr. Bandas "routinely represents objectors purporting to challenge class action settlements, and does not do so to effectuate changes to settlements, but does so for his own personal financial gain; he has been excoriated by Courts for this conduct." *In re Cathode Ray Tube Antitrust Litig.*, 2012 WL 1319881, at *1 (N.D. Cal. Apr. 16, 2012). Another court found that Mr. Bandas had submitted objections that were "not supported by law or the facts and are indeed meritless" and that he had "a documented history of filing notices of appeal from orders approving other class action settlements, and

thereafter dismissing said appeals when they and their clients were compensated by the settling class or counsel for the settling class." *In re: Wal-Mart Wage and Hour Employment Practices Litig.*, 2010 U.S. Dist. LEXIS 21466, at *16-*17 (D. Nev. Mar. 8, 2010). In yet another case, the court labeled his objections "unfounded" and "patently frivolous." *Conroy v. 3M Corp.*, 2006 U.S. Dist. LEXIS 96169, at *11-*12 (N.D. Cal. Aug. 10, 2006). The court in that case ordered Mr. Bandas and his client to jointly post an appeal bond for $431,167.00. *See id.* at *12.

Mr. Palmer likewise has a long history of objecting to class action settlements and filing an appeal when his objection is overruled. One court has described him as a "serial objector." *Gemelas v. Dannon Co.*, No. 1:08-CV-236, slip op. at *3 (N.D. Ohio Aug. 31, 2010).

Courts frown upon serial objectors. *See, e.g., In re UnitedHealth Group PSLRA Litig.*, 643 F. Supp. 2d 1107, 1108 (D. Minn. 2009) (condemning professional objectors); *In re Initial Public Offering Sec. Litig.*, 721 F. Supp. 2d 210, 214-15 (S.D.N.Y. 2010) (requiring serial objectors to post appellate bond where they had engaged in "bad faith or vexatious conduct," including an effort to "extort an exorbitant fee from Class Counsel in exchange for withdrawing their appeal"); *In re Delphi Corp. Sec. Litig.*, 248 F.R.D. 483, 500 (E.D. Mich. 2008) (rejecting objection submitted by "serial objector"). Scholars have described the problem thusly:

> Class action practice in the United States has developed its own cohort of professional objectors: attorneys who enter a case after a settlement is announced, manage not only to object to the settlement but to intervene as counsel on behalf of a class member, and then threaten to disrupt the settlement unless they are given a hefty reward. The threat is not an idle one. As long as they can intervene, they can appeal the settlement as of right, and during the appeal process, the settlement will be in limbo. Class counsel will not be paid and class members will not receive their benefits. The prospect of delaying a settlement for months or years by taking an appeal is the realistic threat that objectors hold over the heads of the settling parties.

Geoffrey P. Miller & Lori S. Singer, *Nonpecuniary Class Action Settlements*, 60 Law & Contemporary Problems 97, 126 n.64 (Autumn 1997). Accordingly, the Federal Judicial Center has advised courts to be wary of objections "filed by professional objectors who seek out class actions to simply extract a fee for lodging generic, unhelpful protests." Barbara J. Rothstein &

Thomas E. Willging, Federal Judicial Center, *Managing Class Action Litigation: A Pocket Guide for Judges*, at 11 (2005).

## IV. THE COURT SHOULD APPROVE THE PARTIES' PROPOSED DISTRIBUTION OF UNCLAIMED SETTLEMENT PROCEEDS.

There are considerable unclaimed portions of the cash and product credit funds. Class members have submitted timely claims for approximately $3.7 million in product from the $21 million product credit fund, leaving $17.3 million in unclaimed product. (Stinehart Decl. ¶ 10.) Class members have submitted approximately $6.3 million in cash claims based on BSM losses, and approximately $1.6 million in payable cash claims based on hardship.[10] (*Id.*) Even after any award of attorneys' fees is paid and the costs of class notice and claims administration are deducted, there will be millions of dollars remaining in the cash fund after the current claims are honored.

Under Sections 6.1.5 and 6.2.4 of the Settlement Agreement, these unclaimed proceeds may be distributed by the Court for the benefit of the class. To give effect to these provisions, the parties propose to distribute the unclaimed cash and product to the class in the manner described below. Since the potential recovery of class members from the settlement is being increased, the claims period for certain types of claims will be re-opened, and supplemental class notice will be issued to class members advising them of the increased potential recovery and the renewed opportunity to submit claims.

**Cash**. The period for submitting claims based on BSM losses will be re-opened. Eligibility for such claims will be expanded by waiving the requirement that claimants possess documentary proof of their BSM losses. Instead, a signed statement by the claimant attesting to his or her losses will suffice. In addition, claimants will no longer be limited to recovering 20%

---

[10] The estimated value of hardship claims is based on claims that were submitted with supporting documentation and that specified the amount for which recovery is sought. Only 21% of the 5,940 timely hardship claimants submitted the required documentation, of whom only 286 specified the amount claimed. (Stinehart Decl. ¶ 10.) The parties propose sending a follow-up letter to hardship claimants to allow them a second opportunity to submit documentation. Quixtar anticipates that many claimants will take advantage of this opportunity, which will likely result in a substantial increase in the total value of hardship claims.

of their BSM losses. Rather, the percentage of recovery will depend on the number of claimants, and will be set at a point that (after other distributions from the cash fund, including hardship claims, attorneys' fees, and notice costs, are accounted for) ensures that all funds in the $34 million cash are distributed, leaving no excess.

New hardship claims will not be permitted. However, in light of the fact that approximately 80% of hardship claimants did not submit the required documentation, the Claims Administrator will send follow-up "cure letters" seeking appropriate documentation from those hardship claimants. It is possible that this effort will result in significantly more payable hardship claims. To accommodate the existing and anticipated hardship claims, the Court may raise the aggregate cap on hardship claim awards (currently $5 million) and adjust the percentage of claimed losses that hardship claimants may recover (currently 20%).

**Product**. The period for submitting claims on the product credit fund will be re-opened. Eligibility for such claims will be expanded. Currently, to receive a portion of the product credit fund, a class member must have failed to renew his or her registration with Quixtar after his or her initial term as an IBO. Under the parties' proposal, all class members who were former IBOs as of February 21, 2012, shall be eligible for product. Thus, the number of former IBOs eligible to receive product will rise from approximately 1.4 million to approximately 2.7 million. (Declaration of Ray Alexander in Support of Joint Motion for Final Approval of Settlement and Proposal, Adopting Proposal for Distribution of Excess, Adopting Proposed Consent Judgment, and Dismissal of All Claims With Prejudice ("Alexander Decl.") ¶ 7.)

In addition, the amount of product available to claimants will increase. Currently, each class member eligible to receive a portion of the product credit fund may receive a single product bundle (chosen from 12 different bundles composed of a diverse range of products) worth approximately $75 retail. Now, Quixtar will increase the retail value of product bundles selected by class members to an estimated value of approximately $150 retail, although the exact value may be higher or lower, depending on the number of new claimants. This additional product shall

consist of items that were featured in the product bundle(s) chosen by the claimant. (Alexander Decl. ¶¶ 6, 8.)[11]

## V. CONCLUSION

For the reasons discussed above, as well as those discussed in Quixtar's and Plaintiffs' briefing in connection with the parties' joint motion for preliminary approval, Quixtar respectfully asks the Court to grant final approval of the settlement, enter the proposed Consent Judgment, certify the settlement class, and dismiss this action with prejudice.

Dated: October 12, 2012

Respectfully submitted,

CEDRIC C. CHAO
WILLIAM L. STERN
RAYMOND M. HASU
MORRISON & FOERSTER LLP

JAMES R. SOBIERAJ
BRINKS HOFER GILSON & LIONE

By: /s/ *Cedric C. Chao*
   Cedric C. Chao

Attorneys for Defendant
QUIXTAR INC.

---

[11] In addition, because the claims period for product claims and for cash claims based on BSM losses will be re-opened, the parties propose that all untimely claims received by the Claims Administrator (*see* Stinehart Decl. ¶ 11) be deemed timely and payable under the new terms proposed by the parties.