```
                    UNITED STATES OF AMERICA

                 NORTHERN DISTRICT OF CALIFORNIA

                     SAN FRANCISCO DIVISION

          BEFORE THE HONORABLE SAMUEL CONTI, JUDGE PRESIDING

                          COURTROOM ONE

                            ---oOo---

JEFF POKORNY, et al.,           )
                                )
        Plaintiffs,             )  Case No. C-07-0201-SC
                                )  Settlement
vs.                             )
                                )  Pages 1 - 13
QUIXTAR, INC.,                  )
                                )
        Defendant,              )
_____)
```

**Reporter's Transcript of Proceedings**

Friday, November 16, 2012

**APPEARANCES OF COUNSEL:**

For Plaintiffs:

    Boies, Schiller & Flexner LLP
    401 East Las Olas Boulevard, Suite 1200
    Fort Lauderdale, Florida 33301-2211
    (965) 356-0011
    By: **STUART H. SINGER, Attorney at Law**

    Gary, Williams, Finney, Lewis, Watson & Sperando, PL
    221 SE Osceola street
    Stuart, Florida  34994-2175
    (772) 283-8260
    By: **LORENZO WILLIAMS, Attorney at Law**

**(Appearances continued on next page.)**

Reported By:   ERIC L. THRONE, CSR No. 7855, RPR, RMR, CRR

APPEARANCES - Continued:

For Defendant:

    Morrison & Foerster
    425 Market Street
    San Francisco, California  94105-2482
    (415) 268-6692
    By:  **CEDRIC CHAO, Attorney at Law**
        **RAYMOND M. HASU, Attorney at Law**

                ---o0o---

1 **FRIDAY, NOVEMBER 16, 2012, SAN FRANCISCO, CALIFORNIA, 10:00 A.M.**

2     **COURTROOM DEPUTY:** Number 1, calling Civil-07-201, Jeff
3 Pokorny et al. versus Quixtar et al.

4     **MR. SINGER:** Good morning, Your Honor. Stuart Singer
5 from Boies, Schiller & Flexner, together with Lorenzo Williams
6 from the Gary, Williams law firm, counsel for the plaintiffs.

7     **MR. CHAO:** Good morning, Your Honor. Cedric Chao and
8 Ray Hasu from Morrison & Foerster, on behalf of defendant
9 Quixtar.

10     **THE COURT:** Is there anybody in the courtroom that has
11 any objection to the settlement, you can come forward and put
12 their objection on the record, I'm happy to hear from you.
13 Hearing none, all right.

14 Well I have reviewed all of your papers and let me go over
15 them with you. The class period of all Quixtar participants is
16 from January 1, 2003, through February 21, 2012, the notice
17 reached 97 percent of the three million class members. The opt
18 outs were 262, and the objections were 18, and I have read the
19 objections.

20 Counsel predicted a 15 percent class rate, claims rate.
21 Counsel predicted a 15 percent claims rate, but received less
22 than 3 percent, roughly 65,000 total claimants, 74,000 total
23 claims. I can't figure out how we get the discrepancy between
24 that. If you add up all of the claims it comes to around 65,000
25 total claimants.

1     But in any event 18,225 BDM claims, the claimants have got
2 20 percent of confirmed losses; 48,908 product claims, claimants
3 got $75 product bundles.
4     5,940 special hardship cases, claimants came up to $10,000
5 each, capped at a $5 million total.
6     The special hardship claimants either lost more than the
7 $10,000 or two declared personal bankruptcy.
8     Special hardship claims equal roughly 5.9 million, which
9 exceeds the cap of $5 million. So we either have to have a
10 pro -- I would think we have to have a pro rata reduction of the
11 awards to these people or increase the cap.
12     The total relief is 55 million plus injunctive relief; it's
13 34 million cash and 21 million in product.
14     Now with reference to the product, I'd like to know whether
15 the product is wholesale or retail and how you arrive at a value
16 of 21 million for the product and who valued it.
17     The cash fund is 34 million, as I have said, and at least
18 4.9 million is unclaimed, the overage of about 4.9 million. The
19 cash fund will be use reduced by attorney fees which are now
20 requesting 15 million, which is 6.5 million lodestar and 2.9
21 multiplier, which equals their 15 million.
22     The cost, including expert witnesses and mediation, is
23 600,000 and the claims administration and notices comes to
24 1,394,000 to date. The products are 21 million, at least
25 17 million are unclaimed. The injunctive relief benefits

1  current and future IBO's only.
2  Now apparently you have got a joint proposal for
3  distribution of the excess. You want a 60-day extension of time
4  to file cash claims which would be, as I understand it, giving
5  notice to all the people that have filed a claim and are
6  entitled to file a claim, and claims could be supported only by
7  a signed statement only and pro rata distribution of cash
8  without respect to the previous 20 percent cap.
9  Any class member may file a product claim no more than one
10 year restriction, as you had before with the previous one. The
11 products will be distributed pro rata.
12 After receiving the class responses to the supplemental
13 notice, the Court may adjust the special hardship cap and/or
14 order a distribution of products or cash. There will be no
15 excess because there's a pro rata distribution.
16 Now, that pretty well summarizes the whole distribution?
17 **MR. SINGER:** Your Honor, I think that that is accurate
18 with just one exception. I believe the multiplier of lodestar
19 is not 2.9, but somewhere based between 2.08 and 2.2 that we're
20 seeking on the attorney's fees.
21 **THE COURT:** All right.
22 **MR. SINGER:** With that exception, we believe everything
23 else is accurate.
24 **THE COURT:** Well how about this, what about the $100
25 million on the injunctive relief, that's merely to support the

1 attorney fees?

2 **MR. SINGER:** That's a valuation Quixtar reached, what
3 it would cost them supported by declarations to implement the
4 various aspects of the injunctive relief, and we believe that
5 the injunctive relief, which no one has taken issue with, as
6 being important --

7 **THE COURT:** Well, who is that?

8 **MR. SINGER:** Well, this notice went out to a lot of
9 people, including states, and we submitted a declaration of --

10 **THE COURT:** Well, I don't particularly like it. So I
11 will take that up later.

12 **MR. SINGER:** Yes.

13 **THE COURT:** Okay. What about the -- what is this
14 product that people get, what is it, wholesale, retail or what?

15 **MR. CHAO:** I can respond to that, Your Honor. The
16 product of 21 million value is valued at retail, is set forth --

17 **THE COURT:** Why would it be retail?

18 **MR. CHAO:** Well, case authority already supports that,
19 Your Honor, in terms of valuation for someone.

20 **THE COURT:** Who supports it?

21 **MR. CHAO:** Case authority supports that. It's in our
22 brief.

23 **THE COURT:** Yeah.

24 **MR. CHAO:** But in addition it also reflects reality,
25 which is former IBO's who are no longer in the Quixtar system.

1  They would be the ones who would be making claims for the
2  products, they could only get the product at retail value today.
3      If they were in a current IBO, a current distributor, they
4  would be allowed to get a wholesale, which is approximately
5  63 percent or 64 percent.
6      So in the Alexander declaration, Your Honor, the 21 million
7  retail product is equivalent to about 13.3 or $13.4 million at
8  cost.
9          **THE COURT:** What is your feeling of deducting the costs
10 before you compute the attorney fees? That sort of puts the
11 attorneys in a more fiduciary relationship with the claimants.
12         **MR. SINGER:** I believe --
13         **THE COURT:** You settle it for $100 million, and you
14 have $10 million cutoffs.
15         **MR. CHAO:** Right.
16         **THE COURT:** Do you assess the attorney's fees on the
17 100 million or the $90 million?
18         **MR. SINGER:** I believe the case authority has already
19 looked at the total amount of economic value, and has not
20 reduced the expenses from that in applying either a benchmark of
21 25 percent or other figures.
22         **THE COURT:** Well, I understand that. But I think
23 whether I agree with it or not seems to be of no significance.
24 But I think that it would be better procedure to have the
25 attorney fees based on the net after the costs, because that

1  would put the attorney fees in a position to monitor what the
2  costs are and whether they are appropriate.
3       This way, the attorney fees don't care what the costs are.
4  The costs could be $50 million out of $100 million claim, and
5  they'd still get their attorney fees on the 100 million.  That's
6  my thinking, but I'm here not on some other street.
7       All right.  What I am going to do is, I'm going to take this
8  under submission.  Some of the things you have said I agree with
9  and some of the things you have said I don't agree with, and I'm
10 going to look at it again.
11      What do you think we should do, put this over until we have
12 the new notice filed?
13           **MR. SINGER:**  We don't think it's required, Your Honor.
14 We think you can get final approval now, because under the
15 existing settlement agreement it provides in two places that the
16 Court has discretion to award the excess product in one place
17 and cash in another place, for the benefit of the class or
18 cy pres.
19           **THE COURT:**  Tell me this, you are asking for $15
20 million in attorney fees now.  If we do this there will be more
21 work involved, isn't there?
22           **MR. SINGER:**  There will be certain work.
23           **THE COURT:**  Is there attorney fees involved?
24           **MR. SINGER:**  There will certainly be work on our
25 behalf, but we are not planning to come back to you for more in

1  the way of attorney fees.
2      **THE COURT:** So as I understand it, no more attorney's
3  fees?
4      **MR. SINGER:** We're not planning to make an additional
5  submission. Indeed, under the agreement, we're required for
6  four years to have certain monitoring responsibilities.
7      **THE COURT:** Do you agree that there will be no excess
8  of funds or will there be an excess of funds?
9      **MR. SINGER:** There should not be any excess of funds
10 based on pro rata distribution.
11     **THE COURT:** What you do you think about the cap, do you
12 think the cap should be raised?
13     **MR. SINGER:** Once you look at the claims, it may be you
14 don't have a full $5.9 million worth of valued special hardship
15 claims, that's at face value.
16    If it's necessary to honor the 20 percent on special
17 hardship claims and these are valid claims, and since there is
18 excess cash, we would suggest it would make sense to adjust the
19 cap.
20     **THE COURT:** Don't you think the people that are getting
21 declared personal bankruptcy and have great losses over $10,000,
22 shouldn't they get more money?
23     **MR. SINGER:** We agree. We think the cap --
24     **THE COURT:** So how --
25     **MR. SINGER:** -- should be adjusted.

1    **THE COURT:** -- how are you going to handle that?

2    **MR. SINGER:** Well, there is somewhere around 4.9
3    million additional cash, if we need to move -- if the Court
4    needs to move $900,000 from that to the special hardship fund,
5    that's provided for in the settlement agreement and we would
6    support it.

7    **THE COURT:** All right. Okay.

8    **MR. CHAO:** Your Honor, perhaps I could give a little
9    bit of my gloss in answer to one of your questions --

10   **THE COURT:** Yes.

11   **MR. CHAO:** -- which is at this stage the joint proposal
12   to the Court for distribution of excess cash and products
13   there's some uncertainties right now.

14       So, for example, on hardship claims Your Honor did
15   articulate the total value, but a number of hardship claims
16   didn't have complete documentation.

17       So sometimes there was consulting, the claims administrator
18   did not know how much the claim was, and part of the proposal
19   was to send further notice back to those hardship claimants --

20   **THE COURT:** Uh-huh.

21   **MR. CHAO:** -- saying "You don't have a complete claim,
22   you need more documentation." So as we stand here today, we
23   don't know what the total value of hardship claims will be.

24       On the hardship claims, Your Honor, the parties are in
25   agreement that the Court should, when the claims come into

1  hardship, you would have authority, discretion, to lift the cap
2  which is currently $5 million in aggregate.  It could well be
3  more than that, whatever the Court deems is appropriate.
4      The other uncertainty, right now, is under our proposal to
5  the Court we're expanding the number of former ideals who can
6  make a claim for what we call BSM cash.  Previously, it was
7  limited to those who had not renewed.  So they were in the
8  Quixtar system for less than one year and then renewed.
9      Our proposal to the Court is anybody, no matter if you never
10 renewed, you did renew once, twice, five times, no matter how
11 many times, as long as your former IBO, you would be able to
12 make a claim for cash based on the expenditures for BSM for
13 materials.
14     That would roughly, almost double the number of potential
15 claimants for BSM cash.  We think that would go a long way
16 towards absorbing a lot of excess cash.
17     We've also suggested jointly that to avoid any cy pres
18 issues based on the Ninth Circuit decision in Kellogg, that the
19 Court would then top off, you know, what you call the pro rata
20 distribution so there would be no cash left, no product left.
21     So in answer to your question should we come back, it's in
22 the Court's discretion, and I think we'll have more finality in
23 terms of total dollars that are available and how you distribute
24 that after the next round of both.
25         **THE COURT:**  How much time do you think that would take?

1  **MR. SINGER:** We propose, Your Honor, that there be 60
2  days' notice given; to get those out would probably be another
3  30 days. So you're looking at somewhere maybe 120 days
4  downstream.
5  **THE COURT:** Uh-huh.
6  **MR. SINGER:** May I correct the record on one point? I
7  think inadvertently my colleague at bar mentioned that the BSM
8  currently attached payments were limited to people who quit
9  after one year. That's really true for the product
10 distribution, not the cash payments. Those don't have that
11 limitation under the settlement.
12 **THE COURT:** You have no more than one year.
13 **MR. SINGER:** There is no --
14 **THE COURT:** Yeah, that's right.
15 **MR. SINGER:** We also, under the settlement agreement,
16 the hardship claims are supposed to be evaluated by a special
17 master appointed by the Court, who would then make
18 recommendations to the Court for how to handle those claims.
19 And under the settlement agreement the parties are authorized to
20 propose names for consideration to the Court.
21    We, as plaintiffs, believe there's two former judges who are
22 familiar with the case by their role. One is Judge Dan
23 Weinstein who serves as a mediator; the other is Judge Renfrew
24 who served as our attorneys' fees expert. We haven't raised
25 this with either of them, but those are both --

```
 1          THE COURT:  I think I will appoint my own.  Okay.
 2          MR. SINGER:  Ah --
 3          THE COURT:  So when do you think that's appropriate to
 4  do the appointing?
 5          MR. SINGER:  We think that should be done with the
 6  final approval --
 7          THE COURT:  Uh-huh.
 8          MR. SINGER:  -- because that would be part of the
 9  order.
10          THE COURT:  All right, fine.  I may be calling you back
11  again for further information.
12     Fine.  I'll take the matter under submission at this
13  particular point, and you will hear from me in the near future.
14  Thank you.
15          MR. SINGER:  Thank you very much, Your Honor.
16          MR. CHAO:  Thank you very much, Your Honor.
17          COURTROOM DEPUTY:  All rise.  This Court stands in
18  recess.
19                    (Proceedings concluded.)
20                           ---o0o---
21
22
23
24
25
```

COURT REPORTER'S CERTIFICATE

State of California )
) ss.
County of San Francisco )

    I, Eric L. Throne, hereby certify that I am a Certified Shorthand Reporter and that I recorded verbatim in shorthand the proceedings had Friday, November 16, 2012, in the matter of Jeff Pokorny, et al., Plaintiffs, versus Quixtar, Inc., Defendant, Case Number C-07-0201-SC, completely and correctly to the best of my ability; that I have caused said shorthand to be transcribed into typewriting and the foregoing pages, 1 to 13, constitute a complete and accurate transcript of said shorthand writing taken in the above-mentioned proceedings.

    Dated at San Francisco, California, this 16th day of November, 2012.

_____
ERIC L. THRONE, CSR No. 7855, RPR, RMR, CRR

---oOo---